## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DIAMOND SPORTS GROUP, LLC, *et al.*,[1] | ) | Case No. 23-90116 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| DIAMOND SPORTS GROUP, LLC and DIAMOND SPORTS NET, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. _____ |
| | ) | |
| SINCLAIR BROADCAST GROUP, INC., SINCLAIR TELEVISION GROUP, INC., DIAMOND SPORTS TOPCO LLC, DIAMOND SPORTS INTERMEDIATE HOLDINGS LLC, DIAMOND SPORTS INTERMEDIATE HOLDINGS A LLC, DIAMOND SPORTS HOLDINGS LLC, DAVID SMITH, CHRISTOPHER RIPLEY, LUCY RUTISHAUSER, SCOTT SHAPIRO, and BALLY'S CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/DSG.  The Debtors' service address for purposes of these chapter 11 cases is: c/o Diamond Sports Group, LLC, 3003 Exposition Blvd., Santa Monica, CA 90404.

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

JURISDICTION AND VENUE .......................................................................................... 10

PARTIES ............................................................................................................................ 10

FACTS ................................................................................................................................ 12

I.      Diamond's Businesses ........................................................................................... 12

II.     August 2019: Sinclair Purchases the Diamond RSNs from Disney ..................... 14

III.    Sinclair's Post-Acquisition Control of Diamond .................................................. 16

IV.     August 2019 through the Petition Date: Diamond's Business Prospects Further
        Deteriorate under Sinclair's Management ............................................................. 22

        A.      The Irretrievable Loss of DISH Network ................................................... 22

        B.      Diamond Loses Additional Major Distribution Revenue Streams,
                Including Those From YouTube and Hulu .................................................. 27

        C.      Impact of COVID-19 .................................................................................. 29

V.      At Least as Early as December 2019, If Not Earlier, Diamond Was Insolvent ....... 30

VI.     August 2019–May 2022: Sinclair "Milk[s]" DSG of $100 Million a Year in Purported
        Management Fees .................................................................................................... 37

        A.      Sinclair Imposes an Unfair and One-Sided Management Services
                Agreement on DSG ..................................................................................... 38

        B.      Duff & Phelps' Opinion That the MSA Was Fair to Sinclair Underscores
                the MSA's Gross Unfairness to Diamond .................................................. 47

        C.      Sinclair Charged DSG Millions of Dollars in Additional Fees That Were
                Already Covered by the MSA Management Fees, or Which Sinclair Has
                Failed to Justify .......................................................................................... 51

        D.      DSG, Acting Under The Complete Control And Domination Of Sinclair,
                Acted with Fraudulent Intent in Entering Into and Paying Enormous Fees
                to Sinclair Under the MSA .......................................................................... 57

VII.    September 2019–March 2021: Sinclair Forces DSG to Distribute Approximately $929
        Million to DSIH to be Subsequently Transferred to JPMCFI to Satisfy  DSH's and
        SBG's Obligations, with No Benefit to DSG .......................................................... 58

        A.      Terms of the Preferred Units ...................................................................... 59

        B.      Structure and Approval of Distributions and Purported Solvency
                Certifications ............................................................................................... 60

        C.      Empire's Solvency Opinion ........................................................................ 63

        D.      Chronology of Distributions ....................................................................... 69

E.      DSG, Acting Under The Complete Control And Domination Of Sinclair, Acting with Fraudulent Intent in Causing DSG to Make Payments to DSIH........ 71

VIII.   November 2020: The Bally's Transaction--Diamond Gives Bally's Most or All of the Value; Sinclair Receives by Far More Consideration....................................... 74

A.      The Bidding Process Reveals Substantial Value in Diamond's Naming Rights ............................................................................................................. 75

B.      The Fairness Opinion Provided to Sinclair by Duff & Phelps Grossly Overstated the Value Provided by Sinclair, While Indefensibly Valuing the Diamond Naming Rights—the Principal Component of the Deal—at Zero ................................................................................................................ 79

C.      DSG, Acting Under The Complete Control And Domination Of Sinclair, Acted with Fraudulent Intent in Structuring the Bally's Transaction.................. 82

IX.     Sinclair Misappropriates Diamond's Employees and Resources for Its Own Gain ......... 85

X.      Subsequent Events ................................................................................................. 88

A.      New Financing and the Appointment of an Independent Board.......................... 88

B.      Diamond Files for Bankruptcy............................................................................ 89

CAUSES OF ACTION ...................................................................................................... 90

COUNT I ........................................................................................................................... 90

COUNT II .......................................................................................................................... 93

COUNT III ........................................................................................................................ 94

COUNT IV ........................................................................................................................ 95

COUNT V .......................................................................................................................... 97

COUNT VI ........................................................................................................................ 99

COUNT VII ..................................................................................................................... 101

COUNT VIII .................................................................................................................... 102

COUNT IX ....................................................................................................................... 103

COUNT X ........................................................................................................................ 106

COUNT XI ....................................................................................................................... 108

COUNT XII ..................................................................................................................... 109

COUNT XIII .................................................................................................................... 110

COUNT XIV .................................................................................................................... 112

COUNT XV ..................................................................................................................... 113

COUNT XVI .................................................................................................................... 114

COUNT XVII ................................................................................................................... 115

COUNT XVIII .................................................................................................................. 117

COUNT XIX...................................................................................................................... 118

PRAYER FOR RELIEF ...................................................................................................... 118

Plaintiffs Diamond Sports Group, LLC ("DSG") and Diamond Sports Net, LLC ("DSN") (together, "Diamond" or "Plaintiffs"), for their Complaint against Defendants Sinclair Broadcast Group, Inc. ("SBG"), Sinclair Television Group, Inc. ("STG"), Diamond Sports TopCo LLC ("TopCo"), Diamond Sports Intermediate Holdings LLC ("DSIH"), Diamond Sports Intermediate Holdings A, LLC ("DSIH-A"), Diamond Sports Holdings LLC ("DSH") (collectively, "Sinclair"), David Smith, Chris Ripley, Lucy Rutishauser, and Scott Shapiro (the "Individual Defendants" and, collectively with Sinclair, the "Sinclair Defendants"), and Bally's Corporation ("Bally's") (collectively with the Sinclair Defendants, the "Defendants"), allege as follows:

## PRELIMINARY STATEMENT

1.     For years after Sinclair's 2019 acquisition of the regional sports networks now owned by Diamond, Sinclair pursued a strategy of—in the words of defendant David Smith, Sinclair's current Executive Chairman and former longtime CEO and the scion of its founding family—"***milk[ing]***"[2] Diamond for more than $100 million annually in purported management fees "***and whatever else I can take out of the company***" before it filed for bankruptcy.  In furtherance of that nefarious strategy, during the approximately two and a half years that Sinclair owned, controlled, and dominated Diamond in all material respects—stacking its board and management with senior Sinclair executives—Sinclair wrongfully caused Diamond to transfer more than ***$1.5 billion*** in cash and other consideration to or for the benefit of Sinclair.  All of this was conceived of and implemented while Diamond's business was, as Sinclair officers and directors knew or should have known, careering toward bankruptcy, and it continued after Diamond was unquestionably insolvent.  Diamond now brings this action to recover for those

---

[2] All emphasis is added unless otherwise noted.

fraudulent transfers, breaches of fiduciary duties, and other acts of misconduct by Sinclair and certain of its officers and directors who controlled Diamond's affairs.

2.       Sinclair acquired Diamond's business from The Walt Disney Company in August 2019 in a $10.6 billion leveraged acquisition.  To fund the acquisition, Sinclair caused DSG to incur $8.2 billion in new debt, which in turn imposed on DSG between $400 and $650 million in annual debt service (approximately a quarter of DSG's current annual revenues). Sinclair obtained additional financing by causing defendant DSH (a shell Sinclair subsidiary created for the acquisition) to issue $1.025 billion in units of what purported to be preferred equity to JP Morgan Chase Financing, Inc. ("JPMCFI").  To induce JPMCFI to provide this financing, Sinclair guaranteed DSH's obligations under the preferred units.  DSG had no obligations whatsoever with respect to the preferred units, but Sinclair imposed on DSG the financial burden of making distributions used to fund periodic interest payments to JPMCFI and the repayment of principal well before the preferred units matured.

3.       Even at the time of the acquisition, as Sinclair was well aware, Diamond's business was facing significant headwinds.  DSG owns and operates regional sports networks, or RSNs.  The RSNs acquire broadcast and other rights from sports teams and leagues, generally through multiyear agreements requiring large fixed payments by the RSN, and enter into distribution agreements with cable, satellite, or virtual distributors to include the RSNs in packages the distributors sell to their subscribers.  For years before Sinclair's acquisition, the RSNs' business model faced a secular decline from increasingly large numbers of potential viewers "cutting the cord" on their subscriptions and instead viewing sports broadcasts via streaming services, in short highlight segments, or not viewing sports at all.  Cord-cutting by customers reduces the fees paid to the RSNs and its distributors' willingness to continue paying

carriage fees to the RSNs at historic levels (or at all), while the RSNs continue to incur large fixed fees payable under their rights agreements with teams and leagues.

4.      Less than a month before the acquisition closed, a major satellite distributor that carried the RSNs, DISH Network LLC ("DISH Network"), cut its ties with the RSNs, and its Chairman—Charlie Ergen, a longtime professional acquaintance of Sinclair Executive Chairman Smith—had stated publicly that "it doesn't look that the regional sports will ever be on DISH again."  DISH Network had previously represented approximately 10% of the RSNs' total revenue—approximately $350 to $400 million—and 20% of their EBITDA.  Sinclair was well aware of the loss of DISH Network's business and the material deleterious impact it would have on the RSNs, and accordingly negotiated for a $400 million reduction in the price it paid in the acquisition.

5.      Following the acquisition and until at least April 2021, Sinclair controlled every aspect of DSG's business.  Despite having its own lenders, bondholders, and other creditors as Sinclair had arranged, DSG had no independent board members, senior officers, or outside advisors to look after its own interests as distinct from those of Sinclair.  On the contrary, Smith—a public company board member and former CEO who is no stranger to fiduciary obligations—testified that he did not believe that DSG even had its own interests, and that instead he viewed Sinclair and Diamond as "one and the same."  DSG was controlled by Sinclair through a chain of holding companies created by Sinclair for purposes of the acquisition (defendants TopCo, DSH, DSIH-A, and DSIH).  DSG was managed by its sole member, DSIH; DSIH was managed by its sole member, DSIH-A; and DSIH-A was in turn managed by its controlling member, DSH.  DSIH-A and DSH were each managed by a three-person Board of Managers consisting of three senior Sinclair executives designated by Sinclair—defendants

Smith (SBG's Executive Chairman), Ripley (SBG's CEO), and Rutishauser (SBG's CFO).  All three of these individuals also served as officers or de facto managers of DSG, along with defendant Shapiro, who served in senior positions at both SBG and DSG during the relevant time period.  Nearly all of DSG's business operations were handled by Sinclair pursuant to a management services agreement that Sinclair—with Ripley signing the agreement for both Sinclair and DSG—unilaterally imposed on DSG (and that Sinclair then repeatedly breached).

6.      DSG's business continued to substantially decline after the Sinclair acquisition.  On November 6, 2019—just three months after the acquisition—Sinclair publicly disclosed that it was removing DISH Network revenue from its projected earnings and at the same time removed DISH Network from its internal revenue models.  By December 2019, equity analysts publicly reported that "the market price[d] in as little as 10% chance that DISH comes to terms on the RSNs."  Other significant distribution customers, including YouTube TV and Hulu, soon followed DISH Network in abandoning the RSNs.  As a senior Sinclair executive explained at the time, these distributors terminated carriage of the RSNs "because they don't think they are worth the money."

7.      By no later than December 2019, only a few months after the acquisition, and possibly earlier, DSG was insolvent by any objective measure.  At the same time, analysts questioned whether DSG's debt exceeded its value—so much so, that Rutishauser complained internally that she and others at Sinclair were "busy beating back" the short-selling thesis that DSG had lost all equity value.  By December 2019, Sinclair's internal projections for DSG's 2020 EBITDA had fallen by 30%—over $400 million—with other internal Sinclair documents reflecting a decline of more than $500 million.  By mid-March 2020, trading prices for DSG's secured debt had fallen to 70 cents on the dollar, its unsecured debt traded below 60 cents, and

analysts expressed the view that DSG had "negative equity value."  In April 2020 and for months afterwards, Sinclair's internal models showed DSG "fail[ing]" industry standard solvency tests. As of September 2020, according to Sinclair's own financial reporting, DSG had to write off **_$4.2 billion_** in goodwill, leaving DSG with billions of dollars in negative equity.

8.     Throughout this entire period of precipitous decline, Sinclair unrelentingly continued to carry out its plan to "milk" Diamond for Sinclair's own benefit and to extract whatever value it could salvage before Diamond's inevitable bankruptcy.  As noted, between its acquisition of the RSNs and DSG's bankruptcy filing, Sinclair drained plaintiffs of at least **_$1.5 billion_** (and likely substantially more).  It did so by at least four means:

9.     **_First_**, immediately upon acquiring Diamond in August 2019, Sinclair caused DSG to enter into a Management Services Agreement, or MSA, with Sinclair, obligating Diamond to pay extortionate, off-market base fees and incentive bonuses to Sinclair for management services.  But the fees far exceeded the value of those services by any fair estimate. In all, Sinclair caused Diamond to make MSA payments that amounted to more than **_$400 million_** through April 2023, or more than **_$100 million a year_** over four years (and counting). By design, these payments far exceeded Sinclair's anticipated costs to provide those services, which, by Sinclair's estimate, would be only approximately $20 million a year.  They also far exceeded fees paid by other RSNs under comparable arrangements.  Indeed, before the Sinclair acquisition, most of the same RSNs had paid no such fees at all to their prior owner, Twenty-First Century Fox, and those RSNs that did paid a small fraction of the exorbitant fees Sinclair imposed.  Prior to signing the MSA, Duff & Phelps, a financial consultancy firm engaged by Sinclair, concluded that the fees that Diamond was required to pay were "significantly in excess" of those paid in comparable transactions.  Duff & Phelps opined only that the MSA was fair *to*

*Sinclair*; neither Duff & Phelps nor anyone else was asked to determine whether it was fair to Diamond.

10.      The vast bulk of the MSA fees, if not all of them, were paid while Diamond was insolvent, and the only purpose of this arrangement was to drain money from Diamond for the benefit of Sinclair and to the detriment of Diamond and its creditors.  Making its receipt of exorbitant fees under the MSA even more egregious, Sinclair repeatedly breached its obligations to Diamond under that agreement—including its obligations (i) to provide certain enumerated services without additional charge, (ii) to render such services in a "commercially reasonable" manner, and (iii) not to "materially disadvantage" Diamond for the benefit of Sinclair.

11.      ***Second***, between September 2019 and December 2022, Sinclair funneled an additional approximately ***$929 million*** in cash from DSG, which was then transferred up the corporate chain and used to redeem nearly ***$850 million*** of JPMCFI's preferred units.  The preferred units were not obligations of DSG in any way.  Instead, they were obligations of defendant DSH.  DSG received nothing of value for these transfers.  And, in contrast to DSG's own debt, which was not guaranteed by Sinclair or any of the other defendants, Sinclair guaranteed DSH's obligations on the preferred units.  By using cash from DSG to fund these obligations, Sinclair directly benefitted itself at the expense of DSG.  This was, to quote Moody's, "detrimental to [DSG's] debtholders."

12.      Sinclair knew, as its CEO has testified, that it could have used its own money to redeem the preferred units, but chose not to.  Sinclair was also well aware that it could not use DSG's cash to repay DSH's obligations (again, obligations guaranteed by Sinclair itself) if DSG was insolvent.  Yet, as early as December 13, 2019, it caused DSG to distribute over $300 million in cash to its immediate parent for that purpose, when DSG was either already insolvent

or was rendered insolvent by that distribution.  Sinclair continued to do so even after the evidence of DSG's insolvency became too obvious to ignore, depleting Diamond's coffers to the tune of hundreds of millions of dollars a year.  Between September 2019 and June 2020, Sinclair caused DSG to distribute more than $550 million to its immediate parent DSIH for eventual transfer to JPMCFI, with no assessment of DSG's solvency.  Instead, Rutishauser merely executed a boilerplate Officer's Certificate purporting to attest that DSG was solvent.  The certificate, however, was hardly worth the paper it was printed on:  it had no supporting analysis, and Rutishauser—by her own repeated admissions and as Ripley also acknowledged—is "not a solvency expert."

13.      In August 2020, and before siphoning more than $350 million from DSG to fund DSH's redemption of the preferred units, Sinclair engaged a firm called Empire Valuation Consultants to provide an opinion that DSG was solvent.  For reasons Sinclair has never credibly explained, Sinclair did not retain Empire (or anyone else) to provide a solvency opinion before any of the prior multi-hundred-million-dollar distributions it had caused DSG to make.  In any event, once retained, Empire did what it was told, generating a report for Sinclair purporting to conclude that DSG was solvent, although Sinclair's internal analysis at the time (which Sinclair never disclosed to Empire) reached the opposite conclusion.

14.      Any realistic assessment of Empire's report, however, shows that it establishes that DSG was *insolvent*, and that Sinclair knew it.  Empire was able to justify opining that DSG was solvent only because Sinclair provided projections that relied on wholly unrealistic assumptions about the future of DSG's business—such as assuming, against all available evidence, a 100% probability that DISH Network would return as a customer.  Empire's opinion also rested on additional assumptions that were contrary to internal Sinclair information that

senior Sinclair personnel (including defendants Ripley and Rutishauser) hid from Empire and that Empire apparently never knew about until its corporate representative was deposed in pre-litigation discovery.  For example, Empire assumed that DSG would have EBITDA above $1 billion in 2021, while contemporaneous internal emails from Rutishauser and Ripley showed—in what Rutishauser characterized as Diamond's "True P/L"—projected EBITDA for the same year of only $775 million.  As Empire's corporate representative testified in his deposition, Sinclair's failure to provide these "true" projections to Empire was a "***material omission***."  Sinclair's deliberate concealment of material information from its own outside valuation firm demonstrates that Sinclair was well aware that DSG was insolvent and used Empire's report to mask the truth.

15.    ***Third***, in November 2020—when Sinclair's publicly available financial statements for DSIH showed that DSG was irrefutably insolvent—Sinclair and DSG entered into a partnership with a gaming company, defendant Bally's, that further enriched Sinclair at Diamond's expense.  The most valuable consideration by far was provided by DSG, in the form of the right to rename all of the Fox-branded RSNs the "Bally's Sports" RSNs, whereas Sinclair provided comparatively little to Bally's in the deal.  Yet Sinclair, not DSG, received by far the largest share of the consideration provided by Bally's, in the form of options and warrants worth (according to Duff & Phelps, which Sinclair again hired to provide a wholly unreliable fairness opinion in connection with the transaction many months after the transaction closed) between ***$184 and $199 million*** (and were likely worth significantly more).  Sinclair specifically rejected competing bids for the DSG naming rights that would have provided DSG with far more consideration but would not have provided similar equity value to Sinclair—precisely for that reason, in fact.  ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

16.    ***Fourth***, Sinclair misappropriated Diamond assets and breached the MSA by causing Diamond employees to provide services exclusively for the benefit of Sinclair.  Thus, at the same time that Sinclair was charging Diamond millions of dollars under the MSA purportedly to provide services for Diamond, Sinclair was arranging for dozens of employees compensated by Diamond to provide services principally or exclusively for Sinclair.  Some of these ostensible Diamond employees spent, by Sinclair's own calculations, 100% of their time working for Sinclair yet 100% of their compensation was paid by Diamond.  In another example of Sinclair's mismanagement of Diamond funds, Sinclair agreed to advance the costs of an employee's golf club membership—which were upwards of $1 million—but then funded a third of that extravagant expense with Diamond's own money.

17.    Defendants' actions in draining Diamond for Sinclair's own benefit and without fair (or any) consideration were actual and constructive fraudulent transfers that plaintiffs are entitled to avoid under the Bankruptcy Code and applicable state law.  They also constituted illegal distributions under the law of Delaware (under which the Diamond entities are organized).  Sinclair's raiding of Diamond's coffers also violated its fiduciary duties as the ultimate controller of Diamond and breached the MSA and/or constituted unjust enrichment.  And in approving and executing these transactions for the sole benefit of Sinclair and its affiliates and to the detriment of DSG, the Individual Defendants—Smith, Ripley, Rutishauser, and Shapiro—violated the fiduciary duties they owed to Diamond as officers and managers of DSG.

18.    Plaintiffs accordingly bring this action to avoid these fraudulent transfers and to recover damages to compensate Diamond fully for the enormous damage the defendants have caused.

## JURISDICTION AND VENUE

19.    This Court has subject-matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E), and (O).

20.    This Court has personal jurisdiction over each of the Defendants under Bankruptcy Rule 7004(f).

21.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## PARTIES

22.    Plaintiffs are Debtors in these Chapter 11 cases filed on March 15, 2023 (the "Petition Date").

23.    Plaintiffs DSG and DSN are limited liability companies formed under the laws of Delaware and have their principal place of business at Sinclair's offices in Hunt Valley, Maryland.

24.    Sinclair is a diversified media company with its headquarters in Hunt Valley, Maryland, whose principal business before the Diamond acquisition was the ownership and operation of local television stations.  Sinclair was founded in the 1970s by defendant Smith's father and Smith and his family are the company's majority shareholders.  Smith himself owns between 8% to 10% of SBG and has "ten-to-one voting rights."

25.    Defendants SBG and STG are and were Maryland corporations and have their principal places of business in Hunt Valley, Maryland.

26.     Defendants TopCo, DSH, DSIH-A, and DSIH are and were Delaware corporations and have their principal places of business in Hunt Valley, Maryland.  All of these defendants were and are holding companies with no material assets except the equity of other entities in the chain of ownership between SBG and DSG.

27.     Defendant David Smith is and was at all relevant times the Executive Chairman of SBG.  Smith is also the former longtime CEO of SBG or its predecessors-in-interest.  Smith was also a member of the Board of Managers of DSH and DSIH-A from August 2019 through at least April 2021, and has served as a de facto manager of DSG from August 2019 through at least May 2022.  Smith is a citizen of Maryland.

28.     Defendant Chris Ripley is and was at all relevant times the CEO of SBG. Ripley was also a member of the Board of Managers of DSH and DSIH-A from August 2019 through at least April 2021.  Ripley was also a member of the Board of Managers of DSG from May 2022 at the latest through the present.  Ripley has also served between August 2019 and approximately December 2022 as DSG's President.  Ripley is a citizen of Maryland.

29.     Defendant Lucy Rutishauser is and was at all relevant times the CFO and Treasurer of SBG.  Rutishauser was also a member of the Board of Managers of DSH and DSIH-A from August 2019 through at least April 2021.  Rutishauser has also served between August 2019 and approximately December 2022 as DSG's CFO and Treasurer.  Rutishauser is a citizen of Maryland.

30.     Defendant Scott Shapiro is the current Executive Vice President for Corporate Development and Strategy at SBG.  He was previously the Senior Vice President for Corporate Development, Chief Development Officer, and Chief Strategy Officer of Sports at SBG at various points between August 2019 and December 2022, in which roles he served as a de facto

11

manager of DSG.  He also served as the CFO and Chief Operating Officer of DSG from at least

May 2020 through December 2022.  Shapiro is a citizen of Maryland.

31.     Defendant Bally's Corporation is and was a Delaware corporation with its

principal place of business in Providence, Rhode Island.

## FACTS

32.     The facts alleged herein are based upon Diamond's investigation to date.

Numerous discovery commitments by various discovery targets, including Sinclair, remain

incomplete and unfulfilled, and Sinclair remains the primary source for Diamond's own

historical documents and information.  Diamond intends to pursue this and other information

from defendants and third parties through discovery in this adversary proceeding and by other

appropriate means.

**I.     Diamond's Businesses**

33.     Diamond is the leading provider of local sports programming in the United

States, operating RSNs under the "Bally Sports" tradename (the result of the Bally's transaction

mentioned above and discussed further below, *see* ¶¶ 203–34).  As of the commencement of the

Chapter 11 cases, the RSNs broadcast Major League Baseball, National Basketball Association,

and National Hockey League games for 42 teams in their local markets.  Diamond also has a

number of joint venture partnerships, including Marquee Sports Network ("Marquee"), the local

broadcast home of the Chicago Cubs, and the YES Network ("YES"), the local broadcast home

of the New York Yankees and the Brooklyn Nets.  Diamond is an important part of the local

sports ecosystem in its markets, broadcasting approximately 4,500 local professional sports

games annually.  All of Diamond's operations are conducted by direct and indirect subsidiaries

of DSG, including plaintiff DSN.

34.     The RSNs' programming has traditionally been delivered by multichannel video programming distributors ("MVPDs" or "distributors") via cable and satellite, or "linear," broadcast.  The primary driver of revenue for the RSNs has historically been the distribution agreements they negotiate with MVPDs.  Pursuant to these agreements, MVPDs pay the RSNs monthly licensing (or "carriage") fees, based in part upon the number of MVPD subscribers in exchange for access to the RSNs' live sports content, which the MVPDs deliver to subscribers. Examples of MVPDs that have historically carried the RSNs include Charter, Comcast, DirecTV, and DISH Network.  Diamond has also entered into distribution agreements with virtual MVPDs, or streaming services, such as DIRECTV STREAM, Hulu, YouTube TV ("YouTube"), Sling, and FuboTV.  The distribution agreements generally require the RSNs to meet certain thresholds (e.g., a minimum number of telecasts per year), and contain fee reduction, rebate, refund, and/or termination provisions in favor of the distributors if the thresholds are not met.

35.     Under the historical linear model, MVPDs bundle multiple channels that are sold as a package to their subscribers.  These bundles typically include the RSNs.  When cable and satellite subscriptions were the primary means for viewers to access television programming, this model was highly profitable for the RSNs.  The RSNs earned increasing carriage fees from MVPDs driven by higher annual rates while subscriber levels remained stable.

36.     In turn, the RSNs made large payments to their team and league partners for the right to broadcast games and other content.  These agreements generally cover multiple years and grant the RSNs the exclusive right to telecast all local games (other than those that are selected for exclusive national telecast) within a specified territory (generally the city where the team's arena is located and the surrounding area).  Most of the Diamond RSNs have rights

agreements with at least one MLB and one NBA or NHL team.  Diamond also has agreements with its league partners that provide it with access to certain digital rights.

37.       The RSNs were originally subsidiaries of Fox and operated as the Fox Sports RSNs.  Fox, including the RSNs, was subsequently acquired by Disney.  As part of a settlement of an antitrust lawsuit brought by the Department of Justice, Disney agreed, among other things, to divest Fox's RSNs.

**II.       August 2019: Sinclair Purchases the Diamond RSNs from Disney**

38.       In 2019, Sinclair acquired the RSNs from Disney based on a value, before non-controlling interests, of approximately $10.6 billion.  The transaction was announced on May 3, 2019, and closed on August 23, 2019.  Sinclair created the Diamond entities—plaintiffs DSG and DSN, and defendants DSH, DSIH, DSIH-A, and TopCo—for the purpose of consummating the transaction and holding the RSNs following the closing.

39.       Sinclair's acquisition of the RSNs was heavily leveraged with the vast majority of the financing for the purchase funded by third-party debt incurred by Diamond itself.  To fund the transaction, Sinclair caused Diamond to incur $8.2 billion of new debt, consisting of $3.3 billion in secured term loans, $3.1 billion of secured notes, and $1.8 billion of unsecured notes. The balance of the financing was provided by a $1.4 billion capital contribution by Sinclair and the issuance of $1.025 billion of preferred units issued by DSH to JPMCFI and guaranteed by Sinclair.  While Sinclair tried to structure the transaction so that the entirety of the financing obligations were incurred by DSG, JPMCFI refused to underwrite preferred equity at DSG and required Sinclair to guarantee the additional $1.025 billion of preferred units and issue them at the DSH level, above the DSG debt silo.  The preferred units imposed no obligations on DSG itself.

40.      The transaction dramatically increased the RSNs' leverage, debt load, and interest burden.  The DSG debt required Diamond to pay more than $400 million in debt service for each of 2020 and 2021, more than $500 million in 2022, and will require approximately $650 million in debt service in 2023.  In addition, as discussed above, Sinclair used funds from DSG to pay DSH and SBG's obligations on the preferred units held by JPMCFI.

41.      Diamond's business faced significant headwinds at the time of the acquisition even apart from this enormous debt load.  In recent years, the earnings of traditional MVPDs have slumped as many Americans have "cut the cord" on their MVPD subscriptions (or never subscribed to MVPDs in the first place) in favor of watching television programming through streaming services.  This loss of subscribers—known as "subscriber churn"—has materially reduced distributors' willingness to continue contracting with Diamond or to pay carriage fees at historical levels.  As a result, certain rights fee arrangements with league and team partners have threatened to become uneconomical for the RSNs, as the amounts owed under such agreements are not dependent upon the number of subscribers and instead continue to increase annually.

42.      Even before the Sinclair transaction closed, a major MVPD counterparty and key revenue driver for the RSNs, DISH Network, let its distribution agreement with the RSNs lapse.  DISH Network's chairman, Charlie Ergen, stated publicly at the time that "[i]t doesn't look that the regional sports will ever be on DISH again" because "they're not very good economic deals" for DISH Network and are "overpriced."

43.      Sinclair was aware of the risk that Diamond would lose DISH Network at the time it negotiated the acquisition with Disney.  As early as April 2019, Sinclair's Board was informed of the "risk" that DISH Network could "potentially go[] dark" on the RSNs during the closing period for the acquisition.  To account for that risk, Sinclair negotiated a $400 million

purchase price adjustment in the event that DISH Network dropped the RSNs, with an obligation to repay some portion of that amount if Sinclair signed a new deal with DISH Network.  That risk materialized when DISH Network dropped the RSNs in late July 2019, after Sinclair agreed to purchase the RSNs but before the acquisition closed, and Sinclair received the $400 million reduction in the transaction purchase price.

### III.    Sinclair's Post-Acquisition Control of Diamond

44.    At all times between the acquisition and May 2022, Sinclair controlled all aspects of Diamond's business.

45.    Between August 2019 and the Petition Date, DSG was an indirect wholly owned subsidiary of Sinclair.  Sinclair owned and controlled DSG through four intermediate holding companies: defendants TopCo, DSH, DSIH-A, and DSIH.  Until shortly before the Petition Date, a third party, Byron Allen (a broadcaster whom Smith has known for 30 to 40 years) owned a minuscule 0.003% equity interest in DSIH-A (Sinclair has since redeemed that interest and now owns 100% of the equity in DSIH-A through DSH).  A simplified organizational chart of Sinclair's control over DSG and the ownership structure of the entities from shortly before the Petition Date is provided below.



46.      Sinclair controlled DSG's day-to-day operations through its indirect wholly

owned equity interest in DSIH, the sole member of DSG, and the other entities in the chain

between DSG and Sinclair.  DSG was member-managed by DSIH; DSIH was member-managed

by DSIH-A; and DSIH-A was managed by a three-member Board of Managers and its sole

member, DSH.  DSH—and its subsidiaries, including DSG—were controlled by DSH's three-

member Board of Managers.  Between DSG's formation in August 2019 and April 2021, the

DSIH-A and DSH Boards of Managers were made up entirely of Sinclair executives.  According

to the Amended and Restated Limited Liability Company Agreement of DSH dated August 23, 2019, the Sinclair Member was "entitled to designate all managers" of DSH's board.  DSG's LLC Agreement also entitled Sinclair, by way of its control of DSG's sole member, to appoint officers of DSG to "manage, control, administer, and operate the day-to-day business and affairs" of DSG.  SBG ultimately controlled DSH through its ownership of TopCo, which was the sole member of DSH.  This ownership structure made SBG the ultimate controller of DSG.

47.     Sinclair caused the appointment of its own employees and directors as the members of the DSH and DSIH-A Boards of Managers and DSG's senior officers.  As Ripley explained, Sinclair "controlled Diamond via employees of [Sinclair] being on the board of Diamond."

48.     Specifically, David Smith, Chris Ripley, and Lucy Rutishauser each served as members of the three-member Board of Managers of DSIH-A and DSH from August 2019 through April 2021.  Each of these individuals, as well as Scott Shapiro, also served as senior officers of DSG.  As officers of DSG or members of the Boards of DSG's parent companies, all four of these individuals owed fiduciary duties to DSG.

49.     Ripley, Sinclair's CEO, was installed by Sinclair as the President of DSG and also served as a member of the three-person DSH and DSIH-A Boards.  In his capacity as DSG's President, Ripley was responsible for the daily business and affairs of DSG.

50.     Rutishauser, Sinclair's CFO, was appointed DSG's CFO and Treasurer, and also served as a member of the DSH and DSIH-A Boards.  Rutishauser was the most senior financial officer of DSG.

51.     Smith, Sinclair's Executive Chairman, served as the third DSH and DSIH-A Board member and had managerial authority over DSG's affairs.  Smith is the direct supervisor

of Ripley, who testified that there are "always conversations going on about what is going on at Diamond . . . with David Smith."  As a principal of Sinclair, Smith "reserve[s] the right to . . . become involved in whatever [he] choose[s] to become involved in" at Sinclair and its subsidiaries.  As Executive Chairman, he receives regular reports on the business and he continues to come into the office every day—Monday through Friday, and weekends as necessary—to deal with Sinclair business.  Smith has consistently directed the affairs of SBG and the Diamond entities, including DSG, through his positions on the boards of Sinclair and the entities between it and DSG.  As a few examples, he was involved in directing the strategy relating to DSG's relationship with MLB, the decisions to cause DSG to distribute close to a billion dollars to its corporate parent, and the decision to sell DSG's naming rights to Bally's so that Sinclair could acquire an equity stake in a gaming partner.

52.     Scott Shapiro, Sinclair's Executive Vice President for Corporate Development and Strategy, also served as an officer and manager of DSG's affairs, including as the CFO and COO of DSG from at least May 2020 through in or about December 2022.  As discussed below, most of DSG's business operations—including affiliate sales and marketing; legal and business affairs; payroll; finance and accounting; IT support; human resources; and insurance—were required to be provided by Sinclair under a one-sided Management Services Agreement entered into at the closing of the acquisition in consideration for outsized fees paid by DSG.  Shapiro was the principal architect of that MSA structure.  Shapiro was also intimately involved in the search for a partner to acquire the naming rights to the Diamond RSNs that resulted in the Bally's transaction.

53.     Although Smith, Ripley, and Rutishauser all sat on the Boards of DSIH-A and DSH from August 2019 to April 2021, and in those positions, caused DSG to engage in a

number of payments and transactions worth well over a billion dollars, those individuals were largely unable to recall any meetings of those Boards at which those transactions were discussed or authorized. Indeed, they were either unable to recall even serving as a director of a Diamond entity Board or recalled only that DSG's affairs were largely conducted through "informal meetings" or as part of SBG Board meetings.

54.     For instance, when asked if he had any recollection of serving on or participating in the boards of any Diamond entities, Smith responded: "I have no particular recollection []of that actually happening" and "[i]f I did, it was only by virtue that it was at the Sinclair board, and there may have been [] a common activity at that meeting, at a Sinclair meeting," but he had "no particular recollection of having a separate, discrete board meeting on behalf of Diamond." Nor could Smith ever remember seeing any minutes of any Diamond entity's board meetings. Smith was only able to recall a single telephonic meeting of Diamond's board, which took place in November 2020—more than a year after the acquisition closed, and after the majority of the relevant transactions were authorized. Ripley confirmed that "[f]or wholly-owned subsidiaries with internal boards, [Sinclair] never produced minutes," and he stated that there were only "informal meetings" of the Diamond entity Boards, but no memorialization, notes, or other documentation evidencing such meetings. Similarly, Rutishauser testified that she was "not sure which board of members that [she] was on."

55.     Smith also candidly acknowledged Sinclair's total control over DSG. He testified that he

> viewed Diamond as essentially really nothing more than another television station that we owned. We owned a hundred percent of it. We treated it like we owned a hundred percent of it, so I treated it like every other business that I own. . . . I view Diamond as essentially one and the same as Sinclair, even though I know technically as a matter this is a subsidiary of some sort. ***But the fact of the matter***

20

*is I treated it like it's mine*. . . . Notwithstanding the different credit stacks, I still view them as one and the same from my perspective.

56.     When pressed to explain how his view of Diamond as "one and the same as Sinclair" could comport with his dual fiduciary duty responsibilities to both entities, Smith reiterated his view that "as a hundred percent shareholder, I viewed it as one and the same." Smith was unable to recall a single discussion about any actual or potential conflict of interest between Sinclair and DSG considering the dual fiduciary responsibilities that Smith, Ripley, and Rutishauser owed.

57.     Similarly, Rutishauser was unable to articulate how, if at all, she managed conflicts of interest as a fiduciary for the various companies for which she was an officer or manager when their interests diverged.

58.     Ripley acknowledged that he owed fiduciary duties to both Sinclair and Diamond and that it was "impossible for there to be always aligned interests" between Sinclair and Diamond, and that conflict "is inevitable in any situation like this."  Ripley even conceded that "any instance where money would have left the [DSG] system," such as the "distributions of cash" from DSG, would have constituted examples of misaligned interests between Sinclair and Diamond.  However, Ripley was also unable to identify any process that was used to manage these "inevitable" conflicts of interest between DSG and Sinclair, including Sinclair's Related Party Transaction procedures, claiming that it "just wasn't necessary."

59.     In April 2021, DSG's LLC agreement was amended to establish a three-member Board of Managers at the DSG level.  Between April 2021 and May 2022, a majority of DSG's board members were unaffiliated with Sinclair, but were subject to removal by Sinclair at any time.

IV.     **August 2019 through the Petition Date: Diamond's Business Prospects Further Deteriorate under Sinclair's Management**

60.     Between the August 2019 closing of Sinclair's acquisition and the Petition Date, Diamond's business dramatically deteriorated.  Diamond's earnings continued to decline as a result of cord-cutting and continually increasing sports rights payments.  As early as late 2019, it was apparent that Diamond had no realistic prospect of negotiating a new long-term distribution agreement with DISH Network.  Meanwhile, approximately a year after the acquisition, other major MVPDs, including YouTube and Hulu, chose to let their existing agreements with the RSNs expire.  By March 2020, when the major sports leagues cancelled games for an indeterminate period due to the COVID-19 pandemic, Diamond was faced with greatly reduced distribution revenue while saddled with large fixed payments and operating expenses.

61.     Nonetheless, throughout this period, as Diamond's business slid toward bankruptcy, Diamond was forced to (1) make outsized payments to Sinclair purportedly for management and administrative services, (2) pay hundreds of millions of dollars in dividends to DSIH for the ultimate purpose of enabling DSH and SBG to satisfy their obligations to JPMCFI under the preferred units, (3) serve as the engine for a partnership with Bally's that largely benefitted Sinclair rather than Diamond, and (4) provide valuable services exclusively for Sinclair's benefit.

62.     As a result of these business developments and self-serving actions by the Sinclair Defendants to Diamond's detriment, Diamond was rendered insolvent by no later than December 2019, and possibly earlier.

    A.     **The Irretrievable Loss of DISH Network**

63.     Just one month before the acquisition closed, in July 2019, DISH Network, one of the largest and most important players in the market and one of only two national satellite

operators, dropped carriage of the RSNs.  Sling TV, which is owned by DISH Network, also

dropped carriage of the RSNs at or about the same time.  Historically, DISH Network had been a

critical distributor for the RSNs, accounting for approximately $350 to $400 million in annual

distribution revenue—approximately 10% of the RSNs' total revenue and 20% of EBITDA.

64.     In the immediate aftermath of DISH Network dropping the RSNs, DISH

Network executives, including its Chairman, Charlie Ergen, said publicly that the decision to

discontinue the RSNs was likely permanent.  Ergen commented during a July 2019 earnings call

that the RSNs are "not very good economic deals for us"; there are only "a very small fraction of

our customers that are avid viewers of the regional sports"; since DISH Network had already

dropped the RSNs and "lost the customers that want" to watch the RSNs, it "[m]akes no sense"

to add the RSNs back, and therefore, "it doesn't look that the regional sports will ever be on

DISH again."  On the same call, Warren Schlichting, Executive Vice President and Group

President of Sling TV, made similar comments, stating that the RSN model "is broken" and "not

a good deal," and that DISH Network had "real data" that showed carrying the RSNs was "an

expensive gamut [sic]," such that his recommendation was to "leave those RSNs off the service

long term."

65.     Not surprisingly, in light of these unequivocal statements by DISH Network's

senior executives, analysts and investors concluded that DISH Network was unlikely to return as

a DSG distributor.  In December 2019, Wells Fargo expressed the view that "the market prices in

as little as 10% chance that DISH comes to terms on the RSNs."  In February and March 2020,

J.P. Morgan and Wolfe Research issued analyst reports on Diamond that assumed DISH

Network would not return.  And in May 2020, Morningstar stated that "Dish and its iconoclastic

chairman, Charlie Ergen, is likely to refuse to revive the expired carriage contract this year and

even beyond." Even Sinclair's Executive Chairman, Smith—a personal acquaintance of Ergen—agreed that, "[k]nowing Charlie, there's nothing to change with Charlie when he makes up his mind."

66.     As early as September 2019—a month after the acquisition closed—Sinclair was sufficiently concerned about the enterprise's prospects in the event of a permanent loss of DISH Network that the company's internal models assumed a $400 million reduction in RSN EBITDA per year. Despite the clear evidence that DISH Network would never carry the RSNs again, Ripley claimed in public statements to the market—as the CEO of a publicly traded company—that he viewed the loss of DISH Network as a "temporary issue."

67.     Although Sinclair attempted to negotiate a new deal with DISH Network for the carriage of the RSNs, it was at all times apparent that DISH Network was not interested in carrying the RSNs on terms that would be remotely acceptable to Sinclair or Diamond. ███

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

68.     The timing of DISH Network's termination of its carriage arrangement with the RSNs provides further evidence that it assigned them little if any value and had no intention of carrying them in the future. DISH Network dropped the RSNs in the midst of baseball season, the season with the most attractive and valuable content broadcast on the RSNs. MVPDs

interested in carrying the RSNs would want to carry the RSNs at the start of baseball season, regardless of when a contract was up for renewal.  DISH Network's willingness to abandon the RSNs in the midst of the most popular season—when its customers would be most affected by that decision—reflected the scant likelihood that it would ever return.

69.     On November 6, 2019, Ripley announced on Sinclair's Q3 2019 earnings call that because Sinclair "can't predict whether or when we will get a carriage deal done with [DISH Network] for the RSNs, we've removed DISH affiliate fees from our forecast until we have a better sense of timing and terms of any such resolution."  Similarly, at a meeting of Sinclair's board on December 12, 2019, the board "requested DISH be taken out of the budget for RSNs since timing of the relaunch of the contract was still to be determined."  Yet, although there was never further clarity as to whether or when DISH Network would relaunch with the RSNs or on what terms, projected revenue from DISH Network would soon creep back into Sinclair's forecasts for the RSNs.

70.     Although the parties exchanged proposals in 2019 and 2020, a deal never materialized. ██████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████

71.     In early February 2020, Ergen again publicly confirmed that DISH Network would not be entering into a new agreement to carry the Diamond RSNs.  During DISH Network's earnings call, an analyst asked whether there was "any reason to think that this wasn't a great decision" for DISH Network to drop the RSNs, given that DISH Network was "saving over $400 million a year on not having those RSNs" and had "lost, at most, $30 million to $40 million . . . of EBITDA from the sub[scriber] losses" who switched to other distributors.  Ergen responded that the number of DISH Network subscribers who are regional sports fans are a "fraction" of what they were before DISH Network dropped the RSNs and there was "no reason to put it back and tax the rest of the people."

72.     During February and March 2020, DISH Network and Sinclair continued to exchange counter-proposals for a global deal that would include carriage of the RSNs as well as Sinclair's broadcast stations.  ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████

73.     In 2021, Sinclair once again engaged DISH Network in efforts to negotiate a deal that included carriage of the RSNs.  ████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

**B.     Diamond Loses Additional Major Distribution Revenue Streams, Including Those From YouTube and Hulu**

74.     By early 2020, Diamond's relationships with other major distributors, including YouTube and Hulu, were similarly imperiled.  Diamond's carriage agreements with YouTube and Hulu were set to expire later that year.  YouTube and Hulu together represented more than $200 million in annual distribution revenue for DSG and were projected to bring in more than $300 million in annual distribution revenue if both had renewed.  By the end of 2020, both distributors had let their carriage agreements with the RSNs lapse.

75.     In February 2020, ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████  Following Faber's warning, Rutishauser instructed other Sinclair finance personnel to remove future YouTube revenue from internal projections, leading to a reduction in projected revenues for the RSNs of over $60 million for March through December 2020.

76.     Later in February 2020, Faber informed YouTube that Sinclair had ████████

████████████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███

77.     Ultimately, in a sign of Sinclair's desperation, it agreed to give YouTube a short-term contract extension that allowed YouTube to pick and choose which RSNs it would carry—a highly unusual deal for Diamond that raised "a great deal of concern" from investors and "a number of investor questions."  As Sinclair's Vice President of Investor Relations, Steven Zenker, told Faber on March 10, 2020, ████████████████████████

███████████████████████████████████

██████████████████████████████

████   In response to a question from Zenker regarding whether the YouTube deal would have an impact on any future deal with Hulu, Faber stated that Diamond ████████████

███████████████████████████████████

██████████████████████████████████

████

78.     Even the extraordinary concession provided to YouTube proved insufficient. When Faber attempted to negotiate a new deal with YouTube as the short-term extension was set to expire, he conveyed to YouTube that ████████████████████████████

███████████████████████████████████

██████████████████

79.     As Faber had predicted, both YouTube and Hulu dropped carriage of Diamond's RSNs by the fall of 2020.  YouTube did not renew carriage of the RSNs when its

short-term extension contract ended on October 1, 2020, and Hulu did not renew carriage when its contract with the RSNs lapsed on October 15, 2020.  In a draft Q&A prepared for the Q4 2020 earnings call, Faber commented that Hulu and YouTube ████████████████████████ ████████████████████████████████████████████

### C.      Impact of COVID-19

80.      In March 2020, the COVID-19 pandemic began to manifest itself broadly in the United States.  Diamond's business had already declined drastically, and as shown above—as a result of its extremely high debt burden, its costly contractual obligations to Sinclair, the business being in secular decline, and the loss of DISH Network—it was already insolvent.  The impact of the pandemic accelerated Diamond's decline and made it impossible for Sinclair to continue to hide Diamond's insolvency.

81.      On March 12, 2020, as a result of the onset of the COVID-19 pandemic in the United States, MLB announced that the remainder of spring training was cancelled and that the start of the 2020 regular season would be delayed by at least two weeks.  Other leagues made similar announcements at around the same time.

82.      This cessation of sports programming substantially reduced Diamond's distribution and advertising revenue, which depends upon games actually played and televised. Diamond received some short-term financial relief, in the form of rebates from the teams and leagues to compensate for the lack of games to broadcast, as required by the relevant contracts with the teams and leagues.  But a significant portion of these rebates were required to be passed along by Diamond to its MVPD partners to compensate the distributors for the lack of broadcasts.

83.     DSG's debt trading prices dropped more than 30% following the shutdown of live sports.  Investors became increasingly concerned about Diamond's liquidity and covenants, particularly in light of the company's "fixed costs, including interest payments[.]"

**V.     At Least as Early as December 2019, If Not Earlier, Diamond Was Insolvent**

84.     The information currently available to Plaintiffs shows that Diamond was insolvent by no later than December 2019, and possibly earlier.  By December 2019, DISH Network had dropped distribution of the RSNs; Sinclair recognized that YouTube and Hulu were unlikely to agree to long-term renewals; the economics of Diamond's business model were shifting beneath it; and hundreds of millions of dollars were leaving Diamond's accounts for Sinclair's coffers.  As shown below, by March 2020, Diamond's secured and unsecured debt was trading materially below par, reflecting grave market doubts about its ability to pay its debts when due.  *See* ¶ 97.  By September 2020, a valuation of DSG undertaken for purposes of Sinclair's financial statements forced Sinclair to take a multi-billion dollar impairment to DSG's goodwill and intangible assets, leaving DSG with $2.5 billion in negative equity.

85.     The steep decline in DSG's prospects is reflected in repeated reductions in Sinclair's internal forecasts.  Between late April 2019, when Sinclair agreed to purchase the RSNs, and February 2020, ten months later, Sinclair's forecasts for the RSNs' 2020 EBITDA before management fees declined from $1.505 billion to $1.006 billion—a reduction of more than 30%.  By July 2020, five months later, Sinclair forecast 2020 EBITDA for Diamond of approximately $750 million, a decline of another 25%.

86.     Between April 2019 and the closing of the acquisition in August 2019, Sinclair's financial advisor, Guggenheim Securities, and Sinclair's own internal corporate development team consistently projected 2020 EBITDA of over $1.5 billion, or $1.4 billion net of management fees.  This figure was presented to the Sinclair Board of Directors during the

meeting in which the Sinclair Board authorized the purchase of the RSNs; it was provided to potential lenders when raising debt to finance the transaction; and it was presented to ratings agencies in order to obtain ratings for Diamond's debt.

87.     Almost immediately after the transaction closed, however, Diamond's business began to rapidly decline, and when Sinclair removed DISH Network from the projections following the November 6, 2019 earnings call, Diamond's projections fell through the floor.  On November 12, 2019, Justin Bray, Sinclair's Treasurer, emailed Rutishauser updated projections for DSG's attributable EBITDA forecast for 2020.  The removal of DISH Network and the continued deterioration of the RSN business model resulted in new attributable EBITDA projections for 2020 of approximately $1 billion—roughly $500 million less than Sinclair's projections prepared in June 2019, just five months earlier.

88.     Notwithstanding this precipitous decline in projected EBITDA, Sinclair caused DSG to transfer over $300 million on December 13, 2019, and close to $200 million on January 20, 2020, to DSIH for the ultimate benefit of Sinclair and in exchange for no value whatsoever to DSG, as well as additional, smaller distributions totaling over $27 million between September 2019 and January 2020 for the same purpose.  Sinclair forced these distributions over the recommendation of Bray, who advised in early November 2019 that any distributions from DSG "should wait until February" 2020 because the "2020 forecast will be more clear at that point." At her deposition, Rutishauser confirmed that, as Treasurer, Bray's job is to "monitor liquidity for the company," and that she "would expect him to have some input" in decisions regarding DSG's distributions.  But Sinclair nevertheless proceeded to distribute over $500 million of DSG's cash by January 2020 despite Bray's recommendation.

89.     Sinclair's internal projections for DSG continued to decline in early 2020. When Sinclair set the 2020 budget in December 2019, Diamond's 2020 EBITDA was projected at $1.1 billion before management fees, or $996 million after management fees.  By February 25, 2020, when Sinclair finalized its year-end 2019 financials and updated its projections for 2020, DSG's projected 2020 EBITDA had declined another $90 million to $1.006 billion, or only $902 million after management fees.

90.     In April 2020, analyses by senior Sinclair finance personnel showed that DSG was insolvent.  On April 21, 2020, McIntire sent Rutishauser and Ripley a multi-year financial model for DSG showing projected 2020 DSG EBITDA of $931 million.  McIntire's model included tests of DSG's solvency using cash flow coverage and balance sheet/asset value tests. The model showed that DSG "[f]ail[ed]" these tests, indicating insolvency.  McIntire bluntly told Rutishauser and Ripley that "[i]t doesn't look good on any of the [solvency] tests."  McIntire was still making changes to the model's inputs in June 2020, but the solvency tests were still resulting in failures.

91.     By July 2020, DSG's financial performance under Sinclair's stewardship had continued to deteriorate.  In an email from Rutishauser to Ripley entitled "DSG true P/L," Rutishauser informed Ripley that DSG's "true adj[usted] ebitda" forecast for 2020 was now down to $658 million after management fees, or $627 million after subtracting $31 million in projected EBTIDA for Marquee.  Rutishauser attributed this enormous additional decline to decreased distribution revenues, which were "down $320M vs budget," and significantly increased subscriber churn.

32

92.     The below chart illustrates the dramatic decline in Sinclair's forecasts of DSG 2020 EBITDA, after management fees and excluding any revenue from Marquee, between April 2019 and July 2020.



93.     Even in the face of these dramatic declines in Sinclair's financial projections for DSG, Sinclair caused DSG to make more than $350 million in distributions to DSIH for the ultimate benefit of Sinclair on August 18, 2020—less than a month after Rutishauser emailed Ripley that DSG's "true" adjusted EBITDA was hundreds of millions of dollars less than anticipated at the beginning of the year

94.     Sinclair's publicly filed financial statements as of the third quarter of 2020 (ending September 30, 2020) showed that DSG's fair value was less than the amount of its debt—a clear acknowledgement of insolvency.  In connection with the quarterly financial reporting process, KPMG conducted a valuation of DSG's reporting units to determine whether goodwill associated with the Diamond acquisition was impaired.  KPMG concluded that the value of DSG's reporting units was $4.4 billion, resulting in a $4.2 billion write-down of DSG's

goodwill and a consequent negative equity of $2.5 billion.  Sinclair's internal forecasting from December 2020 likewise showed DSG with $0 in equity value.

95.     As Sinclair disclosed on November 4, 2020, the impairment

was driven by a decline in distribution revenue brought on by a number of factors, including the recent loss of two virtual distributors, that together represented approximately 10% of the [the RSNs'] gross distribution revenue for the month of September 2020, as well as elevated levels of subscriber erosion influenced by numerous factors including fragmentation of content distribution platforms, shifting consumer behaviors due to the current economic environment, the COVID-19 pandemic, and related uncertainties.

96.     Even after publicly disclosing this extraordinary write-down, Sinclair continued to cause DSG to issue distributions to DSIH for its benefit.  Between September 29, 2020 and the end of 2022, DSG was forced to issue distributions of close to $19 million for Sinclair's benefit.

97.     The market also recognized that DSG was insolvent.  By December 2019, its unsecured debt was trading below par.  Then, as discussed above, by mid-March 2020, following the COVID-driven shutdowns of live sporting events, the trading prices of DSG's debt plummeted.  DSG's secured notes due 2026 fell to 66 cents on the dollar and the trading prices of its unsecured notes due 2027 fell as low as 49 cents.  These prices never again reached their pre-COVID levels; from March 6, 2020 through the Petition Date, DSG's secured notes never again traded above 90 cents, and from June 11, 2020, through the Petition Date, its unsecured notes never traded above 70 cents.  These prices reflect the market's view that DSG's ability to pay its debts when due was a matter of substantial doubt.  A chart illustrating this precipitous decline is below:



98.     Commentary by analysts further reflects the market's understanding that Diamond was insolvent, even long before the impact of COVID-19 was felt.  As early as December 18, 2019, Wells Fargo estimated that DSG's estimated 7x debt leverage exceeded its value based on the purchase price multiple paid by Sinclair—in other words, that DSG had negative equity value.  Recognizing the declining value in DSG, a major alternative asset manager launched a short position in the unsecured bonds of DSG as part of its long/short credit fund portfolio, noting in the December 13, 2019 announcement of its position that DSG's bonds were one of the "most shorted bonds in the high yield market."

99.     Other analysts expressed the same view.  On December 31, 2019, an analyst sent Rutishauser "notes from a dinner event, where investors present to one another various short ideas."  The presenter made the case for shorting both SBG's stock and DSG's unsecured bonds, and estimated (correctly) that DSG's forecasted EBITDA as of December 2019 was ~$900 million, as opposed to its prior forecasted EBITDA of $1.5 billion.  Rutishauser forwarded the

analyst's notes to Ripley and Faber and commented that Sinclair has "been busy beating these talking points back."

100.     By March 2020, a consensus of market analysis expressed a similarly bleak outlook.  For example, in February 2020, an analyst from Goodnow Investment Group concluded that without DISH Network, "SBGI's equity investment in [Diamond] looks highly likely to be a zero," and DSG "will be challenged to avoid a bankruptcy/debt restructuring event down the road."  On March 4, 2020, JP Morgan noted that "at the forward leverage implied by the outlook, it's unclear when the [DSG] silo can dividend cash back to the holding company."

101.     On March 12, 2020, Wells Fargo expressed the view that "there is negative equity value at Diamond if cash flow remains constant," and noted that "our operating model . . . implies a more severe gap."  Wells Fargo noted that the "DISH drop and YouTube renewals have left investors worried about RSN earnings and leverage going forward."  The Wells Fargo report ascribed "zero RSN value" to Sinclair given Diamond's enormous debt burden.

102.     Analysts continued to express similar views as 2020 progressed.  On May 6, 2020, Wells Fargo concluded that the RSNs "could soon be restructured with bondholders."  On August 6, 2020, Wolfe Research indicated that its price target for Sinclair "attributes zero equity value to the RSN business."

103.     In summary, Sinclair acquired a business that it internally forecast to achieve $1.4 billion in EBITDA in 2020, and in less than a year had reduced the EBITDA forecast for the same period by approximately 50%.  Only a few months after that, DSG incurred a $4.2 billion impairment in the third quarter of 2020, resulting in a negative equity of $2.5 billion.  All the while, Sinclair caused DSG to issue close to a billion dollars in distributions to DSIH for Sinclair's benefit and with no benefit to DSG.

**VI.    August 2019–May 2022: Sinclair "Milk[s]" Diamond of $100 Million a Year in Purported Management Fees**

104.    Immediately after acquiring Diamond in August 2019, Sinclair caused DSG to enter into the MSA with STG, under which Sinclair agreed to provide a range of managerial, operational, and administrative services on DSG's behalf.  The MSA was egregiously one-sided and forced Diamond to pay Sinclair enormous fees that far exceeded any fair value of the services Sinclair provided.  Although Sinclair internally estimated the "cost to achieve"—i.e., the incremental cost of providing these services to DSG—as only $20 million the first year (with modest increases of less than one million dollars each year thereafter), the agreement obligated DSG to pay Sinclair $68 million a year of "base fees" in the first year (with multi-million dollar increases each year thereafter) and hefty additional "incentive fees."  In total, between Sinclair's acquisition of Diamond in August 2019 and the Petition Date, DSG paid fees to Sinclair under the MSA of more than $316 million and accrued additional liabilities to pay deferred fees beginning March 2022 of over $104 million, for a total of at least $420 million, or over $100 million a year.  The vast majority of this amount was paid or accrued after Diamond was insolvent.  The timing and amounts of base and incentive fees paid and deferred are reflected in the chart attached to the Complaint as Exhibit A.

105.    As shown by the fairness opinion by Duff & Phelps that Sinclair obtained for the MSA—an opinion that, at Sinclair's direction, attested to the purported "fairness" of the MSA to Sinclair but not to DSG—these fees were grossly out of line with other comparable arrangements.  For instance, Fox had charged nothing to manage its wholly owned RSNs.  And the base fees that Fox charged to RSNs it partially owned as part of a joint venture were far less than those Sinclair charged to Diamond as a percentage of revenue (the metric Duff & Phelps

37

adopted)—as little as one-fifth as much for some of the RSNs.  And, none of the Fox joint venture RSNs paid any "incentive fees" to Fox.

106.     Recent sworn testimony by the Commissioner of MLB and MLB's Chief Revenue Officer show that the extortionate MSA fees imposed by Sinclair were part of Sinclair's self-interested machinations.  As Commissioner Rob Manfred testified, Smith told Manfred in late 2021 that he intended to "continue to milk [Diamond]" of more than a hundred million dollars in annual management fees "and whatever else [he] can take out of the company until [he] basically ha[s] [his] original investment in the RSNs out," at which point he would place Diamond in bankruptcy.  Noah Garden, Chief Revenue Officer of MLB, corroborated Manfred's testimony, stating under oath that Manfred came into his office immediately after the meeting with Smith and reported that Smith had threatened to "continue to milk [Diamond] for its fees that were owed to Sinclair and he was going to put [Diamond] into bankruptcy."  In more recent live testimony during a hearing in Diamond's bankruptcy proceedings, Commissioner Manfred—whom the Court found to be "credible"—repeated his account of Smith's plan to recover his $2 billion investment in Diamond through management fees paid to Sinclair, and Smith's statement that he would "keep this going long enough until [he] get[s] [his] $2 [b]illion out" of Diamond before "put[ting] the entity into bankruptcy."  In this regard, at least, Smith was true to his word:  that is just what he and Sinclair did.

**A.     Sinclair Imposes an Unfair and One-Sided Management Services Agreement on DSG**

107.     The MSA was executed on August 23, 2019, contemporaneously with the closing of the acquisition.  Ripley, as Sinclair's CEO and the new President of DSG, signed the MSA on behalf of both DSG and STG.

108.    As Ripley has acknowledged under oath, "[t]here wasn't any negotiation" regarding the terms of the MSA.  Instead, it was drafted unilaterally by Sinclair in the lead-up to the August 23 closing of the acquisition of the RSNs by Sinclair.  No independent representative of Diamond (or Fox or Disney) was involved in setting the terms or executing the agreement. Instead, the key groups involved in drafting the MSA and structuring its economic terms—for both parties—were Sinclair's legal team (led by General Counsel David Gibber and supported by his subordinate, Bell) and its corporate development team (led by Shapiro, who Sinclair witnesses confirmed was the "leader[] in coming up with . . . the charges and drafting of the MSA," and supported by Brian Nickols), with ultimate signoff by Ripley.  Shapiro testified that he was  "responsible for modeling the fees that would be paid under the [MSA]."  No one with sole (or even principal) responsibility for Diamond's interests was involved in negotiating or drafting the MSA, and no one on the Sinclair side otherwise focused on the interests of Diamond rather than those of Sinclair.

109.    Pursuant to the MSA, Sinclair agreed to provide DSG a range of critical managerial, operational, and administrative services.  Under Exhibit B to the MSA—which appears to have been the brainchild of Gibber, Sinclair's General Counsel—these services included affiliate sales and marketing services, which included negotiating carriage rights agreements with MVPDs, and general and administrative services, including legal and business affairs, finance and accounting, IT support, payroll, employee benefits, and insurance.

110.    The MSA foisted enormous fees on DSG.  In particular, Sinclair used the MSA to force DSG to pay annual "base fees," also referred to as "management fees," of $4 million annually for each of 17 RSNs, for a total of $68 million for the first year, and which were subject to an annual 4% escalator thereafter.  DSG was also compelled to pay Sinclair additional

"incentive fees" representing a percentage of revenue from new and renewed distribution deals entered into by Sinclair's affiliate sales and marketing team on behalf of the RSNs.  These fees were paid to STG by various Diamond entities, including DSG and DSN.  The fees far exceed the reasonably equivalent value of the services that STG provided.

111.     The fees that DSG was forced to pay to Sinclair far exceeded the expected and actual costs to Sinclair of providing services under the MSA.  Sinclair's internal projections presented to the Sinclair Board of Directors in April 2019 showed a forecasted cost to Sinclair of only $20 million to provide the contracted MSA services to the RSNs in the first year.  Sinclair expected its "cost to achieve" the MSA services to increase by less than $1 million per year, far less than the 4% annual escalator in the base fees charged to the RSNs—an amount of $2.7 million more per year for the second year and an increasing amount thereafter.  Sinclair's projections show that the difference between Sinclair's costs and the fees charged to DSG was expected to be $92 million in 2020, and as much as $183 million by 2034, representing a margin of 82% in 2020 and 86% by 2034.

112.     The actual costs to Sinclair to provide services to Diamond post-acquisition were similarly far below the fees it charged.  As set forth in Sinclair's 2020 Annual Report, Sinclair's entire corporate general and administrative expenses increased by only $37 million between 2018 and 2020—far less than the fees Diamond was required to pay.  David Bochenek, Sinclair's Chief Accounting Officer, conceded at his deposition that the expenses to Sinclair of providing services to Diamond would be booked in that line item.

113.     The fees Diamond was required to pay to Sinclair were also grossly excessive compared to the fees the RSNs previously paid to Fox before Sinclair's acquisition, as reflected in the purported fairness opinion that Sinclair obtained from Duff & Phelps in connection with

the transaction.  (As discussed further below, the opinion purported to show the transaction was

fair only to Sinclair, not to Diamond).  This disparity is particularly striking in light of the fact

that, according to Shapiro, the Fox MSA fees represented "market rates."

114.    At the outset, Fox did not charge ***any*** fees to the RSNs that it wholly owned.

115.    Fox did charge management fees to the four RSNs in which it held a majority,

but less than complete, equity interest (between 70% and 87%) through joint ventures.  Those

joint venture RSNs—Fox Sports West, Fox Sports Cincinnati, Fox Sports West, and Fox Sports

San Diego—paid Fox base fees ranging from $1.3 million to $1.9 million in 2018.  In other

words, the initial $4 million per year fees charged by Sinclair were more than double the largest

fees charged by Fox to the same joint venture RSNs one year earlier.

116.    At the same time, the actual services provided by Sinclair were materially *less

than* the services Fox provided under its MSAs.  For example, Fox's MSA with Fox Sports West

(the predecessor entity of debtor Diamond Sports Net West 2) provided that Fox would provide a

broad array of services, including Logos, Marks and Graphics; Media and Public Relations and

Consumer Marketing; Programming Services; Music Acquisition and Licensing; and

Programming Research services.  In contrast, the Sinclair MSA did not include these services.

Thus, Diamond would have to pay Sinclair *additional* fees if it wished to receive these services

from its new parent.  In other words, as compared to the Fox MSAs—which Shapiro

characterized as "market" benchmarks—the Sinclair MSA charged DSG more money for fewer

services.

117.    Shapiro, the Sinclair executive principally responsible for modeling the fee

structure that was installed through the MSA, was unable at his deposition to explain or justify

the fees.  Nor could Shapiro explain the specific services Sinclair was providing the Diamond

RSNs in exchange for millions of dollars in fees.  In fact, Shapiro testified that he did not believe it was necessarily important for him to understand "what services are actually going to be provided and paid in exchange for that amount" in designing the fee structure.  Indeed— apparently recognizing that the fees were unjustifiable—he somehow, under oath, denied responsibility at his deposition for deciding on the fees even when confronted with documents establishing that he was their principal architect.  Other Sinclair executives—including defendants Smith, Ripley and Rutishauser—likewise disclaimed responsibility for the MSA's terms (although Ripley admitted, as he had to, that he had signed it on behalf of both parties) and could not identify who was responsible.

118.    In addition to charging Diamond exorbitant and oppressive fees under the MSA, Sinclair also charged these fees to too *many* Diamond entities, further enriching itself far in excess of the value of the services it provided.  As stated above, the MSA charged a $4 million dollar base fee per RSN in year one, and this fee was charged to 17 Diamond RSNs.  But when Sinclair acquired the RSNs, it believed—as it publicly communicated to investors—that the assets it was acquiring included only 14 RSNs, which included a total of 21 "brands."  The difference between the 14 RSNs that Sinclair claimed to believe it was acquiring and the 17 RSNs it determined to charge relate to various "sub-brands," which are extensions of particular RSNs into an adjacent region with slightly different content programming rights.  For example, a sub-brand might have the rights to air the games of one different team than its parent RSN.  But for the most part, the sub-brand is an extension of the network's content into a neighboring state or region.  Yet, when Sinclair structured the MSA incentive fees, it decided to charge the $4 million per year base fee to three of these sub-brands, even though the sub-brands are merely

extensions of the parent networks with minimal incremental services needed to run their operations.

119.     Diamond employees expressed concern to Sinclair that 17 entities would pay management fees to Sinclair, when in reality there were only 14 RSNs.  At a September 24, 2019 meeting, a DSG finance employee who originally worked at Fox when it owned the RSNs told Ryan Tewey, Sinclair's Financial Reporting Manager, that "the RSNs were under the impression that it would be $4m times the 14 networks listed" on the investor materials.  This impression was shared by senior Sinclair executives. ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████. Rutishauser therefore asked Shapiro to provide "a reason we modeled for 3 extra networks" to pay management fees.  Shapiro responded simply that the extra networks were "due to the subrands [sic]," without providing any justification for why those "sub-brands" should pay the same fee as full-fledged RSNs.

120.     Nor was there any plausible justification for the additional—and highly lucrative to Sinclair—"incentive" fees that Sinclair imposed on Diamond.  As set forth in Exhibit D of the MSA, Sinclair was entitled to collect from Diamond "incentive" fees when Sinclair secured carriage agreements with MVPDs on the RSNs' behalf that met certain pre-determined metrics.  For "new" carriage agreements entered into with MVPDs that were not already carrying the RSNs, Exhibit D mandated that Sinclair was entitled to "a two percent (2%) commission on Annual Distributor Revenue attributable" to that new carriage agreement.  For "renewal"

carriage agreements with MVPDs that were already carrying the RSNs, the formula set forth in Exhibit D allowed Sinclair to receive an incentive fee of 50% of the "Growth Outcome Percentage" multiplied by "Annual Distributor Revenue," so long as the agreement's "Growth Outcome Percentage" met or exceeded a threshold of 2%.

121.    These contractually defined terms and the incentive fee formula set forth in Exhibit D of the MSA ensured that Sinclair would receive a fixed percentage of the revenue generated from a renewal agreement, regardless of whether or not the agreement ultimately generated increased revenue for Diamond.  The definition of "Annual Distributor Revenue" specified that it "assum[ed] the subscriber counts as of the effective date of the Affiliate Agreement remain static throughout the entire term of such Affiliate Agreement."  Similarly, Exhibit D explicitly stated that the formula for calculating "renewal" incentive fees would hold "all subscriber calculations static as of the effective date of a Renewal Agreement so that neither party b[ore] the risk of subscriber gains, fluctuations, or attrition."  As Shapiro acknowledged during his deposition, this means Sinclair allowed itself to earn a commission on a renewal agreement even if the number of subscribers declined over the lifetime of the deal and the deal consequently resulted in a decrease in revenue to the RSNs.  Likewise, Daniel Gallagher, Sinclair's Operations Controller who was responsible for overseeing the calculation of incentive fees after the RSN acquisition closed, acknowledged that an increase in subscriber churn could make a renewal agreement worse for Diamond than a prior deal even while, under the MSA, Diamond would have to pay an incentive fee to Sinclair.  The very fact that, as Diamond's business spiraled

44

downward following the acquisition and it lost major customers, it was nevertheless saddled with paying Sinclair tens of millions of dollars in supposed incentive fees, underscores the inequitable, indefensible, and off-market nature of the fee structure.

122.    It is not a coincidence that Sinclair designed the incentive fees in this way: Sinclair was fully aware that cord-cutting was worsening even before the acquisition, so it designed the MSA to ensure that it was paid incentive fees even if subscriber numbers declined and Diamond's distribution revenue accordingly decreased.  For example, Sinclair's Board of Directors was informed by its financial advisor in connection with the RSN acquisition, Guggenheim Securities, in a February 26, 2019 presentation that the "[a]cceleration of cord cutting" and the corresponding "[d]irect reduction in affiliate revenue" was a risk associated with acquiring the RSNs.  Aware of these trends, Sinclair structured the incentive fee component of the MSA in an effort to insulate itself from industry-wide headwinds and to ensure that Sinclair extracted additional fees from Diamond in what was then known to be the highly likely event that subscriber numbers declined over the lifetime of a renewal agreement.

123.    As predicted, cord-cutting and subscriber churn did in fact worsen after the acquisition closed in August 2019.  An August 4, 2020 presentation by Bain & Company to the SBG Board of Directors stated that "RSN linear subscribers [are] projected to accelerate decline over next five years" and estimated a "~5% year-on-year decline of linear subscriptions over next 3 years."  Yet Sinclair structured the MSA to ensure that it could still extract excessive and unwarranted incentive fees from the RSNs at the time a renewal deal was executed regardless of actual or anticipated subscription declines.

124.    The below chart illustrates the RSN's declining revenues between 2019 and 2022, and the increasing incentive fees that Sinclair charged Diamond over that same period:



125.     Incentive fees were largely unprecedented in the regional sports industry for transactions of this kind, a fact well known to Sinclair's executives when designing the MSA. Emails from July 2019 reveal that Shapiro knew that none of the MSAs between Fox and the RSNs provided any amount of incentive fees to Fox. ████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████

126.     At his deposition, Shapiro was only able to identify one other MSA with an incentive fee structure. ██████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████     In contrast, because Diamond was wholly controlled by

Sinclair, Sinclair was able to impose on Diamond a far more favorable incentive fee structure—
for the exact same service.

127.    Indeed, no incentive fee should have been necessary in the Diamond MSA at all
in view of the fact that Sinclair indirectly owned Diamond.  In July 2019, Shapiro sought to
justify the incentive fee component of the MSA by explaining that it was "important to align
incentives" between Diamond and Sinclair and to "give [Sinclair] incentive to maximize
economics for the RSNs."  Yet, as the owner of DSG, Sinclair should have already had that
incentive, as Shapiro acknowledged at his deposition.  Moreover, Sinclair had fiduciary and
contractual duties to ensure that it was using its best efforts to aid Diamond in renewing and
securing new distribution agreements.  The only plausible reason to institute an incentive fee is
to provide another avenue for pumping cash into Sinclair's bank accounts at the expense of
Diamond and its creditors.

128.    Other provisions of the MSA that Sinclair imposed on DSG were also one-sided
in Sinclair's favor.  For example, the MSA gives Sinclair the sole right to renew the agreement
after five years for three additional five-year terms—a total of 20 years.  That provision is
contrary to industry norms, which typically give the entity receiving services—here DSG—the
sole right of renewal.  The MSA thus gave DSG no power to decide whether Sinclair's provision
of services was effective and worth the cost.

**B.    Duff & Phelps' Opinion That the MSA Was Fair to Sinclair Underscores the
MSA's Gross Unfairness to Diamond**

129.    The "fairness" opinion that Sinclair obtained in connection with the MSA
underscores the one-sided nature of the agreement.

130.    In July 2019—a month before the acquisition closed—Sinclair retained Duff &
Phelps to analyze the fairness of the MSA fees.  Sinclair obtained such an opinion because

certain of STG's debt documents required that any affiliate transaction (such as the MSA between Sinclair and Diamond) be on terms not materially less favorable to STG than those STG might reasonably have obtained in a comparable transaction with a non-affiliate.

131.     Accordingly, Duff & Phelps's sole task was to opine on whether the MSA was fair *to Sinclair*.  Neither Duff & Phelps nor anyone else analyzed or opined on the fairness of the MSA fees to Diamond.  In fact, the Duff & Phelps report confirms that the MSA, while no doubt fair to Sinclair, was grossly unfair to Diamond.

132.     Duff & Phelps did not evaluate the MSA fees based upon Sinclair's actual or anticipated costs to provide the base services to Diamond.  Duff & Phelps asked for an explanation of how Sinclair "determined the $4.0 million cost (per RSN) for the services that Sinclair will be providing" or for "data as to the level of staffing required to provide the services."  Sinclair, however, refused to substantiate the $4 million base fee with any such analysis.  On the contrary, Sinclair represented to Duff & Phelps that "accurate cost estimates associated with the provision of the Base Services are not currently available."  This statement is plainly false in light of internal Sinclair documents showing a "cost to achieve" of $20 million in the first year and increasing by relatively small amounts each subsequent year—an analysis that was not shared with Duff & Phelps.  It is also not remotely credible that Sinclair would have entered into the MSA without a reliable estimate of its costs to provide the services it was thereby obligating itself to provide.

133.     To determine whether the MSA was fair to Sinclair, Duff & Phelps compared the fees payable by Diamond to fees charged in similar transactions calculated as a percentage of revenues or expected revenues for the entity receiving the services.  Duff & Phelps considered the management fees previously paid to Fox by the RSNs that had a joint venture partner; ■

 Duff & Phelps viewed these
comparators as "indicative of fees that are reasonable for such services because they have been
agreed to by third parties."

134.    The comparison highlights the unfairness of the MSA to Diamond.  The base
fees alone under the MSA far exceeded as a percentage of Diamond's revenue the fees payable
under any comparable transaction that Duff & Phelps considered.  Furthermore, ▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮, none of the comparable transactions layered on additional incentive
fees on top of the base fees as did the DSG MSA.

135.    Duff & Phelps calculated that the base management fee of $68 million per year
was approximately equivalent to 1.8% of the Diamond RSNs' combined annual revenue.  In
contrast, the four RSNs that were operated as joint ventures with outside equity interests paid
management fees to Fox that accounted for 0.6% to 1.7% of their annual revenue, ▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮.

136.    Thus, as Duff & Phelps noted, Diamond's payment of base management fees
representing 1.8% of its annual revenue was "significantly in excess" of what Duff & Phelps
viewed as the "most meaningful" benchmark ▮▮▮▮▮▮▮▮▮▮.  Duff &
Phelps also observed that the Diamond base fee was "significantly in excess" of the range of
management fees paid by the joint venture RSNs to Fox for what Sinclair told D&P were "highly
comparable" services (and that were, as noted, less comprehensive than the services Fox
provided the joint venture RSNs for smaller fees).  Again, as Duff & Phelps made clear, this

comparison took into consideration *only* the base fees under the Sinclair MSA.  Duff & Phelps did not render an opinion as to the additional incentive fees that Sinclair required Diamond to pay, and all but one of the comparable transactions did not include such fees.  Duff & Phelps did note, however, that the fact that the joint venture RSNs did not pay Fox an incentive fee "could potentially make the Base Services Fee higher and the 1.8 percent of sales measurement of those fees conservative."

137.    Duff & Phelps's assumptions and projections about the fees the Diamond RSNs would pay Sinclair in management fees significantly understated the amount they actually paid. Individually, the Diamond RSNs have paid Sinclair base management fees that account for as much as 8.6% of certain of the Diamond RSNs' individual annual revenue in a given year.  On a combined basis across all the Diamond RSNs, the base management fees paid to Sinclair accounted for 2.7% of DSG's revenue in 2020 and 2.5% in 2021 (compared to the 1.8% that Duff & Phelps forecast).  Beyond that, the incentive fees the Diamond RSNs paid to Sinclair accounted for an additional 1.0% of revenue in 2020, and 1.2% in 2021.

138.    All told, the management and incentive fees paid by Diamond to Sinclair totaled 3.7% of DSG's revenue in both 2020 and 2021— ███████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████ and between two times and more than five times higher than the management fees charged to the Fox joint venture RSNs (between one and four times more if just comparing management fees).

139.    Apparently recognizing the damning nature of the Duff & Phelps analysis for Sinclair, Shapiro, in a transparent attempt to deflect responsibility, claimed at his deposition that

Duff & Phelps's methodology of measuring management fees as a percentage of annual revenue was unreasonable. Shapiro also testified that he did not provide Duff & Phelps with what he believed to be the most relevant materials related to the MSA fees.

140.    Shapiro's after-the-fact effort to throw Duff & Phelps under the bus—although Sinclair itself hired Duff & Phelps and directed its work—is not remotely credible. Shapiro and others at Sinclair were well aware of the methodology Duff & Phelps was using as its report was being prepared, and they weighed in on and actually edited the report themselves. Moreover, the very purpose of the Duff & Phelps opinion was to contemporaneously justify the reasonableness of the MSA fees to Sinclair's lenders. Sinclair's post hoc, made-for-litigation attack on the methodology and consequent conclusions of Sinclair's own chosen valuation firm does not pass the smell test. Proving the point, in 2020, Sinclair again engaged Duff & Phelps to opine on the fairness of the Bally's transaction. Had Sinclair truly believed at the time that Duff & Phelps's methodology in opining on the fairness of the MSA was flawed and unreasonable, as Shapiro has now conveniently claimed in sworn testimony, it would not have used that opinion to justify the MSA as required by its loans, or engaged Duff & Phelps again to opine on yet another transaction one year later.

### C.    Sinclair Charged DSG Millions of Dollars in Additional Fees That Were Already Covered by the MSA Management Fees, or Which Sinclair Has Failed to Justify

141.    In addition to at least $420 million in base and incentive fees, Sinclair invoices reflect $117 million in additional net charges to Diamond. These additional charges cover all manner of services, including insurance, accounting, computer support, and legal fees. Invoices show that these types of services resulted in charges by Sinclair to Diamond of $160 million, with $43 million in credits back to Diamond, for a net total payment of $117 million.

51

142.     These additional charges result from the absence of any clear definition in the MSA that Sinclair drafted of the services it was required to provide, and Sinclair's subsequent effort, in breach of the MSA, to take advantage of the absence of such definitions for its own benefit.

143.     Exhibit B of the MSA states that Sinclair agreed to provide, in exchange for significant management fees, "certain general and administrative services necessary or appropriate for [Diamond's] business, as mutually determined by [Sinclair and Diamond], consisting of certain of the following:

      a.      Legal and business affairs

      b.      Payroll

      c.      Finance and accounting

      d.      IT support

      e.      Human resources

      f.      Insurance[.]"

144.     Sinclair employees were unable during their depositions to identify any process that was used to determine which of the "certain" categories of services were actually provided, or whether Sinclair and Diamond have ever "mutually determined" what services were "necessary or appropriate" for Diamond's business or what that process would look like.

145.     Moreover, the MSA (which, as noted, was entirely drafted by Sinclair for Sinclair's own benefit) did not expressly define the broad categories of services in Exhibit B that Sinclair was obligated to perform (and that were encompassed within the base fees that DSG was obligated to pay).  Bochenek and Gallagher both testified that they did not know what "business affairs" as set forth in Exhibit B of the MSA would encompass.  Nevertheless, both Bochenek

and Gallagher were called upon by others at Sinclair to determine whether certain services were included in Exhibit B or whether they warranted additional fees. Sinclair employees testified that they were not aware of any document providing further color as to what is and is not covered by the MSA base fee.

146.     Sinclair sought to take advantage of the absence of any contractual definition of these terms to further benefit itself at the expense of Diamond by declaring that certain services were not encompassed in Exhibit B and, accordingly, charging Diamond additional fees (on top of the millions of dollars in monthly base management fees) for those services. In November 2019, Sinclair unilaterally and significantly narrowed the scope of the base fee by announcing that the MSA base fees would cover *only* the labor of Sinclair employees, not any additional costs incurred by Sinclair in providing services to Diamond. But that assertion has no basis in the language of the MSA. In trying to reconcile this decision with the language of the MSA and Exhibit B, Sinclair employees expressed confusion as to what was and was not covered by the base fee, admitting, "[w]e had some trouble ourselves gaining an understanding of what was covered by the MSA[] as it's not spelled out specifically in the agreement." By declaring that the MSA base fees covered only labor costs, Sinclair was able to use its complete control over Diamond to markedly increase the number of expenses for which Diamond was forced to pay separately, above and beyond the millions in dollars of base management fees it was funneling to Sinclair each month.

147.     Sinclair attempted to take advantage of the broad, undefined categories in Exhibit B by claiming that certain internal costs were not covered by the MSA base management fee. For example, in 2020, Sinclair undertook a project to replace the RSNs' mobile application, which was previously called "Fox Sports Go." When allocating expenses for this project

between Diamond and Sinclair, a Sinclair financial analyst explained that he did not know "whether or not the management fee between Diamond and [] Sinclair already considers these expenses" and that he needed Bochenek to resolve that question.  Bochenek responded that costs related to this project were not covered by the management fee.  However, when asked about this decision during his deposition, Bochenek was unable to explain how he determined that the expenses should be charged to Diamond rather than covered by the MSA base fee, what processes (if any) he followed to make that determination, whether he consulted with anyone at Sinclair or Diamond in making that determination, and whether there was any formal documentation regarding this decision.

148.     The MSA also requires Diamond to "reimburse Sinclair for all reasonable expenses incurred by [Sinclair] in the performance of the Services" and to "issue the reimbursement within thirty (30) days after [Diamond's] receipt of an undisputed itemized invoice."  Gallagher, the Sinclair accounting executive responsible for overseeing the employees who prepare expenses reimbursement invoices, testified that he does not know what "reasonable" means in this context and has not seen any documentation setting forth what expenses would or would not be "reasonable."  There were no contractual safeguards to prevent Sinclair from charging or passing through excessive or unreasonable fees, and because Sinclair personnel managed and controlled Diamond, Diamond was left entirely unable to dispute invoices it received from Sinclair.

149.     Similarly onerous and one-sided was the manner in which Sinclair invoiced Diamond for purported third-party expenses and its practice of "allocating" to Diamond a portion, determined solely by Sinclair, of third-party expenses that related both to Diamond and to other Sinclair entities.  When sending expense reimbursement invoices to Diamond, Sinclair

provided no backup invoices from third parties or explanations as to how invoices pertaining to services provided to multiple Sinclair entities were allocated.  As a result, Diamond had no ability to ascertain what the expenses were for or how they were allocated, or to challenge Sinclair's claims for purported expense reimbursements.

150.     Sinclair's allocation methodology was deficient in other respects as well. Sinclair allocated certain expenses to Diamond based on the percentage of Sinclair's total revenue contributed by a given RSN.  Sinclair allocated other expenses to Diamond, including computer support expenses and insurance costs, based on the percent of total headcount attributable to an RSN.  But documentation provided by Sinclair reveals that Sinclair's allocation is based upon outdated headcount metrics, calling into serious doubt whether the allocation is reasonable or accurate.

151.     Even more egregiously, Sinclair appears to have charged Diamond for services that were provided by third parties to other Sinclair entities rather than to the RSNs.  For example, Gallagher acknowledged that Sinclair appears to have charged Diamond for services provided by Wide Orbit (a vendor that tracks advertising revenue) to Stadium, one of Sinclair's other, non-Diamond subsidiaries.

152.     In addition, Sinclair frequently charged Diamond for services purportedly provided by other Sinclair entities with no explanation as to how or why Diamond ought to cover those amounts.  For example, starting in early 2022, Diamond began to be charged more than $200,000 a month for "rent" in the Tennis Channel building.  Gallagher, who oversees the allocation of expenses to Diamond, was unable in his deposition to provide any explanation of how this amount of rent was allocated to Diamond and why Diamond was first charged for rent

in 2022.  Other Sinclair entities that send invoices to Diamond without any backup information or allocation justification include Sinclair Sports Group and Stadium.

153.    Every time Sinclair charged Diamond for expenses that reflect more than Diamond's fair share, Sinclair breached the express terms of the MSA, which prohibits Sinclair from "unreasonably and disproportionately allocat[ing] to [Diamond] costs for assets or services procured from third parties for [Diamond] and other Sinclair Services."  Sinclair violated this provision time and time again by causing Diamond to pay for expenses incurred by other Sinclair entities, and by depriving Diamond of the information that would be needed to even identify when this provision is being violated.  Moreover, the lack of any principled method for charging Diamond for services separate from the management fees covered by the MSA makes it likely that Diamond was charged double for services covered under the MSA.

154.    Sinclair also imposed additional fees on Diamond by unilaterally determining to provide certain supplementary services (and to charge Diamond for them) in violation of the MSA.  The MSA provides that Sinclair may "provide certain supplementary services to support the functioning of each [RSN] from time to time *as mutually agreed by the parties*."  The MSA further provides that Sinclair may only provide these supplementary services "if the parties mutually agree in writing in advance, including with respect to the scope of the Supplementary Services and applicable costs or fees."  Sinclair executives have contended in depositions that Sinclair is providing supplementary services to DSG, such as services related to advertising sales, but Sinclair has not produced *any* documentation establishing that Diamond agreed to these additional fees as required by the MSA.  In fact, Sinclair employees testified that Diamond was not involved in reviewing or approving charges arising out of the MSA at all.  And no Sinclair employee was able to describe a methodology for determining what services would be

considered "Supplementary Services" under the MSA and subject to additional charges to DSG as opposed to the services already covered by the base fee.

155.     In sum, Sinclair has used the broadly written categories of services set forth as Exhibit B to determine unilaterally what it would charge Diamond.  As a result, in violation of the MSA, Sinclair has charged Diamond—and Diamond has paid—approximately $117 million in additional fees purportedly as "expense reimbursements" under the MSA without any information enabling Diamond to understand the basis for the charges or to challenge their reasonableness.

> **D.     DSG, Acting Under The Complete Control And Domination Of Sinclair, Acted with Fraudulent Intent in Entering Into and Paying Enormous Fees to Sinclair Under the MSA**

156.     Sinclair's siphoning of over $100 million a year in management fees, pursuant to an MSA that was hand-crafted by Sinclair, as well as millions of dollars more in duplicative charges, was intended to fraudulently transfer Diamond's assets away from Diamond and its creditors.  By virtue of Sinclair's domination and control of Diamond, Sinclair's intent is attributable to Diamond.

157.     There are numerous indicia of fraud.  No independent Diamond representative participated in the process of drafting the MSA, resulting in a one-sided agreement that benefited Sinclair to the detriment of Diamond.  The disparity between the MSA fees paid by Diamond and the fees paid by other RSNs—including all the other MSAs used as precedents by Duff & Phelps, such as ███████, and the Fox joint venture RSNs—is enormous and unjustifiable. Shapiro, Sinclair's architect of the MSA fee structure, could not explain at his deposition how the Diamond MSA fees were determined and could not recall seeing a quantitative analysis to support them.  No other Sinclair executive had any idea either.

158.     The inherent unfairness of the MSA incentive fee structure is evident from Sinclair's own internal projections, which anticipated significant declines in the number of subscribers tuning into the Diamond RSNs between 2019 and 2024, but significantly increasing MSA fees paid by Diamond to Sinclair over that same date range.  These models predicted a 5% drop in subscribers between 2019 and 2024 with a corresponding 4.3% increase in the fees paid to Sinclair by Diamond.  No reasonable commercial party would agree to pay another party an increasing amount of fees for less benefit.

159.     As previously alleged, according to sworn testimony by MLB Commissioner Manfred, Smith expressly acknowledged that the MSA was part of a plan by Sinclair to "milk [Diamond] of $150 million . . . in management fees every year, and whatever else I can take out of the company until I basically have my investment in the RSNs out," and then to "file for bankruptcy."

160.     Garden, MLB's Chief Revenue Officer, corroborated Manfred's testimony, and the Court found Manfred "credible."

**VII.     September 2019–March 2021: Sinclair Forces DSG to Distribute Approximately $929 Million to DSIH to be Subsequently Transferred to JPMCFI to Satisfy DSH's and SBG's Obligations, with No Benefit to DSG**

161.     As discussed above, Sinclair financed a portion of the purchase price for the RSNs by causing its wholly owned subsidiary, defendant DSH, to issue $1.025 billion of preferred units in DSH to JPMCFI.  SBG guaranteed JPMCFI's collection of all payments owed by DSH on account of the units.  The units required quarterly distributions by DSH to JPMCFI in cash or kind, and gave DSH the option to redeem units at any time more than 90 days after the acquisition closed.

162.     Beginning in September 2019—little more than a month after the Acquisition closed—and continuing through the end of 2022, SBG caused DSG to make distributions to

58

DSIH in amounts sufficient to transfer the distributions further up the corporate chain and then (after paying a dividend to Byron Allen, who held a small equity interest in DSIH-A) to pay JPMCFI to satisfy DSH's (and SBG's) obligations on the preferred units and to voluntarily redeem the preferred units.  These payments totaled $929 million in cash, of which approximately $79.5 million was intended for quarterly distributions to JPMCFI and $849.5 million was intended for optional redemptions.  DSG received no consideration or benefit for making these distributions.

163.    Because SBG guaranteed DSH's obligations under the preferred units, it benefitted directly when funds distributed by an insolvent DSG were used by DSH to pay JPMCFI and to redeem preferred units.  On the other hand, because SBG did not guarantee DSG's obligations, if Sinclair perceived that DSG was insolvent or was likely to become insolvent, it had every incentive to use funds distributed upwards by DSG to make payments due under the preferred units and to redeem those units.  That is particularly so because DSH itself had no material assets other than its ownership interest in DSG, so if DSG did not ultimately fund the payments to JPMCFI, Sinclair would be left as the only remaining source of such payments.

A.    **Terms of the Preferred Units**

164.    The terms of the preferred units are set forth in the Amended and Restated LLC Agreement of Diamond Sports Holdings LLC dated August 23, 2019 (the "DSH LLC Agreement") and the Guaranty of Collection dated August 23, 2019.  Both documents were executed concurrently with the closing of the acquisition on August 23, 2019.  DSG was not a party to either document.  JPMCFI was a member of DSH by virtue of its preferred holdings and held no interest in DSG, DSIH, or DSIH-A.

165.     Under Article IV, Section 4.2 of the DSH LLC Agreement, DSH was required to make quarterly distributions to JPMCFI on account of the preferred units.  The payments were based upon the number of preferred units outstanding multiplied by a rate determined by the agreement.  These quarterly distributions could be made, at DSH's election, in cash or in the form of additional preferred units.

166.     Additionally, the preferred units could be redeemed by DSH at its election at any time starting 91 days after the closing of the acquisition.  Redemption payments were required to be made in cash, and the amount of the required redemption payment was determined by the face value amount of the units redeemed plus a call premium of 1–3%.  No call premium was required for redemptions made more than four years after the closing date.

167.     While JPMCFI had the right to force any outstanding preferred units to be redeemed, that right could not be exercised until August 23, 2027, eight years after the closing date.

168.     SBG issued a Guaranty of Collection in JPMCFI's favor, which guaranteed collection by JPMCFI of DSH's obligations under the preferred units from SBG.  DSG had no obligation to JPMCFI or anyone else with respect to the preferred units.  Because SBG guaranteed DSH's obligations under the preferred units but did not guarantee DSG's debts, distributions by DSG that were ultimately used to fund DSH's redemptions of the DSH preferred units directly benefited SBG at the expense of DSG and its creditors.

### B.     Structure and Approval of Distributions and Purported Solvency Certifications

169.     Payments to JPMCFI for redemptions and mandatory quarterly distributions were structured and approved as distributions by DSG to its immediate parent DSIH, and then as subsequent distributions to DSIH-A, DSH, and JPMCFI.

170.     The decisions as to when to redeem the preferred units, the number of units to redeem at a given time, and whether to pay the quarterly interest payments in cash or in kind, were made by Ripley or other senior officers of Sinclair, together with the Sinclair-controlled Boards of Managers of DSH and DSIH-A, which governed the affairs of DSG. No independent representative of Diamond was involved in any of these decisions.

171.     In or around December 2019, with DSG's senior unsecured notes trading between 92.5 and 93.5 cents on the dollar, Sinclair considered causing DSG to take advantage of those depressed trading levels by buying back and retiring a portion of its outstanding notes through open market repurchases and thereby reducing its level of debt. In discussion materials prepared for Sinclair management, JPMorgan estimated that DSG could repurchase $110–$175 million of its notes at a discount in a matter of weeks. Sinclair elected not to pursue open market repurchases, however, and instead caused DSG to distribute hundreds of millions of dollars to DSIH to enable DSH to redeem preferred units. As JPMorgan explained, "[p]aying down preferred equity is more NPV positive than buying back [DSG]notes"—more NPV positive, that is, to Sinclair itself, but with no benefit to DSG. The reason not to use DSG's funds to reduce its own debt levels at a discount was simple: as JPMorgan also noted, "[p]aying down preferred equity will reduce the amount of obligations that are subject to a guarantee from SBG."

172.     Sinclair recognized that it could not cause DSG to make these transfers if DSG was insolvent at the time of the transfer or if the transfer would render it insolvent. Accordingly, for each such transfer, Rutishauser, Diamond's Treasurer and most senior financial officer, who was also the CFO of Sinclair and a member of the DSH and DSIH-A Boards of Managers, issued an Officer's Certificate attesting to DSG's solvency after the contemplated payment, and the respective boards purported to rely on those certificates in approving the distributions. No one—

neither Rutishauser nor anyone else at Sinclair—could identify *anything* Rutishauser did to justify the purported "conclusions" in those certificates, and none of the documents or testimony obtained to date reflect that they were supported by any analysis or solvency expertise.

173.     The distributions were also accompanied by written consents of the boards of DSH, DSIH-A, DSIH, and DSG, which described the sequential distributions as follows:

> **WHEREAS**, it has been proposed that DSG make a distribution in an amount equal to $353,862,279.02 (the "DSG Distribution") to DSIH;
>
> **WHEREAS**, it has been proposed that DSIH make a distribution in an amount equal to $353,862,279.02 (the "DSIH Distribution") to DSIHA;
>
> **WHEREAS**, it has been proposed that DSIHA make distributions to its members, DSH and Byron Allen Folks, in an aggregate amount equal to $353,862,279.02 (the "DSIHA Distribution"), to be distributed to each member on a pro rata basis in proportion to their holdings of DSIHA;
>
> **WHEREAS**, it has been proposed that DSH make a distribution to its Preferred Member, JPMorgan Chase Funding, Inc., in an amount equal to $353,843,005 (the "Preferred Distribution," and together with the   DSG Distribution, the DSIH Distribution and the DSIHA Distribution, the "Distributions") in accordance with Section 4.2(a) of the Limited Liability Company Agreement of Diamond Sports Holdings LLC (the "DSH Operating Agreement");
>
> **WHEREAS**, pursuant to Section 6.1 of the Limited Liability Company Agreement of Diamond Sports Group, LLC, DSG shall make distributions of cash or property to its sole member in such amounts and at such times as shall be determined by the sole member in its sole and absolute discretion;
>
> **WHEREAS**, pursuant to Section 6.1 of the Limited Liability Company Agreement of Diamond Sports Intermediate Holdings LLC, DSIH shall make distributions of cash or property to its sole member in such amounts and at such times as shall be determined by the sole member in its sole and absolute discretion;

> **WHEREAS**, pursuant to Section 3.2 of the Limited Liability Company Agreement of Diamond Sports Intermediate Holdings A, LLC, DSIHA shall make distributions of cash or property to its members in such amounts and at such times as shall be determined by the Manager, DSH, in its sole and absolute discretion;
>
> **WHEREAS**, pursuant to Section 4.2 of DSH Operating Agreement, DSH shall make distributions of cash or property to its members in such amounts and at such times as shall be determined by the board of directors in its sole and absolute discretion;

174.     DSIH's consolidated financial statements (including DSG and its subsidiaries) similarly described these transfers as "distribut[ions] . . . to Diamond Sports Holdings, LLC (DSH), . . . for the redemption of a portion of DSH's preferred equity."

### C.     Empire's Solvency Opinion

175.     On August 4, 2020, in connection with a planned distribution of $535 million from DSG to DSIH to fund a redemption of the preferred units in DSH held by JPMCFI, Sinclair obtained a report from Empire concluding that DSG would be solvent after giving effect to this distribution.  Empire has never provided an opinion that an entity is *insolvent* since its founding more than 30 years earlier, in 1988.  While Empire concluded that DSG would be solvent after giving effect to the August 2020 distribution, its opinion rested on unreasonable and objectively wrong assumptions that were irreconcilable with contemporaneous internal estimates by Sinclair and the views consistently expressed by market analysts.  Sinclair also deliberately withheld certain information from Empire, including what Rutishauser described as Diamond's "true P/L," which Empire's corporate witness described as a "material omission" when he learned of it at his deposition.  Applying Empire's analysis to assumptions consistent with the views expressed by Sinclair personnel and relied on internally would have resulted in a conclusion that Diamond was insolvent.

176.     Among the multiple unrealistic assumptions on which Empire's opinion rested were the following:

177.     **First**, the revenue and EBITDA projections for DSG that Sinclair provided and Empire used assumed the "[r]eturn of DISH Network in April 2021," the start of the 2021 baseball season.  Even Empire's purported "downside case" assumed that DISH Network would begin carrying the RSNs at the latest by August 2021.  Empire applied no risk adjustment to this assumption—i.e., it valued DSG on the assumption that DISH Network's return was a certainty.

Sinclair understood that Empire was not "vouching for the reasonableness of the assumption about obtaining DISH as a customer," and Empire made clear that it rested that assumption entirely on the "case" made by Sinclair's management. But even Sinclair management was not willing to back a "100 percent chance likelihood" that DISH Network would return, with McIntire—who maintained Sinclair's internal financial models—calling a 100% assumption "unusual."

178.     As discussed in detail above, the assumption that DISH Network would return was wholly unrealistic and contrary to DISH Network's public and private statements, Sinclair's internal projections, and the views of industry analysts. *See* ¶¶ 63–73, above.

179.     The assumption that DISH Network would return is also inconsistent with a goodwill impairment analysis conducted by KPMG. KPMG's analysis began around the same time as Empire's analysis and solvency report. But unlike Empire's solvency analysis, KPMG's goodwill impairment analysis did not assume that DISH Network would ever carry the RSNs again. Rather, KPMG told Sinclair that "if dish doesn't exist now, a buyer wouldn't be buying that relationship if sold and would have to negotiate themselves, so [revenue from Dish Network] wouldn't be in [fair value] now."

180.     Bochenek testified that the Empire and KPMG assumptions regarding DISH Network were not consistent, and he agreed that it was reasonable for KPMG to exclude revenue from DISH Network in the impairment testing. Derek Nance, Sinclair's Assistant Corporate Controller, expressed the same view in an October 12, 2020 email to KPMG, stating that because Diamond did "not have a deal negotiated [with DISH Network] yet," he had "a hard time saying [it's] an intangible asset" that should be included in KPMG's analysis.

181.     Empire's corporate representative confirmed that although they were not shown the projections provided to KPMG, Empire "assumed that the projections would be consistent." Rutishauser likewise stated that it was important that the assumptions underlying the solvency analysis and the impairment analysis be consistent.  They were not, though, which led to the paradoxical result that Empire concluded DSG was solvent enough to issue half a billion dollars in distributions to its corporate parent, but KPMG impairment testing concluded that Diamond revenues without DISH Network would require Sinclair to publicly acknowledge a $4.2 billion goodwill impairment three months later.  At their depositions, neither Rutishauser nor Bochenek was able to explain or justify this glaring inconsistency.

182.     The assumption that DISH Network would return was critical to Empire's conclusion that DSG was solvent and would remain solvent after the proposed distribution.  Empire's corporate representative testified that it was "important" that the assumptions regarding DISH Network be accurate because DISH Network provided "sizeable additional income coming back into the company."  In particular, Empire's model assumed DISH Network would contribute approximately $300 million of annual revenue to DSG upon its return; in accordance with Empire's analysis, that equates to approximately $2.1 billion in overall enterprise value. ***Assuming that DISH Network would not return would have flipped Empire's solvency conclusion even if no other changes were made to its analysis.***  Sinclair itself acknowledged that the assumption that DISH Network would return was "fundamental to the [solvency] conclusion" reached by Empire.

183.     ***Second***, Empire's analysis included distribution revenue from two other major distributors, Hulu and YouTube.  Yet—as discussed above—internal documents show that

████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████ *See* ¶¶ 74–79.  The inclusion of projected revenue from Hulu and YouTube was critical to Empire's finding of solvency.  Empire's corporate representative testified that removing Hulu and YouTube would have "created a big problem for the transaction," and given the "magnitude of the change" of losing both Hulu and YouTube, DSG "wouldn't have passed solvency had [Empire] known all that."  In fact, DISH Network never returned, and Hulu and YouTube let their contracts with Diamond expire in October 2020.

184.    Empire was not aware that Sinclair did not believe Hulu and YouTube would sign a long-term renewal agreement to carry the RSNs.  In fact, Empire was not even aware that Hulu and YouTube were up for renewal.  When asked whether it would have been important for Empire to know that Sinclair believed they would be "extremely lucky if Hulu and YouTube carried [the RSNs] after the end of the Summer," the Empire corporate representative said that he "would have wanted to know about it" since projected revenue from Hulu and YouTube were still in Empire's projections.  Indeed, Empire had actually asked Sinclair for information about Diamond's "existing relationships with carriers" and whether there was "any pushback on your rates charged to the carriers."  Instead of responding truthfully, Sinclair responded (as reflected in prepared talking points) that it had "good, long-term relationships with our carriers" and that the carriers "understand the valuable content we bring to their businesses."

185.    ***Third***, Empire's EBITDA forecasts, which relied upon a model provided by Sinclair, were materially higher than those used internally by the company, and Sinclair withheld from Empire its own lower forecasts.  In connection with Empire's opinion, Rutishauser, as the CFO of Diamond, was requested to, and did, provide Empire with a management representation

letter certifying that the "financial projections" provided to Empire were "prepared in good faith and are based upon assumptions which are believed by management to be reasonable at the time such projections were made." Empire's corporate representative testified that it was important "to make sure . . . that there weren't any alternate projections that were being used anywhere else," and Empire would have wanted to know if Sinclair "had alternate projections that it was using at the same time" that differed from those it had provided to Empire.

186.    The model Empire used, based upon information provided by Sinclair, projected DSG EBITDA above $1 billion for 2021. Yet, Rutishauser informed Ripley in late July 2020 that Diamond's "True P/L" showed an EBITDA of $775 million for 2021—more than 20% lower. When shown Rutishauser's email, Empire's corporate designee testified that he would have wanted to know whether, as the email indicates, Sinclair believed Diamond had a lower projected EBITDA than what was supplied to Empire "[b]ecause it would have affected the starting point" for Empire's work. Empire's designee testified further that it "would have asked for different projections" and "wouldn't have delivered an opinion" on August 4, 2020 based on stale projections. He testified that he viewed the fact that Sinclair did not provide these "true" projections as a "material omission."

187.    In that same internal email not shared with Empire, Rutishauser further warned that the loss of distribution revenues for DSG resulted in financials down "$320M vs budget" and that "the Street will do this math, as well because they will see the MVPD rebates and the change in team rts pmts [rights payments] and assume that ex-Dish and Marquee, this is a $700 ebitda business." But at Rutishauser's direction, Sinclair hid from Empire the fact that its internal models showed a much lower EBITDA forecast than what was shown in Empire's model.

188.     ***Fourth***, Empire's overstated valuation opinion was made evident by the enormous implied 11.1x multiple to DSG's projected EBITDA.  In contrast, the list of eight comparable companies identified by Empire showed a multiple range of 5.7x to 10.4x—a range that, even at the high end, was well below the multiple that Empire employed.  The median multiple of those comparable companies was 7.9x.  At a 7.9x multiple, the value of DSG would have been $6.4 billion, which would indicate that the RSNs were significantly insolvent.

189.     Empire acknowledged to Sinclair that it was not "taking professional responsibility for the higher assumed multiple" and instead was "taking [Sinclair's assumption] at face value."  But Empire's implied 11.1x multiple was also dramatically higher than the 6.5x multiple that Sinclair used internally for its own financial modeling.  Sinclair witnesses acknowledged that "[s]ix and a half times, seven times . . . are reasonable levels based on industry norms."

190.     ***Fifth***, Sinclair also did not share with Empire its own internal analyses of solvency showing that DSG would not be solvent if Sinclair forced DSG to distribute hundreds of millions of dollars to its corporate parent.  *See* ¶ 90, above.  As McIntire, the author of the models that showed DSG would be insolvent, put it in an email to Rutishauser, the model "doesn't look good on any of the tests" for solvency.  At her deposition, McIntire confirmed that the models she prepared showed that DSG failed the solvency tests.  Rather than share this information with Empire, though, Rutishauser explicitly instructed McIntire not to share her models with Empire.  Empire's corporate representative confirmed that they did not know Sinclair had run its own solvency analysis in which DSG was found to be insolvent, and stated that Empire would have wanted to know this information.

191.     At their depositions, both Rutishauser and Ripley tried to downplay the credibility of Sinclair's own model showing that DSG was insolvent.  Rutishauser described the model as "just a back of the envelope that we did."  And Ripley called it a "draft" that "really doesn't reflect anything."  But those descriptions belie the facts:  emails show that McIntire spent many hours on the model over a 14-hour work day, and made numerous changes to it at the CFO's direction, before it was ultimately presented to the CEO.  Even with those changes, the model still showed that DSG failed the tests and was insolvent.  Nor was this a one-time use of this model; on the contrary, the model was originally created in April 2020, was further updated over the ensuing months, and in June 2020, while Empire was performing its own analysis, it still showed that DSG was insolvent.

192.     Purportedly in reliance on the Empire opinion, Sinclair's CFO delivered an officer's certificate on August 18, 2020 attesting to DSG's solvency.  Sinclair did not, as it had planned, redeem all of the remaining preferred units; instead, it caused DSG to pay in excess of $350 million to redeem a corresponding number of units, leaving approximately 175,000 units outstanding.

### D.     Chronology of Distributions

193.     The below chart sets forth the chronology of the distributions that Sinclair caused DSG to make to DSIH, which were subsequently transferred to DSIH-A, then DSH and

Byron Allen in proportion with their holdings, and then from DSH to JPMCFI for the benefit of SBG:

| Date | DSG Distribution Amount[3] |
|---|---|
| 9/30/2019 | $10,183,879.57 |
| 12/13/2019 | $306,582,971.43 |
| 12/31/2019 | $17,401,842.72 |
| 1/20/2020 | $198,538,098.16 |
| 6/30/2020 | $23,887,929.76 |
| 8/18/2020 | $353,862,279.02 |
| 9/29/2020 | $3,609,500.25 |
| 12/31/2020 | $3,609,500.25 |
| 3/31/2021 | $3,609,500.25 |
| Q2 2021 through Q4 2022 | ~$8,000,000.00 |
| **Total** | **~$929,285,501.41** |

194.     In publicly available consolidated financial statements for DSIH and its direct and indirect subsidiaries (including DSG), Sinclair described these distributions under the heading "Distributions to Parent," as follows:

> In December 2019 and January 2020, the Company [i.e., DSIH] distributed $300 million and $200 million, respectively, to Diamond Sports Holdings, LLC (DSH), an indirect parent of the Company, for the purposes of the redemption of a portion of DSH's preferred equity.

---

[3] The amounts set forth in this chart are based upon the written consents produced to Diamond by Sinclair.  Based on what appears to be an incomplete set of records produced by Sinclair to date, Diamond is currently unable to conclusively determine either the precise funds flow or the amounts of money that flowed out of DSG's bank account pursuant to these approvals.

> Additionally, during the period April 29, 2019 through December 31, 2019, the Company made additional distributions to DSH for the payment of dividends on its preferred equity totaling $33 million.

Subsequent financial statements included nearly identical descriptions of the later distributions Sinclair caused DSG to make to DSIH.

###### E.   DSG, Acting Under The Complete Control And Domination Of Sinclair, Acted with Fraudulent Intent in Causing DSG to Make Payments to DSIH

195.    As illustrated above, the evidence of the fraudulent motives of DSG, acting under the complete control and domination of Sinclair, in transferring over $900 million to its parent company less than a year after Sinclair acquired Diamond is overwhelming. *See* ¶¶ 161–94.

196.    The amounts that Sinclair caused DSG to distribute to DSIH were subsequently transferred to DSH and used to fund its redemption of the preferred units.  Neither DSG nor its creditors had any obligations with respect to the preferred units, which was an obligation only of DSH and SBG (as guarantor).  In fact, Ripley admitted at his deposition that Sinclair could have caused the money for the distributions to come from anywhere else within Sinclair, but Sinclair instead chose to have DSG make them.  By causing DSG to pay a distribution that ultimately funded DSH's debts and SBG's obligations, Sinclair exploited DSG for its own benefit, at the expense of DSG and its creditors' expense.  To quote a March 9, 2021 Moody's Credit Opinion on DSG, these payments to cover the preferred unit redemptions were "detrimental to [DSG's] debtholders."  Indeed, even when DSG's own debt was trading at a significant discount, Sinclair chose to use DSG's cash to pay down the preferred units at par instead of repurchasing DSG's debt at a discount.  The reason is obvious:  repurchasing DSG's debt would be best for Diamond, but using DSG's dwindling cash to relieve Sinclair of its guarantor obligations on the preferred units would be best for Sinclair and its strategy of "milk[ing]" Diamond until bankruptcy.

71

197.     Sinclair authorized these massive wealth transfers from DSG to DSIH when it knew or reasonably should have known that DSG was insolvent.  Sinclair's internal projections and private comments demonstrate that Sinclair knew DSG was facing significant financial headwinds, including the loss of $350 to $400 million in annual revenue from DISH Network's decision to drop the RSNs, the loss of additional revenue from Hulu and YouTube's expected and eventual abandonment of the RSNs, increasing subscriber churn caused by cord-cutting, the market value of DSG's debt, which was trading at a severe discount to par, a 50% forecasted decline in revenue between 2018 and 2023, and a decline in projected 2020 EBITDA of more than $850 million over the course of one year.

198.     Smith and Ripley testified that they relied on Rutishauser's reports certifying that DSG was financially solvent and able to issue millions of dollars of distributions to its parent, but that they did not pressure test her reports or know what specifically she did to get comfortable in delivering those reports.  Indeed, they both signed written consents on behalf of the Board of Managers of DSH and DSIH-A, and on behalf of the sole members of DSIH and DSG, authorizing those distributions on the basis that they "received and reviewed" Rutishauser's reports certifying to the solvency of DSG.

199.     But when confronted with the evidence of DSG's worsening financials and insolvency at the same time that Sinclair was forcing DSG to distribute nearly a billion dollars for Sinclair's benefit, Rutishauser claimed ignorance and an inability to remember anything of substance related to Diamond's financials or the basis for her conclusion that Diamond was solvent.  Rutishauser was "sure there would have been conversations around . . . changes in estimates" for DSG's 2020 EBITDA at any time between the acquisition and the end of February 2020 (when DSG's projected 2020 EBITDA had dropped by over half a billion dollars), but she

"just [could not] recall what those conversations [were]." She testified that she "assume[d] that we looked at the assets minus the liabilities" of DSG and also "would have looked at the liquidity of Diamond for the next 12 months out" before making any of the distributions, but she was unable to identify the models or forecasts that would have been used or state that anyone in fact ran such analyses. Rutishauser repeatedly acknowledged that she is "not a solvency expert" or a "valuation expert." And she acknowledged that the only internal liquidity and solvency model she was aware of was a forecast and recommendation from Sinclair's treasurer that DSG not issue *any* distributions until February 2020 at the earliest (a recommendation that was disregarded by Rutishauser and the rest of the DSH and DSIH-A Boards), and McIntire's solvency analysis, which showed DSG was insolvent.

200.    Nor could Rutishauser, or anyone else for that matter, explain how it was in DSG's interest to make distributions to fund obligations on debt that it did not have obligations to repay, especially considering how leveraged DSG was from its own debt. When pressed on this question, Rutishauser deferred to "the attorneys" as to whether DSG had any obligations to help Sinclair pay off the preferred units, and was unsure whether the preferred units sat in Diamond's capital table or the capital table of DSG's corporate parents. Rutishauser was unable to recall any time in which she considered whether another entity should fund the payments on the preferred units, despite serving as an officer of DSG and a member of the Boards of DSH and DSIH-A.

201.    Likewise, Smith testified that he did not even understand at the time of the distributions that DSG was the payor, or whether DSG had any legal obligations to pay off the preferred units, stating that he "viewed Diamond as one entity," despite acknowledging that there are "tens, hundreds or thousands of subsidiaries structured underneath there for financial reasons

or legal reasons or tax reasons" and "different credit stacks."  When asked to explain how it was beneficial for DSG to pay hundreds of millions of dollars to help Sinclair reduce its debt obligations, Smith acknowledged that "the structure of those types of things isn't something I spent any time focusing on; therefore, . . . the amount of money that might have been paid from Diamond up to JPMorgan or Diamond . . . to Sinclair into JPMorgan just didn't occur to me.  I didn't give it any thought."  Smith's willful ignorance does not shield him from his fiduciary duties to DSG.

202.    Finally, Sinclair's purported reliance on the wholly unreliable Empire solvency opinion in causing DSG to distribute hundreds of millions of dollars to DSIH for Sinclair's benefit and Sinclair's failure to disclose material information and analyses to Empire demonstrate its bad faith and its full awareness of DSG's insolvency.

## VIII.    November 2020: The Bally's Transaction--Diamond Gives Bally's Most or All of the Value; Sinclair Receives by Far More Consideration

203.    In the second half of 2020, after Diamond was insolvent and as its business continued to flounder, Sinclair negotiated and then entered into a transaction with Bally's that further benefitted Sinclair at Diamond's expense.  The transaction—a sports gaming partnership between Diamond, Sinclair, and Bally's—relied almost entirely on the value of Diamond's assets, but provided little compensation to Diamond while vastly enriching Sinclair.  The agreement was negotiated concurrently with Sinclair's impairment testing and signed just two weeks after Sinclair announced a $4.2 billion impairment of DSG's goodwill and intangible assets that left DSG with $2.5 billion in negative equity.

204.    Under the agreements with Bally's, Sinclair caused Diamond to surrender naming rights to all of the RSNs in exchange for $88 million payable on a backloaded schedule over 10 years—far below what other bidders expressed a willingness to pay—together with

purported marketing commitments from Bally's that Sinclair recognized had no real value to Diamond. Sinclair, on the other hand, while providing only nominal value in the transaction, received options and warrants that, according to Sinclair's advisors at Duff & Phelps, were worth $184–$199 million, and were probably worth substantially more. None of these options or warrants went to Diamond. In other words, Diamond provided by far the largest share of the value to the transaction but Sinclair received the most valuable consideration.

205.     The Bally's transaction was negotiated and approved entirely by Sinclair personnel. Much like with the MSA and distributions, no independent representative of Diamond or the RSNs was involved or was asked to review or approve the agreement. Rather, Ripley claimed that Sinclair negotiated the deal on behalf of Diamond pursuant to its affiliate sales and marketing responsibilities under the MSA. But the principal beneficiary of the transaction was Sinclair, not Diamond.

**A.     The Bidding Process Reveals Substantial Value in Diamond's Naming Rights**

206.     Beginning in the summer of 2019, Sinclair, with the assistance of Moelis & Company, explored a sale of the naming rights to the RSNs and other partnership opportunities with sports gaming companies. As the proposals it received made clear, the naming rights represented by far the most valuable asset Sinclair and DSG were able to offer. Yet Sinclair's objective was not to maximize Diamond's fees for its naming rights. It was to trade Diamond's naming rights for a large equity investment in a gaming company *for Sinclair*. While multiple bidders proposed to pay Diamond substantially more for its naming rights than Bally's ultimately paid, Sinclair rejected these proposals because they did not provide sufficient equity consideration to Sinclair itself. Indeed, Sinclair instructed Moelis to pursue bids that would maximize Sinclair's equity in a sports gaming partner and "maximize upside potential" for Sinclair. Ultimately, only Bally's was willing to make a deal on the terms Sinclair demanded.

207.     No fewer than eight parties submitted initial proposals to Moelis involving Diamond's naming rights, affiliate fees, and marketing commitments.  At least three sports gaming companies—PointsBet, FanDuel, and DraftKings—expressed interest in Diamond's naming rights for a range of $101 million to $190 million—far more than the $88 million over 10 years that Bally's ultimately agreed to pay.

208.     These proposals would have added substantial value to Diamond's balance sheet, at a time when Diamond was in dire need of liquidity.  Sinclair, however, ultimately rejected all these bids on the ground that they did not offer "a meaningful ownership stake" to Sinclair.  In emails with Ripley and Rob Weisbord, Sinclair's Chief Revenue Officer, Smith confirmed that his desire to "extract equity" for Sinclair was paramount in the search for a partner to acquire DSG's naming rights.  At his deposition, Smith admitted that the prospect of an equity stake for Sinclair motivated his decision to go with Bally's over other bidders.

209.     On November 18, 2020, Sinclair, Diamond (at Sinclair's direction), and Bally's entered into a series of agreements documenting the terms of the transaction.

210.     The principal terms of the Bally's transaction were these:

   a.     Diamond granted Bally's "Top Billing Naming Rights" to all of the Diamond RSNs and the digital platforms primarily relating to the Diamond RSNs for a 10-year term.  Pursuant to this grant, each of the Diamond RSNs was renamed "Bally's" (for example, "Bally Sports Southwest").

   b.     Diamond also committed to five "integrations" with Bally's for each of the RSNs in which Bally's had market access (i.e., the use of the Bally's

name integrated into the RSN's programming, such as naming the half-time or post-game programming after Bally's).

c.   Sinclair also granted Bally's two such integrations per state in which both Bally's and Sinclair operate, secondary naming rights to two small sports-focused Sinclair properties (the Stadium website and the Tennis Channel), and a guarantee to honor the Diamond integrations if Diamond filed for bankruptcy.

d.   Sinclair received a combination of stock and penny warrants equivalent to approximately 23% of Bally's equity on a fully diluted basis.  Duff & Phelps valued this equity at between $184 and $199 million (and other evidence points to a materially higher value).

e.   In return for the naming rights and integrations, Bally's agreed to pay Diamond annual fees of $2 million for the first year and an increasing amount for the remaining 10-year term, for a total of $88 million.

f.   Bally's also provided Diamond a purported "marketing commitment" to commit 20% of its marketing spend in sports betting and certain other categories to the Diamond RSNs, but only in states in which Bally's and DSG both operated.  Diamond was obligated to sell advertising to Bally's at the lowest rate used with any other sports gaming company.  The marketing commitment did not require Bally's to spend any amount on advertising in those categories; as Sinclair recognized, the amount that Bally's would spend was "dependent upon Bally's marketing budget and

is inherently variable." At the time of Duff & Phelps's valuation, there were only two states in which Bally's and DSG both operated.

211.     The terms of the agreement reveal that Sinclair and Bally's were acutely aware that Diamond was at risk of filing for bankruptcy. For example, the agreement provided that "in the event that Diamond fails to provide any Integration contemplated to be provided by it hereunder by reason of a rejection of this Agreement by Diamond . . . including in connection with the bankruptcy, insolvency or similar event of Diamond," then Sinclair would provide Bally's with the required integrations on its broadcast stations. Sinclair considered this backstop "a big give, not something we wanted to do," but something they "needed to do [] to get the deal done . . . given DSG's bad press."

212.     Likewise, Sinclair designed the allocation of consideration in the Bally's deal to ensure that it would receive its full consideration even if Diamond ended up in bankruptcy. As the transaction was structured, DSG would receive an initial cash payment from Bally's in exchange for its naming rights at the outset of the agreement, and, as Bochenek bluntly explained, "sbg has the right to the rest if diamond blows."

213.     Internally, Sinclair recognized that the value to Diamond of the Bally's marketing commitment was minimal. Sports leagues cap the number of minutes that can be allocated to sports betting advertisements, creating a limited inventory for Diamond to sell advertisements to sports betting companies. Moreover, the demand for such advertising by sports betting companies was high, and at the time of the transaction, Diamond had completely sold out its limited inventory in the few markets where sports betting was legalized. Thus, if Bally's purchased less advertising time, that time could readily be sold to another advertiser. As

Weisbord explained, "[w]hatever [Bally's] spend[s] would not be accretive to [Diamond's] business because another sports betting company would be pushed out."

214.     Nor does it appear that Bally's has actually purchased a meaningful amount of advertisements on the Diamond RSNs since the agreement was executed in November 2020. April 2021 emails confirm that Bally's had not spent anything on marketing with the Diamond RSNs, and Shapiro stated that they were not even planning on "launching markets" until later that year.  Shapiro also commented that once they did start spending with Diamond, he "expect[ed] their marketing spend to be tepid."

**B.     The Fairness Opinion Provided to Sinclair by Duff & Phelps Grossly Overstated the Value Provided by Sinclair, While Indefensibly Valuing the Diamond Naming Rights—the Principal Component of the Deal—at Zero**

215.     In February 2021—three months *after* the Bally's agreement was executed, Sinclair obtained an opinion from Duff & Phelps purporting to opine on the fairness of the transaction to Sinclair and Diamond (the same firm whose work on the prior MSA fairness opinion Shapiro claimed at his deposition he believed was unreliable).

216.     Duff & Phelps was able to opine that the transaction was fair only by (a) grossly overvaluing the consideration provided by Sinclair; (b) similarly overvaluing the consideration paid by Bally's to Diamond; and (c) assigning no value whatsoever to principal component of the transaction—the DSG naming rights.

217.     The values assigned by Duff & Phelps to each aspect of consideration given or received by DSG or Sinclair are summarized in the below table excerpted from the "Conclusion" slide to the Duff & Phelps opinion:

| | Concluded Fair Market Value | | | |
| | Diamond Sports | | Sinclair Broadcast | |
| Value Received | Low | High | Low | High |
| --- | --- | --- | --- | --- |
| Equity Consideration | $        - | $        - | $ 183,600 | $ 198,600 |
| Naming Rights Fees | 63,500 | 103,700 | - | - |
| Marketing Commitment | 85,100 | 137,300 | - | - |
| **Total Value Received** | **$148,600   -** | **$ 241,000** | **$ 183,600   -** | **$ 198,600** |
| **Value Given** | | | | |
| Naming Rights | $        - | $        - | n/a | n/a |
| Integrations | 11,800 | 19,500 | 28,700 | 47,400 |
| Corporate Backstop | n/a | n/a | - | - |
| **Total Value Given** | **$ 11,800   -** | **$ 19,500** | **$ 28,700   -** | **$ 47,400** |
| **Net Value** | **$136,800   -** | **$ 221,500** | **$ 136,200   -** | **$ 169,900** |

218.     The Duff & Phelps opinion dramatically overvalued the consideration provided by Sinclair.  While valuing the *five* integrations by Diamond per RSN market in which both Bally's and DSG both operate at between $11.8 and $19.5 million total, it valued the merely *two* integrations by Sinclair per state in which Sinclair and Bally's both operate at more than twice as much, or $28.7 to $47.4 million.  The opinion assumed that Diamond would provide marketing integrations to Bally's from six existing RSN markets where Bally's conducted sports gambling operations, plus two additional RSN markets where Bally's planned to expand its operations, for a total of 40 integrations provided by Diamond RSNs.  These valuations are specious given that Duff & Phelps's corporate representative was unable to explain how the integrations were valued, instead calling it a "bespoke analysis" because "the value of an integration . . . [isn't]

generally valued directly," but then admitting that "the underlying data on things like advertising spend and what an integration was and how we might think about it . . . came directly from Sinclair."

219.     At the same time, the opinion greatly overvalued the marketing commitment received by Diamond.  Duff & Phelps opined that the marketing commitment was worth between $85 and $137 million to Diamond.  Duff & Phelps based this opinion on representations from Sinclair "that there is surplus advertising inventory at the RSNs and Management considers the Bally's marketing spend to all be incremental profit."  This representation from Sinclair was false, and directly contrary to Sinclair's internal conclusions expressed by multiple senior executives at Sinclair that the marketing commitment was "not . . . accretive to [Diamond's] business" because any advertising purchased by Bally' would just "push[] out" a different sports gaming company and if "Bally's doesn't buy the inventory in a live market someone else will."

220.     Even more egregiously, Duff & Phelps assigned a value of *zero* to the naming rights provided by Diamond to rename all of the RSNs as Bally's Sports—the primary consideration Bally's got in the deal.  Duff & Phelps has offered no explanation or justification for assigning no value to Diamond's naming rights.  Nor could it do so, in view of the fact that a robust market existed for those rights, multiple sophisticated third parties proposed to buy them for between $101 and $190 million in cash, and Bally's itself agreed to pay $88 million for them. Sinclair viewed the naming rights as valuable and marketed them accordingly.  An email from Ripley to Amazon soliciting interest in acquiring Diamond's naming rights describes the rights as a "marketing opportunity that is unmatched in the history of media."

221.     Sinclair also appears to have concealed the existence of these potential competing bidders from Duff & Phelps.  Duff & Phelps asked Sinclair whether the $88 million

in cash consideration was a fair value for Diamond.  Sinclair falsely responded that it "maximized what we could get for these naming rights" and claimed that there was "[n]ot a lot of demand as Bally's first entered the deal."  Sinclair apparently failed to disclose that before Bally's entered the bidding, Sinclair had pivoted away from better cash offers from larger gaming companies because they would not give Sinclair the equity it wanted.

222.    Duff & Phelps' valuation of the equity consideration Sinclair received in the deal was also substantially understated.  Duff & Phelps valued the equity at between $184 million and $199 million.  Bally's, however, reported in its 2020 annual report that the equity was worth $239 million as of the closing date, far higher than Duff & Phelps' valuation.  Only days after the deal was signed, on November 22, 2020, Ripley boasted that the warrants Sinclair held were "now worth about 500mm."  Sinclair's internal forecasts from December 2020 valued its equity stake in Bally's at $438 million, and Sinclair publicly reported that the fair value of the equity soared after the closing on November 18, 2020, from $199 million to $332 million on December 31, 2020—a purported increase in value of 66% in less than two months.

223.    In summary, Duff & Phelps' conclusion that the consideration split between Sinclair and Diamond was fair was based on patently unreasonable and inaccurate assumptions and apparent misinformation provided by Sinclair.

## C.    DSG, Acting Under The Complete Control And Domination Of Sinclair, Acted with Fraudulent Intent in Structuring the Bally's Transaction

224.    Despite ostensibly negotiating the Bally's transaction on behalf of both Diamond and Sinclair, Sinclair orchestrated the Bally's transaction to disproportionately benefit itself at the expense of Diamond.

225.    Multiple parties bid significantly in excess of Bally's $88 million offer for the naming rights.  Sinclair rejected these offers because they were worse for Sinclair and did not

provide the "significant equity upside" in a gaming company that Sinclair wanted.  Indeed, although Diamond's naming rights were critical consideration being offered in the deal, Sinclair "made the strategic decision that its preferred partnership would include Sinclair owning a meaningful ownership stake in its partner."  This "strategic decision" by Sinclair was purely for Sinclair's benefit, as Sinclair never considered the possibility that Diamond would receive any of the equity.  Sinclair's decision to focus primarily if not exclusively on equity also precluded any deal with the highest cash bidders for Diamond's naming rights because "the larger operators were unwilling to grant" Sinclair its desired equity interest.

226.    Sinclair chose Bally's not because it provided the best deal to Diamond, but because it provided the most equity to Sinclair.  That is theft; Sinclair stole a Diamond asset and used it to obtain a benefit for itself and at Diamond's expense.

227.    Internally, Sinclair was not shy about its intention to use Diamond's naming rights as a tool to acquire value for Sinclair.  In July 2020, Shapiro noted that Sinclair has "spent approximately 9 months vetting various sports betting companies looking to strike a partnership that will yield marketing dollars and equity *for Sinclair* in exchange for exclusivity and naming rights."

228.    Sinclair also knew that the transaction was unfair to Diamond and its creditors and sought a fairness opinion to try to prove that "diamond bondholders not getting screwed" by Sinclair's retention of the Bally's equity.  In October 2020, Zenker expressed concern to Ripley and Rutishauser that "the DSG lenders will be all over us about how [the sports gaming partnership] fits into and how it benefits (or doesn't benefit) DSG."

229.    ███████████████████████████████████████

███████████████████████████████████████████████████████



230.

231.

232. 

233. ███████████████████████—and months before

receiving a fairness opinion about the transaction—Sinclair went through with the deal as

planned, and Smith, Ripley, and Rutishauser, the Sinclair-appointed members of the DSH and

DSIH-A Boards of Directors that controlled DSG, signed a unanimous consent certifying that the

transaction was fair to DSG.  The certification, dated November 18, 2020, baselessly stated that

> the Transactions [i.e., the Bally's transaction], on their terms, taken as a whole,
> are commercially reasonable and of fair market value from the relative
> perspectives of both Sinclair and Diamond, and are substantially as favorable to
> Diamond and its subsidiaries as those that would have been obtained in a
> comparable transaction by Diamond or any of its subsidiaries with an unrelated
> person on an arm's-length basis.

As Sinclair and the Individual Defendants well knew, there was no basis for these conclusions.

234. Internal Duff & Phelps emails further reflect Sinclair's knowledge of the unfair

split Sinclair had structured.  Based upon information it obtained from Sinclair, Duff & Phelps

personnel described the transaction and its assignment as follows:

> [E]quity consideration all goes [to] Sinclair's TV stations (or the corporate entity
> and not Diamond Sports).  Diamond [S]ports is highly leveraged and might
> possibly have a bankruptcy issue down the road, so there is a sensitivity of
> allocation.  This is why we need to get a sense of the equity consideration to make
> sure the allocation works properly.

## IX.    Sinclair Misappropriates Diamond's Employees and Resources for Its Own Gain

235. Sinclair also misappropriated Diamond's employees and assets for Sinclair's

benefit and without Diamond's knowledge, let alone consent.  Although Diamond is still

investigating Sinclair's historical misappropriation of Diamond assets, it is clear that Sinclair's

mismanagement has cost Diamond more than $4.4 million a year (separate and apart from the other instances of misappropriation described above, *see* ¶¶ 148–52).

236.     Since Sinclair's acquisition of Diamond, Sinclair has repeatedly engaged Diamond employees to perform work for Sinclair, but has placed these employees on Diamond's payroll and arranged for Diamond to pay for their benefits.  By doing so, Sinclair breached the MSA, which required Sinclair to provide HR and payroll services to DSG in a "commercially reasonable" manner.  Sinclair was able to accomplish this because Sinclair was entrusted and compensated by Diamond to handle human resources, payroll, and IT services for Diamond as part of the MSA.

237.     In particular, Sinclair hired at least 46 employees in Sinclair's Technology Partners department within their COBRA group, but arranged for their salary and benefits to be paid by DSN, not Sinclair.  Indeed, each of these employee's offer letters state that they have been offered a job "with Diamond Sports Net, LLC d/b/a Sinclair," evidencing Sinclair's blatant scheme to hire individuals to work for Sinclair but to be paid by Diamond.

238.     When Diamond's current, independent management discovered this arrangement, Diamond reached out to these *Diamond* employees and asked them to explain their job responsibilities.  The *Diamond* employees refused to speak with Diamond, stating that Sinclair instructed them to refer the matter to Sinclair's attorneys.

239.     When Diamond reached out to Sinclair's attorneys, Sinclair candidly confessed that most of these employees—all of whom are on DSN's payroll—were providing little to no services to Diamond but were instead providing all or the bulk of their services to Sinclair. Sinclair admitted that 12 of these 46 employees dedicate 100% of their time to Sinclair work, and 23 of these 46 employees dedicate 90% of their time to Sinclair, and only 10% to DSG.  In

other words, Sinclair arranged for 35 employees in one particular department to be employed by and paid by DSN while dedicating 90% to 100% of their time to Sinclair.  That is textbook misappropriation.  Even worse, when asked about this, Ripley was not surprised that there would be Diamond employees paid exclusively by Diamond working for the benefit of Sinclair.

240.     Diamond currently estimates that Sinclair's misappropriation of Diamond's employees has cost Diamond at least $4.4 million per year.

241.     As another example of Sinclair's misuse of Diamond resources, in June 2022, Sinclair executed a "Reimbursement Agreement" with a Diamond employee, in which SBG— not Diamond—agreed to, among other things, advance the employee's membership fees to an exclusive golf club in Southampton, New York.  The fees were $1,031,937.50 and were to be advanced to the employee by Sinclair in three installments.  The agreement was signed by the employee and Ripley on behalf of SBG.  No Diamond entity was a party to the contract. Nonetheless, Sinclair directed that one of the three installments—$343,980—be advanced by Diamond.  This corrupt arrangement was only discovered after DSG became managed independently from Sinclair.

242.     Further evidencing the one-sided nature of the MSA, Diamond is barred from "persuad[ing] or attempt[ing] to persuade any employee of or exclusive consultant to Sinclair . . . to leave the employ of or engagement by Sinclair . . . or to become employed as an employee or retained as a consultant by [Diamond]," while Sinclair is not similarly restricted from poaching Diamond's employees.  Indeed, the Diamond employee who Gallagher testified was "critical to Sinclair" has since been poached by Sinclair.  Sinclair has done the same with respect to other former Diamond employees who are now Sinclair employees, and without so much as notice to Diamond.

## X.      Subsequent Events

### A.      New Financing and the Appointment of an Independent Board

243.      In April 2021, as Diamond's financial condition continued to deteriorate, Sinclair re-shuffled DSG's corporate governance by creating a DSG-level three-member Board of Managers.  The new DSG Board of Managers consisted of Steve Rosenberg, a Sinclair insider, and two independent directors not affiliated with Sinclair, David Dunn and Jason Pappas. Despite this reorganization, Sinclair—through its full equity ownership of TopCo, DSH, DSIH-A, DSIH, and DSG—maintained control over DSG's affairs, and Sinclair officers and managers continued to serve dual-roles as Diamond officers and managers.  In addition, all of the new DSG directors served at the pleasure of Sinclair.

244.      Throughout 2021, Diamond engaged in discussions with its creditors for a significant capital infusion.  Those discussions ultimately resulted in $635 million of new money financing in March 2022.  At the lenders' insistence, Diamond's payment obligations to Sinclair for management and incentive fees under the MSA were amended beginning in March 2022. Under this new arrangement, Sinclair would continue to charge Diamond the same amount of fees required by the MSA, but the amount of cash that Diamond had to pay to Sinclair each month was capped, with the remaining monthly balance deferred as a liability to Sinclair. Despite this concession, Diamond was still obligated to pay an average of over $4 million each month in base and incentive fees, plus a similar amount of additional fees deferred and recorded as a liability in Sinclair's favor each month.  This arrangement modestly helped Diamond manage its cash, but did not eliminate the excessive management and incentive fees it was obligated to pay Sinclair under the one-sided MSA.

245.      In May 2022, in connection with the March 2022 financing transaction, Diamond's governance structure was overhauled.  DSG's three-member Board of Managers was

replaced with a five-member Board consisting of a majority of independent directors appointed by a group of creditors, as opposed to Sinclair, and removable only at the will of the creditor group, as opposed to Sinclair.

246.     On October 20, 2022, Diamond entered into a tolling agreement with SBG, TopCo, DSH, DSIH A, and DSIH, which included "each of the foregoing entities' direct and indirect subsidiaries and Boards of Directors or Managers."  The tolling agreement recognized that DSG and its subsidiaries may have claims against each of the Sinclair entities and their directors and officers, and agreed to toll "any applicable law, statute of limitations, statue of repose, lookback period, or any other legal bar to bringing claims after a certain amount of time fixes a period for commencing an action or proceeding" until the later of the end of such limitations period or June 13, 2023.  The tolling agreement explicitly covers any claims DSG or its subsidiaries could assert against Sinclair in its own right or under any cause of action belonging to or actionable by DSG's bankruptcy estate, including pursuant to 11 U.S.C. § 544 and § 548.  On May 26, 2023, the parties agreed to extend the tolling agreement's effect through December 13, 2023.

###     B.     Diamond Files for Bankruptcy

247.     On March 14 and March 15, 2023, Diamond and certain affiliates filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code.

## CAUSES OF ACTION

## COUNT I

**Avoidance of the Distributions from DSG to DSIH as an Actual Fraudulent Transfer
Against DSIH under 11 U.S.C. §§ 548 and 544(b), Maryland Uniform Fraudulent
Conveyance Act, and/or Delaware Uniform Fraudulent Transfer Act**

248.     Plaintiffs incorporate by reference the factual allegations in each of the
preceding paragraphs of this Complaint.

249.     Under 11 U.S.C. § 548(a)(1)(A), Diamond, as a debtor and debtor in possession,
may avoid the transfer of an interest of the debtor in property if the debtor made such transfer
with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on
or after the date that such transfer was made or such obligation was incurred, indebted.

250.     Under 11 U.S.C. § 544(b), Diamond, as a debtor and debtor in possession, may
avoid the transfer of an interest of the debtor in property which is avoidable under applicable law
by an unsecured creditor of the debtor, including under the Maryland Uniform Fraudulent
Conveyance Act, Md. Code Com. Law, § 15-207, *et seq*., the Delaware Uniform Fraudulent
Transfer Act, 6 *Del. C.* § 1301, *et seq.*, and other applicable law.

251.     DSIH was DSG's sole member and also the direct recipient of DSG's
distributions.

252.     DSIH and DSG are both subsidiaries of Sinclair and were, at the time of the
distributions, under the complete control and domination of Sinclair.  The officers and managers
of DSIH are the same as the officers and managers of DSG, and both groups were composed of
all Sinclair executives.  These officers—namely, Smith, Ripley, Rutishauser, and Shapiro—
caused DSG to issue distributions to DSIH and were well aware of Diamond's insolvency when
DSG issued the distributions.

253.     Sinclair caused DSG to issue approximately $929 million in distributions (the "Distributions") to its sole member, DSIH, which was in turn distributed to its sole member, DSIH-A, which was in turn distributed to its parent, DSH, and was ultimately used to redeem the preferred units and relieve SBG and DSH of their obligations under the preferred units and the Sinclair Guaranty. DSG had no obligations to fund any payments under the preferred units or to redeem the preferred units. DSG did not receive any material consideration for making the Distributions. Instead, Sinclair, who gave up nothing as part of the transactions, utilized Diamond to fulfill debt obligations Sinclair and DSH had assumed.

254.     The distributions were issued with the actual intent to hinder, delay, or defraud creditors. This intent to hinder, delay, or defraud creditors is evidenced by the facts set forth in detail in this Complaint, including but not limited to the following badges and direct indications of fraud:

a.      DSG received less than reasonably equivalent value (and in fact, received zero consideration) in exchange for the Distributions.

b.      When the Distributions were made, DSG was (or was caused by the Distributions to be) (i) insolvent; (ii) engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

c.      Sinclair and the other defendants were aware at the time the Distributions were made that DSG was (or was caused thereby to be) insolvent, as evidenced by the internal analyses and communications discussed in detail

91

herein, including but not limited to internal analyses concluding that DSG was insolvent and financial statements demonstrating that the fair value of DSG's assets was billions of dollars less than the amount of its debt.

d.      The Distributions were made to an insider of DSG.

e.      SBG—through its full domination and control of TopCo, DSH, DSIH-A, DSIH, and DSG—maintained control over DSG's affairs and SBG's officers and managers served dual-roles as DSG's officers and managers.

f.      SBG authorized the Distributions when it knew or reasonably should have known that DSG was insolvent.

g.      Neither DSG nor its creditors had any obligations with respect to the preferred units, which was a liability only of DSH and SBG (as guarantor).

h.      The Distributions directly benefited DSH and SBG at the expense of DSG and its creditors.

i.      Defendants concealed material information from Empire in connection with obtaining a solvency opinion purporting to support certain of the Distributions, and purporting to rely on Empire's opinion that it know rested on materially unreliable assumptions.

j.      Defendant Smith expressly acknowledged Sinclair's intent to "milk[]" Diamond before causing it to file for bankruptcy.

255.    As of the Petition Date, there were one or more unsecured creditors of DSG that could avoid the transaction under 11 U.S.C. §§ 548, 544(b), or other applicable law, including

the Maryland Uniform Fraudulent Conveyance Act and the Delaware Uniform Fraudulent Transfer Act.

256.     The transactions are avoidable by DSG as an actual fraudulent transfer pursuant to 11 U.S.C. § 548, 544(b), or other applicable law, including the Maryland Uniform Fraudulent Conveyance Act and the Delaware Uniform Fraudulent Transfer Act.

## COUNT II

**Avoidance of the Distributions from DSG to DSIH as Constructively Fraudulent Transfers Against DSIH under 11 U.S.C. §§ 548 and 544(b), Maryland Uniform Fraudulent Conveyance Act, and/or Delaware Uniform Fraudulent Transfer Act**

257.     Plaintiffs incorporate by reference the factual allegations in in each of the preceding paragraphs of this Complaint.

258.     Under 11 U.S.C. § 548(a)(1)(B), Diamond, as a debtor and debtor in possession, may avoid the transfer of an interest of the debtor in property if the debtor received less than reasonably equivalent value in exchange for such transfer and was insolvent on the date that such transfer was made, or became insolvent as a result of such transfer or obligation.

259.     Under 11 U.S.C. § 544(b), Diamond, as a debtor and debtor in possession, may avoid the transfer of an interest of the debtor in property which is avoidable under applicable law by an unsecured creditor of the debtor, including under the Maryland Uniform Fraudulent Conveyance Act, Md. Code Com. Law, § 15-204, *et seq*., Delaware Uniform Fraudulent Transfer Act, 6 *Del. C.* § 1301, *et seq.*, and other applicable law.

260.     DSIH was DSG's sole member and also the direct recipient of DSG's distributions.

261.     Sinclair caused DSG to issue approximately $929 million in distributions to its sole member, DSIH, which was in turn distributed to its sole member, DSIH-A, which was in turn distributed to its parent, DSH, and was ultimately used to redeem the preferred units and

relieve SBG and DSH of their obligations under the preferred units and the Sinclair Guaranty. DSG had no obligation to redeem the preferred units. DSG provided the primary consideration for the transaction but did not receive any value in return. Instead, Sinclair, who gave up nothing as part of the transactions, utilized Diamond to fulfill debt obligations Sinclair and DSH assumed.

262.    The Distributions were made at a time when Diamond was insolvent or they rendered it insolvent.

263.    DSG did not receive reasonably equivalent value or fair consideration in exchange for the Distributions.

264.    As of the Petition Date, there were one or more unsecured creditors of DSG that could avoid the transaction under 11 U.S.C. §§ 548, 544(b), or other applicable law, including the Maryland Uniform Fraudulent Conveyance Act and the Delaware Uniform Fraudulent Transfer Act.

265.    The transactions are avoidable by Diamond as a constructive fraudulent transfer pursuant to 11 U.S.C. §§ 548, 544(b), or other applicable law, including the Maryland Uniform Fraudulent Conveyance Act and the Delaware Uniform Fraudulent Transfer Act.

## COUNT III

**Recovery of Avoided Fraudulent Transfers of the Distributions from DSG to DSH Against DSIH, DSIH-A, DSH, and SBG under 11 U.S.C. §§ 550**

266.    Plaintiffs incorporate by reference the factual allegations in in each of the preceding paragraphs of this Complaint.

267.    Under 11 U.S.C. § 550, DSG, as a debtor and debtor in possession, may recover property transferred or the value of such property that has been avoided as a constructive or fraudulent transfer pursuant to 11 U.S.C. §§ 548, 544(b), or other applicable law, including the

Maryland Uniform Fraudulent Conveyance Act, Md. Code Com. Law, § 15-204, *et seq*., and the

Delaware Uniform Fraudulent Transfer Act, 6 *Del. C.* § 1301, *et seq*.

268.    Sinclair caused DSG to issue approximately $929 million in distributions to its

sole member, DSIH, which was in turn distributed to its sole member, DSIH-A, which was in

turn distributed to its parent, DSH, and was ultimately used to redeem the preferred units and

relieve SBG and DSH of their obligations under the preferred units and the Sinclair Guaranty.

DSG had no obligation to redeem the preferred units.  DSG provided the primary consideration

for the transaction but did not receive any value in return.  Instead, Sinclair, who gave up nothing

as part of the transactions, utilized Diamond to fulfill debt obligations Sinclair and DSH

assumed.

269.    Under 11 U.S.C. § 550, DSG is entitled to recover the property transferred in

the Distributions or the value of such property from "(1) the initial transferee of such transfer or

the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee

of such initial transferee."

270.    As such, DSG is entitled to recover the $929 million in distributions from

DSIH, DSIH-A, and DSH as the initial, immediate, or mediate transferees, and from DSH and

SBG as the beneficiaries of the transfer.

## <u>COUNT IV</u>

### Avoidance and Recovery of the Distributions from DSG to DSH as Unlawful LLC Distributions against DSIH under 6 *Del. C.* § 18-607

271.    Plaintiffs incorporate by reference the factual allegations in each of the

preceding paragraphs of this Complaint.

272.    Under 6 *Del. C.* § 18-607, DSG, as a Delaware LLC, shall not make a

distribution if, at the time of the distribution, its liabilities exceeded the fair value of its assets.  A

member who receives a distribution and knew that DSG was insolvent shall be liable to DSG for the amount of the distribution.

273.     DSIH was DSG's sole member and also the direct recipient of the Distributions.

274.     DSIH and DSG are both subsidiaries of Sinclair and were, at the time of the Distributions, under the complete control and domination of Sinclair.  The officers and managers of DSIH are the same as the officers and managers of DSG, and were composed of all Sinclair executives.  These officers—namely, Smith, Ripley, Rutishauser, and Shapiro—caused DSG to issue distributions to DSIH and were well aware of DSG's insolvency when DSG issued the distributions.

275.     Sinclair caused DSG to issue approximately $929 million in distributions to its sole member, DSIH, which was in turn distributed to its sole member, DSIH-A, which was in turn distributed to its parent, DSH, and was ultimately used to redeem the preferred units and relieve SBG and DSH of their obligations under the preferred units and the Sinclair Guaranty. DSG had no obligation to redeem the preferred units.  DSG provided the primary consideration for the transaction but did not receive any value in return.  Instead, Sinclair, who gave up nothing as part of the transactions, utilized DSG to fulfill debt obligations Sinclair and DSH assumed.

276.     DSIH is liable to DSG for the amount of the distributions pursuant to 6 *Del. C.* § 18-607.

## COUNT V

**Avoidance of MSA Payments as Actual Fraudulent Transfers against STG and SBG under 11 U.S.C. §§ 548 and 544(b), Maryland Uniform Fraudulent Conveyance Act and/or Delaware Uniform Fraudulent Transfer Act**

277.     Plaintiffs incorporate by reference the factual allegations in each of the preceding paragraphs of this Complaint.

278.     Under 11 U.S.C. § 548(a)(1)(A), Diamond, as a debtor and debtor in possession, may avoid the transfer of an interest of the debtor in property or any obligation incurred by the debtor if the debtor made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

279.     Under 11 U.S.C. § 544(b), Diamond, as a debtor and debtor in possession, may avoid the transfer of an interest of the debtor in property or any obligation incurred by the debtor which is avoidable under applicable law by an unsecured creditor of the debtor, including under the Maryland Uniform Fraudulent Conveyance Act, Md. Code Com. Law, § 15-201, *et seq.*, the Delaware Uniform Fraudulent Transfer Act, 6 *Del. C.* § 1301, *et seq.*, and other applicable law.

280.     Since the MSA was executed, Diamond has transferred payments or accrued liabilities totaling at least $420 million to Sinclair as MSA management and incentive fees, and paid Sinclair $117 million in additional fees that Sinclair claimed were not covered by the MSA management fees (together, the "MSA Payments").

281.     DSG, under Sinclair's control and domination, made the MSA Payments with actual intent to hinder, delay, or defraud creditors. This intent to hinder, delay, or defraud creditors is evidenced by the facts set forth in detail in this Complaint, including but not limited to the following badges and direct indications of fraud:

a.   The MSA was drafted unilaterally by Sinclair and no independent representative of DSG was involved in setting the terms or executing the agreement.

b.   DSG received less than reasonably equivalent value and fair value in exchange for payments made under the MSA, as evidenced by, among other things, the fact that the MSA fees far exceeded both Sinclair's cost to provide the services and comparable fees under similar arrangements.

c.   At the time that the payments were made, or immediately thereafter, DSG (i) was insolvent; (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

a.   Sinclair and the other defendants were aware at the time that some or all of the MSA payments were made that DSG was (or was caused thereby to be) insolvent, as evidenced by the internal analyses and communications discussed in detail herein, including but not limited to internal analyses concluding that DSG was insolvent and financial statements demonstrating that the fair value of DSG's assets was billions of dollars less than the amount of its debt.

d.   The MSA payments were made to an insider of DSG.

e.   Defendants concealed material information from Duff & Phelps in connection with its opinion that the MSA was fair to Sinclair, including

but not limited to the expected cost to Sinclair of providing services under the MSA.

f.    The MSA payments benefitted Sinclair at the expense of DSG's creditors.

g.    Sinclair's Executive Chairman admitted that Sinclair intended to "milk[]" DSG of management fees before putting it into bankruptcy.

282.    As of the Petition Date, there were one or more unsecured creditors of Diamond that could avoid the MSA Payments under 11 U.S.C. §§ 548, 544(b), the Maryland Uniform Fraudulent Conveyance Act, Delaware Uniform Fraudulent Transfer Act, or other applicable law.

283.    The transaction is avoidable by Diamond as an actual fraudulent transfer pursuant to 11 U.S.C. §§ 548, 544(b), or other applicable law, including the Maryland Uniform Fraudulent Conveyance Act and the Delaware Uniform Fraudulent Transfer Act.

## <u>COUNT VI</u>

**Avoidance of MSA Payments as Constructively Fraudulent Transfers against STG and SBG under 11 U.S.C. §§ 548 and 544(b), the Maryland Uniform Fraudulent Conveyance Act, and/or the Delaware Uniform Fraudulent Transfer Act**

284.    Plaintiffs incorporate by reference the factual allegations in each of the preceding paragraphs of this Complaint.

285.    Under 11 U.S.C. § 548(a)(1)(B), Diamond, as a debtor and debtor in possession, may avoid the transfer of an interest of the debtor in property or any obligation incurred by the debtor if the debtor received less than reasonably equivalent value in exchange for such transfer or obligation and was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.

286.    Under 11 U.S.C. § 544(b), Diamond, as a debtor and debtor in possession, may avoid the transfer of an interest of the debtor in property or any obligation incurred by the debtor

which is avoidable under applicable law by an unsecured creditor of the debtor, including under the Maryland Uniform Fraudulent Conveyance Act, Md. Code Com. Law, § 15-201, *et seq*., the Delaware Uniform Fraudulent Transfer Act, 6 *Del. C.* § 1301, *et seq.*, and other applicable law.

287.    Since the MSA was executed, Diamond has transferred payments or accrued liabilities totaling at least $411 million to Sinclair as MSA management and incentive fees, and paid Sinclair $117 million for additional expenses that Sinclair claimed were not covered by the MSA management fees (together, the "MSA Payments").

288.    Diamond did not receive reasonably equivalent value or fair consideration from Sinclair in exchange for the MSA Payments.

289.    The MSA Payments made on or after December 1, 2019, and perhaps earlier, were transfers made at a time when Diamond was insolvent or they rendered Diamond insolvent.

290.    As of the Petition Date, there were one or more unsecured creditors of Diamond that could avoid the transaction under 11 U.S.C. §§ 548, 544(b), the Maryland Uniform Fraudulent Conveyance Act, the Delaware Uniform Fraudulent Transfer Act, or other applicable law.

291.    The transaction is avoidable by Diamond as a constructive fraudulent transfer pursuant to 11 U.S.C. §§ 548, 544(b), or other applicable law, including the Maryland Uniform Fraudulent Conveyance Act and the Delaware Uniform Fraudulent Transfer Act.

## COUNT VII

**Recovery of Avoided Fraudulent Transfer of MSA Payments against STG and SBG under 11 U.S.C. §§ 550**

292.    Plaintiffs incorporate by reference the factual allegations in each of the preceding paragraphs of this Complaint.

293.    Under 11 U.S.C. § 550, DSG, as a debtor and debtor in possession, may recover property transferred or the value of such property that has been avoided as a constructive or fraudulent transfer pursuant to 11 U.S.C. §§ 548, 544(b), or other applicable law, including the Maryland Uniform Fraudulent Conveyance Act, Md. Code Com. Law, § 15-204, *et seq*. and the Delaware Uniform Fraudulent Transfer Act, 6 *Del. C.* § 1301, *et seq.*

294.    Since the MSA was executed, Diamond Sports Group has transferred payments or accrued liabilities totaling at least $420 million to Sinclair as MSA management and incentive fees, and paid Sinclair $117 million in additional fees that Sinclair claimed were not covered by the MSA management fees (together, the "MSA Payments").

295.    Under 11 U.S.C. § 550, Diamond is entitled to recover the property transferred in the MSA Payments or the value of such property from "(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee."

296.    As such, Diamond is entitled to recover the MSA Payments from STG as the initial transferee and from SBG as the beneficiary of the transfer.

## COUNT VIII

### Breach of MSA against STG

297.     Plaintiffs incorporate by reference the factual allegations in each of the preceding paragraphs of this Complaint.

298.     Under the MSA, STG was prohibited from "unreasonably and disproportionately allocat[ing] to [Diamond] costs for assets or services procured from third parties for [Diamond] and Other Sinclair Services."

299.     STG breached this contractual obligation by unreasonably and disproportionately allocating expenses to Diamond, including expenses for services provided by third parties to other Sinclair entities, and unexplained and unjustified expenses provided by other Sinclair entities, including Tennis Channel, Stadium, and Sinclair Sports Group.

300.     Under the MSA, STG was contractually obligated to provide to DSG certain enumerated services, as well as "supplementary services" on written terms mutually agreed upon by STG and DSG.

301.     STG breached its obligations to provide certain services or mutually agreed supplementary services, as set forth in the MSA, when it billed Diamond for additional sums on top of the base fees for all manner of services, including services already rendered and purported supplementary services.

302.     The invoices related to the purported supplementary services provided by STG establish that these types of services are precisely the types of services that the MSA's base fee is intended to cover.

303.      Moreover, to the extent any of these supplementary services were not covered by the management fee, DSG and STG never reached any written agreement pertaining to the purported supplementary services and the terms and conditions of STG's provision of such

102

services—including the additional fees to be charged by STG—in advance of STG providing these services.

304.    Under the MSA, STG was contractually obligated to provide to DSG certain enumerated services in a "commercially reasonable" manner, including payroll and human resources.

305.    STG breached its obligations to provide payroll and human resource services in a commercially reasonable manner by using Diamond employees for the benefit of Sinclair while maintaining those employees on Diamond's payroll.

306.    As a result of STG's breaches of the MSA, Diamond has incurred damages in an amount to be determined, but which it currently estimates to be not less than $117 million.

307.    As a direct and proximate result of STG's breaches, Diamond paid excessive, unwarranted, and unsubstantiated management and supplementary fees and STG is liable to Diamond to compensate for these and other losses as a result of their breaches of the MSA.

## <u>COUNT IX</u>

**Avoidance of the Bally's Transaction as an Actual Fraudulent Transfer against SBG under 11 U.S.C. §§ 548 and 544(b), the Maryland Uniform Fraudulent Conveyance Act, and/or the Delaware Uniform Fraudulent Transfer Act**

308.    Plaintiffs incorporate by reference the factual allegations in each of the preceding paragraphs of this Complaint.

309.    Under 11 U.S.C. § 548(a)(1)(A), Diamond, as a debtor and debtor in possession, may avoid the transfer of an interest of the debtor in property if the transfer was made with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

310.    Under 11 U.S.C. § 544(b), Diamond, as a debtor and debtor in possession, may avoid the transfer of an interest of the debtor in property which is avoidable under applicable law

by an unsecured creditor of the debtor, including under the Maryland Uniform Fraudulent Conveyance Act. Md. Code Com. Law, § 15-201, *et seq*., the Delaware Uniform Fraudulent Transfer Act, 6 *Del. C.* § 1301, *et seq.*, and other applicable law.

311.     DSG, under Sinclair's control and domination, transferred its naming rights to Bally's, or transferred its naming rights to Sinclair which then transferred them to Bally's.  In doing so, Diamond provided the primary consideration for the transaction but did not receive commensurate value in return.  Instead, SBG, which gave up virtually nothing of value as part of the deal, received warrants and options from Bally's that Duff & Phelps valued at between $184 and $199 million and which Bally's valued at $239 million as of the date of the transaction's close.  Diamond, on the other hand, only received naming rights fees totaling $88 million payable on a backloaded schedule over the course of the 10-year agreement.

312.     The Bally's transaction was entered into with the intent to hinder, delay, or defraud creditors.  This intent to hinder, delay, or defraud creditors is evidenced by the facts set forth in detail in this Complaint, including but not limited to the following badges and direct indications of fraud:

a.     DSG received less than reasonably equivalent value in exchange for the assets it provided to Bally's, as evidenced by, among other things, the willingness of other interested parties to pay more for the DSG naming rights in cash than Bally's paid to DSG and the consideration that Bally's provided to Sinclair in the same transaction although the consideration provided by Sinclair to Bally's was of little if any value.

b.     At the time of the Bally's transaction, or immediately thereafter, DSG (i) was insolvent; (ii) was engaged in a business or transaction for which its

remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

c.     Sinclair and the other defendants were aware at the time of the Bally's transaction that DSG was (or was caused thereby to be) insolvent, as evidenced by the internal analyses and communications discussed in detail herein, including but not limited to internal analyses concluding that DSG was insolvent, and financial statements prepared by Sinclair personnel demonstrating that the fair value of DSG's assets was billions of dollars less than the amount of its debt.

d.     Sinclair, an insider of DSG, which purported to negotiate the transaction on Diamond's behalf, received highly valuable consideration from Bally's in the transaction although it provided little if anything in return.

e.     Sinclair, while purporting to negotiate the transaction on Diamond's behalf, determined to enter into the transaction with Bally's rather than a transaction with another counterparty that would have been more valuable to Diamond for the admitted purpose of maximizing the consideration that Sinclair would receive.

f.     The transaction was negotiated without the participation of any independent representative of Diamond.

g.     Defendants concealed material information from Duff & Phelps in connection with obtaining a purported fairness opinion for the transaction

Case 23-03134   Document 27   Filed in TXSB on 08/16/23   Page 110 of 128


months after it closed, including but not limited to the fact that multiple

potential counterparties had expressed interest in DSG's naming rights for

materially more in cash than Bally's paid.

313.    As of the Petition Date, there were one or more unsecured creditors of Diamond

that could avoid the transaction under 11 U.S.C. §§ 548, 544(b), or other applicable law,

including the Maryland Uniform Fraudulent Conveyance Act and the Delaware Uniform

Fraudulent Transfer Act.

314.    The transaction is avoidable by Diamond as an actual fraudulent transfer

pursuant to 11 U.S.C. §§ 548, 544(b), or other applicable law, including the Maryland Uniform

Fraudulent Conveyance Act or the Delaware Uniform Fraudulent Transfer Act.

### COUNT X

**Avoidance of the Bally's Transaction as a Constructively Fraudulent Transfer against SBG under 11 U.S.C. §§ 548 and 544(b), the Maryland Uniform Fraudulent Conveyance Act, and/or the Delaware Uniform Fraudulent Transfer Act**

315.    Plaintiffs incorporate by reference the factual allegations in each of the

preceding paragraphs of this Complaint.

316.    Under 11 U.S.C. § 548(a)(1)(B), Diamond, as a debtor and debtor in possession,

may avoid the transfer of an interest of the debtor in property if the debtor received less than

reasonably equivalent value in exchange for such transfer or obligation and was insolvent on the

date that such transfer was made or such obligation was incurred, or became insolvent as a result

of such transfer or obligation.

317.    Under 11 U.S.C. § 544(b), Diamond, as a debtor and debtor in possession, may

avoid the transfer of an interest of a debtor in property which is avoidable under applicable law

by an unsecured creditor of the debtor, including under the Maryland Uniform Fraudulent

Conveyance Act, Md. Code Com. Law, § 15-201, *et seq*., the Delaware Uniform Fraudulent Transfer Act, 6 *Del. C.* § 1301, *et seq.*, and other applicable law.

318.     When SBG caused Diamond to transfer its naming rights to Bally's, Diamond provided the primary consideration to Bally's for the transaction but did not receive commensurate value in return.  Instead, SBG, which gave up virtually nothing of value as part of the deal, received warrants and options from Bally's that Duff & Phelps valued at between $184 and $199 million and which Bally's valued at $239 million as of the date of the transaction's close, and $247.1 million as of the present day.  Diamond, on the other hand, only received naming rights fees totaling $88 million over the course of the 10-year agreement.

319.     Diamond did not receive reasonably equivalent value or fair consideration in exchange for transferring its naming rights in the Bally's transaction.

320.     The transaction was entered into at a time when Diamond was insolvent or it rendered Diamond insolvent.

321.     As of the Petition Date, there were one or more unsecured creditors of Diamond that could avoid the transaction under 11 U.S.C. §§ 548, 544(b), or other applicable law, including the Maryland Uniform Fraudulent Conveyance Act and the Delaware Uniform Fraudulent Transfer Act.

322.     The transaction is avoidable by Diamond as a constructive fraudulent transfer pursuant to 11 U.S.C. §§ 548, 544(b), and other applicable law, including the Maryland Uniform Fraudulent Conveyance Act and the Delaware Uniform Fraudulent Transfer Act.

## COUNT XI

**Recovery of Avoided Fraudulent Transfer of Value of Naming Rights against SBG and Bally's under 11 U.S.C. § 550**

323.     Plaintiffs incorporate by reference the factual allegations in in each of the preceding paragraphs of this Complaint.

324.     Under 11 U.S.C. § 550, Diamond, as a debtor and debtor in possession, may recover property transferred or the value of such property that has been avoided as a constructive or fraudulent transfer pursuant to 11 U.S.C. §§ 548, 544(b), or other applicable law, including the Maryland Uniform Fraudulent Conveyance Act, Md. Code Com. Law, § 15-204, *et seq*., and the Delaware Uniform Fraudulent Transfer Act, 6 *Del. C.* § 1301, *et seq.*

325.     When SBG caused Diamond to transfer its naming rights to Bally's, Diamond provided the primary consideration to Bally's for the transaction but did not receive commensurate value in return.  Instead, SBG, which gave up virtually nothing of value as part of the deal, received warrants and options from Bally's that Duff & Phelps valued at between $184 and $199 million and which Bally's valued at $239 million as of the date of the transaction's close, and $247.1 million as of the present day.  Diamond, on the other hand, only received naming rights fees totaling $88 million over the course of the 10-year agreement.

326.     Under 11 U.S.C. § 550, Diamond is entitled to recover the property transferred in the Bally's transaction or the value of such property from "(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee."

327.     As such, Diamond is entitled to recover the fair value of its naming rights from Bally's as the initial transferee and from SBG as the beneficiary of the transfer.

<u>**COUNT XII**</u>

**Breach of MSA against STG Related to Bally's Transaction**

328.　　Plaintiffs incorporate by reference the factual allegations in each of the preceding paragraphs of this Complaint.

329.　　Under Section 6(b)(i) of the MSA, STG was contractually obligated to use "commercially reasonable efforts" to perform the contracted services and to "reasonably use the same degree of care Sinclair and its Affiliates use in rendering comparable services for their respective operations."  Further, STG was obligated to use "reasonable efforts" to provide "affiliate sales and marketing services" for DSG.

330.　　To the extent that STG negotiated the Bally's transaction on behalf of DSG pursuant to the MSA, STG failed to use "commercially reasonable efforts" and also failed to "reasonably use the same degree of care" it uses when providing "comparable services."

331.　　STG and SBG used DSG's naming rights to enrich themselves by obtaining significant valuable equity from Bally's.  As part of the Bally's Transaction, Sinclair only provided a few integrations for its own niche sports channel and website, whereas DSG provided its valuable naming rights and five integrations per RSN market in which Bally's also operates. In contrast, Sinclair only provided up to two integrations per state in which both Bally and Sinclair operates.  As Sinclair understood, the crux of the Bally's Transaction was the sale of DSG's naming rights.

332.　　Although DSG provided its naming rights and the bulk of the valuable consideration in the transaction to Bally's, the consideration DSG received in return was dwarfed by the value Sinclair reserved for itself.  DSG is only set to receive $88 million in cash over 10 years and non-accretive revenue from a hollow marketing commitment from Bally's, whereas Sinclair received penny warrants, options, and performance warrants valued to be, at minimum,

between $184 million and $199 million at the time of execution, and as much as $247.1 million today.  Sinclair provided significantly less in consideration to Bally's compared to DSG, but still allocated to itself the majority of the consideration provided by Bally's.

333.    STG and SBG fully controlled DSG, and purportedly represented DSG's interests in the negotiations with Bally's.  STG and SBG took advantage of their control of authority as DSG's agent to sell DSG's naming rights for STG and SBG's own benefit, and to the detriment of DSG.  The lack of justification for STG and SBG's actions in retaining the bulk of the consideration earned from the sale of DSG's naming rights is further compounded by the fact that DSG was insolvent at the time of the Bally's Transaction.

334.    As a result of this drastically one-sided allocation of the consideration provided by Bally's, STG breached its obligation under the MSA to "reasonably use the same degree of care" that it would otherwise use in rendering services for its own operations and deprived DSG of the consideration it was rightfully due in exchange for DSG's naming rights.

335.    As a result of STG's breach of the MSA, DSG has been damaged in an amount to be determined.

## <u>COUNT XIII</u>

### Unjust Enrichment against STG and SBG Related to Bally's Transaction (in the Alternative to Count XII)

336.    Plaintiffs incorporate by reference the factual allegations in each of the preceding paragraphs of this Complaint.

337.    In the alternative to Count XII, if STG did not negotiate the Bally's Transaction pursuant to the MSA, then STG and SBG's conduct related to the Bally's deal was not covered by an express contract and DSG may recover for STG and SBG's unjust enrichment.

338.     STG and SBG used DSG's naming rights to enrich themselves by obtaining significant valuable equity from Bally's.  As part of the Bally's Transaction, Sinclair only provided a few integrations for its own niche sports channel and website, whereas DSG provided its valuable naming rights and five integrations per RSN market in which Bally's also operates. In contrast, Sinclair only provided two integrations per state in which both Bally and Sinclair operates.  As Sinclair understood, the crux of the Bally's Transaction was the sale of DSG's naming rights.

339.     Although DSG provided its naming rights and the bulk of the valuable consideration in the transaction to Bally's, the consideration DSG received in return was dwarfed by the value Sinclair reserved for itself.  DSG is only set to receive $88 million in cash over 10 years and non-accretive revenue from a hollow marketing commitment from Bally's, whereas Sinclair received penny warrants, options, and performance warrants valued to be, at minimum, between $184 million and $199 million at the time of execution, and as much as $247.1 million today.  Sinclair provided significantly less in consideration to Bally's compared to DSG, but still allocated to itself the majority of the consideration provided by Bally's.

340.     By securing for themselves significantly more consideration from Bally's than DSG received, despite providing significantly less value to Bally's under the agreement compared to DSG's valuable naming rights, STG and SBG were unjustly enriched.  Indeed, Bally's would not have provided equity absent the sale of DSG's naming rights.

341.     STG and SBG fully controlled DSG, and purportedly represented DSG's interests in the negotiations with Bally's.  STG and SBG took advantage of their control of DSG and their authority as DSG's agent to sell DSG's naming rights for STG and SBG's own benefit, to the detriment of DSG.  The lack of justification for STG and SBG's actions in retaining the

bulk of the consideration earned from the sale of DSG's naming rights is further compounded by the fact that DSG was insolvent at the time of the Bally's Transaction.

342.     DSG is entitled to the inflation-adjusted dollar value of the equity that STG and SBG unjustly received at DSG's expense.

## COUNT XIV

### Breach of the Implied Covenant of Good Faith and Fair Dealing Against DSIH Related to Misappropriation of Diamond Employees and Assets

343.     Plaintiffs incorporate by reference the factual allegations in each of the preceding paragraphs of this Complaint.

344.     DSG and DSIH are parties to DSG's LLC Agreement dated July 18, 2019 (as subsequently amended), which constitutes a valid and enforceable contract.

345.     Between August 2019 and April 2021, DSG was member-managed by its immediate parent and sole member, DSIH.  At all times before April 2021, the applicable LLC Agreement provided that "[t]he conduct and control of the business and affairs of the [DSG] is vested in the Member, who shall have the powers necessary and incidental to such conduct and control."

346.     DSIH  allowed STG and SBG to misappropriate DSG's employees and assets for STG and SBG's benefit without DSG's consent and without justification, and with no benefit to DSG, in violation of the implied covenant of good faith and fair dealing.

347.     DSIH allowed STG and SBG to intentionally arrange for certain employees to be employed by and compensated by DSN while spending 90% to 100% of their time working for STG and SBG instead of Diamond.  STG and SBG also used Diamond's assets to fulfill their own obligations under agreements with at least one employee to fund unnecessary

extravagancies, such as golf club membership fees totaling hundreds of thousands of dollars, with no benefit to DSG.

348.     DSIH's actions in allowing Sinclair to misappropriate DSG's employees and assets were not in good faith, and have caused DSG significant damages in an amount to be determined.

## COUNT XV

### Unjust Enrichment against STG and SBG Related to Misappropriation of Diamond Employees and Assets (In the Alternative to Count XIV)

349.     Plaintiffs incorporate by reference the factual allegations in each of the preceding paragraphs of this Complaint.

350.     STG and SBG misappropriated Diamond's employees and assets for STG and SBG's benefit without justification.  STG and SBG intentionally arranged for certain employees to be employed by and compensated by DSN while spending 90% to 100% of their time working for STG and SBG instead of Diamond.  STG and SBG also used Diamond's assets to fulfill its own obligations under agreements with at least one employee to fund unnecessary extravagancies, such as golf club membership fees totaling hundreds of thousands of dollars.

351.     STG and SBG fully controlled DSG, and purportedly represented DSG's interests in the negotiations with Bally's.  STG and SBG took advantage of their control of DSG and their authority as DSG's agent to cause DSG employees who were compensated by DSG to provide services exclusively or almost exclusively for STG and SBG's benefit, to the detriment of DSG.  The lack of justification for STG and SBG's actions in causing DSG to expend resources for STG and SBG's benefit is further compounded by the fact that DSG was insolvent at the time of these decisions.

352.    By securing for themselves benefits paid for with Diamond assets, STG and SBG unjustly enriched themselves to Diamond's detriment.

353.    Diamond is entitled to reimbursement of the value of the resources that SBG misappropriated from Diamond.

## COUNT XVI

**Breach of Fiduciary Duty Against Smith, Ripley, Rutishauser, and Shapiro Under Delaware Law**

354.    Plaintiffs incorporate by reference the factual allegations in each of the preceding paragraphs of this Complaint.

355.    Under Delaware law, managers and officers of an LLC owe fiduciary duties of loyalty and care to the LLC.  From August 2019 until May 2022, DSG's LLC Agreement did not modify or eliminate those duties.   It was not until May 2022 that DSG's LLC Agreement was amended to purportedly waive such fiduciary duties.

356.    When a wholly owned subsidiary LLC is insolvent, the managers and officers of that subsidiary breach their fiduciary duties to the entity by making decisions that favor the LLC's unitholders and diminish the value of the entity and the residual value of which the LLC's creditors are the primary constituency.

357.    From August 2019 through April 2021, David Smith, Chris Ripley, and Lucy Rutishauser were members of the DSH and DSIH-A Boards of Managers, which controlled DSG and DSIH, the sole member of DSG.  All three were appointed by Sinclair.

358.    From August 2019 through December 2022, Chris Ripley was the President of DSG and Lucy Rutishauser was the CFO and Treasurer of DSG.  From April 2021 through December 2022, David Smith was a de facto manager of DSG, as set forth in ¶¶ 46–51.  From

August 2019 through December 2022, Scott Shapiro was either an officer or de facto manager of DSG.

359.     Smith, Ripley, Rutishauser, and Shapiro breached their fiduciary duties by, among other things, structuring the MSA to permit SBG and its subsidiaries to milk DSG for hundreds of millions of dollars a year in grossly inflated and unreasonable MSA Payments; causing DSG to issue close to a billion dollars' worth of Distributions to DSIH, which funds were used by DSH to redeem the preferred units for Sinclair and DSH's benefit; and authorizing the sale of DSG's valuable naming rights in the Bally's transaction—even though there were other proposals available that would have provided an objectively greater benefit to DSG—while allowing SBG to retain by far the largest share of consideration provided by Bally's.  All of these actions caused DSG to lose more than a $1.5 billion of value.

## COUNT XVII

### Breach of Fiduciary Duty against SBG Under Delaware Law

360.     Plaintiffs incorporate by reference the factual allegations in each of the preceding paragraphs of this Complaint.

361.     When a wholly owned subsidiary LLC is insolvent, the ultimate controller of that subsidiary breaches its fiduciary duties to the entity by making decisions that favor the LLC's unitholders and diminish the value of the entity and the residual value of which the LLC's creditors are the primary constituency.

362.     From August 2019 through the Petition Date, SBG was the ultimate controller of DSG, through its 100% equity ownership interest of TopCo, which has a 100% equity ownership interest in DSH, which has a 99.99653% equity ownership interest in DSIH-A, which has a 100% equity ownership interest in DSIH, which has a 100% equity ownership interest in DSG.

363.     SBG exerted its ultimate control over DSG by appointing members to the Boards of Managers of the entities supervising DSG's affairs, and installing its executives as officers of DSG who managed DSG's every function.

364.     In August 2019, SBG exercised its ultimate control over DSG by causing the appointment of David Smith, Chris Ripley, and Lucy Rutishauser—all officers of SBG—as members of the DSH and DSIH-A Boards of Managers, which in turn controlled DSG and DSIH, the sole member of DSG.  These three SBG executives remained on the Boards of Managers of DSH and DSIH-A through April 2021.

365.     In August 2019, SBG exercised its ultimate control over DSG by causing the installment of Chris Ripley as the President of DSG and Lucy Rutishauser as the CFO and Treasurer of DSG, which positions they held until December 2022.  SBG also exercised its ultimate control over DSG by permitting David Smith to serve as a de facto manager of DSG from August 2019 through December 2022.  SBG also exercised its ultimate control over DSG by permitting Scott Shapiro to serve as either an officer or de facto manager of DSG from August 2019 through December 2022.

366.     SBG breached its fiduciary duties to DSG by, among other things, causing its Board and officer designees who managed DSG to structure the MSA to permit SBG and its subsidiaries to milk DSG for hundreds of millions of dollars a year in grossly inflated and unreasonable MSA Payments; cause DSG to issue close to a billion dollars' worth of Distributions to DSIH, which funds were used by DSH to redeem the preferred units for SBG and DSH's benefit; and authorize the sale of DSG's valuable naming rights in the Bally's transaction—even though there were other proposals available that would have provided an objectively greater benefit to DSG—while allowing SBG to retain by far the largest share of

consideration provided by Bally's.  All of these actions caused DSG to lose more than $1.5 billion of value.

## COUNT XVIII

**Aiding and Abetting Breach of Fiduciary Duty Against Ripley, Rutishauser, Smith, Shapiro, and SBG Under Delaware Law**
**(In the Alternative to Count XVI and Count XVII)**

367.    Plaintiffs incorporate by reference the factual allegations in each of the preceding paragraphs of this Complaint.

368.    Under Delaware law, managers and officers of an LLC owe fiduciary duties of loyalty and care to the LL C.  From August 2019 to May 2022,  DSG's LLC Agreement did not modify or eliminate those duties.   It was not until DSG's LLC Agreement was amended in May 2022 that fiduciary duties were eliminated.

369.    As set forth above, Ripley, Smith, Rutishauser, Shapiro, and SBG owed fiduciary duties of loyalty and care to the LLC as the ultimate controller of the LLC, members of the DSH and DSIH-A Boards of Managers, officers of DSG, and/or de facto managers of DSG.

370.    As alleged herein, Ripley, Smith, Rutishauser, Shapiro, and SBG, acting both individually and collectively, breached their respective duties of loyalty and care to the LLC.

371.    Ripley, Smith, Rutishauser, Shapiro, and SBG knew that the others of Ripley, Smith, Rutishauser, Shapiro, and SBG owed fiduciary duties as alleged herein.

372.    To the extent that any of Ripley, Smith, Rutishauser, Shapiro, and SBG are deemed not to owe fiduciary duties of loyalty and care to the LLC, they each knowingly participated in, and aided and abetted, the breaches of fiduciary duties by the others of Ripley, Smith, Rutishauser, Shapiro, and SBG, and was an active and knowing participant in those breaches of fiduciary duties by, among other things, structuring the MSA to permit SBG and its subsidiaries to milk DSG for hundreds of millions of dollars a year in grossly inflated and

117

unreasonable MSA Payments; causing DSG to issue close to a billion dollars' worth of Distributions to DSIH, which funds were used by DSH to redeem the preferred units for Sinclair and DSH's benefit; and authorizing the sale of DSG's valuable naming rights in the Bally's transaction—even though there were other proposals available that would have provided a substantially greater benefit to DSG—while allowing SBG to retain by far the largest share of consideration provided by Bally's.  All of these actions caused DSG to lose over $1.5 billion of value.

## COUNT XIX

### Alter Ego and Piercing the Corporate Veil against DSIH, DSIH-A, DSH, and TopCo

373.     Plaintiffs incorporate by reference the factual allegations in each of the preceding paragraphs of this Complaint.

374.     Delaware law permits piercing a company's corporate veil when the individuals or entities in control of the company commit improper acts through the company, such that it is necessary to treat the company as the alter egos of the individuals or entities in control of the company and hold those controlling individuals and entities personally liable for the improper acts committed through the company in order to avoid fundamental unfairness.

375.     DSIH, DSIH-A, DSH, and TopCo are the alter egos of SBG.

376.     SBG controlled the business and affairs of DSIH, DSIH-A, DSH, and TopCo. Testimony from Smith, Ripley, and Rutishauser, the three Sinclair executives appointed by Sinclair to sit on the Boards of Managers of DSIH-A and DSH, and who controlled the sole member of DSG, DSIH, clearly shows that Sinclair treated all of the Diamond-related subsidiaries of SBG as "one and the same" as SBG.

377.     Sinclair and its executives and managers who were designated to use SBG's full equity interest in the Diamond entities to manage the business and affairs of the Diamond entities

118

for Sinclair's benefit did not abide by traditional corporate formalities or respect the separate legal form of the Diamond entities from SBG. Diamond entity board meetings were held as part of SBG's regular board meetings, through "informal discussions," or not at all, with no minutes or notes for most—if not all—of the few meetings that did occur.

378.    The explicit testimony from, and behavior of, Sinclair executives appointed to serve as managers and officers of the Diamond entities confirm that SBG operated the Diamond entities as a single economic entity with SBG, despite the distinct credit stacks and debt obligations amongst the various Diamond entities.

379.    SBG carried out improper acts through DSIH, DSIH-A, DSH, and TopCo, all to the detriment of DSG, including by structuring the MSA to permit SBG and its subsidiaries to milk DSG for hundreds of millions of dollars a year in grossly inflated and unreasonable MSA Payments; causing DSG to issue close to a billion dollars' worth of Distributions to DSIH, which funds were used by DSH to redeem the preferred units for SBG and DSH's benefit; and authorizing the sale of DSG's valuable naming rights in the Bally's transaction—even though there were other proposals available that would have provided an objectively greater benefit to DSG—while allowing SBG to retain by far the largest share of consideration provided by Bally's. All of these actions caused DSG to lose more than $1.5 billion of value for the direct benefit of SBG.

380.    Upon information and belief, TopCo, DSH, DSIH-A, and DSIH do not have any assets separate from their membership and equity interests in other Diamond entities, including DSG.

381.    DSG and DSN have been unjustly and inequitably harmed by SBG's improper and wrongful use of the TopCo, DSH, DSIH-A, and DSIH entities. It would be manifestly

unjust to allow SBG to shield its liability and assets as the ultimate controller of DSG and these other Diamond entities by limiting DSG's recovery for the claims discussed above to the non-existent assets of TopCo, DSH, DSIH-A, and DSIH.

382.    To prevent this injustice, and to ensure that SBG, as the ultimate controller and bad actor responsible for the claims described above, is appropriately liable for its improper acts committed against DSG through TopCo, DSH, DSIH-A, and DSIH, SBG should be held personally liable for any and all damages awarded to DSG and DSN pursuant to the above causes of action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment and grant the following relief to the extent consistent with the any plan of reorganization the Court may approve:

1.    Avoidance of the Distributions as actual and/or constructive fraudulent transfers;

2.    recovery of the property fraudulently transferred, or compensatory damages in an amount to be determined at trial of the value thereof, from the direct and indirect transferees, including DSIH, DSIH-A, DSH, SBG, STG, and Bally's;

3.    a judgment against STG and SBG avoiding the MSA Payments as actual and/or constructive fraudulent transfers;

4.    a judgment against SBG and Bally's avoiding the Bally's transaction as actual and/or constructive transfers;

5.    a judgment against DSIH finding and declaring that the Distributions were unlawful LLC distributions and awarding damages and other appropriate relief;

6.    compensatory damages in an amount to be determined at trial from Smith, Ripley, Rutishauser, Shapiro, and SBG for the full amount of the unlawful distributions approved under their tenure as officers of the ultimate controller of DSG;

7.     compensatory damages in an amount to be determined at trial from STG for breach of the MSA;

8.     compensatory damages in an amount to be determined at trial from STG and SBG for their unjust enrichment of Diamond's naming rights;

9.     compensatory damages in an amount to be determined at trial from SBG for their unjust enrichment and misappropriation of DSG employees and assets;

10.     compensatory damages and disgorgement of ill-gotten gains in an amount to be determined at trial from Smith, Ripley, Rutishauser, Shapiro, and SBG for their breaches of their fiduciary duties and/or aided and abetted the same with respect to the Distributions, the MSA Payments, and the Bally's Transaction;

11.     a judgment finding that DSIH, DSIH-A, DSH, and TopCo are alter egos of SBG, such that claims against DSIH, DSIH-A, DSH, and TopCo may pierce the corporate veil and be asserted against SBG, and that any recovery from such claims may be obtained from SBG;

12.     prejudgment and postjudgment interest;

13.     reasonable attorneys' fees, costs, and expenses incurred in this action; and

14.     any other and further relief as the Court deems just, proper, or equitable under the circumstances.

Dated: July 19, 2023

/s/ *John F. Higgins*

**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
Eric D. Wade (TX Bar No. 00794802)
Heather K. Hatfield (TX Bar No. 24050730)
M. Shane Johnson (TX Bar No. 24083263)
Megan Young-John (TX Bar No. 24088700)
Bryan L. Rochelle (TX Bar No. 24107979)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6248
jhiggins@porterhedges.com
ewade@portergedges.com
hhatfield@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com
brochelle@porterhedges.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Brian S. Hermann (Admitted *Pro Hac Vice*)
Andrew M. Parlen (Admitted *Pro Hac Vice*)
Gregory F. Laufer (Admitted *Pro Hac Vice*)
William A. Clareman (Admitted *Pro Hac Vice*)
Randy Luskey (Admitted *Pro Hac Vice*)
Jonathan Hurwitz (*Pro Hac Vice* Pending)
Yotam Barkai (Admitted *Pro Hac Vice*)
Alison R. Benedon (Admitted *Pro Hac Vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
bhermann@paulweiss.com
aparlen@paulweiss.com
glaufer@paulweiss.com
wclareman@paulweiss.com
rluskey@paulweiss.com
jhurwitz@paulweiss.com
ybarkai@paulweiss.com
abenedon@paulweiss.com

*Attorneys for Plaintiffs*

# Exhibit A

| Month[1] | Billed[2] | | | Deferred[3] | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|
| | Base Fees | Incentive Fees | Total | Base Fees | Incentive Fees | Total | Base Fees | Incentive Fees | Total |
| Oct 2019 | $ 12,978,494.63 | $ - | $ 12,978,494.63 | $ - | $ - | $ - | $ 12,978,494.63 | $ - | $ 12,978,494.63 |
| Dec 2019 | 11,333,334.00 | - | 11,333,334.00 | - | - | - | 11,333,334.00 | - | 11,333,334.00 |
| Jan 2020 | 5,666,667.00 | - | 5,666,667.00 | - | - | - | 5,666,667.00 | - | 5,666,667.00 |
| Feb 2020 | 5,666,667.00 | - | 5,666,667.00 | - | - | - | 5,666,667.00 | - | 5,666,667.00 |
| Mar 2020 | 5,666,667.00 | - | 5,666,667.00 | - | - | - | 5,666,667.00 | - | 5,666,667.00 |
| Apr 2020 | 5,666,667.00 | - | 5,666,667.00 | - | - | - | 5,666,667.00 | - | 5,666,667.00 |
| May 2020 | 5,666,667.00 | - | 5,666,667.00 | - | - | - | 5,666,667.00 | - | 5,666,667.00 |
| Jun 2020 | 5,666,667.00 | - | 5,666,667.00 | - | - | - | 5,666,667.00 | - | 5,666,667.00 |
| Jul 2020 | 5,666,667.00 | - | 5,666,667.00 | - | - | - | 5,666,667.00 | - | 5,666,667.00 |
| Aug 2020 | 5,893,333.00 | - | 5,893,333.00 | - | - | - | 5,893,333.00 | - | 5,893,333.00 |
| Sep 2020 | 5,893,333.34 | 6,459,127.12 | 12,352,460.46 | - | - | - | 5,893,333.34 | 6,459,127.12 | 12,352,460.46 |
| Oct 2020 | 5,893,333.34 | - | 5,893,333.34 | - | - | - | 5,893,333.34 | - | 5,893,333.34 |
| Nov 2020 | 5,893,333.34 | 4,306,084.72 | 10,199,418.06 | - | - | - | 5,893,333.34 | 4,306,084.72 | 10,199,418.06 |
| Dec 2020 | 5,893,333.34 | 2,153,042.36 | 8,046,375.70 | - | - | - | 5,893,333.34 | 2,153,042.36 | 8,046,375.70 |
| Jan 2021 | 5,893,333.34 | - | 5,893,333.34 | - | - | - | 5,893,333.34 | - | 5,893,333.34 |
| Feb 2021 | 5,893,333.34 | 4,306,084.72 | 10,199,418.06 | - | - | - | 5,893,333.34 | 4,306,084.72 | 10,199,418.06 |
| Mar 2021 | 5,893,333.34 | 3,179,380.03 | 9,072,713.37 | - | - | - | 5,893,333.34 | 3,179,380.03 | 9,072,713.37 |
| Apr 2021 | 5,893,333.34 | 3,179,380.03 | 9,072,713.37 | - | - | - | 5,893,333.34 | 3,179,380.03 | 9,072,713.37 |
| May 2021 | 5,893,333.34 | 2,179,408.03 | 8,072,741.37 | - | - | - | 5,893,333.34 | 2,179,408.03 | 8,072,741.37 |
| Jun 2021 | 5,893,333.34 | 2,846,055.89 | 8,739,389.23 | - | - | - | 5,893,333.34 | 2,846,055.89 | 8,739,389.23 |
| Jul 2021 | 5,893,333.34 | - | 5,893,333.34 | - | - | - | 5,893,333.34 | - | 5,893,333.34 |
| Aug 2021 | 6,129,066.67 | 2,846,055.89 | 8,975,122.56 | - | - | - | 6,129,066.67 | 2,846,055.89 | 8,975,122.56 |
| Sep 2021 | 5,800,910.17 | 5,692,111.78 | 11,493,021.95 | - | - | - | 5,800,910.17 | 5,692,111.78 | 11,493,021.95 |
| Nov 2021 | 12,258,133.34 | 8,538,167.67 | 20,796,301.01 | - | - | - | 12,258,133.34 | 8,538,167.67 | 20,796,301.01 |
| Mar 2022 | 20,387,200.01 | 19,515,341.30 | 39,902,541.31 | 4,129,066.67 | 2,854,967.47 | 6,984,034.14 | 24,516,266.68 | 22,370,308.77 | 46,886,575.45 |
| Apr 2022 | 2,000,000.00 | 2,424,396.28 | 4,424,396.28 | 4,129,066.67 | 2,854,967.47 | 6,984,034.14 | 6,129,066.67 | 5,279,363.75 | 11,408,430.42 |
| May 2022 | 2,000,000.00 | 2,335,791.71 | 4,335,791.71 | 4,129,066.67 | 2,854,967.47 | 6,984,034.14 | 6,129,066.67 | 5,190,759.18 | 11,319,825.85 |
| Jun 2022 | 2,000,000.00 | 2,335,791.71 | 4,335,791.71 | 4,129,066.67 | 2,854,967.47 | 6,984,034.14 | 6,129,066.67 | 5,190,759.18 | 11,319,825.85 |
| Jul 2022 | 2,000,000.00 | (1,598,595.38) | 401,404.62 | 4,129,066.67 | 2,854,967.47 | 6,984,034.14 | 6,129,066.67 | 1,256,372.09 | 7,385,438.88 |
| Aug 2022 | 2,000,000.00 | 1,534,810.62 | 3,534,810.62 | 4,200,242.92 | 2,880,362.59 | 7,080,605.52 | 6,200,242.92 | 4,415,173.21 | 10,615,416.14 |
| Sep 2022 | 2,000,000.00 | 1,525,453.18 | 3,525,453.18 | 4,374,229.33 | 2,832,984.49 | 7,207,213.82 | 6,374,229.33 | 4,358,437.67 | 10,732,667.00 |
| Oct 2022 | 2,000,000.00 | 1,613,700.28 | 3,613,700.28 | 4,374,229.33 | 2,996,871.95 | 7,371,101.29 | 6,374,229.33 | 4,610,572.23 | 10,984,801.57 |
| Nov 2022 | 2,000,000.00 | 1,675,509.92 | 3,675,509.92 | 4,374,229.33 | 3,111,815.52 | 7,486,044.85 | 6,374,229.33 | 4,787,325.43 | 11,161,635.82 |
| Dec 2022 | 2,000,000.00 | 1,675,509.92 | 3,675,509.92 | 4,374,229.33 | 3,111,815.52 | 7,486,044.85 | 6,374,229.33 | 4,787,325.43 | 11,161,635.82 |
| **Total** | $ 197,273,807.6 | $ 96,197,890.7 | $ 293,471,698.3 | $ 42,342,493.6 | $ 29,059,139.0 | $ 71,401,632.6 | $ 239,616,300.12 | $ 125,257,029.7 | $ 364,873,589.9 |

| Month | Billed[2] | | | Deferred[3] | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|
| | Base Fees | Incentive Fees | Total | Base Fees | Incentive Fees | Total | Base Fees | Incentive Fees | Total |
| Jan 2023 | $ 3,333,333.34 | $ 3,160,319.99 | $ 6,493,653.33 | $ 9,415,125.33 | $ 3,077,654.73 | $ 12,492,780.06 | $ 12,748,458.67 | $ 6,237,974.72 | $ 18,986,433.39 |
| Feb 2023 | 5,162,211.79 | 6,400,024.02 | 11,562,235.81 | 4,707,562.67 | 7,001,170.00 | 11,708,732.67 | 9,869,774.46 | 13,401,194.02 | 23,270,968.48 |
| Mar 2023 | - | 2,820,305.40 | 2,820,305.40 | 4,707,562.67 | 3,697,314.20 | 8,404,876.87 | 4,707,562.67 | 6,517,619.60 | 11,225,182.27 |
| Apr 2023 | 1,666,666.67 | - | 1,666,666.67 | - | - | - | 1,666,666.67 | - | 1,666,666.67 |
| **Total** | $ 10,162,211.80 | $ 12,380,649.41 | $ 22,542,861.21 | $ 18,830,250.67 | $ 13,776,138.93 | $ 32,606,389.60 | $ 28,992,462.47 | $ 26,156,788.34 | $ 55,149,250.81 |
| **Grand Total** | $ 207,436,019.36 | $ 108,578,540.13 | $ 316,014,559.49 | $ 61,172,744.27 | $ 42,835,277.91 | $ 104,008,022.18 | $ 268,608,763.63 | $ 151,413,818.04 | $ 420,022,581.67 |

[1] Amounts billed through 2022 are shown in the month in which the fees were paid, based on payment information provided by Sinclair.

[2] Amounts billed during 2023 are shown in the month in which the fees were invoiced, based on invoices provided by Sinclair.

[3] Amounts deferred during 2023 are based on invoices provided by Sinclair.