**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re:<br><br>DIAMOND SPORTS GROUP, LLC, *et al.*,[1]<br>Debtors. | ) | Chapter 11<br><br>Case No. 23-90116 |
| DIAMOND SPORTS GROUP, LLC and DIAMOND SPORTS NET, LLC,<br>Plaintiffs,<br><br>v.<br><br>SINCLAIR BROADCAST GROUP, INC., SINCLAIR TELEVISION GROUP, INC., DIAMOND SPORTS TOPCO LLC, DIAMOND SPORTS INTERMEDIATE HOLDINGS LLC, DIAMOND SPORTS INTERMEDIATE HOLDINGS A LLC, DIAMOND SPORTS HOLDINGS LLC, DAVID SMITH, CHRISTOPHER RIPLEY, LUCY RUTISHAUSER, SCOTT SHAPIRO, and BALLY'S CORPORATION,<br>Defendants. | ) | (Jointly Administered)<br><br><br><br><br>Adv. Pro. No. 23-03134 |

## SINCLAIR DEFENDANTS' MOTION TO DISMISS COMPLAINT

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

[1] A complete list of each of the debtors in these chapter 11 cases (collectively, the "Debtors" or "Diamond") may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/DSG. The Debtors' service address for purposes of these chapter 11 cases is: c/o Diamond Sports Group, LLC, 3003 Exposition Blvd., Santa Monica, CA 90404.

# TABLE OF CONTENTS

**Page**

**I. ALL BUT ONE OF THE DEBTORS' CLAIMS RELATED TO TRANSFERS TO JPMCFI (COUNTS I THROUGH IV) ARE BARRED BY 11 U.S.C. § 546(e). .......... 18**

A. The Relevant Transfer Is From DSG Through DSH To JPMCFI. .......... 20

B. The Transfers Attacked By Debtors Are Qualifying Transactions Under Section 546(e) As Both Settlement Payments And In Connection With A Securities Contract. .......... 25

1. The Transfers Are In Connection With A Securities Contract. .......... 25

2. The Transfers Of The $849.5 Million Used To Redeem The Preferred Equity Units Are Settlement Payments. .......... 27

C. Both DSH and JPMCFI Are "Financial Participants" In The Transaction. .......... 28

D. Except for 11 U.S.C. § 548(A)(1), Section 546(e) Bars All Other Claims Based On the JPMCFI Transfers. .......... 30

**II. PAYMENTS REQUIRED UNDER THE MSA ARE NOT CONSTRUCTIVE FRAUDULENT TRANSFERS (COUNTS VI AND VII). .......... 33**

**III. THE COMPLAINT FAILS TO PLAUSIBLY PLEAD THE DEBTORS' ACTUAL INTENT TO DEFRAUD CREDITORS AS REQUIRED TO PREVAIL ON AN ACTUAL FRAUD CLAIM (COUNTS I, III, V, VII, IX, XI). .......... 40**

**IV. THE DEBTORS' CLAIM FOR IMPROPER DISTRIBUTION FAILS BECAUSE DIAMOND HAS NOT ALLEGED ACTUAL KNOWLEDGE THAT THE DISTRIBUTIONS WOULD CAUSE DSG'S INSOLVENCY. .......... 51**

**V. SECTION 548'S TWO-YEAR LOOK BACK BARS MANY OF DIAMOND'S CLAIMS (COUNTS I, II, III, V, VI, VII) UNDER THAT STATUTE. .......... 54**

**VI. COUNT VIII FAILS TO STATE A CLAIM AGAINST STG FOR BREACH OF CONTRACT UNDER THE MSA. .......... 55**

A. The Complaint Fails To Identify Specific MSA Provisions Purportedly Breached By STG. .......... 56

B. The Complaint's Conclusory Allegations Fail To State A Claim Under Any Breach Of Contract Theory Articulated In Count VIII. .......... 57

**VII. THE COMPLAINT FAILS TO PLEAD FACTS TO SUPPORT A CLAIM THAT DSIH BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING UNDER THE DSG LLC AGREEMENT (COUNT XIV). ... 61**

**VIII. COUNT XV FOR UNJUST ENRICHMENT IS BARRED BY AN EXPRESS CONTRACT, THE 2019 DSG LLC AGREEMENT ... 65**

**IX. DIAMOND'S BREACH OF FIDUCIARY DUTY CLAIMS (COUNTS XVI, XVII, XVIII) ARE BARRED BY ENFORCEABLE WAIVER CLAUSES AND PREVAILING CASE LAW. ... 66**

A. Express Waiver Clauses Bar Debtors' Breach Of Fiduciary Duty Claims ... 67

1. The Waiver Clause In DSG's 2022 LLC Agreement Bars Claims Based On Both Future And Past Alleged Fiduciary Duty Breaches. ... 70

2. The Exculpatory Clause In DSH's 2019 LLC Agreement Independently Bars The Complaint's Fiduciary Duty Claims. ... 76

B. SBG Does Not Owe Any Fiduciary Duties To Its Indirect Subsidiary, DSG. ... 79

C. Without A Fiduciary Duty And Breach, There Can Be No Aiding And Abetting ... 81

**X. THE COMPLAINT FAILS TO PLEAD FACTUAL CONTENT TO PIERCE EACH CORPORATE VEIL BETWEEN DSG AND SBG (COUNT XIX). ... 82**

A. The Complaint Fails To Plead That Each Parent And Subsidiary Operated As A Single Economic Entity. ... 84

B. The Complaint Fails To Plead Injustice Or Fraud Beyond The Underlying Causes Of Action, Which Is Insufficient To Pierce The Corporate Veil ... 91

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Airborne Health, Inc. v. Squid Soap, LP*,
984 A.2d 126 (Del. Ch. 2009).....64

*Alberto v. Diversified Group, Inc.*,
55 F.3d 201 (5th Cir. 1995) .....83

*Ally Fin. Inc. v. Comfort Auto Grp. NY LLC*,
2021 WL 4033249 (E.D.N.Y. Sept. 3, 2021) .....56

*Alpine View Co. v. Atlas Copco AB*,
205 F.3d 208 (5th Cir. 2000) .....83

*AM Gen. Holdings LLC v. The Renco Grp., Inc.*,
2016 WL 4440476 (Del. Ch. Aug. 22, 2016) .....67

*Anadarko Petroleum Corp. v. Panhandle E. Corp.*,
545 A.2d 1171 (Del. 1988) .....79

*ASARCO LLC v. Americas Mining Corp.*,
396 B.R. 278 (S.D. Tex. 2008) .....79

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).....16, 40, 57, 82

*Auriga Capital Corp. v. Gatz Props., LLC*,
40 A.3d 839 (Del. Ch. 2012).....67

*Baldwin v. New Wood Res. LLC*,
283 A.3d 1099 (Del. 2022) .....61, 62, 63, 64

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).....16, 40, 57, 82

*Crescent Res. Litig. Tr. ex rel. Bensimon v. Duke Energy Corp.*,
500 B.R. 464 (W.D. Tex. 2013).....19, 23, 25, 27

*BMO Harris Bank, N.A. v. Petr, Tr. for BWGS, LLC*,
2023 WL 3203113 (S.D. Ind. May 2, 2023).....30, 32

*Buck v. Viking Holding Mgmt. Co.*,
2021 WL 673459 (Del. Super. Ct. Feb. 22, 2021).....57

*Wallace ex rel. Cencom Cable Income Partners II, Inc. v. Wood*,
752 A.2d 1175 (Del. Ch. 1999)....................................................................................84

*Clingman & Hanger Mgmt. Assocs LLC v. Rieck*,
2023 WL 2744399 (S.D. Tex. Mar. 30, 2023).............................................................. *passim*

*Coca-Cola Beverages Fla. Holdings, LLC. v. Goins*,
2019 WL 2366340 (Del. Ch. June 4, 2019)...................................................................56

*Contemporary Indus. Corp. v. Frost*,
564 F.3d 981 (8th Cir. 2009) ...................................................................................27, 31

*Crystallex Int'l Corp. v. Petróleos De Venezuela, S.A.*,
879 F.3d 79 (3d Cir. 2018)..........................................................................................34

*Culverhouse v. Paulson & Co.*,
133 A.3d 195 (Del. 2016) ..........................................................................................82

*DG BF, LLC v. Ray*,
2021 WL 776742 (Del. Ch. Mar. 1, 2021)....................................................................71

*Dill v. Rembrandt Grp., Inc.*,
2020 WL 1881062 (Colo. App. Apr. 16, 2020).............................................................83

*E.I. du Pont de Nemours & Co. v. Agfa-Gavaert NV*,
335 F. Supp. 3d 657 (D. Del. 2018)............................................................................87

*Ellis v. Koppers Inc.*,
2006 WL 2432092 (N.D. Miss. Aug. 21, 2006) ............................................................83

*Ellis v. United States*,
2018 WL 11470101 (S.D. Tex. June 13, 2018).............................................................68

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
651 F.3d 329 (2d Cir. 2011)....................................................................................18, 27

*Enzolytics, Inc. v. Empire Stock Transfer Inc.*,
2023 WL 2543952 (Del. Ch. Mar. 16, 2023)................................................................65

*Erisman v. Zaitsev*,
2021 WL 6134034 (Del. Ch. Dec. 29, 2021).................................................................56

*Esmark, Inc. v. NLRB*,
887 F.2d 739 (7th Cir. 1989) ......................................................................................89

*Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*,
53 F. Supp. 3d 882 (E.D. La. 2014)............................................................................51

*Fletcher v. Atex, Inc.*,
68 F.3d 1451 (2nd Cir. 1995)....................84

*Fletcher v. Atex, Inc.*,
861 F. Supp. 242 (S.D.N.Y. 1994), *aff'd*, 68 F.3d 1451 (2nd Cir. 1995)....................89

*Gallant v. Holden*,
2016 WL 3742300 (S.D. Ohio Apr. 21, 2016)....................51

*Gatz Props., LLC v. Auriga Capital Corp.*,
59 A.3d 1206 (Del. 2012)....................67

*Hall v. Hodgkins*,
305 F. App'x 224 (5th Cir. 2008)....................68

*Hillman v. Maretta*,
569 U.S. 483 (2013)....................31

*Holliday v. Credit Suisse Securities (USA) LLC*,
2021 WL 4150523 (S.D.N.Y. Sept. 13, 2021).................... *passim*

*Hollis v. Hill*,
232 F.3d 460 (5th Cir. 2000)....................67

*Hurd v. BAC Home Loans Servicing, LP*,
880 F. Supp. 2d 747 (N.D. Tex. 2012)....................60

*In re 3P Hightstown, LLC*,
631 B.R. 205 (Bankr. D.N.J. 2021)....................67

*In re Accuride Corp.*,
2009 WL 7226901 (Bankr. D. Del. Dec. 21, 2009)....................26

*In re AlphaStar Ins. Grp. Ltd.*,
383 B.R. 231 (Bankr. S.D.N.Y. 2008)....................56

*In re Alta Mesa Res., Inc.*,
2022 WL 7750353 (Bankr. S.D. Tex. Oct. 13, 2022)....................83

*In re Atlas Energy Res., LLC*,
2010 WL 4273122 (Del. Ch. Oct. 28, 2010)....................71

*In re Bayou Steel BD Holdings, L.L.C.*,
642 B.R. 371 (Bankr. D. Del. 2022)....................68

*In re Bernard L. Madoff Inv. Secs. LLC*,
773 F.3d 411 (2d Cir. 2014)....................25, 30

*In re BH S & B Holdings LLC*,
420 B.R. 112 (Bankr. S.D.N.Y. 2009) ........ *passim*

*In re Boston Generating LLC*,
617 B.R. 447 (Bankr. S.D.N.Y. 2020) ........ 24, 32, 33

*In re CLK Energy Partners, LLC*,
2011 WL 1312275 (Bankr. W.D. La. Mar. 31, 2011) ........ 67, 68, 69, 71

*In re Consolidated Meridian Funds*,
485 B.R. 604 (W.D. Wash. 2013) ........ 51

*In re Cred Inc.*,
650 B.R. 803 (Bankr. D. Del. 2023) ........ 80

*In re Cyrus II P'ship*,
413 B.R. 609 (Bankr. S.D. Tex. Nov. 24, 2008) ........ 34

*In re Diamond Sports Grp. LLC*,
Case No. 23-90116 (Bankr. S.D. Tex. Mar. 15, 2023) ........ 1, 4, 12, 44

*In re Dual D Heath Care Operations, Inc.*,
2021 WL 3083344 (Bankr. N.D. Tex. July 21, 2021) ........ 38, 40

*In re Duke & King Acquisition Corp.,*
508 B.R. 107 (Bankr. D. Minn. 2014) ........ *passim*

*In re Elec. Components Int'l, Inc.*,
2010 WL 3350305 (Bankr. D. Del. May 11, 2010) ........ 26

*In re Enron Creditors Recovery Corp.*,
422 B.R. 423 (S.D.N.Y. 2009), *aff'd*, 651 F.3d 329 (2d Cir. 2011) ........ 18

*In re Essar Steel Minn. LLC*,
602 B.R. 600 (Bankr. D. Del. 2019) ........ 79

*In re Fairfield Sentry Ltd.*,
2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020) ........ 32

*In re Foxmeyer Corp.*,
290 B.R. 229 (Bankr. D. Del 2003) ........ 85, 90

*In re Gulf Fleet Holdings, Inc.*,
2014 WL 4560441 (Bankr. W.D. La. Apr. 2, 2014) ........ 37

*In re Gulf Fleet Holdings, Inc.*,
491 B.R. 747 (Bankr. W.D. La. Apr. 2, 2013) ........ *passim*

*In re Hechinger Inv. Co. of Del.*,
274 B.R. 71 (D. Del. 2002)....31, 32

*In re HH Liquidation, LLC*,
590 B.R. 211 (Bankr. D. Del. 2018).... *passim*

*In re Kilroy*,
357 B.R. 411 (Bankr. S.D. Tex. 2006)....83, 84

*In re Louisiana Pellets, Inc.,*
838 F. App'x 45 (5th Cir. 2020)....34, 35, 39

*In re Martin*,
617 B.R. 866 (Bankr. S.D. Miss. 2020)....17

*In re MBS Mgmt. Servs., Inc.*,
690 F.3d 352 (5th Cir. 2012)....18, 19, 27

*In re Moore*,
379 B.R. 284 (Bankr. N.D. Tex. 2007)....83

*In re Nine West LBO Secs. Litig.*,
482 F. Supp. 3d 187 (S.D.N.Y. 2020)....32, 35

*In re NSC Wholesale Holdings LLC*,
637 B.R. 71 (Bankr. D. Del. 2022)....68, 69

*In re Olympic Natural Gas Co.*,
294 F.3d 737 (5th Cir. 2002)....27

*In re OPP Liquidating Co.*,
2022 WL 774063 (Bankr. D. Del. Mar. 14, 2022)....34

*In re Opus East, LLC*,
528 B.R. 30 (Bankr. D. Del. 2015).... *passim*

*In re Petters Co.*,
557 B.R. 711 (Bankr. D. Minn. 2016)....54

*In re Pitt Penn Holding Co.*,
2012 WL 204095 (Bankr. D. Del. Jan 24, 2012)....54

*In re Quorum Health Corp.*,
2023 WL 2552399 (Bankr. D. Del. Mar. 16, 2023)....19, 23, 24

*In re Samson Res. Corp.*,
2022 WL 3135288 (Bankr. D. Del. Aug. 4, 2022)....29

*In re Santa Fe Pac. Corp. S'holder Litig.*,
669 A.2d 59 (Del. 1995) ....................60

*In re Stanwich Fin. Servs. Corp.*,
488 B.R. 829 (D. Conn. 2013) ....................54

*In re SunEdison, Inc.*,
620 B.R. 505 (Bankr. S.D.N.Y. 2020) ....................19, 22, 24

*In re Superior Air Parts, Inc.*,
486 B.R. 728 (Bankr. N.D. Tex. 2012) ....................57

*In re Tribune Co. Fraudulent Conveyance Litig.*,
10 F.4th 147 (2d Cir. 2021) ....................41

*In re Tribune Co. Fraudulent Conveyance Litig.*,
946 F.3d 66 (2d Cir. 2019) .................... *passim*

*In re Tronox Inc.*,
855 F.3d 84 (2d Cir. 2017) ....................83

*In re W.J. Bradley Mortgage Capital, LLC*,
598 B.R. 150 (Bankr. D. Del. 2018) ....................68, 69

*In re Xtreme Power Inc.*,
563 B.R. 614 (Bankr. W.D. Tex. 2016) ....................84

*Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc.*,
995 F. Supp. 2d 587 (N.D. Tex. 2014) ....................56

*Intel Corp. Inv. Pol'y Comm. v. Sulyma*,
140 S. Ct. 768 (2020) ....................51

*Johnson v. Loutzenhiser*,
2020 WL 7327320 (W.D. Okla. Dec. 11, 2020) ....................51

*Kelly v. Blum*,
2010 WL 629850 (Del. Ch. Feb. 24, 2010) ....................68

*Kingsville Dodge, LLC v. Almy*,
2007 WL 2332699 (D. Md. July 30, 2007) ....................34

*Lippe v. Bairnco Corp.*,
249 F. Supp. 2d 357 (S.D.N.Y. 2003) ....................45, 46

*Mason v. Network of Wilmington, Inc.*,
2005 WL 1653954 (Del. Ch. July 1, 2005) ....................85

*McDonald v. Williams*,
174 U.S. 397 (1899)....................46

*Merit Management Group, LP v. FTI Consulting, Inc.*,
138 S. Ct. 883 (2018).................... *passim*

*Miller v. CitiMortgage, Inc.*,
970 F. Supp. 2d 568 (N.D. Tex. 2013) ....................60

*Miller v. HCP & Co.*,
2018 WL 656378 (Del. Ch. Feb. 1, 2018) ....................67

*Mobil Oil Corp. v. Linear Films, Inc.*,
718 F. Supp. 260 (D. Del. 1989)....................82, 90

*Moore Bus. Forms, Inc. v. Cordant Holdings Corp.*,
1995 WL 662685 (Del. Ch. Nov. 2, 1995) ....................81

*NAMA Holdings, LLC v. Related WMC LLC*,
2014 WL 6436647 (Del. Ch. Nov. 17, 2014) ....................66, 89

*Nationwide Emerging Managers, LLC v. Northpointe Holdings, LLC*,
112 A.3d 878 (Del. 2015) ....................62

*Nemec v. Shrader*,
991 A.2d 1120 (Del. 2010) ....................61

*Nespresso USA, Inc. v. Ethical Coffee Co. SA*,
263 F. Supp. 3d 498 (D. Del. 2017)....................66, 89

*Northwell Health, Inc. v. Lexington Ins. Co.*,
550 F. Supp. 3d 108 (S.D.N.Y. 2021)....................57

*Official Unsecured Creditors' Comm. of Broadstripe, LLC v. Highland Capital Mgmt., L.P. (In re Broadstripe, LLC)*,
444 B.R. 51 (Bankr. D. Del. 2010) ....................84

*Outokumpu Eng'g Enters., Inc. v. Kvaerner EnviroPower, Inc.*,
685 A.2d 724 (Del. Super. Ct. 1996) ....................83

*Oxbow Carbon & Mins. Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC*,
202 A.3d 482 (Del. 2019) ....................61, 63, 64, 65

*Pepsi-Cola Bottling Co. v. Handy*,
2000 WL 364199 (Del. Ch. Mar. 15, 2000)....................51

*Pipefitters Local No. 636 Defined Benefit Plan v. Zale Corp.*,
499 F. App'x 345 (5th Cir. 2012) ....................17

*Quantum Capital, LLC v. Banco de los Trabajadores*,
2016 WL 10536988 (S.D. Fla. Sept. 8, 2016) ....................26

*United States ex rel. Raffington v. Bon Secours Health Sys.*,
285 F. Supp. 3d 759 (S.D.N.Y. 2018)....................83

*Ramunno v. Cawley*,
705 A.2d 1029 (Del. 1998) ....................57

*Renco Grp, Inc. v. MacAndrew AMG Holdings LLC*,
2015 WL 394011 (Del. Ch. Jan. 29, 2015)....................81

*Rome v. HCC Life Ins. Co.*,
323 F. Supp. 3d 862 (N.D. Tex. 2018) ....................17

*Ryan v. Buckeye Partners, L.P.*,
2022 WL 389827 (Del. Ch. Feb. 9, 2022) ....................59

*Tae H. Kim v. Ji Sung Yoo*,
776 F. App'x 16 (2d Cir. 2019)....................46

*Tradepoint Atl., LLC v. Envtl. Liab. Transfer, Inc.*,
2022 WL 4564633 (D. Md. Sept. 29, 2022) ....................34

*Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*,
906 A.2d 168 (Del. Ch. 2006)....................65, 79

*Trevino v. Merscorp, Inc.*,
583 F. Supp. 2d 521 (D. Del. 2008)....................84, 85, 91

*Unbound Partners Ltd. P'ship v. Invoy Holdings Inc.*,
251 A.3d 1016 (Del. Super. Ct. 2021) ....................57

*US Ecology, Inc. v. Allstate Power Vac, Inc.*,
2018 WL 3025418 (Del. Ch. June 18, 2018)....................56

*Verdantus Advisors, LLC v. Parker Infrastructure Partners, LLC*,
2022 WL 611274 (Del. Ch. Mar. 2, 2022)....................82

*Wenske v. Blue Bell Creameries, Inc.*,
2018 WL 3337531 (Del. Ch. July 6, 2018)....................84

*Zimmerman v. Crothall*,
62 A.3d 676 (Del. Ch. 2013)....................68

**Statutes**

6 Del. C. § 18-101....................51

6 Del. C. § 18-607 .......... 50, 51, 54

6 Del. C. § 18-1101(b) .......... 67

6 Del. C. § 18-1101(c) .......... 67, 68, 76, 77

6 Del. C. § 18-1101(e) .......... 67

6 Del. C. § 1304(a)(1) .......... 40

6 Del. C. § 1304(a)(2) .......... 34

11 U.S.C. § 101(5)(A) .......... 38

11 U.S.C. § 101(12) .......... 38

11 U.S.C. § 101(22A)(A) .......... 28, 29

11 U.S.C. § 101(51A) .......... 27

11 U.S.C. § 544 .......... 30, 32

11 U.S.C. § 544(b) .......... 30, 31, 33

11 U.S.C. § 546(e) .......... *passim*

11 U.S.C. § 547 .......... 37

11 U.S.C. § 547(b) .......... 37

11 U.S.C. § 548 .......... *passim*

11 U.S.C. § 548(a) .......... 54

11 U.S.C. § 548(a)(1) .......... 18, 29

11 U.S.C. § 548(a)(1)(A) .......... *passim*

11 U.S.C. § 548(a)(1)(B) .......... 34, 54

11 U.S.C. § 548(d)(2)(A) .......... 37

11 U.S.C. § 561(a)(1) .......... 28

11 U.S.C. § 741(7) .......... 18, 24, 25, 28

11 U.S.C. § 741(8) .......... 27, 28

28 U.S.C. § 157(b) .......... 1

28 U.S.C. § 1334 ..... 1

28 U.S.C. § 1408 ..... 1

28 U.S.C. § 1409 ..... 1

MD Code Comm. L. § 15-207 ..... 40

**Rules**

Fed. R. Bankr. P. 7012 ..... 1

Fed. R. Civ. P. 9(b) ..... 16, 17, 40

Fed. R. Civ. P. 12(b)(1) ..... 1

Fed. R. Civ. P. 12(b)(6) ..... 1, 56, 68, 69

**Other Authorities**

*Joint Task Force of Committee on LLCs, Partnerships and Unincorporated & Entities and the Committee on Taxation, ABA Section of Business Law, Model Real Estate Development Operating Agreement with CommentaryCommentary*, 63 Bus. Law. 385 (2008) ..... 51

Craig B. Smith*, Limited Partnerships-Expanded Opportunities Under Delaware's 1988 Revised Uniform Limited Partnership Act*, 15 Del. J. Corp. L. 43, 74-75 (1990) ..... 51

5B Charles Alan Wright & Arthur Miller, *Fed. Prac. & Proc. Civ.* § 1357 (3d ed. 2023 update) ..... 17

Defendants Sinclair Broadcast Group, Inc. ("SBG"), Sinclair Television Group, Inc. ("STG"), Diamond Sport TopCo LLC ("TopCo"), Diamond Sports Holdings LLC ("DSH"), Diamond Sports Intermediate Holdings A LLC ("DSIH-A"), Diamond Sports Intermediate Holdings LLC ("DSIH") (collectively, "Sinclair"), David Smith, Christopher Ripley, Lucy Rutishauser, and Scott Shapiro (collectively with Sinclair, the "Sinclair Defendants") state the following in support of this motion (this "Motion"):

**Relief Requested**

1. The Sinclair Defendants seek entry of an order, substantially in the attached form (the "Order"), dismissing certain claims of Debtors Diamond Sports Group, LLC and Diamond Sports Net, LLC (collectively, "Diamond" or "Debtors") in their Complaint filed in this adversary proceeding.

**Jurisdiction and Venue**

2. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. Sinclair confirms its consent to the entry of a final order by the Court in connection with this Motion.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The bases for the relief requested herein are Federal Rules of Bankruptcy Procedure 7012, and Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

**Preliminary Statement**

5. The Debtors' Complaint strains to portray a nefarious plot by Sinclair at Diamond's expense. Beneath the overheated rhetoric, however, the Debtors' own allegations present a series of ordinary business transactions and extraordinary efforts by Sinclair to support the Diamond enterprise, including in the face of a global pandemic and unprecedented business disruption.

Sinclair had every incentive to see Diamond succeed, as Sinclair invested $1.4 billion of its own money into purchasing Diamond,[2] an equity investment that would be lost if Diamond's business faltered. That Diamond could not ultimately navigate these challenges is deeply unfortunate for all involved. It does not follow, however, that Sinclair—which indeed lost its entire investment in Diamond—is liable (no matter how much bombast the Debtors pack into the Complaint). Nor does it mean that the Debtors can actually state each of their nineteen purported claims as a matter of law. For the reasons set forth herein, they have failed to do so with respect to all or parts of Counts I-IX, XI, and XIV-XIX and those claims should be dismissed.[3]

6. The Debtors spent six months investigating potential claims against Sinclair before filing the Complaint, taking more than a dozen depositions and receiving tens of thousands of documents from Sinclair and other third parties. Yet from the first paragraph of the Complaint forward, the Debtors lash their claims to a single snippet of testimony by the Commissioner of Major League Baseball, Rob Manfred, who purports to have heard Sinclair's Chairman state that he would "milk" Diamond of value and then file the company for bankruptcy. It is rare to see a plaintiff so heavily rely on a single statement—the word "milk" appears in the Complaint no fewer than *thirteen* times—particularly where, as here, the statement is disputed by a party to the conversation (a fact that the Complaint fails to acknowledge). But the Debtors clearly think that Mr. Manfred's testimony—given during litigation between the Debtors and Major League Baseball to which Sinclair was not even a party—can paper over the glaring pleading deficiencies in the Complaint. The Debtors are wrong.

---

2 Compl. ¶ 39.

3 Following discovery, Sinclair will present facts which make clear that Debtors' remaining claims likewise fail as as a matter of law.

7. Beneath its lactose-infused rhetoric, the Complaint actually demonstrates that Sinclair provided key services and support to Diamond and continues to do so today. Sinclair had a strong incentive to see Diamond succeed to preserve, and thereby increase, its $1.4 billion investment. As the Complaint admits, Sinclair provided numerous tangible benefits to Diamond in pursuit of this goal. Among other things, defendant STG entered into a Management Services Agreement ("MSA") with plaintiff DSG under which, according to the Complaint itself, "Sinclair agreed to provide DSG a range of critical managerial, operational, and administrative services."[4] While Diamond now complains about the rates in the MSA, it does not allege that any third party would provide that same array of critical services for less than what STG charged (and, indeed, the Debtors continue to rely on Sinclair for critical services under the MSA post-petition). The Complaint also shows that Sinclair entities provided key services to Diamond outside of the MSA, such as services related to advertising sales.[5] Moreover, while Diamond complains about the terms of the Bally's naming rights transaction, the Complaint admits—as it must—that Diamond received crucial cash consideration, marketing commitments, and other support through the transaction.

8. Contrary to the Debtors' baseless insinuations, Sinclair worked diligently to navigate the effects of the COVID pandemic, to improve Diamond's finances, and to position the company to continue as a going concern. Among other things, in early 2022, STG agreed to defer a large portion of the fees for its MSA services while continuing to provide its full suite of services,

---

[4] *Id.* ¶ 109.

[5] *Id.* ¶ 154.

and DSG continues to take advantage of STG's MSA services at the below-contract rate to this very day.[6]

9. With the effects of COVID and other operational challenges persisting into 2022 and early 2023, Sinclair worked with Diamond and a group of its bondholders to attempt a financial and operational restructuring of Diamond.[7] Indeed, Sinclair agreed to have Diamond's creditors take control of the company in May 2022, allowing the creditors to create a new board of managers with a majority appointed by the creditors.[8] While the Complaint now tries to spin a tale of adversity and discord, Debtors' counsel's own statements at the first day hearing show otherwise. At the hearing, Debtors' counsel acknowledged that Sinclair has "been good partners in managing business."[9] Debtors' counsel further explained that "we've been working cooperatively with Sinclair on the separation" of Diamond's business from Sinclair and "we've been in regular dialogue with the folks who provide the services from Sinclair so that we know exactly what we will need to be an independent, standalone business when we emerge from Chapter 11."[10] By this time, the creditor-appointed board had been managing Diamond for nearly a year. Thus, these statements were not mere platitudes or guesses, but based on creditor-managed Diamond's experiences with Sinclair's efforts to aid the company.

---

6 *Id.* ¶ 244.

7 *E.g.*, D. Devoe Decl. ("First Day Decl.") ¶¶ 12, 14, 16, ECF No. 26 (*In re Diamond Sports Grp. LLC,* Case No. 23-90116 (Bankr. S.D. Tex. Mar. 15, 2023)).

8 Compl. ¶ 245.

9 Mar. 16, 2023 Hr'g Tr. ("First Day Tr.") at 32:10, ECF No. 217 (*In re Diamond Sports Grp. LLC,* Case No. 23-90116 (Bankr. S.D. Tex. Mar. 21, 2023) (attached as Exhibit 1).

10 *Id.* at 32:22-25, 34:23-24.

10. Diamond's First Day Declaration likewise undercuts the Debtors' newly manufactured antagonism. The Declaration states that the transactions contemplated in a restructuring settlement agreement ("RSA") "*and in the potential amendments adding Sinclair to the RSA* will position Diamond to continue as a going-concern, maximize the value of its business for the benefit of all stakeholders, and enable it to continue serving local sports fans across the United States."[11] Echoing this sentiment, during the first day hearing, Diamond professed that "[w]e hope -- we and the creditors hope -- that we can fold [Sinclair] in [the RSA] after we get through our first-day hearing and intend to spend time with them to try to do that."[12]

11. In short, while certain parties to that RSA ultimately re-traded their commitment to include Sinclair in favor of pursing a litigation-first strategy, the Debtors' statements in the First Day Declaration and at the first day hearing plainly acknowledge Sinclair's efforts on behalf of Diamond and the benefits Sinclair has provided and continues to provide to the Diamond (including from STG at below-contract rates). Sinclair looks forward to presenting the full picture of Sinclair and Diamond's relationship, and rebutting the Complaint's revisionist, made-for-litigation assertions in detail at the appropriate time. But even at this stage, the Debtors' own allegations and pleading failures make clear that the vast majority of the claims in the Complaint should be dismissed as a matter of law.

12. *First*, the Complaint pursues claims related to preferred equity transfers that are barred under the Bankruptcy Code. As part of the financing for Sinclair's purchase of Diamond, DSH (an indirect parent of Diamond post-purchase) issued $1.025 billion in preferred equity to JP

[11] *E.g.*, First Day Decl. ¶ 16 (emphasis added).

[12] First Day Tr. at 30:10-12; *see also id.* at 36:24-37:1 ("And also, as I mentioned, 24 we are continuing the work to fold Sinclair into the RSA, which we hope to be able to do.").

Morgan Chase Financing, Inc. ("JPMCFI"). The Complaint alleges that Sinclair then caused DSG to distribute a total of $929 million to DSH that was then paid to JPMCFI, with $849.5 million used to redeem part of the JPMCFI preferred equity and the remaining $79.5 million as quarterly distributions. Diamond now seeks to recover that sum as a fraudulent conveyance or unlawful distribution. But 11 U.S.C. § 546(e) bars all but one of Diamond's claims—under state law as well as the Bankruptcy Code—related to the sums allegedly distributed from DSG through DSH to JPMCFI.[13] Section 546(e) precludes claims that seek to avoid transactions in securities and other financial instruments. Each of Section 546(e)'s elements are satisfied in this matter. Preferred equity units are securities, and the transfers here relating to them are qualifying transactions protected under Section 546(e). Moreover, both DSH and JPMCFI are qualifying participants under the plain language of Section 546(e), as they are "financial participants" because the Complaint alleges they are parties to securities agreements with a value of one billion dollars or more.[14] Accordingly, Counts I through IV are barred to the extent they seek to recover the $929 million allegedly distributed from DSG through DSH to JPMCFI.

13. *Second*, the Complaint fails to state a claim as a matter of law in seeking to avoid payments required under the MSA as a constructive fraudulent conveyance. Constructive fraud claims fail where a debtor receives reasonably equivalent value in exchange for its payments. The Fifth Circuit and other courts hold that a debtor receives reasonably equivalent value in making payments required by an existing contract, such as the MSA. Here, the Complaint alleges that DSG made $420-plus million in payments required by the terms of the MSA. DSG thus received

---

[13] The sole exception is Diamond's actual fraud claims under 11 U.S.C. § 548(a)(1)(A) in Count I, which the statutory language carves out of Section 546(e)'s scope.

[14] *E.g.*, Compl. ¶¶ 2, 39, 161.

reasonably equivalent value for those payments and cannot now state a claim for constructive fraudulent conveyance. Accordingly, Counts VI and VII should be dismissed to the extent they seek to recover the $420-plus million in payments required by the MSA.

14. *Third*, in seeking to plead actual fraudulent conveyances, the Complaint is long on bluster (and use of the word "milk") but short on adequate allegations of actual fraud with respect to any of the transactions at issue. To the contrary, the Complaint's allegations are consistent with ordinary business conduct and therefore inadequate to support an inference that Diamond intended to defraud its creditors. For example, the Complaint asserts a conclusory actual fraud claim related to the MSA, but the factual content pleaded shows that Diamond was making contractually required payments to STG for what the Complaint admits are critical services for Diamond's operation, something distressed companies routinely do and that here prevented the detrimental loss of services during the period of Diamond's distress. Similarly, the Complaint alleges actual fraud based on DSG's distributions, but distributions by definition are made without consideration, and the making of distributions does not itself suggest any fraudulent intent. Likewise, the Complaint alleges actual fraud based on the sale of naming rights to Bally's, but the Debtors' own allegations show that both Diamond and Sinclair provided value to Bally's as part of this arm's-length deal, and both received consideration in return.[15] In particular, Diamond received cash and marketing commitments that benefitted its creditors. Accordingly, Counts I, V, and IX—and Counts III, VII, and XI to the extent these seek to recover transfers avoided as actual fraudulent transfers—should be dismissed.

15. *Fourth*, the Complaint's claim for unlawful LLC distributions is independently barred because it fails to plead sufficient factual content showing that DSG's member DSIH had

[15] *E.g.*, *id.* ¶ 210(c).

actual knowledge that the distributions would cause DSG to become insolvent. Indeed, the Complaint's allegations support the opposite conclusion—that DSIH had good reasons based on independent valuations to believe that DSG would remain solvent after making distributions. Thus, Count IV should be dismissed for this additional reason.

16. *Fifth*, the Debtors try to ignore that many of their claims are time-barred. Under 11 U.S.C. § 548, actual and constructive fraudulent transfer claims are subject to a strict two-year look back period from the petition date. Here, Debtors filed their Chapter 11 petition on March 14 and 15, 2023, and the parties entered into a tolling agreement on October 20, 2022. Thus, at a minimum, Section 548 cannot be used to avoid any transfers made before October 20, 2020. Therefore, Counts I, II, III, V, VI, and VII should be dismissed to the extent they seek to avoid or recover any payments or other transfers made before October 20, 2020 under Section 548.

17. *Sixth*, the Debtors flatly fail to state a claim that STG breached the MSA because the Complaint fails to specify what provisions of the MSA were supposedly breached. Independently, the Complaint relies on mere conclusions instead of alleging the required factual content to explain how STG breached the MSA. Count VIII should be dismissed based on these failures.

18. *Seventh*, the Debtors' implied covenant of good faith and fair dealing claim should be dismissed out of hand as a matter of law. The Complaint alleges that DSG's direct parent DSIH breached the implied covenant in DSG's LLC Agreement by purportedly misappropriating DSG's employees and assets. But the parties' rights on these issues are expressly governed by the DSG LLC Agreement. The Complaint pleads no contractual gap that should be implied or any other grounds for invoking the implied covenant. Count XIV should be dismissed accordingly.

Likewise, Count XV asserts an unjust enrichment based on similar allegations and should be dismissed because a contract, DSG's LLC Agreement, governs these issues.

19. *Eighth*, the Debtors' purported claims for breach of fiduciary duty against the individual defendants and SBG are expressly barred by waiver clauses in the 2022 DSG LLC agreement that the Debtors themselves approved, as well as waiver clauses in the 2019 DSH LLC agreements. Both of those companies are organized under Delaware law, which affords maximum contractual freedom in organizing an LLC, including allowing the elimination of all fiduciary duties. The 2022 DSG LLC Agreement expressly eliminates fiduciary duties, and its broad language—approved in 2022 when the Debtors' board had a majority of independent directors appointed by its creditors—explicitly applies to past as well as future fiduciary duties, as a court in this district held just this year based on analogous language. The 2019 DSH LLC Agreement likewise eliminates all fiduciary duties, and DSG is subject to the terms of this Agreement by its plain language. Based on these enforceable waiver provisions, the Complaint's fiduciary duty counts, XVI and XVII, should be dismissed. Moreover, as there are no fiduciary duties or breaches of such duties, Count XVIII alleging aiding and abetting a breach of fiduciary duties likewise must fall.

20. *Ninth*, the Debtors fail to allege facts sufficient to sustain their alter ego / veil piercing theory and that claim should be dismissed. The Complaint seeks to hold SBG liable for transfers from DSG, but there are *four* companies (DSIH, DSIH-A, DSH, and Topco) between those entities. Established law holds that Diamond must plead sufficient factual content to pierce the veil of each company before reaching SBG. The Complaint does not come close to alleging factual content showing that each parent-subsidiary operated a single economic entity; to the contrary, it contains barely any allegations regarding DSIH, DSIH-A, DSH, and Topco.

Separately, the Complaint fails to plead any fraud or injustice beyond the underlying causes of action, which likewise supports dismissal under Delaware law.

21. For these and other reasons, as set forth in greater detail subsequently, the Court should grant the relief requested herein.

## Relevant Allegations in the Complaint[16]

22. The Complaint alleges that in a transaction closing on August 23, 2019, Sinclair purchased regional sports networks ("RSNs") from Disney, and created various entities to consummate the transactions and hold the RSNs.[17] These RSNs were originally subsidiaries of Fox, and were required to be divested when Disney acquired Fox.[18] While the purchase price was funded partly by debt incurred by Diamond, the Complaint admits that Sinclair invested a $1.4 billion capital contribution in the transaction.[19] In addition, part of the purchase price financing came from DSH (one of the entities formed as part of the transaction, and a Defendant) issuing $1.025 billion in preferred equity units to JPMCFI.[20]

23. Two of the Sinclair entities existed before the transaction with Disney. These are SBG and its subsidiary STG, both of which are Maryland corporations.[21] The remaining Sinclair entity defendants were created as part of the transaction. These are SBG's subsidiary TopCo,

---

16 Diamond has filed a 121-page complaint with nearly 400 paragraphs. This section summarizes the Complaint allegations necessary to understand the Sinclair Defendants' Motion to Dismiss. Nothing in this Motion should be interpreted as conceding the accuracy of any of the Complaint's allegations, and the Sinclair Defendants reserve the right to present evidence to rebut each of the Complaint's allegations.

17 Compl. ¶ 38.

18 *Id.* ¶ 37.

19 *Id.* ¶ 39.

20 *Id.* ¶¶ 38, 45.

21 *Id.* ¶ 39.

which wholly owned DSH, which almost wholly owned[22] DSIH-A, which wholly owned DSIH, which wholly owned plaintiff DSG, which wholly owns plaintiff DSN. All six of these entities are LLCs organized under Delaware law. Finally, the Complaint alleges the four individual Sinclair Defendants are directors or officers of SBG and also supposedly officers or "de facto manager[s]" of DSG.[23]

24. Contemporaneously with the transaction, STG entered into the MSA with DSG.[24] The Complaint admits that "[p]ursuant to the MSA, Sinclair agreed to provide DSG a range of critical managerial, operational, and administrative services."[25] These "services included affiliate sales and marketing services, which included negotiating carriage rights agreements with MVPDs [multichannel video programming distributors, which are Diamond's customers], and general and administrative services, including legal and business affairs, finance and accounting, IT support, payroll, employee benefits, and insurance."[26] Diamond does not allege that it did not need these services or could provide them itself. To the contrary, Diamond admits that other companies provided the RSNs with management services when they were part of Fox.[27]

25. In exchange for these critical services under the MSA, Diamond agreed to pay STG (a) an annual base fee of $4 million per Diamond RSN for the first year, subject to annual four

---

22 DSH owned a 99.997% interest in DSIH-A, with non-party Byron Allen owning the remaining 0.003% interest in DSIH-A. *Id.* ¶ 45.

23 *Id.* ¶¶ 27-30.

24 *Id.* ¶ 107.

25 *Id.* ¶ 109.

26 *Id.* ¶ 109; First Day Tr. at 28:14-17 (Diamond's counsel explaining "we have a management agreement with Sinclair where they provide a lot of the nuts and bolts, day-to-day management of the company, including a lot of back office stuff.").

27 Compl. ¶ 105.

percent increases; plus (b) incentive management fees, calculated as a percentage of revenue of any new (or renewed) distribution agreement for Diamond RSNs, assuming certain thresholds were met.[28] Diamond alleges that pre-petition it paid STG over $316 million in MSA fees, and also accrued deferred fees (as described subsequently) of over $104 million, for a total cost of at least $420 million.[29] Diamond does not allege that it has, or could, obtain the MSA services for a lower cost than what the MSA provides.[30] STG continues to provide these services to DSG to this day at well below the proper contract rates as the Debtors drag their feet on whether to assume or reject the contract.[31]

26. After Sinclair's purchase of the Diamond RSNs was complete, DSG made several distributions.[32] These distributions were largely used to pay down obligations incurred by DSH during the purchase of the Diamond RSNs. Specifically, DSG distributed funds that were used to redeem the preferred equity units DSH issued to JPMCFI as part of the purchase. The Complaint alleges that banking company JPMorgan observed that "'paying down preferred equity is more NPV positive than buying back DSG notes.'"[33] In total, DSG distributed $929 million, with $849.5 million used to repurchase the JPMCFI preferred equity units and $79.5 million used for quarterly

---

28 *Id.* ¶ 110.

29 *Id.* ¶ 104.

30 While the Complaint artfully pleads that Fox did not "charge" certain RSNs for expenses, Compl. ¶¶ 113-14, the Complaint does not deny that Fox allocated millions of dollars of expenses to the RSNs.

31 In the main docket, Sinclair has filed a Motion for Entry of An Order Compelling Assumption or Rejection of the Management Services Agreement for the reasons described in that Motion. *In re Diamond Sports Grp. LLC,* Case No. 23-90116 (Bankr. S.D. Tex. Aug. 21, 2023) ECF No. 1092.

32 Compl. ¶ 169.

33 *Id.* ¶ 171 (brackets omitted).

distributions to JPMCFI on account of that preferred equity.[34] The bulk of these distributions were made within twelve months after Sinclair's purchase of the Diamond RSNs—in December 2019, January 2020, and August 2020.[35]

27. Starting in late 2019 and continuing into 2020, Sinclair launched an enterprise-wide process for partnerships with sports gaming, including potentially selling the naming rights of Diamond RSNs.[36] The RSNs had previously been branded and operated as the Fox Sports RSNs Fox,[37] and predictably that branding was no longer feasible once the RSNs were no longer part of the Fox family. The Complaint alleges that Sinclair sought a large equity investment in the purchaser of the naming rights.[38] Ultimately, in late 2020, Sinclair entered into an agreement with co-defendant Bally's Corporation. As part of this agreement, both Sinclair and Diamond provided consideration to Bally's and each received consideration in return. Diamond granted Bally's naming rights to its RSNs and agreed to integrate Bally's name into the RSNs' programming.[39] Similarly, Sinclair granted Bally's two integrations in each state in which both Bally's and Sinclair operated as well as secondary naming rights to two of its properties.[40] In exchange, Bally's provided DSG with annual cash payments and a marketing commitment to purchase advertising

---

[34] *Id.* ¶ 162.

[35] *Id.* ¶ 193.

[36] *Id.* ¶ 206.

[37] *Id.* ¶ 37.

[38] *Id.* ¶ 206.

[39] *Id.* ¶ 210(a).

[40] *Id.* ¶ 210(b)-(c).

on the Diamond RSNs.[41] Sinclair received "a combination of stock and penny warrants equivalent to approximately 23% of Bally's equity on a fully diluted basis."[42]

28. Diamond's financial health was increasingly affected by the COVID pandemic. Sinclair purchased the Diamond RSNs in August 2019, months before the emergence of the pandemic. Other DSG-related business transactions—such as the majority of the distributions made to redeem the JPMCFI preferred equity units, which were made in December 2019 and January 2020—likewise occurred before the pandemic. The pandemic manifesting broadly in the United States in March 2020 took a toll on Diamond's finances, as well as the finances of RSN advertisers.[43] Sports programming, including Major League Baseball, was cancelled and/or delayed, leading to substantially reduced revenue for Diamond.[44]

29. As Diamond's finances became more challenging, SBG and STG continued to aid the Debtors. In April 2021, Sinclair created a three-member board of managers for DSG, with two of those being independent managers.[45] In March 2022, after discussions with Diamond's lenders, STG agreed to to cap the cash DSG paid under the MSA and defer the remainder of the payments.[46] STG's concessions resulted in DSG paying less in cash for the array of critical services STG provides to it, with STG providing the same services—an arrangement that largely continues today.

---

41 *Id.* ¶ 210(e)-(f).

42 *Id.* ¶ 210(d).

43 *Id.* ¶ 80.

44 *Id.* ¶¶ 81-82.

45 *Id.* ¶ 243.

46 *Id.* ¶ 244.

30. In 2022, Sinclair, Diamond, and Diamond's creditors engaged in discussions to improve Diamond's balance sheet and "position its business for future growth and success."[47] Diamond's counsel acknowledged during the first day hearing that Sinclair has "been good partners in managing business."[48] They further explained that "we've been working cooperatively with Sinclair on the separation" of Diamond's business from Sinclair. Indeed, they said "we've been in regular dialogue with the folks who provide the services from Sinclair so that we know exactly what we will need to be an independent, standalone business when we emerge from Chapter 11," confirming that Sinclair has worked cooperatively with Diamond even as Sinclair knew that Diamond would no longer be part of the Sinclair family of companies.[49]

31. Before entering Chapter 11, Diamond had reached agreement on a RSA with certain of its lenders.[50] In its First Day Declaration, Diamond stated that it "believes that the restructuring transactions documented in the RSA *and in the potential amendments adding Sinclair to the RSA* will position Diamond to continue as a going-concern, maximize the value of its business for the benefit of all stakeholders, and enable it to continue serving local sports fans across the United States."[51] During the first day hearing, Diamond professed that "[w]e hope -- we and the creditors hope -- that we can fold [Sinclair] in [the RSA] after we get through our first-day hearing and

[47] First Day Decl. ¶ 12.

[48] First Day Tr. at 32:10.

[49] *Id*. at 32:22-25, 34:23-24; *see also id.* at 32:15-19 ("We have been working behind the scenes with Sinclair's cooperation to try to emulate all of the back-office things that Sinclair does for us so that we can do them for ourselves, either once we emerge or shortly after we emerge.").

[50] First Day Decl. ¶¶ 13-14.

[51] *Id*. ¶ 16 (emphasis added).

intend to spend time with them to try to do that."[52] Thus, as of its Chapter 11 filing, Diamond recognized and acknowledged the benefits provided by Sinclair and the benefit of having Sinclair consensually participate in its restructuring.

32. Yet despite recognizing the benefits of cooperating with Sinclair, the Debtors decided to pivot to a litigation-first strategy and filed this adversary proceeding, asserting a glut of overlapping claims and seeking nearly $1.5 billion in damages. To distract from the otherwise glaring pleading deficiencies in the Complaint, the Debtors—seemingly more intent on driving headlines than legal arguments—lean heavily on snippets of disputed testimony by Major League Baseball Commissioner, Rob Manfred, from a separate litigation (in which Sinclair was not even a party) that was filed against the Debtors. As set forth herein, the Debtors' embrace of optics and insinuation instead of pleading the elements required for their claims, backed by actual factual content, fails as a matter of law.

## <u>Argument</u>

33. Claims survive a motion to dismiss only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face."[53] A claim is facially plausible "when the plaintiff pleads *factual content* that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[54] A plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully."[55] "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of

---

52 First Day Tr. at 30:10-12; *see also id.* at 36:24-37:1 ("And also, as I mentioned, we are continuing the work to fold Sinclair into the RSA, which we hope to be able to do.").

53 *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

54 *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556) (emphasis added).

55 *Id.*

entitlement to relief."[56] In deciding whether a plaintiff has made this showing, a court should disregard "legal conclusions" and "conclusory statements."[57] If the plaintiffs' pleadings "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."[58]

34. Under Rule 9(b), in "alleging fraud …, a party must state with particularity the circumstances constituting fraud."[59] "Rule 9(b) requires the plaintiff to allege the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what that person obtained thereby."[60] "In other words, Rule 9(b) requires 'the who, what, when, where, and how' to be laid out in the complaint."[61]

35. In evaluating a motion to dismiss, the "court considers the complaint and its attachments and may also consider (1) documents incorporated by reference into the complaint, (2) documents attached to the motion to dismiss that are central to the plaintiff's claim and referred to in the complaint, (3) matters of which the court may take judicial notice, and (4) matters of public record."[62]

---

[56] *Id.* (internal quotation marks omitted).

[57] *Id.*; *see also Twombly,* 550 U.S. at 555 (holding that a plaintiff cannot rely on mere "labels and conclusions") (internal quotation marks omitted).

[58] *Twombly,* 550 U.S. at 570.

[59] Fed. R. Civ. P. 9(b).

[60] *Pipefitters Local No. 636 Defined Benefit Plan v. Zale Corp.*, 499 F. App'x 345, 349 (5th Cir. 2012) (internal quotation marks and brackets omitted).

[61] *Id.* (internal quotation marks omitted).

[62] *In re Martin*, 617 B.R. 866, 872 (Bankr. S.D. Miss. 2020); *see also Rome v. HCC Life Ins. Co.*, 323 F. Supp. 3d 862, 866 (N.D. Tex. 2018) (collecting cases); 5B Charles Alan Wright & Arthur Miller, *Fed. Prac. & Proc. Civ.* § 1357 (3d ed. 2023 update) ("Although district courts primarily consider the allegations in the complaint when deciding a Federal Rule 12(b)(6) motion to dismiss, courts may consider matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned … .").

## I. ALL BUT ONE OF THE DEBTORS' CLAIMS RELATED TO TRANSFERS TO JPMCFI (COUNTS I THROUGH IV) ARE BARRED BY 11 U.S.C. § 546(e).

36. The bulk of damages sought in the Complaint relate to $929 million allegedly improperly transferred from DSG through DSH to JPMCFI, with $849.5 million being used to redeem preferred equity units that DSH had issued to JPMCFI and the remaining $79.5 million being distributions to JPMCFI on account of the preferred equity. These claims are made in Count I (alleging actual fraud under the Bankruptcy Code and state law), Count II (alleging constructive fraud under the Bankruptcy Code and state law), Count III (seeking recovery of avoided transfers under Counts I and II), and an allegation that these distributions were unlawful under Delaware law (Count IV).

37. Other than their actual fraud claim under 11 U.S.C. § 548(a)(1), *each* of the Debtors' claims related to the JPMCFI preferred unit redemptions—under both federal and state law—are barred under 11 U.S.C. § 546(e).

38. 11 U.S.C. § 546(e) states in relevant part:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a … settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a … financial institution, [or] financial participant … or that is a transfer made by or to (or for the benefit of) a … financial institution, [or] financial participant … in connection with a securities contract, as defined in section 741(7), … that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

39. Section 546(e) "was designed to ensure settlement finality, and therefore market stability" for securities and other financial transactions.[63] "If a firm is required to repay amounts received in settled securities transactions, it could have insufficient capital or liquidity to meet its

[63] *In re Enron Creditors Recovery Corp.*, 422 B.R. 423, 429 (S.D.N.Y. 2009), *aff'd*, 651 F.3d 329 (2d Cir. 2011).

current securities trading obligations, placing other market participants and the securities markets themselves at risk."[64]

40. As the Fifth Circuit has explained, Section 546(e) "is one among many" limitations on a debtor's ability to avoid transfers.[65] In applying Section 546(e) and the provisions that define its terms, the "courts' task is not to fulfill a vague policy of furthering the recovery of last-minute transfers by debtors to certain creditors, but to apply the statutory provisions as Congress wrote them."[66] The "Fifth Circuit has joined numerous other circuits in applying Section 546(e) as written, notwithstanding congressional dialogues about the provision's purposes."[67]

41. Courts use three steps in determining whether Section 546(e) applies to a transfer: (1) identifying the transfer; (2) determining whether the transfer is a qualifying transaction, such as a "settlement payment" or "in connection with a securities contract"; and (3) determining whether one[68] of the parties to the transfer is a qualifying participant, such as a "financial institution" or "financial participant."[69] Simple application of these steps here clearly establishes that the JPMCFI preferred unit redemptions fall squarely within the scope of Section 546(e).

---

64 *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 334 (2d Cir. 2011).

65 *In re MBS Mgmt. Servs., Inc.*, 690 F.3d 352, 355 (5th Cir. 2012).

66 *Id.* at 355.

67 *Crescent Res. Litig. Tr. ex rel. Bensimon v. Duke Energy Corp.*, 500 B.R. 464, 475 (W.D. Tex. 2013).

68 *E.g.*, *In re Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66, 84 (2d Cir. 2019) (holding that under Section 546(e), "[t]ransfers in which either the transferor or transferee is not a covered entity are clearly included in the language, so long as one of the two is a covered entity").

69 *E.g.*, *In re Quorum Health Corp.*, 2023 WL 2552399, at *5 (Bankr. D. Del. Mar. 16, 2023); *In re SunEdison, Inc.*, 620 B.R. 505, 512-13 (Bankr. S.D.N.Y. 2020).

**A. The Relevant Transfer Is From DSG Through DSH To JPMCFI.**

42. Recent Supreme Court precedent, and cases following that authority, hold that the relevant transfer for purposes of Section 546(e) is the ultimate transfer at issue. That transfer should not be separated into its component parts to determine if Section 546(e) applies. Here, the overarching transfer is the alleged distribution of funds from DSG through DSH to make payments to JPMCFI to redeem, or pay distributions on, the preferred equity units.

43. In *Merit Management Group, LP v. FTI Consulting, Inc.*, the Supreme Court determined how Section 546(e) "operates in the context of a transfer that was executed via one or more transactions."[70] The defendant argued that the courts should not examine only the "end-to-end transfer, but also … all its component parts," which would include the use of banks that were "financial institutions" under Section 546(e).[71] The trustee argued that the only relevant transfer was the "overarching transfer" between the two parties, neither of which were banks or "financial institutions," and that the component parts should be ignored.[72] The Supreme Court held "that the relevant transfer for purposes of the § 546(e) safe-harbor inquiry is the overarching transfer that the trustee seeks to avoid under one of the substantive avoidance provisions."[73] While *Merit Management* sometimes refers to "the transfer the trustee sought to avoid," the opinion clarifies that "the trustee is not free to define the transfer that it seeks to avoid in any way it chooses."[74]

---

[70] 138 S. Ct. 883, 888 (2018).

[71] *Id.* at 892.

[72] *Id.*

[73] *Id.* at 893.

[74] *Id.* at 894-95.

Instead, the focus must be on the overarching transfer—here, the ultimate transfer from DSG through DSH to JPMCFI.

44. Cases since *Merit Management* have repeatedly focused on the overarching transfer and have rejected attempts by debtors or trustees to separate out some component of the transfer and argue that the component does not satisfy Section 546(e). For example, *Holliday v. Credit Suisse Securities (USA) LLC*, involved a leveraged recapitalization transaction where a company, Boston Generating, took on debt to buy back securities.[75] The funds from that debt first went into Boston Generating's bank account with US Bank, then were transferred to the account of an affiliate with Bank of America ("BofA"), and then were distributed to the company's security holders to buy back their securities.[76] After Boston Generating filed for Chapter 11 years later, the trustee sought to challenge just the transfer from Boston Generating's US Bank account to the BofA account of a separate company.[77] The trustee argued that the court should ignore the subsequent transfer from the BofA account to security holders, which would be a settlement payment and transfer in connection with a securities contract that would cause Section 546(e) to apply and preclude the trustee's fraudulent conveyance claims.[78]

45. The *Holliday* district court rejected the trustee's argument as contrary to *Merit Management*. *Holliday* recognized that the trustee challenged the transfer "in a piecemeal fashion by seeking to avoid one component, the BofA Transfer, but the context of the Leveraged Recap

---

[75] 2021 WL 4150523, at *1-2 (S.D.N.Y. Sept. 13, 2021), *appeal filed*.

[76] *Id.* at *2.

[77] *Id.* at *3.

[78] *Id.*

Transaction cannot be ignored."[79] "Such an approach … would permit a trustee to circumvent the safe harbor by carving up an integrated securities transaction consisting of multiple component parts."[80] "Any safe harbor inquiry that focuses on a component part of that transfer would be contrary to the holding in *Merit*, which instructs that the relevant transfer is not limited to 'any component part.'"[81] Instead, as required by *Merit Management*, the focus should be on the "overarching transfer," which was the leveraged recapitalization transfer where securities were bought back using the funds.[82]

46. Similarly, in *In re SunEdison, Inc.*, affiliates of SunEdison Holdings entered into an agreement to purchase the equity of another company, First Wind.[83] As the first step in that purchase transaction, SunEdison Holdings transferred securities it held to a special purpose entity.[84] As the second step, the special purpose entity pledged those SunEdison Holdings securities for the benefit of the sellers, as part of the consideration for SunEdison Holdings' acquiring an equity interest in First Wind.[85] When SunEdison Holdings filed for Chapter 11 several months later, the trustee sought to avoid the first step transfer as a fraudulent transfer, while urging the court to ignore the second step where the transferred securities were used to buy the equity of another company.[86] As in *Holliday*, the *SunEdison* court rejected the trustee's arguments.

---

[79] *Id*.

[80] *Id*.

[81] *Id*. (quoting *Merit Mgmt.*, 138 S. Ct. at 893).

[82] *Id*.

[83] 620 B.R. at 508.

[84] *Id.* at 509.

[85] *Id.*

[86] *Id.* at 513.

"While *Merit* defined the relevant transfer as the overarching transfer that the trustee seeks to avoid, it does not follow that the trustee can escape the reach of the safe harbor by seeking to avoid an intermediate transfer between non-qualifying participants and sue the qualifying participants of the true overarching transfer as subsequent transferees."[87] *SunEdison* instead found that both steps were part of an "integrated transaction" and thus under *Merit* "the Court must consider the overarching transaction and not limit its inquiry to the Step One component."[88]

47. Other courts have similarly held after *Merit Management* that the overarching transaction, and not individual pieces or components, must be considered when deciding whether Section 546(e) applies.[89]

48. Here, the allegations in the Complaint plainly and repeatedly attack integrated transactions in which funds from DSG were distributed through DSH (DSG's indirect parent) to JPMCFI. For example, the Complaint's introduction alleges that "Sinclair funneled an additional approximately $929 million in cash from DSG, which was then transferred up the corporate chain and used to redeem nearly $850 million of JPMCFI's preferred units."[90] The Complaint includes

---

87 *Id.* at 513.

88 *Id.* at 514-15.

89 *E.g.*, *Quorum Health*, 2023 WL 2552399, at *7 (rejecting trustee's argument that it could seek to avoid an intermediate transaction, and instead holding that the court must consider the overarching transaction); *Crescent Res*, 500 B.R. at 472-74 (pre-*Merit* case rejecting trustee's attempt to isolate a single aspect of the overall transaction and argue Section 546(e) did not apply to that part: "There is simply no factual basis for extracting a single aspect of the 2006 Duke Transaction and analyzing it divorced from its context and relationship to the actual transaction.").

90 Compl. ¶ 11 (emphasis omitted); *see also*, *e.g.*, *id.* ¶ 2 ("Sinclair imposed on DSG the financial burden of making distributions used to fund periodic interest payments to JPMCFI and the repayment of principal …"); *id.* ¶ 12 ("Between September 2019 and June 2020, Sinclair caused DSG to distribute more than $550 million to its immediate parent DSIH for eventual transfer to JPMCFI …"); *id.* ¶ 40 ("In addition, as discussed above, Sinclair used funds from DSG to pay DSH and SBG's obligations on the preferred units held by JPMCFI."); *id.* ¶ 61 ("Diamond was forced to … pay hundreds of millions of dollars in dividends to DSIH for the ultimate purpose of enabling DSH and SBG to satisfy their obligations to JPMCFI under the preferred units …").

copies of the written consents of the boards of DSG, DSH, and the intermediate companies describing the distributions as coming from DSG so that DSH can "make a distribution to its Preferred Member, JPMorgan Chase Funding, Inc."[91] The Complaint further quotes from consolidated financial statements describing the transactions as "'distributions to Diamond Sports Holdings, LLC (DSH), for the redemption of a portion of DSH's preferred equity.'"[92]

49. Therefore, in accord with *Merit Management* and its progeny such as *Holliday* and *SunEdison*, in applying Section 546(e) the Court's analysis cannot be limited to the component parts, such as transfers from DSG to DSIH. Instead, the Court should consider the overarching transaction: funds from DSG were distributed through DSH to JPMCFI.

50. Independently, Section 546(e) precludes avoidance of any settlement payments or transfers in connection with a securities contract made "for the benefit of" a financial participant. As discussed in Section I.C., *infra*, JPMCFI is a financial participant. Moreover, the Complaint plainly alleges that the $929 million was "for the benefit" of JPMCFI, as those funds were used to pay JPMCFI to redeem the preferred equity units or as quarterly distributions to JPMCFI. Thus, regardless of what transaction is considered, Section 546(e) applies because the transfer of the $929 million was "for the benefit" of financial participant JPMCFI.[93]

---

[91] *Id.* ¶ 173.

[92] *Id.* ¶ ¶174, 194 (brackets and ellipses omitted).

[93] *E.g.*, *Quorum Health* 2023 WL 2552399, at *7 (holding that whether the transfer went directly to the financial participant was inconsequential because the transfer was "for the benefit" of the financial participant); *In re Boston Generating LLC*, 617 B.R. 447, 491 (Bankr. S.D.N.Y. 2020) (same).

### B. The Transfers Attacked By Debtors Are Qualifying Transactions Under Section 546(e) As Both Settlement Payments And In Connection With A Securities Contract.

51. A transfer qualifies under Section 546(e) if it is either "in connection with a securities contract, as defined in section 741(7)" or a "settlement payment, as defined in section 101 or 741 of this title."[94] The use of $849.5 million of DSG's funds to redeem JPMCFI's preferred equity attacked by Debtors in the Complaint plainly satisfies *both* of these definitions—and satisfying either one is sufficient for the transfer to be a qualifying transaction under Section 546(e). The remaining $79.5 million in distributions are transfers "in connection with a securities contract," and thus also are qualifying transactions.

#### 1. The Transfers Are In Connection With A Securities Contract.

52. 11 U.S.C. § 741(7) provides the definition of "securities contract" in Section 546(e). That lengthy definition provides in part that a "securities contract" includes:

> (i) a contract for the purchase, sale, or loan of a security, …, and including any repurchase or reverse repurchase transaction on any such security …
>
> (vii) any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph; …

53. As the Second Circuit has explained, Section 741(7) "defines 'securities contract' with extraordinary breadth."[95] Under that section, "the term 'securities contract' expansively includes contracts for the purchase or sale of securities, as well as any agreements that are similar or related to contracts for the purchase or sale of securities."[96] Courts within the Fifth Circuit have similarly held that "the plain language of section 741(7) is very broad in its application and

---

94 11 U.S.C. § 546(e).

95 *In re Bernard L. Madoff Inv. Secs. LLC*, 773 F.3d 411, 417 (2d Cir. 2014).

96 *Id.* at 418.

encompasses virtually any contract for the purchase or sales of securities and a wide array of related contracts."[97] "This concept is broadened even farther because § 546(e) also protects a transfer that is 'in connection' with a securities contract."[98]

54. The Complaint alleges that DSH issued units of "preferred equity" to JPMCFI.[99] Equity, whether preferred or common, falls squarely within the meaning of "security," and court opinions and other authorities regularly refer to preferred equity as a security.[100] Especially given the "security contract" definition's "extraordinary breadth," DSH's issuance of preferred equity to JPMCFI falls within that definition.

55. Here, DSH's $849.5 million redemption of JPMCFI shares, allegedly using distributions of cash from DSG, falls squarely within the definition of a "security contract." That definition includes "any repurchase … transaction on any such security," which is precisely the type of transaction the Complaint alleges between DSH and JPMCFI.

56. The remaining $79.5 million in quarterly distributions likewise were made "in connection with a securities contract." As previously explained, "securities contract" expansively includes contracts for the purchase or sale of securities. The Complaint alleges that the preferred

---

97 *Crescent Res.*, 500 B.R. at 475-76 (internal quotation marks and brackets omitted).

98 *Bernard L. Madoff*, 773 F.3d at 418; *see also Crescent Res.*, 500 B.R. at 476 ("Similarly, Section 546(e)'s 'in connection with' language is by its own terms very broad; in the context of avoidance of transfers it has been interpreted to mean 'related to an agreement.'") (internal quotation marks omitted).

99 Compl. ¶ 2 ("Sinclair obtained additional financing by causing defendant DSH (a shell Sinclair subsidiary created for the acquisition) to issue $1.025 billion in units of what purported to be preferred equity to JP Morgan Chase Financing, Inc. ('JPMCFI')."); *id.* ¶ 171 (referring to JPMorgan's recommendation to Sinclair management that it pay down "'preferred equity'"); *id.* ¶¶ 174, 194 (referencing financial statements referring to distribution made to DSH "'for the redemption of a portion of DSH's preferred equity'").

100 *E.g.*, *Quantum Capital, LLC v. Banco de los Trabajadores*, 2016 WL 10536988, at *3 (S.D. Fla. Sept. 8, 2016); *In re Elec. Components Int'l, Inc.*, 2010 WL 3350305, at *17 (Bankr. D. Del. May 11, 2010); *In re Accuride Corp.*, 2009 WL 7226901, at *3 (Bankr. D. Del. Dec. 21, 2009).

equity units are governed by contracts,[101] and thus those contracts are securities contracts within the scope of Section 546(e). The Complaint also alleges that those contracts required that quarterly distributions be paid to JPMCFI: "Under Article IV, Section 4.2 of the DSH LLC Agreement, DSH was required to make quarterly distributions to JPMCFI on account of the preferred units."[102] As the quarterly distribution are required by a securities contracts, paying those distributions is a transfer "in connection with a securities contract," and thus a qualifying transfer under Section 546(e).

#### 2. The Transfers Of The $849.5 Million Used To Redeem The Preferred Equity Units Are Settlement Payments.

57. For the definition of "settlement payment," Section 546(e) refers to 11 U.S.C. § 101(51A) or 11 U.S.C. § 741(8). These sections define "settlement payment" as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." Courts have clarified that this definition refers to "the transfer of cash or securities made to complete a securities transaction."[103] As with consideration of what constitutes "a securities contract," courts have held that the definition of "settlement payment" is "extremely broad."[104] Federal circuit courts have rejected attempts to restrict the definition of "settlement

---

[101] Compl. ¶¶ 164-68.

[102] *Id.* ¶ 166.

[103] *Enron Creditors*, 651 F.3d at 334 (internal quotation marks and brackets omitted); *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 985 (8th Cir. 2009), *abrogated on other grounds by Merit Mgmt.*, 138 S. Ct. 883.

[104] *Enron Creditors*, 651 F.3d at 334 (internal quotation marks omitted) (collecting cases); *see also Crescent Res.*, 500 B.R. at 472 ("[M]ost courts agree that the Code's understanding of a settlement payment is extremely broad and encompasses most transfers of money or securities made to complete a securities transaction") (internal quotation marks and brackets omitted) (collecting cases).

payment" to only publicly traded securities, transactions involving financial intermediaries, transactions that do not retire securities, and other supposed limitations.[105]

58. The alleged use of $849.5 million in DSG's funds to redeem the JPMCFI preferred equity easily falls well within the definition of "settlement payment." According to the Complaint, cash from DSG was transferred to complete a securities transaction, namely the redemption of preferred equity from JPMCFI. The Second Circuit and other courts have held that the payment of cash to redeem securities is a settlement payment under Section 546(e).[106]

59. Therefore, the $849.5 million transfer is a qualifying transaction under Section 546(e) under two separate and alternate grounds: "in connection with a securities contract" and as a "settlement payment."

**C. Both DSH and JPMCFI Are "Financial Participants" In The Transaction.**

60. The final question for applying Section 546(e) is whether at least one of the parties to the transfer is a qualifying participant. A qualifying participant under Section 546(e) includes a "financial participant." A "financial participant" includes "an entity that, at the time it enters into a securities contract … has one or more agreements or transactions described in paragraph (1), (2), (3), (4), (5), or (6) of section 561(a) with the debtor or any other entity (other than an affiliate) of a total gross dollar value of not less than $1,000,000,000 in notional or actual principal amount outstanding … at such time or on any day during the the 15-month period preceding the

---

[105] *Enron Creditors*, 651 F.3d at 334-35; *see also In re Olympic Natural Gas Co.*, 294 F.3d 737, 742 & n.5 (5th Cir. 2002) (rejecting attempts to narrow language of, and impose additional requirements regarding, Section 546(e) in the context of forward contracts); *MBS Mgmt.*, 690 F.3d at 356 (same).

[106] *Enron Creditors*, 651 F.3d at 336 ("Enron next argues that the redemption payments are not settlement payments because they involved the retirement of debt, not the acquisition of title to the commercial paper. We find no basis in the Bankruptcy Code or the relevant caselaw to interpret § 741(8) as excluding the redemption of debt securities."); *see also Tribune*, 946 F.3d at 80-81 (under "in connection with a securities contract" prong, rejecting argument that payment for redemption of shares was not in connection with a securities contract, and instead holding that such a redemption satisfied this prong).

date of the filing of the petition …" 11 U.S.C. § 101(22A)(A). This definition of "financial participant" refers to 11 U.S.C. § 561(a)(1) and other subsections, which includes "securities contracts, as defined in section 741(7)."

61. The Debtors' own allegations in the Complaint make clear that both DHS and JPMCFI meet this definition of a "financial participant." As explained in Section I.B.1, *supra*, DSH's issuance of preferred equity to JPMCFI as part of Sinclair's purchase of Diamond is a "securities contract." Thus, that issuance (a) qualifies as a "securities contract", (b) is an "agreement[] or transaction" under Section 561(a)(1), and (c) was between entities (DSH and JPMCFI) that are not affiliates, satisfying those elements of the "financial participant" definition.

62. The remaining question is whether those agreements or transactions had an amount outstanding of over $1 billion at a time specified in the statute. Under the plain language of Section 546(e), the time for measuring that amount outstanding includes "at time [the entity] enters into a securities contract."[107] This is the "such time" referred to in the portion of the definition specifying the measurement times: "***at such time*** or on any day during the 15-month period preceding the date of the filing of the petition."[108]

63. The Complaint repeatedly alleges that DSH issued $1.025 billion in preferred equity units to JPMCFI.[109] Thus, at the time DSH and JPMCFI entered into the securities contract (the issuance of preferred equity from DSH to JPMCFI) both were parties to agreements or

---

[107] 11 U.S.C. § 101(22A)(A); *see also In re Samson Res. Corp.*, 2022 WL 3135288, at *4 (Bankr. D. Del. Aug. 4, 2022) (holding that "whether an entity is a financial participant is not determined on the transfer date, but on the dates set forth in the Bankruptcy Code's definition of financial participant as § 101(22A).").

[108] 11 U.S.C. § 101(22A)(A) (emphasis added).

[109] *E.g.*, Compl. ¶¶ 2, 39, 161.

transactions with an amount outstanding of over $1 billion, namely the $1.025 billion issuance in preferred equity units.

64. The Debtors' own allegations thus demonstrate that both DSH and JPMCFI are "financial participants" and thus are qualifying participants under Section 546(e).[110] And accordingly, each of the the requirements for application of Section 546(e) are satisfied here.

**D. Except for 11 U.S.C. § 548(A)(1), Section 546(e) Bars All Other Claims Based On the JPMCFI Transfers.**

65. Because it applies to the JPMCFI preferred equity transfers, Section 546(e) bars all of the Debtors' claims based on those transfers—whether brought under federal or state law—other than the Debtors' (otherwise deficient) claim for actual fraud under 11 U.S.C. § 548(a)(1)(A). Courts have repeatedly held that Section 546(e)'s plain language bars all other avoidance actions under the Bankruptcy Code, including state law claims brought under 11 U.S.C. § 544(b). Moreover, courts have held that Section 546(e) preempts any state law claims that would have the effect of avoiding, or seek to recover based on, a transfer covered by Section 546(e), as such claims would frustrate its purposes and effectively render the provisions a nullity.

66. *First*, by its plain language, except for Section 548(a)(1)(A), Section 546(e) bars all other claims for fraudulent conveyances under the Bankruptcy Code. Section 546(e) starts by stating "[n]otwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer …." Therefore, *all* the Complaint's claims based on these cited provisions are barred by Section 546(e) on its face.

[110] Sinclair reserves all arguments that DSH and JPMCFI are qualifying participants based on facts not alleged in the Complaint, including but not limited to those entities being parties to other securities contracts with requisite amounts outstanding and/or are "financial institutions." *See, e.g.*, *Tribune*, 946 F.3d at 78-80 (holding that non-financial party was "financial institution" based on its being the customer of a trust company and bank).

67. *Second*, Section 546(e) also precludes all state law avoidance claims brought through Section 544(b). As described in the preceding paragraph, Section 546(e) expressly states that when it applies a debtor may not avoid a transaction under Section 544, which includes all sections of that provision. Courts have expressly held that Section 546(e) bars any state law avoidance claims brought under Section 544.[111] The Debtors' state law avoidance claims are therefore barred for the same reason as their claims under the Bankruptcy Code.

68. *Third*, courts have similarly barred attempts to bring stand-alone state law claims that seek recovery or damages for payments that are not avoidable under Section 546(e) as being preempted under federal law. "Under the implied preemption doctrine, state laws are 'pre-empted to the extent of any conflict with a federal statute. Such a conflict occurs when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"[112] Section 546(e) "by its terms compels its application to every transaction that constitutes a 'settlement payment' [or 'in connection with a securities contract'] without exception."[113]

69. Multiple circuit courts have recognized that allowing state law claims seeking to recover for transfers that cannot be avoided under Section 546(e) conflicts with that provision. As the Eighth Circuit succinctly explained, "[t]hrough its state law claims, [the trustee] seeks to

---

[111] *E.g.*, *Tribune*, 946 F.3d at 84 ("Section 546(e) thus expressly prohibits trustees et al. from using their Section 544(b) avoidance powers and (generally) Section 548 against the transfers specified in Section 546(e)."); *Bernard L. Madoff*, 773 F.3d at 415-16 (holding that Section 546(e) barred trustee's claims under New York's fraudulent conveyance law brought pursuant to 11 U.S.C. § 544(b)); *BMO Harris Bank, N.A. v. Petr, Tr. for BWGS, LLC*, 2023 WL 3203113, at *12 (S.D. Ind. May 2, 2023) ("[D]espite what § 544 may allow the Trustee to do – here, he alleges that it allows him to recover the Transfer under [the Indiana Uniform Voidable Transactions Act] – he cannot do so if the Transfer falls within § 546(e)'s safe harbor."), *appeal filed*.

[112] *Tribune*, 946 F.3d at 81 (quoting *Hillman v. Maretta*, 569 U.S. 483, 490 (2013)) (brackets and ellipses omitted).

[113] *In re Hechinger Inv. Co. of Del.*, 274 B.R. 71, 97 (D. Del. 2002).

recover the same payments we have already held are unavoidable under § 546(e). Allowing recovery on these claims would render the § 546(e) exemption meaningless, and would wholly frustrate the purpose behind that section."[114] Similarly, the Second Circuit "conclude[d] that the purposes and history of that Section [546(e)] necessarily reflect an intent to preempt" state law fraudulent conveyance claims.[115]

70. District and bankruptcy courts have similarly concluded that Section 546(e) preempts state law claims. For example, the Delaware district court has explained, "[c]laims that Congress deemed unavoidable under sections 544(b) and 546(e) of the Bankruptcy Code can not be avoided by simply re-labeling avoidance claims as unjust enrichment claims; if they could, the exemption set forth in section 546(e) would be rendered useless."[116]

71. Notably, while Section 546(e) does not bar actual fraud claims under Section 548(a)(1)(A), courts hold that Section 546(e) *does* preempt state law claims for actual or intentional fraud. Section 546(e)'s plain language precludes avoidance based on any claim besides section 548(a)(1)(A), and thus covers state law actual and intentional fraud claims. Other courts have concluded that they are "bound by the plain language of section 546(e), which provides an exception only for intentional fraudulent transfer claims brought under the Bankruptcy Code and

---

[114] *Contemporary Indus*, 564 F.3d at 988.

[115] *Tribune*, 946 F.3d at 90.

[116] *Hechinger Inv. Co. of Del.*, 274 B.R. at 96; *see also BMO Harris*, 2023 WL 3203113, at *12 ("[I]f the Trustee has asserted stand-alone claims under the [Indiana fraudulent transfer statute], those claims would be preempted by § 546(e). … [O]ther Circuit Courts have found that § 546(e) preempts state law claims."); *Holliday*, 2021 WL 4150523, at *8-9 (holding that state law intentional fraudulent conveyance claims were preempted by Section 546(e)); *In re Nine West LBO Secs. Litig.*, 482 F. Supp. 3d 187, 203 (S.D.N.Y. 2020) (holding that state law fraudulent conveyance claims brought without involving Section 544 were preempted by Section 546(e); *see also In re Fairfield Sentry Ltd.*, 2020 WL 7345988, at *9 (Bankr. S.D.N.Y. Dec. 14, 2020) ("Several courts have ruled that state law claims that seek to recovery transfers shielded by the Safe Harbor are impliedly preempted by 11 U.S.C. § 546(e). … Allowing a plaintiff to recover a safe harbored transfer by attaching a different label to the claim would frustrate the purpose of section 546(e)," though holding that these principles did not apply to claims brought under foreign law).

no more."[117] "[S]tate law intentional fraudulent transfer claims are not excepted from section 546(e)'s coverage within the section 548(a)(1)(A) exception to section 546(e) nor anywhere else in section 546(e) of the Bankruptcy Code."[118] This bar makes sense as "state law fraudulent transfer statutes are far from uniform" and "Congress may have specifically excluded state law intentional fraudulent transfer claims from section 546(e)'s exception … based on a fear that inconsistent application of fifty (50) states' fraudulent transfer statutes would result in instability in the securities markets."[119]

72. Accordingly, all of the Debtors' state law claims seeking recovery or damages for the transfers covered by Section 546(e) are preempted, regardless of whether they require actual or intentional fraud. This preemption also covers Count IV alleging that the transfers to redeem the JPMCFI preferred units are unlawful distributions, as those challenge the exact transfers that are settlement payments and/or made in connection with a securities contract, and thus are protected by Section 546(e).

73. Based on the foregoing, Section 546(e) bars all of Debtors' claims in the Counts I through IV of the Complaint, except for the Debtors' actual fraud claims under 11 U.S.C. § 548(a)(1)(A).

## II. PAYMENTS REQUIRED UNDER THE MSA ARE NOT CONSTRUCTIVE FRAUDULENT TRANSFERS (COUNTS VI AND VII).

74. The Debtors' constructive fraud claims based on DSG's payments under the MSA should be dismissed because the payments were made to satisfy prior contractual commitments.

---

[117] *In re Boston Generating*, 617 B.R. 442, 479 (Bankr. S.D.N.Y. 2020).

[118] *Id.* at 480; *see also Holliday*, 2021 WL 4150523, at *8-9 (holding that preemption holding of *Tribune* "extends to intentional fraudulent conveyance claims").

[119] *Boston Generating*, 617 B.R. at 479-80.

Count VI of the Complaint alleges constructive fraud claims under 11 U.S.C. § 548, and under the Maryland Uniform Fraudulent Conveyance Act and the Delaware Uniform Fraudulent Transfer Act through 11 U.S.C. § 544(b), while Count VII seeks recovery of the supposedly avoidable transfers. But these constructive fraud claims grounded in MSA payments fail because such payments were to satisfy prior contractual commitments—DSG's obligations under the MSA—and thus were for reasonably equivalent value based on established Fifth Circuit precedent.[120]

75. The constructive fraud statutes under federal bankruptcy law[121] and the Delaware code[122] both require that a plaintiff prove that the debtor did not receive "reasonably equivalent value" for the transfer or obligation. This term has an identical meaning under both federal bankruptcy and Delaware law, as the "relevant Delaware's Uniform Fraudulent Transfer Act and applicable Bankruptcy Code provisions mirror each other, and 'Delaware Courts have interpreted and applied them uniformly.'"[123] Maryland law likewise requires the conveyance be made without "fair consideration," which courts interpret similarly to reasonably equivalent value under federal

[120] While the Complaint cites 11 U.S.C. § 544(b) to allege claims under both Maryland and Delaware law, only one state's law can apply to its claims. Courts within this circuit generally have considered fraudulent conveyance claims to be torts, and thus looked to factors such where the injury occurred, where the conduct causing the injury occurred, the location of the parties, and where the parties' relationship is centered. *E.g.*, *In re Cyrus II P'ship*, 413 B.R. 609, 613-21 (Bankr. S.D. Tex. Nov. 24, 2008); *In re Gulf Fleet Holdings, Inc.*, 491 B.R. 747, 763-65 (Bankr. W.D. La. Apr. 2, 2013). These factors weigh in favor of applying Maryland law, as DSG has its primary place of business in Maryland and thus was injured there, and the Sinclair Defendants likewise have their primary places of business in Maryland and thus their conduct and the parties' relationship was centered there. Compl. ¶¶ 23-26. Nevertheless, Sinclair will address the fraudulent conveyance laws of both states.

[121] 11 U.S.C. § 548(a)(1)(B).

[122] 6 Del. C. § 1304(a)(2).

[123] *In re OPP Liquidating Co.*, 2022 WL 774063, at *12 n.101 (Bankr. D. Del. Mar. 14, 2022) (quoting *Crystallex Int'l Corp. v. Petróleos De Venezuela, S.A.*, 879 F.3d 79, 86 (3d Cir. 2018)).

law.[124] In short, where a debtor has received reasonably equivalent value or fair consideration, then the debtor has no claim for a constructive fraudulent conveyance.

76. As the Fifth Circuit recently explained in *In re Louisiana Pellets, Inc.*, "[w]hether a debtor received reasonably equivalent value is a two-part inquiry: (1) whether the debtor received value, and (2) whether that value was reasonably equivalent."[125] "Value is determined as of the date of transfer."[126] "Although the minimum quantum necessary to constitute reasonably equivalent is undecided, it is clear that the debtor need not collect a dollar-for-dollar equivalent to received reasonably equivalent value."[127]

77. Relevant in this matter, "[w]hen a debtor makes a payment on antecedent debt and receives a dollar-for-dollar reduction of that debt … the question is easy because the debtor by definition receives reasonably equivalent value—indeed, *exactly* equivalent value, assuming of course that the debt itself was based upon value."[128] Applying this principle, *Louisiana Pellets* held that payments pursuant to change orders for Phase II of building a factory were not avoidable, even though Phase II was never completed: "The dollar-for-dollar reduction of [debtor] GPLA's obligation to pay [defendant] Wessel under the Second Change Order was reasonably equivalent value for those three payments … . Separate from the antecedent debt, it was also not clear error to hold that GPLA received reasonably equivalent value in another form: These payments ensured

124 *Tradepoint Atl., LLC v. Envtl. Liab. Transfer, Inc.*, 2022 WL 4564633, at *10 (D. Md. Sept. 29, 2022); *Kingsville Dodge, LLC v. Almy*, 2007 WL 2332699, at *2 (D. Md. July 30, 2007).

125 838 F. App'x 45, 49 (5th Cir. 2020).

126 *Id.* at 49 (internal quotation marks omitted).

127 *Id.* at 50 (internal quotation marks omitted).

128 *Id.*

that GPLA did not breach the contract, keeping alive 'the expected future benefit' of Line B1, and potentially Phase II."[129]

78. In reaching its holding, the *Louisiana Pellets* court cited with approval *In re Gulf Fleet Holdings, Inc.*, a case with facts and claims closely similar to this one with respect to the Debtors' theories and insinuations.[130] In *Gulf Fleet*, the defendant H.I.G. Capital had engaged in a leveraged buyout transaction ("LBO") to purchase the debtor Gulf Fleet.[131] After the LBO, H.I.G. allegedly "'dominated and controlled' Gulf Fleet," including through appointing H.I.G. employees to the boards of directors of Gulf Fleet entities.[132] H.I.G. also required Gulf Fleet to enter into two services agreements known as the PSA and CSA, where H.I.G. would provide professional advice and assist in potential acquisitions in exchange for Gulf Fleet paying an annual fee of $500,000 as well as other fees.[133] These fees were paid when Gulf Fleet was allegedly insolvent.[134] The *Gulf Fleet* trustee alleged that "H.I.G. 'provided no value to Gulf Fleet for these arrangements'" and "the agreements 'were an artifice used to funnel money from Gulf Fleet to other arms of the H.I.G. enterprise.'"[135] The litigation trustee further alleged that "H.I.G. intended to undercapitalize Gulf Fleet and to take actions that solely benefitted H.I.G.'s interests at the expense of Gulf Fleet and its creditors."[136]

---

[129] *Id.* at 51-52.

[130] 491 B.R. 747, 766 (Bankr. W.D. La. Apr. 2, 2013)

[131] *Id.* at 757.

[132] *Id.* at 758.

[133] *Id.*

[134] *Id.* at 766.

[135] *Id.* at 758.

[136] *Id.* at 759.

79. Three years after the LBO, Gulf Fleet and its affiliates filed for Chapter 11.[137] The litigation trustee brought various claims, including arguing that the payments under the CSA and PSA were constructive and actual fraudulent transfers[138]—the same claims Debtors make here. The *Gulf Fleet* court rejected the trustee's arguments and dismissed these claims. The *Gulf Fleet* court began with the trustee's claims to avoid the CSA and PSA payments as constructive fraudulent transfers. "The Trustee's argument with respect to avoiding these payments as constructive fraudulent transfers runs into the immediate problem that the payments were made to satisfy an antecedent debt—the contractual obligations imposed by the CSA and PSA."[139] "By definition, Gulf Fleet received reasonably equivalent value from the satisfaction of its contractual obligations under these agreements. 11 U.S.C. § 548(d)(2)(A) (defining 'value' to include the 'satisfaction or securing of a present or antecedent debt of the debtor.')"[140] "Given the definition of value in section 548, courts have uniformly held that such payments are not avoidable as constructively fraudulent transfers."[141] "Here, the PSA and CSA defined and fixed Gulf Fleet's obligation to pay specific lump sum management fees of approximately $500,000 per year as well as other fees, expense reimbursements, and commissions. As a result, the Trustee cannot avoid these individual payments as constructive fraudulent transfers under section 548 based on the facts pled in the Complaint."[142] *Gulf Fleet* thus demonstrates that DSG received reasonably equivalent

---

137 *Id.* at 760.

138 *Id.* at 765-66.

139 *Id.* at 766.

140 *Id.*

141 *Id.*

142 *Id.* In a subsequent decision, the *Gulf Fleet* court denied a motion to dismiss an amended complaint alleging (1) fraudulent transfers based on payments from Gulf Fleet subsidiaries that were not parties to the CSA or PSA, and (2) a preference action under 11 U.S.C. § 547(b) based on the CSA payments. *In re Gulf Fleet Holdings, Inc.*,

value in making the MSA payments, as those payments satisfied its existing contractual obligations, and mandates dismissal of Debtors' constructive fraud claims based on these MSA payments.

80. Other courts have reached similar decisions in holding that payments made to satisfy existing contractual obligations provide reasonably equivalent value and thus cannot be avoided. For example, in *In re Duke & King Acquisition Corp.*, private equity firms known as the Kinderhook defendants had created Duke & King, the debtor, to purchase fast food restaurants.[143] Duke & King's board of directors was made up primarily of Kinderhook insiders.[144] The Kinderhook defendants entered into a Management Services Agreement with Duke & King obligating Duke & King to pay annual management fees to Kinderhook defendants.[145] The Kinderhook defendants allegedly used their control of Duke & King's board of directors to cause Duke & King to enter into the Kinderhook MSA.[146] At the time Duke & King incurred this liability and when payments were made, Duke & King was allegedly insolvent.[147] After Duke & King filed for Chapter 11, the litigation trustee brought constructive fraudulent conveyance claims, asserting that Duke & King "'received little or no tangible benefit in exchange for the management fees'" and sought to avoid the fees as fraudulent conveyances.[148]

2014 WL 4560441, at *10-11 (Bankr. W.D. La. Apr. 2, 2014). Here, Diamond does not allege that any non-parties to the MSA made the $420 million-plus in payments and accruals, and does not bring a claim under Section 547.

143 508 B.R. 107, 116-17 (Bankr. D. Minn. 2014)

144 *Id.* at 118.

145 *Id.* at 119.

146 *Id.*

147 *Id.* at 120.

148 *Id.* at 142.

81. As in *Gulf Fleet*, the *Duke & King* court rejected this claim, holding that the debtors could not avoid the management fees because they had received reasonably equivalent value:

> [T]he execution of the MSA imposed a contractual duty on Duke and King to pay the management fees, and it gave a right to receive them to the Kinderhook entity-defendants. This created a debt in the sense of the Bankruptcy Code, 11 U.S.C. §§ 101(5)(A) and (12), which became due as the deadlines for payment passed pursuant to the terms of the MSA. The $350,000.00–odd that was actually paid in *partial* satisfaction of that debt abated the contractual liability dollar-for-dollar. Hence there was value that was reasonably equivalent to the extent of the amounts paid.[149]

82. The same principle applies here, where the Complaint pleads that DSG entered into the MSA and under "the MSA, Sinclair agreed to provide DSG a range of critical managerial, operational, and administrative services," such as "affiliate sales and market services, … and general and administrative services, including legal and business affairs, finance and accounting, IT support, payroll, employee benefits, and insurance."[150] In exchange for this wide array of critical services, the MSA obligated DSG to make management fees and incentive fees specified by the contract's terms.[151] The alleged $420 million-plus that DSG seeks to avoid are the amounts it paid or accrued as required by, and to comply with, the MSA's terms. Under the squarely applicable precedent of *Gulf Fleet* and *Duke & King*, as well as the broader principles of *Louisiana Pellets*, DSG plainly received reasonably equivalent value in exchange for making the MSA payments. Accordingly, the Complaint fails to state a claim for constructive fraudulent conveyance with respect to those payments and Counts VI and VII should be dismissed.

---

149 *Id.* at 148 (emphasis in original). *See also In re Dual D Heath Care Operations, Inc.*, 2021 WL 3083344, at *11 (Bankr. N.D. Tex. July 21, 2021) (dismissing constructive fraud claims "because each of the Contractual Payments also resulted in a dollar-for-dollar satisfaction of the contractual liability imposed under the terms of the applicable Kemp Agreement [including those for management services], the Debtor also received reasonably equivalent value in exchange for each such Contractual Payment.").

150 Compl. ¶¶ 109-10.

151 *Id.* ¶ 110.

## III. THE COMPLAINT FAILS TO PLAUSIBLY PLEAD THE DEBTORS' ACTUAL INTENT TO DEFRAUD CREDITORS AS REQUIRED TO PREVAIL ON AN ACTUAL FRAUD CLAIM (COUNTS I, III, V, VII, IX, XI).

83. To establish claims for actual fraudulent conveyance, the Debtors must plead facts demonstrating Sinclair's actual intent to defraud creditors. They fail to do so, and these claims should therefore be dismissed.

84. Specifically, for a claim of actual fraud under 11 U.S.C. § 548(a)(1)(A), a plaintiff must plead, among other requirements, that "the debtor voluntarily or involuntarily— … made such transfer or incurred such obligation with actual intent to hinder, delay, defraud any entity" to which the debtor was indebted. Delaware Code § 1304(a)(1) contains functionally identical language: the plaintiff must show that "the debtor made the transfer or incurred the obligation … [w]ith actual intent to hinder, delay or defraud any creditor of the debtor." Similarly, Maryland Code Commercial Law § 15-207 provides that "Every conveyance made and every obligation incurred with actual intent … to hinder, delay, or defraud present or future creditors" is fraudulent.

85. Under the plain language of these statutes, a plaintiff must establish the *debtor transferor's* actual intent. As a recent case explains, to "succeed on a claim for the avoidance of an actual fraudulent transfer, however, a plaintiff must establish that the *debtor transferor* intended to hinder, delay or defraud its creditors in making the transfer, not that the *recipient transferees* intended such outcome."[152]

86. Claims for actual fraud must also satisfy the heightened pleading requirements of Rule 9(b). And as with other claims, *Twombly* and *Iqbal* require plaintiffs to allege sufficient factual content to create a reasonable inference that the defendant is liable, which here means

---

[152] *Dual D*, 2021 WL 3083344, at *14 & n.70 (emphasis in original) (collecting cases).

providing sufficient factual content to establish the debtor's actual intent.[153] "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."[154]

87. "Because of the difficulties in proving intent to defraud, a pleader may rely on 'badges of fraud,' i.e., circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent."[155] "No particular 'badge' is dispositive, and courts typically require the confluence of multiple badges to establish fraudulent intent."[156]

88. As with the constructive fraud claims related to the MSA, *Gulf Fleet* and *Duke & King* are instructive as to why the Complaint here fails to sufficiently plead that DSG had an actual intent to defraud its creditors. In *Gulf Fleet*, as here, the trustee alleged a series of "badges of fraud" that supposedly evidenced direct or circumstantial evidence of the debtors' actual intent to defraud creditors.[157] *Gulf Fleet* held that many of these supposed badges did not show fraud, as they were consistent with the debtors paying their contractual obligations under the CSA and PSA.[158] For example, *Gulf Fleet* held with respect to the badge of "'lack or inadequacy of consideration,' these payments were made to satisfy antecedent debts and, as explained above, resulted in the receipt of reasonably equivalent value by definition."[159] The timing of the payments was not in response to financial difficulties, additional debt, or the threat of lawsuits—which are

---

153 *Supra* ¶ 29.

154 *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

155 *In re Tribune Co. Fraudulent Conveyance Litig.*, 10 F.4th 147, 160 (2d Cir. 2021).

156 *Gulf Fleet*, 491 B.R. at 767.

157 *Id.*

158 *Id.* at 767-68.

159 *Id.*

potential badges of fraud—but instead "the timing of the payments from 2007 to 2009 appears consistent with the yearly payment obligations of the CSA and PSA as opposed to the financial condition of Gulf Fleet."[160] Likewise, while the *Gulf Fleet* debtors alleged a badge based on "the general chronology of the events and transactions," the court held this was "more consistent with a debtor attempting to comply with its contractual obligations than attempting to delay, hinder, or defraud creditors."[161]

89. *Duke & King* similarly dismissed the trustee's actual fraud claims, finding that he had not sufficiently alleged a "creditor-targeted scheme."[162] Notably, *Duke & King* acknowledged that the trustee had adequately pled three badges of fraud—that the transferees were insiders, the debtors were insolvent at the time, and the transfers were made in the face of substantial debts—yet held that even these three were not a sufficient confluence of badges to establish fraudulent intent.[163]

90. As in *Gulf Fleet* and *Duke & King*, the Complaint's alleged bases for actual fraud related to the MSA payments here are plainly insufficient to satisfy their pleading requirements.[164] These bases were already rejected by *Gulf Fleet* and *Duke & King* and are otherwise insufficient to plead actual fraud:

- The Complaint alleges that DSG received less than reasonably equivalent value from the MSA payments and those payments benefitted Sinclair at the expense of

---

160 *Id.*

161 *Id.*

162 508 B.R. at 139-40.

163 *Id.*

164 Compl. ¶ 281.

DSG's creditors,[165] but as previously explained those payments were made to satisfy DSG's contractual obligations for the critical services Sinclair provided, and to prevent DSG from breaching the MSA. Thus, DSG received reasonably equivalent value from the MSA payments, and conversely Sinclair did not receive an improper benefit from the payment nor did those payments disadvantage DSG's creditors.

- The Complaint alleges that the MSA was drafted by Sinclair and the MSA payments were made to an insider of DSG,[166] but this was equally true in *Gulf Fleet* and *Duke & King*, where the trustees in those cases alleged that the parent companies dominated and controlled the debtors and required them to enter into the contracts.[167]
- Similarly, DSG alleges that it was insolvent (or had unreasonably small assets, or would incur debts beyond its ability to pay) when it made the MSA payments and that Sinclair was aware of that insolvency,[168] but the same was true in *Gulf Fleet* and *Duke & King*.[169] Moreover, an allegedly insolvent company making payments pursuant to existing contractual obligations is common—for example, insolvent companies regularly pay trade creditors. Indeed, DSG breaching the MSA and

---

[165] *Id.* ¶ 281(b), (f).

[166] *Id.* ¶ 281(a), (d).

[167] *Gulf Fleet*, 491 B.R. at 758; *Duke & King*, 508 B.R. at 119.

[168] Compl. ¶ 281(c), (a) [sic]. The Complaint letters the fourth alleged basis for fraud with an "a.", instead of a "d."

[169] *Gulf Fleet*, 491 B.R. at 766; *Duke & King*, 508 B.R. at 120.

causing the withdrawal of the critical services STG was providing would have resulted in a worse outcome for creditors.

- The Complaint alleges the "Defendants" concealed information from Duff & Phelps in connection with their fairness opinions,[170] but the question here is DSG's intent, not the Sinclair Defendants' intent. Moreover, the Complaint does not explain how the information the Sinclair Defendants allegedly provided to Duff & Phelps could show an intent to defraud DSG's creditors. Indeed, the Complaint repeatedly emphasizes that Duff & Phelps' task was to opine whether the MSA was fair to Sinclair, not the fairness to DSG.[171]
- Finally, despite Diamond taking a dozen deposition and receiving tens of thousands of documents through a pre-filing investigation, the Complaint relies on its constant refrain that "Sinclair's Executive Chairman" said he wanted to "milk" Diamond,[172] but this lone statement cannot paper over the absence of any badges of fraud or other factual content that could establish Diamond's fraudulent intent. Moreover, this supposed statement (which is disputed) is not alleged to have occurred until "late 2021,"[173] long after the MSA was signed and when DSG had spent two years receiving, and paying for, the critical services STG provided. Regardless, this supposed statement sheds no light on whether *Diamond* made the MSA payments with fraudulent intent, which is what must be pleaded (and is not). The allegations

---

170 Compl. ¶ 281(e).

171 *Id.* ¶¶ 130-31.

172 *Id.* ¶¶ 106, 281(g).

173 *Id.* ¶ 106.

regarding DSG's intent in making the MSA payments do not show anything besides satisfying contractual obligations.

91. For similar reasons, the Complaint fails to plead actual fraud claims related to DSG's distributions. These distributions did not go into the pockets of SBG or its actual owners. Instead, the overwhelming majority of these distributions—$849.5 million—were used to repay obligations incurred as part of Sinclair's purchase of the Diamond RSNs. Specifically, these distributions were made to redeem the preferred equity units DSH issued to JPMCFI as part of the purchase. Notably, JPMCFI is wholly independent of the Sinclair Defendants, and the Complaint does not allege otherwise and is further evidenced by the separate suit brought against JPMCFI. Moreover, JPMorgan allegedly observed that "'paying down preferred equity is more NPV positive than buying back DSG notes.'"[174]

92. As for the remaining $79.5 million in quarterly distributions to JPMCFI, most of these were made in 2019 or the first half of 2020,[175] when Diamond's financial performance was relatively robust. The Complaint does plead any factual content, such as comparisons to the distributions made by companies of similar size and industry as Diamond, to support that these distributions were unusually large or otherwise improper. Moreover, as with the funds used for redemptions, the Complaint alleges these distributions were made to an independent third party, JPMCFI.[176]

93. Given these allegations, the Complaint's supposed bases for actual fraud related to the distributions are insufficient to satisfy their pleading requirements:

---

174 *Id.* ¶ 171 (brackets omitted).

175 *Id.* ¶ 193.

176 *Id.* ¶ 162.

- Diamond alleges that it did not receive consideration for these distributions and the distributions were initially made to an insider (though the distributions ultimately were paid to an outsider, JPMCFI), but that is true for nearly all distributions. As explained in *Lippe v. Bairnco Corp.* in rejecting a claim to avoid dividends as fraudulent transfers, "[o]f course, no consideration was paid for the dividends and there was a close relationship between [debtor] and [parent], but this is always the case in a dividends situation and it is a generally accepted practice for a corporation to pay dividends to its shareholders."[177] Thus, that distributions are made without the debtor receiving consideration says little to nothing about whether the debtor had the actual intent to defraud creditors. After all, the overwhelming majority of companies make distributions to their owners, and this is not because they intend to defraud their creditors but instead because this is a regular course of their business. Here, Diamond's own allegations weigh even more strongly against relying on this supposed factor as an inference of fraudulent intent as the overwhelming majority of these distributions were used to redeem the JPMCFI preferred units, instead of being used to enrich DSG's owners. Thus, the Complaint's allegations are consistent simply with Diamond making distributions primarily to repay the obligations incurred in the purchase of the Diamond RSNs. As for the small portion of distributions that were not used to redeem the JPMCFI preferred units, these quarterly distributions—which largely were made in the

[177] *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 385 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004), *abrogated in part on other grounds*, *Tae H. Kim v. Ji Sung Yoo*, 776 F. App'x 16, 22 (2d Cir. 2019); *see generally McDonald v. Williams*, 174 U.S. 397, 407-408 (1899) ("The declaration and payment of a dividend is part of the course of business of these corporations. It is the thing for which they are established, and its payment is looked for as the appropriate result of the business which has been done.").

months shortly after the purchase and before, or during the earliest stages of, the COVID pandemic—and are the kind of ordinary course distributions that nearly all companies make. And again, these distributions were ultimately made to JPMCFI, which is independent from Sinclair.

- Diamond's remaining allegations for this claim are similar to, and fail for the same reasons as, those it made in support of its MSA actual fraud claim. Diamond alleges that it was insolvent, but that is insufficient for actual fraud. Moreover, the overwhelming bulk of the distributions were made years before Diamond's bankruptcy, and thus before any alleged insolvency had occurred or was apparent to Diamond itself.
- Diamond alleges that SBG dominated and controlled DSG, but this was equally true in *Gulf Fleet* and *Duke & King*, where the trustees in those cases alleged the parent companies dominated and controlled the debtors and required them to enter into the contracts.[178]
- The Complaint alleges Sinclair supposedly concealed information regarding an internal solvency analysis, but this sheds no light on whether the debtor, DSG, intended to defraud creditors, which is the relevant question.
- Similarly, Diamond once again relies on Commissioner Manfred's disputed testimony about Sinclair's supposed intent, but the Complaint claims this alleged statement was not made until "late 2021," after nearly all the distributions had been made, including all of the ones used to redeem the JPMCFI preferred equity units. No matter how many times the Complaint repeats this allegation, it provides no

[178] *Gulf Fleet*, 491 B.R. at 758; *Duke & King*, 508 B.R. at 119.

support for DSG acting with fraudulent intent a year or more before this alleged comment supposedly occurred.

94. The Complaint's own allegations similarly undercut Debtors' claim that DSG intended to defraud creditors in connection with the Bally's transaction. The Complaint expressly recognizes that both Sinclair and Diamond provided consideration to Bally's through the sale of naming rights and integrations.[179] Bally's agreed to pay Diamond $88 million over 10 years and committed to buy advertising on Diamond's RSNs, providing additional cash.[180] Sinclair received equity in Bally's.[181]

95. The Complaint's actual fraud allegations regarding the Bally's transaction are similar to those for the MSA payments and distributions, and fail to satisfy the heightened pleading standards for fraud for similar reasons:[182]

- The Complaint's asserts that DSG received insufficient value in the Bally's transaction, but other allegations rebut this conclusion and demonstrate that it cannot support DSG having an intent to defraud creditors:
    - The Complaint acknowledges that the Bally's transaction provided cash to Diamond, both through $88 million in direct payment and through Bally's marketing commitment. While Diamond tries to minimize the commitment,[183] the Complaint does not allege that Bally's did not spend money, or otherwise

[179] Compl. ¶ 210.

[180] *Id.* ¶¶ 207, 210.

[181] *Id.* ¶ 210.

[182] *Id.* ¶ 312.

[183] *Id.* ¶ 210(f).

allege any factual content to show how or why that this marketing commitment has no value to Diamond.

- Diamond claims that other companies "expressed interest" in Diamond's naming rights for more money than Bally's,[184] but the Complaint does not allege that any of these companies actually were willing to complete the transaction. Nor does the Complaint allege the terms of any of these expressions of interest, including what the drawbacks of these expressions would have been for Sinclair and Diamond.
- Diamond also complains about Sinclair receiving Bally's equity as part of the transaction,[185] but recognizes that Sinclair provided consideration in the deal, including integration and naming rights.[186]
- Finally, the Complaint acknowledges that Duff & Phelps provided a fairness opinion stating that the transaction was fair to Sinclair and Diamond, including because of the significant value Sinclair provided in the deal.[187] While Diamond criticizes this fairness opinion, it further supports that DSG did not have the intent to defraud creditors.

- The Complaint alleges that Diamond was insolvent at the time of the Bally's transaction, but as explained previously that is insufficient to show actual fraud. Moreover, the Bally's transaction provided DSG with cash payments and a

184 *Id.* ¶ 207.

185 *Id.* ¶ 210(d).

186 *Id.* ¶ 210(c).

187 *Id.* ¶ 215-16.

marketing commitment, both of which improved Bally's financial position and thus benefited its creditors.

- The Complaint alleges that Sinclair was an insider and negotiated on Diamond's behalf, but similar allegations were made in *Gulf Fleet* and *Duke & King* and held to be insufficient for actual fraud. The allegations' factual content show that both Sinclair and Diamond provided value to Bally's and received consideration in return.
- The Complaint alleges that Sinclair concealed information from Duff & Phelps, but again this is irrelevant to DSG's intent. Nor does the Complaint explain how the information the Sinclair Defendants allegedly provided to Duff & Phelps could show an intent to defraud DSG's creditors.

96. The actual facts pleaded by Diamond itself, rather than Debtors' unsupported conclusions and insinuations, paints a picture of a standard business transaction that provided Diamond with additional cash to meet its obligations to creditors rather than a nefarious plot. If anything, the Bally's transaction does not evince an intent to defraud creditors, but the opposite.

97. Finally, as held in *Duke & King* and *Gulf Fleet*, even if a few badges of indications of actual fraud were adequately pled—and here, none are—that is simply not sufficient for the claim to survive a motion to dismiss. Accordingly, Counts I, V, and IX—and Counts III, VII, and XI to the extent these seek to recover transfers avoided under the prior counts—should be dismissed.

## IV. THE DEBTORS' CLAIM FOR IMPROPER DISTRIBUTION FAILS BECAUSE DIAMOND HAS NOT ALLEGED ACTUAL KNOWLEDGE THAT THE DISTRIBUTIONS WOULD CAUSE DSG'S INSOLVENCY.

98. Count IV of the Complaint alleges that DSIH violated 6 Del. C. § 18-607 by taking distributions from DSG when it knew that such distributions would render DSG insolvent. But the Debtors have failed to adequately state a claim because they have not sufficiently pled that DSIH had actual knowledge that the distributions would cause DSG to become insolvent.

99. Liability under § 18-607 requires proof of elements including that the LLC member "knew at that time that the LLC would become insolvent as a result of the distribution."[188] This requires Diamond to plead that DSIH had "actual knowledge" that distributions from DSG to DISH would cause DSG to become insolvent.[189] Actual knowledge is a high standard that requires Diamond to allege that DSIH's knowledge was "more than 'potential, possible, virtual, conceivable, theoretical, hypothetical, or nominal'" knowledge.[190] In addition, allegations with respect to actual knowledge "must be specific as to each individual defendant" and group pleading

---

[188] *Pepsi-Cola Bottling Co. v. Handy*, 2000 WL 364199, at *3 (Del. Ch. Mar. 15, 2000).

[189] *See* 6 Del. C. § 18-101 (defining "knowledge" as used in the Delaware LLC Act as: "a person's actual knowledge of a fact, rather than the person's constructive knowledge of the fact"); *see also* Craig B. Smith*, Limited Partnerships-Expanded Opportunities Under Delaware's 1988 Revised Uniform Limited Partnership Act*, 15 Del. J. Corp. L. 43, 74–75 (1990) (stating that the corollary provision in Delaware's Partnership Act has an actual knowledge standard); *Joint Task Force of Committee on LLCs, Partnerships and Unincorporated & Entities and the Committee on Taxation, ABA Section of Business Law, Model Real Estate Development Operating Agreement with Commentary*, 63 Bus. Law. 385, 510 n.174 (2008) (discussing § 18-607 and stating that "[t]he above obligations apply only where the member has actual knowledge that the distribution is wrongful ... .").

[190] *See Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 776, (2020) (discussing ERISA's "actual knowledge" requirement and quoting Black's Law Dictionary).

is not permitted.[191] Diamond must plead sufficient factual content allowing a reasonable inference that DSIH actually knew distributions from DSG would cause insolvency.[192]

100. The Complaint fails to plead factual content showing that DSIH *actually* knew that the distributions from DSG to DSIH would cause DSG's insolvency. The Complaint alleges that David Smith, Chris Ripley, and Lucy Rutishauser were members of the board of managers of DSIH-A, the member of DSIH.[193] While the Complaint broadly alleges that "Sinclair" (defined to include all of companies and LLCs that are direct or indirect subsidiaries of SBG that are defendants in this case) knew of DSG's financial difficulties, despites taking many hours of depositions and receiving thousands of documents, the Complaint fails to allege that DSIH knew the distributions would cause insolvency.[194] And rather than pleading actual knowledge of pending insolvency, the Complaint's allegations show that DSIH did *not* have actual knowledge of pending insolvency. For example, the Complaint alleges that Sinclair hired an independent third-party (Empire Valuation Consultants) that performed a solvency analysis showing that the distributions would *not* drive DSG into insolvency.[195] While the Complaint asserts that Empire's analysis conflicted with Sinclair's internal projections, it alleges factual content from Rutishauser and Ripley showing that those internal calculations were "back of the envelope" and "[don't] really

---

[191] *Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*, 53 F. Supp. 3d 882, 911 (E.D. La. 2014) (applying securities claim actual knowledge requirement).

[192] *E.g.*, *In re Consolidated Meridian Funds*, 485 B.R. 604, 617 (W.D. Wash. 2013); *Johnson v. Loutzenhiser*, 2020 WL 7327320, at *1 (W.D. Okla. Dec. 11, 2020); *Gallant v. Holden*, 2016 WL 3742300, at *3 (S.D. Ohio Apr. 21, 2016).

[193] Compl. ¶¶ 27-29, 46.

[194] *See, e.g.*, Compl. ¶ 197 (alleging that "Sinclair knew DSG was facing significant financial headwinds").

[195] *Id.* ¶ 175 ("Sinclair obtained a report from Empire concluding that DSG would be solvent after giving effect to the distribution.").

reflect anything."[196] Thus, the allegations show that the managers of DSIH's parent did not put stock in this internal analysis and instead relied on Empire's independent analysis showing the distributions would *not* make DSG insolvent.

101. The Complaint also contains allegations showing that the individuals alleged to be managers of DSIH-A did *not* have actual knowledge of DSG insolvency. For example, the Complaint explains that Smith and Ripley "relied on Rutishauser's reports certifying that DSG was financially solvent."[197] Far from alleging actual knowledge of insolvency, this shows that Smith and Ripley relied on material showing that DSG was solvent and that they lacked actual knowledge of pending insolvency. As for Rutishauser, the Complaint alleges that she is "not a solvency" or a "valuation expert."[198] Again, these allegations weigh against Rutishauser having "actual knowledge" of impending insolvency because Rutishauser was not qualified to form such a solvency opinion.

102. The Complaint also includes allegations that show Sinclair believed DSG to be a profitable entity despite decreasing financial projections. Indeed, the Complaint alleges that even *after* the removal of a customer (DISH Network) from Diamond's financial forecasts, Sinclair projected approximately $1 billion in EBITDA attributable to DSG.[199] While the Complaint highlights Sinclair Treasurer Justin Bray's recommendation to wait to perform the distributions until February 2020, the reason cited by Bray—as included in the allegations—was that the "2020

---

[196] *Id.* ¶ 191.

[197] *Id.* ¶ 198.

[198] *Id.* ¶ 199.

[199] *Id.* ¶ 87.

forecast will be more clear at that point."[200] Thus, the Complaint's own allegations establish that Bray made this recommendation not because anyone *actually knew* that distributions would cause DSG to become insolvent, but because waiting would provide more clarity. Diamond further admits that even later, in July 2020, Sinclair's projections *still* showed DSG as a profitable entity with a projected 2020 EBITDA of over $600 million.[201] Instead of showing that DSIH had actual knowledge that the Distributions would make DSG insolvent, these allegations again indicate Sinclair's internal belief that DSG was a profitable entity at the time of the August 2020 distribution.

103. In short, Diamond has failed to provide sufficient allegations of actual knowledge. If anything, the Debtors' allegations establish that DSIH did *not* have the required actual knowledge to be liable under § 18-607. For these reasons, Count IV should be dismissed.

## V. SECTION 548'S TWO-YEAR LOOK BACK BARS MANY OF DIAMOND'S CLAIMS (COUNTS I, II, III, V, VI, VII) UNDER THAT STATUTE.

104. Section 548 provides that a transfer of debtor can be avoided only if it "was made or incurred on or within 2 years before the date of the filing of the petition."[202] This look-back period includes both actual and constructive fraudulent conveyances under Section 548.[203] Cases consistently hold that this 2-year look-back period is not a statute of limitations, but instead a

---

200 *Id.* ¶ 88.

201 *Id.* ¶ 91.

202 11 U.S.C. § 548(a)(1), (b).

203 *Id.*

substantive element of the statute. Thus, this 2-year period cannot be extended through equitable tolling or other doctrines that might extend a statute of limitations.[204]

105. Diamond filed for Chapter 11 protection on March 14 and 15, 2023.[205] Prior to Diamond's Chapter 11 filing, Diamond and Sinclair entered into a tolling agreement on October 20, 2022.[206] Thus, the 2-year look-back period cannot be measured from earlier than October 20, 2022.

106. Accordingly, at a minimum, the 2-year look-back period bars all Section 548 claims based on transfers occurring before October 20, 2020. This bar specifically prevents DSG from seeking to avoid under Section 548: (a) $914,066,500.90 of the alleged distributions from DSG, including all the amounts used to repurchase the JPMCFI preferred equity units;[207] and (b) all payments under the MSA before October 20, 2020.[208]

## VI. COUNT VIII FAILS TO STATE A CLAIM AGAINST STG FOR BREACH OF CONTRACT UNDER THE MSA.

107. The Complaint alleges that "under the MSA," STG is: (1) prohibited from "unreasonably and disproportionately allocat[ing] to [Diamond] costs for assets or services

---

[204] *E.g.*, *In re Petters Co.*, 557 B.R. 711, 723 (Bankr. D. Minn. 2016) ("Section 548's two-year look back time period is not a statute of limitation and does not serve the purpose of ensuring that a party is diligent in exercising its rights. … Thus, it is not subject to equitable tolling."); *In re Stanwich Fin. Servs. Corp.*, 488 B.R. 829, 835 (D. Conn. 2013) ("The two-year look-back period [of Section 548] is a statutory element, not a statute of limitations, and therefore is not subject to equitable tolling."); *In re Pitt Penn Holding Co.*, 2012 WL 204095, at *2 (Bankr. D. Del. Jan 24, 2012) ("Section 548(a)'s two-year look-back period is a substantive elements of a 548 cause of action, and therefore cannot be equitably tolled.").

[205] Compl. ¶ 247.

[206] *Id.* ¶ 246.

[207] *Id.* ¶ 193.

[208] *Id.* ¶¶ 107, 110, 124

procured from third parties for [Diamond] and Other Sinclair Services[;]"[209] (2) "obligated to provide to DSG certain enumerated services, as well as 'supplementary services' on written terms mutually agreed upon by STG and DSG[;]";[210] and (3) "obligated to provide to DSG certain enumerated services in a 'commercially reasonable' manner, including payroll and human resources."[211] Yet the Complaint fails to tie specific MSA provisions to the Debtors' allegations against STG, let alone allege conduct giving rise to an actual breach of the agreement. Instead, the Complaint relies almost entirely on conclusory allegations and innuendo—coupled with strained readings of the MSA—to support its breach claim. Count VIII for breach of the MSA should be dismissed.

### A. The Complaint Fails To Identify Specific MSA Provisions Purportedly Breached By STG.

108. The MSA is governed by Delaware law.[212] Under settled Delaware law, a party alleging breach of contract "fails to state a claim for relief ... [where it] do[es] not identify any provision of that contract that allegedly was breached."[213] Despite this, Count VIII baldly asserts that STG's various obligations to Diamond arose "[u]nder the MSA," with no specific citation to the contract or recitation of contractual provision at issue.[214] Diamond's mere reference to

---

[209] *Id.* ¶ 298.

[210] *Id.* ¶ 300.

[211] *Id.* ¶ 304.

[212] The MSA includes a choice-of-law provision selecting Delaware Law. MSA at 10.

[213] *Coca-Cola Beverages Fla. Holdings, LLC. v. Goins*, 2019 WL 2366340, at *3 n.19 (Del. Ch. June 4, 2019) (citing *US Ecology, Inc. v. Allstate Power Vac, Inc.*, 2018 WL 3025418, at *5-7 (Del. Ch. June 18, 2018), *aff'd*, 202 A.3d 510 (Del. 2019) (dismissing a breach of contract claim under Rule 12(b)(6) where, "[s]omewhat astonishingly, plaintiffs did not identify in their Complaint a specific provision in the [contract] that [defendant] allegedly breached.").

[214] *See, e.g.*, Compl. ¶¶ 298, 300, 304.

nebulous contractual obligations, without more, is insufficient to state a claim for relief: "To plead a breach of contract claim, a plaintiff must identify a specific provision of the contract that was allegedly breached."[215]

109. Other allegations scattered throughout the Complaint fare no better. Indeed, the Complaint presents only selective quotations of the MSA woven into Diamond's generalized grievances about Sinclair's decisions regarding the Diamond business. For example, the Complaint alleges that "Sinclair misappropriated Diamond assets and breached the MSA by causing Diamond employees to provide services exclusively for the benefit of Sinclair," without citing any provision of the MSA.[216] None of these allegations identify a *specific* contractual provision or explain how STG's conduct *violated* this specific MSA provision at issue. This deficiency requires dismissal of Count VIII for failure to state a claim for relief.

### B. The Complaint's Conclusory Allegations Fail To State A Claim Under Any Breach Of Contract Theory Articulated In Count VIII.

110. Independently, the Complaint's conclusory allegations independently fail to state a claim for relief under all three purported breaches pleaded in Count VIII. Under federal pleading rules, in accord with *Iqbal* and *Twombly*, a complaint cannot state a breach of contract claim where,

---

[215] *Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc.*, 995 F. Supp. 2d 587, 602 (N.D. Tex. 2014); *see also*, *e.g.*, *Ally Fin. Inc. v. Comfort Auto Grp. NY LLC*, 2021 WL 4033249, at *5 (E.D.N.Y. Sept. 3, 2021) ("[Counter-plaintiff's] failure to identify any contractual provisions breached by [counter-defendant] is fatal to its breach of contract claim.") (collecting cases); *In re AlphaStar Ins. Grp. Ltd.*, 383 B.R. 231, 277 (Bankr. S.D.N.Y. 2008) ("The plaintiff must identify what contract provisions were breached as a result of the defendant's acts."); *Erisman v. Zaitsev*, 2021 WL 6134034, at *11 (Del. Ch. Dec. 29, 2021) (finding defendants' argument that plaintiffs failed to well plead breach of contract persuasive "[g]iven Plaintiffs' failure to identify in their pleading any provision of the LLC Agreement that Defendants allegedly breached" but dismissing the claim on other grounds).

[216] Compl. ¶ 16; *see also id.* ¶ 154 ("Sinclair also imposed additional fees on Diamond by unilaterally determining to provide certain supplementary services ... in violation of the MSA. The MSA provides that Sinclair may 'provide certain supplementary services to support the functioning of each [RSN] from time to time *as mutually agreed by the parties*[]'") (no citation to MSA); *id.* ¶ 236 ("Sinclair has repeatedly engaged Diamond employees to perform work for Sinclair, but has placed these employees on Diamond's payroll ... . By doing so, Sinclair breached the MSA, which required Sinclair to provide HR and payroll services to DSG in a 'commercially reasonable' manner") (providing no citation to MSA).

as here, "[t]here are absolutely no specific, non-conclusory factual allegations supporting this claim."[217] Similarly, under Delaware law, a complaint "cannot plead the 'breach' element of [its] claim unless [it] makes non-conclusory allegations" demonstrating a breach of a contractual obligation.[218] All Diamond's allegations fall short under these established standards.

111. *First*, the Complaint alleges that STG breached the MSA by "unreasonably and disproportionately allocating expenses to Diamond, including expenses for services provided by third parties to other Sinclair entities."[219] Despite several strained paragraphs describing STG's alleged expense-allocation transgressions, Diamond never explains ***how*** STG's alleged allocations of expenses were "unreasonable" or "disproportionate" under any obligation set forth in the MSA. Instead, the Complaint merely recites two or three examples of supposed improper charges, and baldly asserts that the charges violated the MSA; for example: "Every time Sinclair charged Diamond for expenses that reflect more than Diamond's fair share, Sinclair breached the express terms of the MSA, which prohibits Sinclair from 'unreasonably and disproportionately allocat[ing] to [Diamond] costs for assets or services procured from third parties for [Diamond] and other Sinclair Services.'"[220] Diamond further alleges that "Sinclair violated this provision time and time again by causing Diamond to pay for expenses incurred by other Sinclair entities, and by depriving

---

217 *In re Superior Air Parts, Inc.*, 486 B.R. 728, 745 (Bankr. N.D. Tex. 2012); *see also Northwell Health, Inc. v. Lexington Ins. Co.*, 550 F. Supp. 3d 108, 115 (S.D.N.Y. 2021) ("A breach of contract claim cannot rest on a conclusory statement that the defendant breached a contract. As such, allegations that merely parrot the language of the contractual provisions alleged to be breached without providing supporting facts are not presumed true.") (citations omitted).

218 *Buck v. Viking Holding Mgmt. Co.*, 2021 WL 673459, at *3 (Del. Super. Ct. Feb. 22, 2021); *see also Ramunno v. Cawley*, 705 A.2d 1029, 1034 (Del. 1998) ("We accept all well-pleaded allegations as true, but we ignore conclusory allegations that lack specific supporting factual allegations"); *Unbound Partners Ltd. P'ship v. Invoy Holdings Inc.*, 251 A.3d 1016, 1023 (Del. Super. Ct. 2021) ("Court[s] won't strain to pull claim-saving interpretations from the complaint").

219 Compl. ¶¶ 298-99.

220 *Id.* ¶ 153.

Diamond of the information that would be needed to even identify when this provision is being violated[,]" yet fails to explain why the expenditures were improperly attributed to Diamond.[221] Indeed, the Complaint concedes that the MSA "requires Diamond to 'reimburse Sinclair for all reasonable expenses incurred by [Sinclair] in the performance of the Services.'"[222] And while Diamond contests whether STG deployed a "principled method" for allocating costs and complains that STG "provided no backup invoices from third parties or explanations as to how invoices pertaining to services provided to multiple Sinclair entities were allocated,"[223] the Complaint identifies no MSA provision requiring STG to use Diamond's preferred allocation methodology or documentation procedure. And even where Diamond struggles to provide a specific example of an improperly-allocated expense, the Complaint presents only vague insinuations that "Sinclair *appears to have charged* Diamond" for services provided to a separate subsidiary.[224] None of those conclusory allegations give rise to a claim for breach of the MSA.[225]

112. *Second*, the Complaint alleges that "STG breached its obligations to provide certain services or mutually agreed supplementary services, as set forth in the MSA," supposedly by billing Diamond for certain services without Diamond's written consent.[226] But once again, Debtors allege virtually nothing to explain which "supplementary services" are at issue, let alone

---

[221] *Id.* The best explanation Debtors muster is that one Sinclair employee purportedly "was unable in his deposition to provide any explanation of how this amount of rent was allocated to Diamond." *Id.* ¶ 152. But Debtors cannot and do not allege that Sinclair employees were required to document detailed "backup information" for all charges to Diamond under the MSA.

[222] *Id.* ¶ 148.

[223] *Id.* ¶¶ 149, 153.

[224] *Id.* ¶ 151 (emphasis added).

[225] *See, e.g.*, *Ryan v. Buckeye Partners, L.P.*, 2022 WL 389827, at *1 (Del. Ch. Feb. 9, 2022) (dismissing a breach of contract claim for pleading merely conclusory allegations).

[226] Compl. ¶¶ 300-01.

the amount Diamond was billed, when STG billed Diamond for the purported supplementary services, or any other facts to substantiate whether an actual breach occurred. Instead, Debtors assert only that witnesses "have contended in depositions that Sinclair is providing supplementary services to DSG, such as services related to advertising sales, but Sinclair has not produced *any* documentation establishing that Diamond agreed to these additional fees as required by the MSA."[227] In other words, the Complaint's entire breach theory rests on STG's purported lack of documentation for supplementary billing, but without identifying a single bill or invoice related to supplementary services. None of these vague allegations give rise to a breach of contract claim either, as "conclusory allegations will not be accepted as true without specific supporting factual allegations."[228]

113. *Third*, the Complaint claims that STG allegedly failed to "provide payroll and human resource services in a commercially reasonable manner by using Diamond employees for the benefit of Sinclair while maintaining those employees on Diamond's payroll."[229] Stretching the MSA beyond its plain language, the Complaint attempts to allege in a single paragraph that STG's provision of payroll and human resource services was not "commercially reasonable" because STG purportedly had unnamed employees "perform work for Sinclair," but had Diamond pay for the employees' salaries.[230] But the Complaint does not contend anywhere that STG failed to provide the services outlined in MSA Exhibit B. Nor do Debtors allege any prohibition in the MSA against Diamond (or Sinclair) employees working on projects for the other business. At

---

[227] Compl. ¶ 154.

[228] *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 65-66 (Del. 1995).

[229] Compl. ¶¶ 304-05.

[230] *Id.* ¶ 236.

bottom, the Complaint's blanket assertion that STG's alleged payroll practices were "commercially unreasonable," without more, is simply not sufficient to state a claim for breach of the MSA.[231]

114. Under any theory, Diamond's conclusory allegations fail to state a claim for breach of the MSA and provide an independent basis for dismissal of Count VIII.

## VII. THE COMPLAINT FAILS TO PLEAD FACTS TO SUPPORT A CLAIM THAT DSIH BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING UNDER THE DSG LLC AGREEMENT (COUNT XIV).

115. Unable to muster a cognizable breach of contract claim under the MSA, the Complaint attempts to shoehorn allegations of misconduct by *STG* into a breach of the implied covenant of good faith and fair dealing against a separate corporate entity (DSIH) and arising under a separate contractual agreement, DSG's 2019 LLC agreement (the "2019 DSG LLC Agreement"[232]). But Diamond's effort to attach liability to DSIH under a separate contract relies on the implied covenant, which is a "limited and extraordinary legal remedy" under Delaware law.[233] The Complaint's re-purposed breach of contract allegations confirm there is no basis to invoke the doctrine here either: Diamond identifies no provision in the 2019 DSG LLC Agreement obligating DSIH (or STG or SBG) to manage Diamonds' employees and assets in the way Diamond would have preferred. The Court should therefore reject the Complaint's attempt to re-write the 2019 DSG LLC Agreement (or the MSA) using the implied covenant and dismiss Count XIV.

---

[231] *Accord Hurd v. BAC Home Loans Servicing, LP*, 880 F. Supp. 2d 747, 766 (N.D. Tex. 2012) (holding plaintiff's unsupported allegation that a sale "was not commercially reasonable" was inadequate to state a claim for wrongful foreclosure upon which relief could be granted); *Miller v. CitiMortgage, Inc.*, 970 F. Supp. 2d 568, 591 (N.D. Tex. 2013) (same).

[232] The 2019 DSG LLC Agreement is attached as Exhibit 2.

[233] *Oxbow Carbon & Mins. Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482, 506-07 (Del. 2019).

116. Under Delaware law, the implied covenant of good faith and fair dealing is rarely invoked, and the Delaware Supreme Court has instructed that the implied covenant is a "cautious enterprise, inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated."[234] Critically, the covenant should not be used "as a backstop to imply terms that the parties failed to include but which could easily have been drafted."[235] To plead a breach of the implied covenant of good faith and fair dealing, the Complaint must allege (1) a specific implied contractual obligation existed, (2) a breach of that obligation, and (3) resulting damages.[236]

117. As a threshold matter, Count XIV attempts to recycle identical allegations supporting Debtors' breach of contract claim *against STG* and arising under the *MSA*. The alleged conduct underlying this Count—that "DSIH allowed STG and SBG to misappropriate DSG's employees and assets"—is indistinguishable from the allegations related to the Sinclair's alleged breach of the MSA between STG and DSG.[237] Diamond never alleges that DSIH was responsible for actions by STG or SBG, nor does any paragraph in the Complaint allege that the 2019 DSG LLC Agreement contains obligations (whether express or implied) related to DSIH's management of employees or assets.[238] Thus, Diamond has failed to tie the allegations of employee and asset "misappropriation"—the sole basis for their breach of implied covenant claim—to either the

[234] *Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1116-17 (Del. 2022); *see also Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010).

[235] *Baldwin*, 283 A.3d at 1117; *see also Nationwide Emerging Managers, LLC v. Northpointe Holdings, LLC*, 112 A.3d 878, 897 (Del. 2015) ("An interpreting court cannot use an implied covenant to re-write the agreement between the parties, and should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it.").

[236] *Baldwin*, 283 A.3d at 1117-18.

[237] Compl. ¶ 346.

[238] *Id*. ¶¶ 344-45.

correct agreement (2019 DSG LLC Agreement) or the correct defendant (DSIH). Count XIV should be dismissed for this reason alone.

118. Beyond the disconnect between alleged "misappropriation" by Sinclair and the claim against DSIH, the Court should dismiss Count XIV for several independent reasons. *First*, the Complaint categorically fails to allege the "specific implied contractual obligation" in the 2019 DSG LLC Agreement, let alone a breach of that obligation.[239] Far from meeting their pleading burden on this element, Diamond provides a cursory reference to one sentence in the LLC Agreement, which provides that "[t]he conduct and control of the business and affairs of [DSG] is vested in the Member [DSIH], who shall have the powers necessary and incidental to such conduct and control."[240] But the Complaint fails to describe *any* implied contractual obligation arising under this or any other provision of the 2019 DSG LLC Agreement. Moreover, even if an implied obligation existed, the Complaint says nothing about how *DSIH* breached the alleged obligation. In fact, DSIH never features once in any of the paragraphs alleging misconduct related to Diamond's employees or assets.[241]

119. *Second*, the Complaint fails to identify any "gap" in the 2019 DSG LLC Agreement that would justify invoking the implied covenant here. "Courts utilize the implied covenant to infer contract terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated."[242] By its terms, and as alleged in the Complaint, the 2019 DSG LLC Agreement anticipated that DSIH would manage "the business and affairs" of DSG, conferring

---

[239] *See Baldwin*, 283 A.3d at 1117.

[240] Compl. ¶ 345.

[241] *See, e.g.*, *id*. ¶¶ 16, 119-20, 235-42, 305, 350-51 (alleging various misconduct by "Sinclair").

[242] *Baldwin*, 283 A.3d at 1116; *see also Oxbow Carbon*, 202 A.3d at 504 n.93.

broad discretion to DSIH.[243] There is no indication from the 2019 DSG LLC Agreement—nor does the Complaint allege—that any contractual gap existed in relation to "business affairs" like payroll or expense reimbursement. Courts routinely decline to invoke the doctrine "to imply new contract terms merely because a contract grants discretion" to one party.[244] Nor will courts use the implied covenant "to imply terms that parties failed to include but which easily could have been drafted."[245] The Court should not re-write the 2019 DSG LLC Agreement to impose new obligations on DSIH simply because Debtors now wish the contract contained more specific standards governing payroll and expense reimbursement.[246]

120. *Third*, the Complaint's conclusory allegations that DSIH's actions were "not in good faith" are obviously insufficient to establish a breach.[247] Debtors do not even try to allege DSIH's management of Diamond was in bad faith, as the Complaint is devoid of any allegations on this topic. Nor does Diamond allege that *DSIH* acted in bad faith—rather, Debtors' allegations about "misappropriation" relate to STG and SBG, not DSIH.[248] In fact, the very first mention of DSIH's lack of good faith appears in Count XIV itself. Courts have dismissed similar conclusory

---

[243] Compl. ¶ 345.

[244] *Oxbow*, 202 A.3d at 503.

[245] *Baldwin*, 283 A.3d at 1117.

[246] *See Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146-48 (Del. Ch. 2009) (holding that just because a business decision did not succeed, the opposing party cannot use the implied covenant to "rewrite the deal it cut in more optimistic days.").

[247] Compl. ¶ 346.

[248] Compl. ¶¶ 16, 235-42, 305, 350-51.

allegations where a party fails to allege the defendant exercised its discretion in bad faith.[249] Absent any credible allegations of bad faith by DSIH, Debtors' claim must fail.

121. *Fourth*, Diamond should not be permitted to invoke the implied covenant to circumvent the principle that wholly owned subsidiaries exist to advance the benefit of the parent entity.[250] At bottom, Diamond argues that Sinclair's alleged misappropriations benefited STG and SBG at DSG's expense. But this argument is nothing more than a re-packaged allegation that DSG—as a wholly owned subsidiary—was managed in a way that benefitted its parent entity. That is plainly permissible under Delaware law.[251] Diamond seeks to avoid this black letter legal principle by imposing liability on DSIH under amorphous implied obligations in the LLC Agreement. But the implied covenant is not an "equitable remedy for rebalancing economic interests" and such a "limited and extraordinary legal remedy" should not allow Diamond to circumvent settled Delaware law governing wholly-owned subsidiaries.[252]

122. Accordingly, for each of the preceding reasons, Count XIV should be dismissed.

## VIII. COUNT XV FOR UNJUST ENRICHMENT IS BARRED BY AN EXPRESS CONTRACT, THE 2019 DSG LLC AGREEMENT.

123. "Courts developed unjust enrichment as a theory of recovery to remedy the absence of a formal contract."[253] "So a party cannot seek recovery under an unjust enrichment theory if a

---

[249] *Airborne Health*, 984 A.2d at 146-47; *see also Oxbow*, 202 A.3d at 503-04 ("although the vesting of a Board with discretion does not relieve the Board of its obligation to use that discretion consistently with the implied covenant of good faith and fair dealing, [the claimants did] not argue that the Board exercised its contractual discretion in bad faith.").

[250] *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 173 (Del. Ch. 2006) ("Wholly-owned subsidiary corporations are expected to operate for the benefit of their parent corporations; that is why they are created."); *see generally infra* ¶ 145.

[251] *Infra* ¶ 145.

[252] *Oxbow*, 202 A.3d at 506-507.

[253] *Enzolytics, Inc. v. Empire Stock Transfer Inc.*, 2023 WL 2543952, at *5 (Del. Ch. Mar. 16, 2023).

contract is the measure of the party's right."[254] If the "alleged enrichment is governed by an express written contract," the unjust enrichment claim should be dismissed.[255]

124. Here, the Complaint admits that the 2019 DSG LLC Agreement states that "[t]he conduct and control of the business and affairs of [DSG] is vested in the Member [DSIH], who shall have the powers necessary and incidental to such conduct and control."[256] Diamond's bases for its unjust enrichment claims in Count XV is that STG and SBG supposedly misappropriated Diamond's employees and assets. But the 2019 DSG LLC Agreement provides that DSIH will conduct and control the business and affairs of DSG, which would include setting general policies and procedures regarding the use of DSG employees and assets.[257] As this express contract applies, Count XV for unjust enrichment should be dismissed.

## IX. DIAMOND'S BREACH OF FIDUCIARY DUTY CLAIMS (COUNTS XVI, XVII, XVIII) ARE BARRED BY ENFORCEABLE WAIVER CLAUSES AND PREVAILING CASE LAW.

125. Diamond's breach of fiduciary duty claims—against individuals Smith, Ripley, Rutishauser, and Shapiro (Count XVI) and entity SBG (Count XVII)—are expressly barred by the waiver clauses in DSG's current LLC agreement as well as the LLC agreement of its indirect

---

[254] *Id.*

[255] *In re HH Liquidation, LLC*, 590 B.R. 211, 286 (Bankr. D. Del. 2018).

[256] Compl. ¶ 345.

[257] *E.g.*, *Nespresso USA, Inc. v. Ethical Coffee Co. SA*, 263 F. Supp. 3d 498, 505 (D. Del. 2017) (holding that a parent "setting the corporate policies and procedures for all subsidiaries" is permissible and is "not sufficient evidence of agency"); *In re BH S & B Holdings LLC*, 420 B.R. 112, 138 (Bankr. S.D.N.Y. 2009) ("That Holdings's parents retained decision-making authority is also insufficient to pierce the corporate veil. … Courts refuse to pierce the veil just because parent corporations retain decision-making authority over subsidiaries.") (collecting cases); *NAMA Holdings, LLC v. Related WMC LLC*, 2014 WL 6436647, at *35 (Del. Ch. Nov. 17, 2014) (A "parent and subsidiary can be expected to consult on matters affecting the subsidiary and to make decisions on behalf of the subsidiary or implement them through shared officers or employees.").

parent, DSH. Independently, case law holds that SBG—an indirect parent four companies removed from DSG—did not owe any fiduciary duties to Diamond.

126. The parties agree that these fiduciary duty claims are governed by Delaware law.[258] Texas follows the "internal affairs" doctrine, which instructs that a corporate entity's state of incorporation governs internal matters like fiduciary duties.[259] Here, the Debtors (and many of their parents and indirect parents who are defendants) are incorporated in Delaware.[260]

**A. Express Waiver Clauses Bar Debtors' Breach Of Fiduciary Duty Claims.**

127. The Delaware Limited Liability Company Act "grants LLC members extreme contractual freedom,"[261] including allowing the LLC agreement to "displace fiduciary duties altogether or tailor their application."[262] Specifically, the Act provides that:

> To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement; provided, that the limited liability company agreement may not eliminate the implied contractual covenant of good faith and fair dealing.[263]

---

[258] Compl. ¶ 355.

[259] *See Hollis v. Hill*, 232 F.3d 460, 464–65 (5th Cir. 2000).

[260] Compl. ¶¶ 23, 26.

[261] *In re 3P Hightstown, LLC*, 631 B.R. 205, 214 (Bankr. D.N.J. 2021); *accord* 6 Del. C. § 18-1101(b) ("It is the policy of this chapter to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements").

[262] *Auriga Capital Corp. v. Gatz Props., LLC*, 40 A.3d 839, 856 (Del. Ch. 2012), *aff'd*, *Gatz Props., LLC v. Auriga Capital Corp.*, 59 A.3d 1206 (Del. 2012).

[263] 6 Del. C. § 18-1101(c); *see also* 6 Del. C. § 18-1101(e) ("A limited liability company agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a member, manager or other person to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement; provided, that a limited liability company agreement may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.").

In accord with the Act's plain language, courts applying the Delaware Act, including those within the Fifth Circuit,[264] have held that LLC agreements can *completely* eliminate fiduciary duties.[265] Indeed, enforceable Delaware LLC agreements can eliminate the duty of loyalty, as well as the duty of care.[266]

128. Courts within this circuit regularly consider such LLC agreement waiver clauses in granting motions to dismiss fiduciary duty claims.[267] In fact, a court in this district granted a motion to dismiss breach of fiduciary duty claims based on a waiver clause just this year.[268] Considering waiver clauses on a motion to dismiss is appropriate regardless of whether such arguments are characterized as an affirmative defense: "If, based on the facts pleaded and

---

[264] *E.g.*, *In re CLK Energy Partners, LLC*, 2011 WL 1312275, at *8 (Bankr. W.D. La. Mar. 31, 2011).

[265] *E.g.*, *Miller v. HCP & Co.,* 2018 WL 656378, at *8 (Del. Ch. Feb. 1, 2018) (holding that the Delaware LLC Act permits parties to "eliminate fiduciary duties that members or managers would otherwise owe to one another"), *aff'd sub nom. Miller v. HCP Trumpet Invs., LLC,* 194 A.3d 908 (Del. 2018); *AM Gen. Holdings LLC v. The Renco Grp., Inc.*, 2016 WL 4440476, at *15 (Del. Ch. Aug. 22, 2016) (noting that "the LLC Act enables contracting parties to alter and even eliminate equitable fiduciary duties in the LLC context"); *Zimmerman v. Crothall*, 62 A.3d 676, 703 (Del. Ch. 2013) (holding that "the parties, through [the LLC at issue's operating agreement] and consistent with their prerogative under 6 Del. C. § 18-1101(c), [had] 'restricted' the fiduciary duties that the Director Defendants owed in the context of their dealings with the Company").

[266] *E.g.*, *Kelly v. Blum*, 2010 WL 629850, at *11 (Del. Ch. Feb. 24, 2010) (observing that the Delaware LLC Act "goes further by allowing broad exculpation of all liabilities for breach of fiduciary duties-including the duty of loyalty") (emphasis added); *In re Bayou Steel BD Holdings, L.L.C.*, 642 B.R. 371, 401 (Bankr. D. Del. 2022) (Delaware's LLC Act "is broad, allowing exculpation of all liabilities for breach of fiduciary duty, including the duty of loyalty"); *In re CLK Energy Partners, LLC*, 2011 WL 1312275, at *7 (Bankr. W.D. La. 2011) ("These provisions eliminate the corporate law fiduciary duties between CLK and its managers and members," including the trustee's claims against defendants "based on their alleged breaches of the fiduciary duties of care, diligence, and ***loyalty*** as is currently pled in the Amended Complaint.") (emphasis added).

[267] *In re CLK Energy Partners, LLC*, 2011 WL 1312275, at *7 (Bankr. W.D. La. Mar. 31, 2011) (granting motion to dismiss where LLC Agreement "eliminate[d] the corporate law fiduciary duties between [debtor LLC] and its managers and members"); *see also In re NSC Wholesale Holdings LLC*, 637 B.R. 71, 84 (Bankr. D. Del. 2022) (holding that "an operating agreement [of an LLC] is integral to the complaint where the complaint alleges breaches of fiduciary duties," and the court may consider the LLC Agreement without converting a Rule 12(b)(6) motion to a motion for summary judgment); *In re W.J. Bradley Mortgage Capital, LLC*, 598 B.R. 150, 166 (Bankr. D. Del. 2018) (explaining that failing to consider the LLC Agreement on a motion to dismiss would require the parties to "engage in discovery and the Court would consider the same issue on a motion for summary judgment with discovery yielding no new necessary facts").

[268] *Clingman & Hanger Mgmt. Assocs LLC v. Rieck*, 2023 WL 2744399, at *15 (S.D. Tex. Mar. 30, 2023) (granting motion to dismiss where "LLC agreement exculpates past (and later) breaches of fiduciary duty").

judicially noticed, a successful affirmative defense appears, then dismissal under Rule 12(b)(6) is proper."[269] As one court held, "the contents of [an] LLC Agreement may be considered on a motion to dismiss because the agreement is referenced in the Trustee's complaint."[270] Moreover, Delaware bankruptcy courts have held that, given that Delaware law allows maximal contractual freedom in structuring LLCs and fiduciary duties to them, "an operating agreement [of an LLC] is a document integral to the complaint where the complaint alleges breaches of fiduciary duties," and the court may consider the agreement on a Rule 12(b)(6) motion.[271] Failing to consider an LLC agreement on a motion to dismiss would require the parties to "engage in discovery and the Court would consider the same issue on a motion for summary judgment with discovery yielding no new necessary facts."[272] In accord with this case law and the rules set forth in Paragraph 31, *supra*, the Sinclair Defendants are attaching the relevant LLC agreements and documents they reference as exhibits.[273]

129. Here, the Court should dismiss the fiduciary duty claims based on the waiver clauses of DSG's own current LLC agreement, as well as the agreement of its indirect parent DSIH.

---

[269] *Hall v. Hodgkins*, 305 F. App'x 224, 227-28 (5th Cir. 2008); *Ellis v. United States*, 2018 WL 11470101, at *2 (S.D. Tex. June 13, 2018).

[270] *CLK Energy*, 2011 WL 1312275, at *7 (granting motion to dismiss where LLC Agreement "eliminate[d] the corporate law fiduciary duties between [debtor LLC] and its managers and members").

[271] *In re NSC Wholesale Holdings LLC*, 637 B.R. 71, 84 (Bankr. D. Del. 2022).

[272] *In re W.J. Bradley Mortg. Capital, LLC*, 598 B.R. 150, 166 (Bankr. D. Del. 2018).

[273] Specifically, Exhibit 3 is the 2022 DSG LLC Agreement; Exhibit 4 contains excerpts from the 2022 First Lien Credit Agreement, which the 2022 DSG LLC Agreement relies on to define certain terms; and Exhibit 5 is the 2019 DSH LLC Agreement.

### 1. The Waiver Clause In DSG's 2022 LLC Agreement Bars Claims Based On Both Future And Past Alleged Fiduciary Duty Breaches.

130. DSG's current LLC agreement is dated May 1, 2022 (the "2022 DSG LLC Agreement"). Notably, this 2022 DSG LLC Agreement was adopted *after* DSG's management was changed to a five-member board of managers with a majority of independent managers appointed by a group of creditors and removable only at the will of the creditor group.[274] The Debtors do not allege that Sinclair's supposed domination of DSG caused it to adopt the 2022 DSG LLC Agreement, and nor could it given that DSG was governed by a majority independent, creditor-appointed board of managers.[275] Instead, the 2022 DSG LLC Agreement was adopted by the independent managers.

131. That 2022 DSG LLC Agreement contains a broad waiver of fiduciary duties:[276]

> Any duties (including fiduciary duties) of any Covered Person to the Company, the Member or any other Person or entity holding an interest in the Company that would otherwise apply by law or in equity are hereby eliminated to the fullest extent permitted under the [Delaware Limited Liability Company] Act and any other applicable law.[277]

"Covered Person" is defined expansively and includes any current or former member or manager; any officer, employee, representative, or agent of a current or former member or manager, or that member or manager's affiliates; and any officer of DSG.[278]

---

274 Compl. ¶ 245.

275 *Id.* ¶ 245.

276 Diamond's Complaint references its current LLC Agreement, Compl. ¶¶ 355, 368, and this Court can take judicial notice of that undisputed Agreement, and thus it is properly considered on this Motion to Dismiss.

277 Ex. 3, 2022 DSG LLC Agreement § 10.1.

278 *Id.* at 2 ("'Covered Person' shall mean any current or former Member or Manager, an Affiliate of a current or former Member or Manager, any officer, director, shareholder, partner, member, employee, representative or agent of a current or former Member or Manager or any of their respective Affiliates or any officer of the Company.")

132. The plain language of the 2022 DSG LLC Agreement's waiver provision eliminates any fiduciary duties: "Any duties (including fiduciary duties) … and hereby eliminated to the fullest extent permitted … ."[279] Courts applying Delaware law have held that similar language eliminates all fiduciary duties. For example, this year a court in this district held that a provision reading "[t]o the fullest extent permitted by applicable law, no manager of the Board or officer of the Company, … shall have any duty, fiduciary or otherwise …" eliminated all fiduciary duties.[280] The Complaint likewise acknowledges that in May 2022 "DSG's LLC Agreement was amended to purportedly waive such fiduciary duties."[281]

133. The 2022 DSG LLC Agreement does not only preclude future fiduciary claims, but also waives any *past* claims for breach of fiduciary duty, as a recent case from this district held based on similar contractual language. In *Clingman & Hanger Mgmt. Assocs LLC v. Rieck*,[282] a litigation trustee pled fiduciary duty claims against officers of an LLC related to management conduct occurring before December 10, 2017.[283] The LLC's pre-December 2017 operating agreements did not include a fiduciary duty waiver, but subsequent amendments contained a broad waiver "to the fullest extent permitted by applicable law" for any "manager of the Board or officer

---

[279] *Id.* § 10.1.

[280] *Clingman & Hanger*, 2023 WL 2744399, at *13; *see also*, *e.g.*, *CLK Energy*, 2011 WL 1312275, at *7 (provision reading: "The Members hereby ... waive to the fullest extent permitted by the Act any duty or other obligation, if any, that a Member may have to the Company or another Member, pursuant to the Act or any other applicable law, rule or regulation"); *DG BF, LLC v. Ray*, 2021 WL 776742, at *10 (Del. Ch. Mar. 1, 2021) ("By exculpating the Individual Directors 'to the maximum extent permitted under the Act,' Section 5.4 of the Operating Agreement exculpates all liabilities for breach of fiduciary duties.") (dismissing breach of duty of loyalty claim); *In re Atlas Energy Res., LLC*, 2010 WL 4273122, at *12 (Del. Ch. Oct. 28, 2010) (holding an LLC agreement eliminates traditional fiduciary duties when it states "none of the Directors ... shall have any duties or liabilities, including fiduciary duties, to the Company or any Member").

[281] Compl. ¶ 355.

[282] 2023 WL 2744399, at *15.

[283] *Id.* at *13.

of the Company."[284] The final LLC amendment was effective January 25, 2018, after the challenged conduct occurred.[285]

134. In *Clingman & Hanger*, defendants argued that the final LLC amendment waived alleged fiduciary breaches occurring before the January 25, 2018 date, and the district court agreed.[286] The court explained that whether the "amended LLC agreement exculpates fiduciary duties arising before that date is simply one of contract interpretation."[287] *Clingman & Hanger* relied on two independent contractual bases in finding that the LLC amendment waived past fiduciary duty breaches. *First*, the LLC amendment superseded and replaced the prior agreement, as shown by language stating that it "'*amends and restates* the previous Agreement in its entirety.'"[288] "Once an LLC agreement is superseded by a subsequent agreement, a limited liability company can no longer bring claims that arose under the superseded agreement."[289] *Second*, the waiver clause's language "vitiates all fiduciary duties … to 'the fullest extent permitted by applicable law'" which "necessarily includes—in accord with authority noted immediately above—exculpation of those fiduciary duties owed (and potentially breached) in the past."[290]

135. Both of the bases *Clingman & Hanger* relied on to find the LLC agreement extinguished past alleged fiduciary duties or breaches apply here. The 2022 DSG LLC Agreement "eliminated to the fullest extent permitted under the [Delaware Limited Liability Company] Act

---

284 *Id.*

285 *Id.*

286 *Id.* at *13-16.

287 *Id.* at *14.

288 *Id.*

289 *Id.*

290 *Id.*

and any other applicable law" any fiduciary duties,[291] which is at least as strong as *Clingman & Hanger*'s language eliminating all fiduciary duties "the fullest extent permitted by applicable law." As in *Clingman & Hanger*, the plain meaning of this language is to eliminate all fiduciary duties, including those that may have existed in the past.

136. Indeed, the 2022 DSG LLC Agreement's language is even stronger than that in *Clingman & Hanger*. The *Clingman & Hanger* exculpatory clause applied to a "manager of the Board or officer of the Company" without specifying whether it applied to former managers or officers.[292] In contrast, the 2022 DSG LLC Agreement's definition of the "Covered Persons" under the waiver clause expressly includes any "current or *former*" members or managers of DSG or its affiliates.[293] The plain language of the 2022 DSG LLC Agreement covering such "former" persons further confirms that the Agreement eliminates any past alleged fiduciary duties or breaches. At the time the 2022 DSG LLC Agreement was adopted, the alleged fiduciary duties or breaches of any "former" persons had necessarily occurred in the past. By eliminating and waiving such past breaches, the Agreement's language demonstrates that it was intended to have a retroactive effect.

137. Similarly, the 2022 DSG LLC Agreement supersedes any prior LLC agreements. The 2022 document is expressly titled the "AMENDED AND RESTATED" LLC agreement, similar to the language relied on by the *Clingman & Hanger* court.[294] Moreover, the 2022 DSG

---

[291] Ex. 3, 2022 DSG LLC Agreement § 10.1.

[292] 2023 WL 2744399, at *13.

[293] Ex. 3, 2022 DSG LLC Agreement at 2 ("'Covered Person' shall mean any current or former Member or Manager, an Affiliate of a current or former Member or Manager, any officer, director, shareholder, partner, member, employee, representative or agent of a current or former Member or Manager or any of their respective Affiliates or any officer of the Company.").

[294] *Id.* at 1.

LLC Agreement expressly states that "[t]his Agreement contains the complete statement of all of the arrangements among the parties hereto with respect to the Company … ."[295] This language further confirms that the 2022 DSG LLC Agreement replaced any prior agreements. No language in the 2022 DSG LLC Agreement suggests any intent to preserve prior LLC agreements, and especially not to preserve any fiduciary duties under those older agreements.

138. Applying the 2022 DSG LLC Agreement to the Debtors' claims, the Complaint itself establishes that all four individuals sued for breach of fiduciary duties in Count XVI have had any such duties eliminated by that Agreement. As noted above, the 2022 DSG LLC Agreement eliminates all fiduciary duties for "Covered Persons," which is broadly defined.[296] In particular, "Covered Persons" includes current or former managers and officers of DSG, which encompasses each of the four individual defendants under the Complaint's own allegations. Specifically, the Complaint alleges that:

- David Smith was a "de facto manager of DSG;"[297]
- Chris Ripley is on the Board of Managers of DSG, and thus is a manager, and also was DSG's president, which is an officer position;[298]
- Lucy Rutishauser was a CFO and Treasurer of DSG, which are officer positions;[299] and

[295] *Id.* § 11.1.

[296] *Id.* at 2 ("'Covered Person' shall mean any current or former Member or Manager, an Affiliate of a current or former Member or Manager, any officer, director, shareholder, partner, member, employee, representative or agent of a current or former Member or Manager or any of their respective Affiliates or any officer of the Company.")

[297] Compl. ¶¶ 27, 358, 365.

[298] *Id.*

[299] *Id.*

- Scott Shapiro was a "de facto manager of DSG" and also DSG's CFO and Chief Operating Officer, both of which are officer positions.[300]

139. Similarly, Count XVII alleging breach of fiduciary duty claims against SBG is barred because SBG is a Covered Person as "an Affiliate of a current or former Member or Manager."[301] "Affiliate's" definition includes a person or entity "that directly or indirectly Controls or is Controlled by or is under common Control with Person specified," with "Control" meaning the direct or indirect power, including through voting rights, to direct management or policies or dismiss or appoint management.[302] The Complaint alleges that DSIH was the member and manager of DSG, and that SBG had an indirect equity ownership interest in DSIH.[303] Therefore, SBG is an Affiliate of DSIH, and thus a Covered Person, under the 2022 DSG LLC Agreement.

140. Furthermore, "when an exculpatory clause immunizes the managers of a limited liability corporation from breach of fiduciary duty claims, a controlling equity holder is likewise immunized."[304] The 2022 DSG LLC Agreement immunizes managers, and the Complaint alleged that SBG was the "ultimate controller" of DSG through its "equity ownership interest" in a series of subsidiaries.[305] Thus the fiduciary duty claim against SBG fails for this independent reason.

---

[300] *Id.*

[301] Ex. 3, 2022 DSG LLC Agreement at 2.

[302] Ex. 4, First Lien Credit Agreement at 2, 17. The 2022 DSG LLC Agreement incorporates the definition of "Affiliate" from the First Lien Credit Agreement. Ex. 3, 2022 DSG LLC Agreement at 2.

[303] Compl. ¶¶ 46, 362.

[304] *HH Liquidation*, 590 B.R. at 272-73.

[305] Compl. ¶ 362.

141. Accordingly, despite the Debtors' strenuous effort to assign fiduciary duties to the individual defendants and claims of breach, any such duties—past or future—have been waived by the 2022 DSG LLC Agreement. Debtors' breach of fiduciary duty claims against Smith, Ripley, Rutishauser, and Shapiro (Count XVI) and SBG (Count XVII) are therefore barred as a matter of law and should be dismissed.

### 2. The Exculpatory Clause In DSH's 2019 LLC Agreement Independently Bars The Complaint's Fiduciary Duty Claims.

142. Delaware Code Section 18-1101(c)'s provision allowing waiver of fiduciary duties in an LLC agreement is not limited to duties to the LLC whose operations are governed by that agreement. Instead, Section 18-1101(c) also allows waiver of any fiduciary duties to "another person that is a party to *or is otherwise bound* by a limited liability company agreement."[306] Under this provision's plain language and Delaware law's emphasis on freedom of contract, if DSG is bound by the LLC agreement of another company in the chain of ownership, then that other LLC's waiver clause can eliminate any fiduciary duties persons might owe to DSG. Here, DSG is "otherwise bound" by the LLC agreement of DSH (the "<u>2019 DSH LLC Agreement</u>"), its indirect parent, and DSH's waiver clause eliminates any fiduciary duties owed by any defendant to DSG.

143. The 2019 DSH LLC Agreement's clear text has multiple provisions binding its "Subsidiaries." For example, that Agreement states that the "Business, property and affairs of the LLC *and its Subsidiaries* shall be managed by a board of managers."[307] "*Subject to the terms of*

---

[306] Del. C. § 18-1101(c) ("To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager *or to another person that is a party to or is otherwise bound by a limited liability company agreement*, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement; provided, that the limited liability company agreement may not eliminate the implied contractual covenant of good faith and fair dealing.") (emphasis added).

[307] Ex. 5, 2019 DSH LLC Agreement § 6.1(a)(i) (emphasis added).

*this Agreement*, the Board shall have full, complete and exclusive authority, power and discretion to manage and control the business, property and affairs of the LLC *and its Subsidiaries*" and "to make all decisions regarding those matters … including exercising the LLC's rights with respect to the business and affairs of the LLC's Subsidiaries."[308] Thus, the 2019 DSH LLC Agreement requires DSH's Subsidiaries to follow the decisions of the DSH board, including regarding managing the affairs of each business. Moreover, that Agreement's use of "[s]ubject to the terms of this Agreement" establishes that the management of DSH's Subsidiaries shall take place pursuant to the terms of the 2019 DSH LLC Agreement. As DSH's Subsidiaries are required to follow these provisions, each one is "*otherwise bound* by [the DSH] limited liability company agreement" under Section 18-1101(c).

144. DSG is a "Subsidiary" under the 2019 DSH LLC Agreement, and thus "otherwise bound" by that Agreement. The 2019 DSH LLC Agreement defines "Subsidiary" to include any entity where more than 50% ownership interests are "owned, controlled or held by the applicable Person or *one or more direct or indirect Subsidiaries of such Person*."[309] Here, DSH owns more than 50% of the interests in DSIH-A, which owns more than 50% of interests in DSIH, which in turn owns more than 50% of the interest in DSG.[310] Thus, DSG is a "Subsidiary" of DSH because DSH's indirect Subsidiary DSIH owns more than 50% of the interests in DSG.

145. Because DSG is a Subsidiary, it is bound by the 2019 DSH LLC Agreement's broad waiver clause, which expressly eliminates fiduciary duties:

> Any duties (including fiduciary duties) of a Covered Person to the LLC, any Member or any Person bound by this Agreement that would otherwise apply

---

[308] *Id.* (emphasis added).

[309] Ex. 5, 2019 DSH LLC Agreement, Ex B-11 (emphasis added).

[310] Compl. ¶¶ 45-46, 362.

> at law or in equity are hereby eliminated to the fullest extent permitted under the Act and any other applicable law; … Without limiting the generality of the foregoing, it is hereby acknowledged and agreed that each Manager, in determining whether or not to vote in support of or against any particular decision for which the Board's consent is required, may act in and consider the best interests of the Sinclair Member[311] and shall not be required to act in or consider the best interests of the LLC, any Subsidiary of the LLC or any other Members.[312]

"Covered Person" has a definition similar to the 2022 DSG LLC Agreement, and includes members and managers, their Affiliates, and the officers and employees of the member or their Affiliates.[313] Affiliates includes any entity that—directly or indirectly—owns 10% or more of another entity's ownership interests or has 10% or more of its interests owned by another entity and includes the officers of any such Affiliate.[314]

146. Under these definitions, all the individual defendants and SBG are Covered Persons, and thus the 2019 DSH LLC Agreement eliminates any of their fiduciary duties to Subsidiaries, including DSG. Specifically, the Complaint alleges that Smith, Ripley, and Rutishauser were all members of the DSH board.[315] Moreover, as discussed in Paragraph 134, *supra*, the Complaints alleges all these individual defendants and Shapiro were officers and/or de facto managers of DSG, an Affiliate of DSH, and thus another reason they fall into the definition of Covered Persons.

---

311 The "Sinclair Member" refers to DSH's member, Diamond Sport Topco LLC, and its affiliates. Ex. 5, 2019 DSH LLC Agreement, Ex. B-11.

312 *Id.* § 6.2(a).

313 *Id.*, Ex. B-5.

314 *Id.*, Ex. B-1.

315 Compl. ¶ 357.

147. As described in Paragraph 135, *supra*, SBG is a Covered Person as an Affiliate of DSH, as well as the Complaint's allegation that SBG controls DSG. Similarly, because the exculpatory clause immunizes the LLC's managers, SBG likewise is immunized. Paragraph 136, *supra*.

148. Accordingly, the 2019 DSH LLC Agreement waives any fiduciary duties or breaches of those alleged duties supposedly owed by the the Sinclair Defendants to DSG. Thus, the 2019 DSH LLC Agreement provides independent grounds for dismissing Counts XVI and XVII.

**B. SBG Does Not Owe Any Fiduciary Duties To Its Indirect Subsidiary, DSG.**

149. Count XVII of the Complaint, which alleges a breach of fiduciary duty claim against SBG, also fails because parent companies—and particularly indirect parent companies—do not owe fiduciary duties to their wholly owned subsidiaries. As Delaware courts have explained, "[w]holly-owned subsidiary corporations are expected to operate for the benefit of their parent corporations; that is why they are created. Parent corporations do not owe such subsidiaries fiduciary duties. That is established Delaware law."[316]

150. The rule that parents do not owe fiduciary duties to wholly owned subsidiaries continues to apply where a subsidiary is insolvent. As a court in this district has explained, "even where a wholly owned subsidiary is insolvent, the parent corporation does not owe a fiduciary duty to that subsidiary or its creditors."[317] This is because "insolvency does not create a new duty,"

[316] *Trenwick Am. Litig. Trust v. Ernst & Young LLP*, 906 A.2d 168, 173 (Del. Ch. 2006); *see also Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988) (recognizing "that a parent does not owe a fiduciary duty to its wholly owned subsidiary"); *HH Liquidation*, 590 B.R. at 271 ("Delaware courts recognize that a parent company does not owe fiduciary duties to its direct or indirect subsidiaries.").

[317] *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 414-16 (S.D. Tex. 2008); *see also In re Essar Steel Minn. LLC*, 602 B.R. 600, 608 (Bankr. D. Del. 2019) ("the Court is persuaded by several other courts that have addressed

but at most "merely changes the beneficiaries of that duty to include creditors."[318] As "a parent corporation does not a owe a fiduciary duty to its wholly owned subsidiary," no duty exists whose beneficiaries can change if a subsidiary becomes insolvent.[319]

151. This rule precludes the Complaint's breach of fiduciary duty count against SBG (Count XVII). The Complaint acknowledges that SBG is an indirect parent of DSG; indeed, there are four companies between SBG and DSG.[320] The rule that parents do not owe fiduciary duties to subsidiaries applies all the stronger when the subsidiary is four companies removed from the indirect parent.[321]

152. No allegation in the Complaint is sufficient to overcome this settled Delaware law. The Complaint's only allegations to support SBG having a fiduciary duty is the chain of equity ownership between SBG and DSG and allegations that SBG appointed members to an indirect parent of DSG and used its control to appoint officers and "de facto" managers of DSG.[322] But such equity ownership is the very definition of being an indirect parent corporation, and appointing managers and officers is standard conduct by a parent corporation, as wholly owned subsidiaries are expected to operate for the benefit of their parent corporations.

---

similar arguments and declined to recognize a duty owed by a parent corporation to an insolvent wholly-owned subsidiary").

318 *ASARCO*, 396 B.R. at 415.

319 *Id.*

320 Compl. ¶¶ 45-46, 362.

321 *HH Liquidation*, 590 B.R. at 271 ("Delaware courts recognize that a parent company does not owe fiduciary duties to its direct or indirect subsidiaries.").

322 Compl. ¶¶ 362-65.

### C. Without A Fiduciary Duty And Breach, There Can Be No Aiding And Abetting.

153. The Complaint's claim for aiding and abetting breach of fiduciary duties (Count XVIII) fails because there is no underlying fiduciary duty or breach. "To state a claim for aiding and abetting breach of fiduciary duty under Delaware law, the [plaintiff] must establish: (1) the existence of a fiduciary relationship; (2) a breach of the fiduciary's duty; (3) knowing participation in that breach by the defendants; and (4) damages proximately caused by the breach."[323] Thus, if there is no fiduciary relationship or underlying breach of a fiduciary duty, any aiding and abetting claim fails as a matter of law.[324]

154. The Complaint alleges in Count XVIII that if any defendant named in Counts XVI and XVII—Ripley, Smith, Rutishauser, Shapiro, and SBG—does not have a fiduciary duty to DSG, then that person aided and abetted breach of fiduciary duties by one (or more) of the other five.[325] But as shown in the preceding subsection, *none* of these five defendants owe any fiduciary duties to DSG. Any fiduciary duty by all of the five were waived by LLC Agreements and for SBG could not have existed in the first place. As none of the five defendants has a fiduciary relationship with DSG, or could have breached any fiduciary duty, the Complaint cannot state the essential elements required for an aiding and abetting breach of fiduciary duty claim. Therefore, Count XVIII fails as a matter of law.

---

[323] *In re Cred Inc.*, 650 B.R. 803, 821 (Bankr. D. Del. 2023).

[324] *Clingman & Hanger*, 2023 WL 2744399, at *16 (granting motion to dismiss aiding and abetting claims to the extent they relied on dismissed breach claims against various officers that were barred by LLC Agreement); *Renco Grp, Inc. v. MacAndrew AMG Holdings LLC*, 2015 WL 394011, at *8 (Del. Ch. Jan. 29, 2015) ("the aiding and abetting fiduciary duty claims against M & F and Perelman must be dismissed for lack of an underlying fiduciary breach"); *Moore Bus. Forms, Inc. v. Cordant Holdings Corp.*, 1995 WL 662685, at *6 (Del. Ch. Nov. 2, 1995) ("Because no cognizable breach of fiduciary duty is stated, [plaintiff's] claim in Count I that [corporate defendant] Cordant aided and abetted the individual defendants' breach of fiduciary duties must be dismissed as well.").

[325] Compl. ¶ 372.

## X. THE COMPLAINT FAILS TO PLEAD FACTUAL CONTENT TO PIERCE EACH CORPORATE VEIL BETWEEN DSG AND SBG (COUNT XIX).

155. "One of the reasons for incorporating in Delaware is its well-established respect for the corporate form."[326] "As the Delaware Supreme Court recently explained, 'Delaware courts take the corporate form and corporate formalities very seriously,' because it would 'upset the contractual expectations' of the parties to conflate separate entities.'"[327] "The corporate identity for single-member LLCs is also respected."[328]

156. Accordingly, under Delaware law corporate separateness "should be disregarded only in 'exceptional circumstances' and 'limited liability is the general rule, not the exception.'"[329] "Persuading a Delaware court to disregard the corporate entity is a difficult task, and the party who wishes the court to disregard that form bears the burden of proving that there are substantial reasons for doing so."[330] "Veil piercing is a tough thing to plead and a tougher thing to get, and for good reason. Delaware is in the business of forming entities, and so Delaware public policy does not lightly disregard their separate legal existence."[331]

---

[326] *HH Liquidation,* 590 B.R. at 256.

[327] *Id.* at 256 (quoting *Culverhouse v. Paulson & Co.*, 133 A.3d 195, 199-200 (Del. 2016) (internal quotation marks omitted)).

[328] *In re Opus East, LLC*, 528 B.R. 30, 57 (Bankr. D. Del. 2015); *see also In re BH S & B Holdings LLC*, 420 B.R. 112, 139 (Bankr. S.D.N.Y. 2009) (explaining that "even though at all relevant times the only Manager of Holdings was the direct parent, Intermediate Holdco, or the indirect parent, Holdco, and thus, there was no board of managers, at least one court has determined that the lack of officers and directors in a subsidiary LLC is not a persuasive veil-piercing factor") (internal citation and quotation marks omitted).

[329] *Opus East, LLC*, 528 B.R. at 57 (quoting *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 270 (D. Del. 1989)).

[330] *Opus East,* 528 B.R. at 57-58 (internal quotation marks and brackets omitted).

[331] *Verdantus Advisors, LLC v. Parker Infrastructure Partners, LLC*, 2022 WL 611274, at *2 (Del. Ch. Mar. 2, 2022) (internal quotation marks and brackets omitted).

157. Here, Diamond provides only sparse and conclusory allegations to support its alter ego and veil piercing claims. Under both the general principles of *Iqbal* and *Twombly* as well as the case law applying specifically to such claims, the Complaint fails to adequately plead that corporate separateness should be ignored, and this Count XIX should be dismissed.

158. For alter ego and veil piercing, Texas choice of law again applies the law of the entity's state of incorporation.[332] Here, each of the entities whose veils Diamond seek to pierce—DSG, DSIH, DSIH-A, DSH, and TopCo—are organized under Delaware law. Thus, Delaware law applies to Diamond's alter ego and veil piercing claims.

159. A plaintiff, like the Debtors here, seeking to ignore the corporate separateness of an ultimate parent must allege sufficient factual content to pierce the veil of *each* entity between the debtor and that parent.[333] Thus, to recover from SBG based on transfers by DSG, the Complaint

[332] *See In re Kilroy*, 357 B.R. 411, 425 (Bankr. S.D. Tex. 2006) (citing *Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 203 (5th Cir. 1995) in applying Delaware law for a Delaware LLC); *see also In re Moore*, 379 B.R. 284, 289 n.3 (Bankr. N.D. Tex. 2007) (explaining that "courts are required to apply the law of the state of incorporation to corporate veil issues").

[333] *E.g.*, *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 218 (5th Cir. 2000) ("Here, although only a prima facie case is required, Appellants' task [to show that a subsidiary is an alter ego of the parent] is made more difficult by the existence of multiple levels of ACAB subsidiaries. For example, in order for the activities of Compressors, Comptec, and Robbins to be attributed to ACAB, Appellants must make a prima facie case that ACAB controls ACNA, itself a holding company, and controls Compressors, Comptec, and Robbins."); *In re Tronox Inc.*, 855 F.3d 84, 106 n.27 (2d Cir. 2017) (holding plaintiffs would need to pierce two veils and at "each level of piercing, the Avoca Plaintiffs would have to show that 'there is fraud' or the entity whose veil they seek to pierce was 'a mere instrumentality or alter ego of its owner'"); *In re Alta Mesa Res., Inc.*, 2022 WL 7750353, at *6 (Bankr. S.D. Tex. Oct. 13, 2022) (holding that "when dealing with multiple layers of parents and subsidiaries, the corporate veil likely must be pierced at each level") (internal quotation marks omitted); *In re Gulf Fleet Holdings*, 491 B.R. 747, 790 (Bankr. W.D. La. 2013) ("Under Delaware law, if a plaintiff seeks to establish liability for all members of a corporate group, it must "establish alter ego liability with respect to each one of the entities.") (internal quotation marks omitted); *Ellis v. Koppers Inc.*, 2006 WL 2432092, at *3 (N.D. Miss. Aug. 21, 2006) ("Furthermore, the plaintiffs in this case must pierce the veil at each corporate level."); *HH Liquidation*, 590 B.R. at 273 ("Further, when dealing with multiple layers of parents and subsidiaries, the corporate veil likely must be pierced at each level."); *Outokumpu Eng'g Enters., Inc. v. Kvaerner EnviroPower, Inc.*, 685 A.2d 724, 729 (Del. Super. Ct. 1996) ("Again, it is KAS which owns KI's stock and suggested KI buy EcoEnergy's stock. In other words, to whatever extent it exists, the veil between KAS and KAB would also have to be pierced."); *see also United States ex rel. Raffington v. Bon Secours Health Sys.*, 285 F. Supp. 3d 759, 769 n.6 (S.D.N.Y. 2018) ("We note, however, that proving claims against Bon Secours would in fact require piercing the corporate veil of two or possibly three entities: … At each level, Raffington would need to establish a prima facie case for veil-

must allege sufficient factual content to pierce each of the corporate veils between: (1) DSG and DSIH; (2) DSIH and DSIH-A; (3) DSIH-A and DSH; (4) DSH and TopCo; and, finally (5) TopCo and SBG.

160. To prevail on an alter ego or veil piercing claim under Delaware law, "[e]ffectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud."[334] A "plaintiff must show (1) that the parent and the subsidiary 'operated as a single economic entity' and (2) that an 'overall element of injustice or unfairness ... is present.'"[335] "Merely presenting evidence of dominion or control of the parent over the subsidiary, without evidence of fraud or similar injustice, will not support alter ego liability."[336]

### A. The Complaint Fails To Plead That Each Parent And Subsidiary Operated As A Single Economic Entity.

161. To determine whether a parent and its subsidiary "operated as a single economic entity," courts consider the following factors: "(1) undercapitalization; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) the insolvency of the debtor corporation at the time; (5) siphoning of the corporation's funds by the dominant stockholder; (6) absence of corporate records; and (7) the fact that the corporation is merely a façade for the operations of the

piercing."); *Dill v. Rembrandt Grp., Inc.*, 2020 WL 1881062, at *5 (Colo. App. Apr. 16, 2020) ("[T]he veils between the separate entities and their owners in the ownership chain must first be pierced.").

334 *Wenske v. Blue Bell Creameries, Inc.,* 2018 WL 3337531, at *15 (Del. Ch. July 6, 2018); *Wallace ex rel. Cencom Cable Income Partners II, Inc. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999).

335 *In re Kilroy*, 357 B.R. 411, 428 (Bankr. S.D. Tex. 2006) (citing *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2nd Cir. 1995)); *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 528 (D. Del. 2008); *Official Unsecured Creditors' Comm. of Broadstripe, LLC v. Highland Capital Mgmt., L.P. (In re Broadstripe, LLC)*, 444 B.R. 51, 102 (Bankr. D. Del. 2010).

336 *Opus East*, 528 B.R. at 64-65.

dominant stockholder or stockholders."[337] "While no single factor justifies a decision to disregard the corporate entity, some combination of the above is required, and an overall element of injustice or unfairness must always be present, as well."[338]

162. As the Complaint seeks to pierce five corporate veils, these factors must be separately (and adequately) pled for *each* parent-subsidiary pairing to reach SBG. The Complaint fails to plead factual content necessary to demonstrate that each of the five parent-subsidiary pairings at issue operated as a single economic entity.

163. *First*, regarding undercapitalization, when "determining whether a subsidiary was adequately capitalized, courts focus on the initial capitalization: whether a corporate entity was or was not set up for financial failure."[339] Diamond does not allege that DSG was undercapitalized at its creation.[340] Nor does Diamond allege any factual content showing that DSIH, DSIH-A, DSH, or TopCo were undercapitalized at their creation or at any other point in their existence. For example, Diamond does not allege any factual content that would show underfunding, such as "a comparison of capitalization of similar firms in the industry."[341] In any event, "a shortage of capital, as with all the factors of the alter ego doctrine, is not per se a reason to pierce the corporate

[337] *In re Xtreme Power Inc.*, 563 B.R. 614, 648 (Bankr. W.D. Tex. 2016) (citing *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 528-29 (D. Del. 2008)).

[338] *Trevino*, 583 F. Supp. 2d at 529 (internal quotation marks omitted).

[339] *BH S & B Holdings*, 420 B.R. at 136 (internal quotation marks omitted).

[340] Compl. ¶¶ 38-43.

[341] *Mason v. Network of Wilmington, Inc.*, 2005 WL 1653954, at *4 (Del. Ch. July 1, 2005).

veil."[342] Indeed, "undercapitalization is rarely sufficient to pierce the corporate veil, because otherwise the veil of every insolvent subsidiary or failed start-up corporation could be pierced."[343]

164. *Second*, for corporate formalities, overlap in ownership, officers, directors, and personnel does not by itself establish a failure to observe corporate formalities.[344] "It is well-established that wholly-owned subsidiaries may share officers, directors and employees with their parent, without requiring the court to infer that the subsidiary is a mere instrumentality for the parent and without requiring the court to conclude that those officers and directors were not functioning properly."[345]

165. The Complaint also alleges that DSG and other companies held only "informal" meetings and did not produce minutes for their meetings.[346] But as other courts have recognized, "the Delaware Limited Liability Company Act (DLLCA) requires little more than that an LLC execute a proper certificate of formation, maintain a registered office in Delaware, have a registered agent for service of process in Delaware, and maintain certain records for membership and tax purposes."[347] Thus, the "failure to hold board meetings does not support piercing, because under the DLLCA, [the company] did not have to hold board meetings or observe other formalities."[348] Here, because all DSG, DSIH, DSIH-A, DSH, and TopCo are all LLCs, they were not required to hold meetings or keep minutes, and the absence of such does not support piercing

---

342 *Trevino*, 583 F. Supp. 2d at 530 (internal quotation marks and brackets omitted).

343 *BH S & B Holdings*, 420 B.R. at 136 (internal quotation marks omitted).

344 *In re Foxmeyer Corp.*, 290 B.R. 229, 245 (Bankr. D. Del 2003).

345 *BH S & B Holdings*, 420 B.R. at 138.

346 Compl. ¶¶ 53-54.

347 *BH S & B Holdings*, 420 B.R. at 138.

348 *Id.* at 140.

the corporative veil. The Complaint does not allege that any of these five failed to satisfy the formalities that actually apply to LLCs under Delaware law.

166. Moreover, even when considering the formalities that apply to corporations rather than to LLCs, "formal" meetings and written minutes are only two considerations regarding corporate formalities, with others including (but not limited to) whether the entity is validly incorporated, has enacted by-laws, issued share certificates, enters into contracts in its own name, and maintains corporate records.[349] Plaintiffs do not allege any deficiencies with regard to these corporate formalities. Indeed, the Complaint includes written consents by the boards of DSG, DSIH, DISH-A, and DSH regarding the distributions used to redeem the JPMCFI preferred equity units,[350] indicating that corporate formalities were properly followed.

167. Delaware courts have held that allegations similar to the Complaint's are insufficient to pierce the corporate veil. For example, in *In re Opus East, LLC*, the complaint alleged that "during the Holding Companies' board meetings no distinction was made between the operations and financial health of one operating company versus the others; that is, all projects were talked about at one time, in one meeting" and that the debtors "could not make final decisions on projects—approval had to come from" the individual who founded the parent company.[351] Yet the *Opus East* court held that such circumstances were not enough to pierce the corporate veil.[352]

349 *E.I. du Pont de Nemours & Co. v. Agfa-Gavaert NV*, 335 F. Supp. 3d 657, 675-76 (D. Del. 2018).

350 Compl. ¶ 173.

351 528 B.R. at 60 (internal quotation marks omitted).

352 *Id.* at 66.

168. *Third*, regarding nonpayment of dividends, Diamond does not make any allegations that any of DSG, DSIH, DISH-A, DSH, or TopCo failed to pay dividends. Instead, the Complaint contains a chart showing regular quarterly distributions from DSG.[353]

169. *Fourth*, as for "the insolvency of the debtor corporation at the time," while the Complaint purports to allege DSG's insolvency at certain times, it contains no allegations regarding the insolvency of DSIH, DISH-A, DSH, or TopCo. Moreover, courts applying Delaware law regularly hold that insolvency is not sufficient to pierce the corporate veil. "Companies commonly become insolvent, then bankrupt; piercing the corporate veil is an exception reserved for extreme situations, rather than the rule."[354]

170. *Fifth*, regarding siphoning of the corporation's funds by the dominant shareholder, while the Complaint purports to allege that money was distributed from DSG, the Complaint does not allege factual content showing these funds went into any dominant shareholder's pockets. Instead, the majority of funds—$929 million—went to JPMCFI, either to redeem the JPMCFI preferred equity units (an obligation incurred in the purchase of the Diamond RSNs) or as quarterly distributions. Another $420-plus million from DSG was used to pay for the critical services that STG provides to DSG under the MSA. Payments made pursuant to existing contracts, such as the MSA or the JPMCFI preferred equity units, do not support any claim of siphoning of funds.[355] Regarding the Bally's transaction, DSG received cash and marketing commitments, also rebutting any argument regarding its funds being siphoned by the dominant shareholder. And once again,

---

[353] Compl. ¶ 193.

[354] *Opus East*, 528 B.R. at 57 (internal quotation marks omitted).

[355] *In re Gulf Fleet Holdings, Inc.*, 491 B.R. 747, 789 (W.D. La. 2013).

the Complaint does not contain any allegations that the funds of DSIH, DISH-A, DSH, or TopCo were improperly siphoned from those companies.

171. *Sixth*, for corporate records, similar to the second factor, while the Complaint purports to allege that minutes were not regularly kept, it does not address other corporate records for DSG, DSIH, DISH-A, DSH, or TopCo, or allege that they were not kept. Indeed, the Complaint itself alleges the existence of written consents by the boards of DSG, DSIH, DISH-A, and DSH regarding the distributions with respect to the JPMCFI preferred equity units,[356] showing those companies did keep corporate records.

172. *Seventh*, the Complaint shows that DSG was not merely a façade for the operations of the dominant stockholder or stockholders. For this prong, "the plaintiff must plead facts showing that the corporation is a sham and exists for no other purpose than as a vehicle for fraud."[357] "The extent of the domination and control must preclude the controlled entity from having legal or independent significance of its own" and the "abuse of the corporate form to effect a fraud or an injustice" must result in "some sort of elaborate shell game."[358] The parent's involvement in setting the subsidiary's policies or approving its major decisions are not bases for piercing the corporate veil.[359]

---

[356] Compl. ¶ 173.

[357] *BH S & B Holdings*, 420 B.R. at 140 (internal quotation marks omitted).

[358] *Id.* at 140-41.

[359] *E.g.*, *Nespresso USA, Inc. v. Ethical Coffee Co. SA*, 263 F. Supp. 3d 498 (D. Del. 2017) (holding that a parent "setting the corporate policies and procedures for all subsidiaries" is permissible and is "not sufficient evidence of agency"); *Fletcher v. Atex, Inc.*, 861 F. Supp. 242, 245 (S.D.N.Y. 1994), (applying Delaware law) ("[I]t is entirely appropriate for a parent corporation to approve major ... policies involving the subsidiary."), *aff'd*, 68 F.3d 1451 (2nd Cir. 1995); *BH S & B Holdings*, 420 B.R. at 138 ("That Holdings's parents retained decision-making authority is also insufficient to pierce the corporate veil. … Courts refuse to pierce the veil just because parent corporations retain decision-making authority over subsidiaries.") (collecting cases); *NAMA Holdings, LLC v. Related WMC LLC*, 2014 WL 6436647, at *35 (Del. Ch. Nov. 17, 2014) (A "parent and subsidiary can be expected to consult on matters affecting the subsidiary and to make decisions on behalf of the subsidiary or

173. The Complaint alleges that Diamond had its own employees,[360] and those employees would sometimes challenge Sinclair's decisions, such as regarding the MSA fees.[361] The Diamond entities were created to run an existing RSN business purchased from Disney, not to function as shells that did not conduct any business.[362] That these entities ran a distinct business for years prior to their purchase by Sinclair "tends to undercut a finding that [debtor] was 'merely a façade for the operations of'" the parent.[363] Similarly, courts have rejected piercing the corporate veil where the debtor "was initially a legitimate business" instead of a "sham entity."[364] And Diamond continues to run its own business, such as by producing thousands of live local telecasts annually,[365] instead of being a façade for the operations of SBG or any other defendant. Sinclair paid a $1.4 billion capital contribution in purchasing this business[366]—putting a sizable investment at risk if Diamond failed—demonstrating that Diamond was not some scheme created to defraud creditors. In sum, there is no basis in the Complaint to conclude that DSG was a mere shell; instead, Diamond had its own independent existence and business.

implement them through shared officers or employees."); *see also Esmark, Inc. v. NLRB*, 887 F.2d 739, 759 (7th Cir. 1989): (In undertaking this analysis, courts recognize that "dominant shareholders are almost always 'active participants' in the affairs of an owned corporation. And, in the usual case, the exercise of such control ... is entirely permissible, and does not result in the owner's personal liability.").

360 Compl. ¶¶ 119, 236.

361 *Id.* ¶ 119.

362 *Id.* ¶¶ 33-38.

363 *Gulf Fleet*, 491 B.R. at 789.

364 *BH S & B Holdings*, 420 B.R. at 136.

365 First Day Decl. ¶¶ 18-19.

366 Compl. ¶ 39.

174. Accordingly, the Complaint does not sufficiently plead that each of the parent-subsidiary pairs whose veil Diamond seeks to pierce operated as a single economic entity, and Count XIX should be dismissed for this reason alone.

**B. The Complaint Fails To Plead Injustice Or Fraud Beyond The Underlying Causes Of Action, Which Is Insufficient To Pierce The Corporate Veil.**

175. For the second prong of the piercing test, cases applying Delaware law have repeatedly held that the "underlying cause of action does not supply the necessary fraud or injustice. To hold otherwise would render the fraud or injustice element meaningless and would sanction bootstrapping."[367] Where the plaintiff does not "allege abuse of injustice in the use of the corporate form" beyond the underlying causes of action, the veil piercing claim should be dismissed.[368] "Merely presenting evidence of dominion or control of the parent over the subsidiary, without evidence of fraud or similar injustice, will not support alter ego liability."[369]

176. The Complaint does not satisfy these black letter standards of Delaware law. The Complaint alleges that SBG controlled other Sinclair entities,[370] but control or dominion is not sufficient to show fraud or injustice. The Complaint also alleges that SBG carried out "improper acts through DSIH, DSIH-A, DSH, and TopCo,"[371] but then simply lists the underlying causes of action such as alleged fraudulent transfers under the MSA, distribution to redeem the JPMCFI preferred equity units, the Bally's transaction, and similar claims. Again, the underlying causes of

---

367 *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 268 (D. Del. 1989); *see also Foxmeyer*, 290 B.R. at 236.

368 *Trevino*, 583 F. Supp. 2d at 531.

369 *Opus East*, 528 B.R. at 64-65 (internal quotation marks omitted).

370 Compl. ¶¶ 376-77.

371 *Id.* ¶ 379.

action are not sufficient to plead fraud or injustice, and thus cannot establish alter ego or veil piercing.

177. Accordingly, in addition to failing to adequately allege that each of the parent-subsidiary pairs whose veil Diamond seeks to pierce operated as a single economic entity, the Complaint also fails to allege the fraud or injustice required to pierce the corporate veil. Thus, Count XIX should be dismissed for this independent reason.

**Reservation of Rights**

178. The Sinclair Defendants reserve all rights with respect to the Complaint, including but not limited to additional motion practice.

**Notice**

179. Notice of this Motion will be provided by email, when available, or by traditional mail to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) the Debtors; and (c) the parties listed on the Debtors' master service list. In light of the nature of the relief requested, no other or further notice need be given.

**Conclusion**

180. The Sinclair Defendants respectfully request that the Court enter the Order, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Respectfully submitted,

September 19, 2023

*/s/ Joshua Greenblatt, P.C.*

**ZACK A. CLEMENT PLLC**
Zack A. Clement (TX Bar No. 04361550)
3753 Drummond Street
Houston, Texas 77025
Telephone: (832) 274-7629
Email: zack.clement@icloud.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
David R. Seligman, P.C. (*pro hac vice* pending)
Jaimie Fedell (*pro hac vice* pending)
Casey McGushin (*pro hac vice* pending)
R. Chris Heck (*pro hac vice* pending)
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: david.seligman@kirkland.com
Email: jaimie,fedell@kirkland.com
Email: casey.mcgushin@kirkland.com
Email: r.chris.heck@kirkland.com

Joshua Greenblatt, P.C. (*pro hac vice* pending)
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: josh.greenblatt@kirkland.com

*Co-Counsel to Sinclair Defendants*

**Certificate of Service**

I certify that on September 19, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Joshua Greenblatt, P.C.*
Joshua Greenblatt, P.C.