## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| DIAMOND SPORTS GROUP, LLC, *et al.*,[1] | ) | Case No. 23-90116 |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) |  |
| DIAMOND SPORTS GROUP, LLC and DIAMOND SPORTS NET, LLC, | ) | |
|  | ) |  |
| Plaintiffs, | ) |  |
|  | ) |  |
| v. | ) | Adv. Pro. No. 23-03134 |
|  | ) |  |
| SINCLAIR BROADCAST GROUP, INC., SINCLAIR TELEVISION GROUP, INC., DIAMOND SPORTS TOPCO LLC, DIAMOND SPORTS INTERMEDIATE HOLDINGS LLC, DIAMOND SPORTS INTERMEDIATE HOLDINGS A LLC, DIAMOND SPORTS HOLDINGS LLC, DAVID SMITH, CHRISTOPHER RIPLEY, LUCY RUTISHAUSER, SCOTT SHAPIRO, and BALLY'S CORPORATION, | ) | |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |

## PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN
## OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/DSG.  The Debtors' service address for purposes of these chapter 11 cases is: c/o Diamond Sports Group, LLC, 3003 Exposition Blvd., Santa Monica, CA 90404.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................... 1

ARGUMENT ............................................................................................................. 9

I.     THE DISTRIBUTIONS ARE NOT SUBJECT TO THE SECTION 546(e) SAFE
      HARBOR (COUNTS I–IV)................................................................................ 9

      A.     The Text of the Safe Harbor and the Supreme Court's Decision in *Merit*
           Direct that the Court's Safe Harbor Analysis Should Focus on the
           Transfers that Diamond Seeks to Avoid. ............................................ 11

      B.     The Sinclair Defendants' Focus on Two Inapposite Out-of-Circuit Cases
           That Misconstrue *Merit* Does Not Compel Dismissal. .......................... 17

      C.     The DSG-to-DSIH Initial Transfers Are Not Subject to the Safe Harbor. .......... 23

           1.     The DSG-to-DSIH Transfers Were Not "for the Benefit of" a
                Qualifying Entity. ............................................................... 23

           2.     The DSG-to-DSIH Transfers Are Not Qualifying Transactions. ............ 26

      D.     The Safe Harbor Cannot Be Resolved in the Sinclair Defendants' Favor on
           a Motion to Dismiss. ................................................................. 28

      E.     The Safe Harbor Does Not Apply to the Illegal Dividend Claim. ................... 30

II.     THE COMPLAINT STATES CLAIMS FOR ACTUAL FRAUDULENT
      TRANSFER (COUNTS I, V, AND IX). ................................................................. 31

      A.     Diamond Alleges Direct Evidence of Fraudulent Intent. ........................... 33

      B.     The Complaint Sufficiently Pleads Multiple Badges of Fraud as to Each of
           the Challenged Transactions. ....................................................... 35

           1.     Diamond Sufficiently Pleads its Actual Fraudulent Transfer Claim
                as to the MSA Payments (Count V). ........................................... 36

           2.     Diamond Sufficiently Pleads Its Actual Fraudulent Transfer Claim
                as to the Distributions to DSIH (Count I). .................................... 40

           3.     Diamond Sufficiently Pleads Its Actual Fraudulent Transfer Claim
                as to the Bally's Transaction (Count IX). ..................................... 42

III.     THE COMPLAINT ALLEGES THAT THE MSA PAYMENTS ARE
      CONSTRUCTIVE FRAUDULENT TRANSFERS (COUNTS VI AND VII). .............. 45

      A.     Plaintiffs Have Adequately Alleged Fair Consideration as Required by
           Maryland Law. ....................................................................... 47

      B.     The Complaint Also Alleges a Lack of Reasonably Equivalent Value
           Under the Bankruptcy Code and Delaware Law. ................................. 50

IV.    DIAMOND'S FRAUDULENT TRANSFER CLAIMS ARE TIMELY (COUNTS I–III, V–VII, AND IX–XI). ................................................................................ 55

V.    THE COMPLAINT STATES CLAIMS FOR BREACH OF FIDUCIARY DUTY (COUNTS XVI, XVII, AND XVIII). ................................................................ 56

    A.    Diamond's Fiduciary Duty Claims Are Not Waived (Counts XVI, XVII, and XVIII). ......................................................................................... 56

        1.    The 2022 DSG LLC Agreement Does Not Retroactively Waive the Sinclair Defendants' Fiduciary Duties to DSG for the Challenged Transactions. ........................................................... 57

        2.    The DSH LLC Agreement Does Not Bar Liability for the Sinclair Defendants' Conduct as Fiduciaries of DSG. ....................... 62

    B.    SBG Owed DSG Fiduciary Duties at the Time of the Challenged Transactions (Count XVII). ...................................................................... 65

    C.    The Complaint States a Claim Against the Sinclair Defendants for Aiding and Abetting Breaches of Fiduciary Duties (Count XVIII). ................................. 68

VI.    DIAMOND SUFFICIENTLY PLEADS ITS ALTER EGO CLAIMS (COUNT XIX). ........................................................................................................... 68

    A.    The Complaint Plausibly Alleges That Sinclair Exercised Dominion and Control over the Companies. ........................................................... 69

    B.    The Complaint Adequately Alleges That Sinclair Used the Companies to Commit Unfairness and Injustice. ................................................... 74

VII.    THE COMPLAINT SUFFICIENTLY PLEADS AN UNLAWFUL LLC DISTRIBUTION CLAIM (COUNT IV) BECAUSE DSIH KNEW OF DIAMOND'S INSOLVENCY AT THE TIME OF THE DISTRIBUTIONS. ............... 76

VIII.    DIAMOND'S UNJUST ENRICHMENT CLAIM AGAINST STG AND SBG (COUNT XV) IS NOT BARRED, BECAUSE SINCLAIR UNJUSTLY ENRICHED ITSELF THROUGH THE 2019 DSG LLC AGREEMENT. ...................... 78

IX.    DIAMOND PROPERLY PLEADS A CLAIM FOR BREACH OF THE MSA (COUNT VIII). ........................................................................................... 79

    A.    The Complaint Identifies the Specific Provisions of the MSA That Sinclair Breached. ................................................................................. 80

    B.    The Complaint Sufficiently Alleges The Conduct Constituting the Breaches. .................................................................................. 81

X.    DIAMOND PROPERLY PLEADS A CLAIM FOR BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING CLAIM (COUNT XIV). ........................................................................................................... 83

CONCLUSION ................................................................................................. 86

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 45 John Lofts, LLC,*
  599 B.R. 730 (Bankr. S.D.N.Y. 2019) ....................................................................28

*In re Adelphia Commc'ns Corp.,*
  365 B.R. 24 (Bankr. S.D.N.Y. 2007) .....................................................................39

*AgroFresh Inc.* v. *MirTech, Inc.,*
  257 F. Supp. 3d 643 (D. Del. 2017) ......................................................................59

*Akhenaten* v. *Najee, LLC,*
  2010 WL 305309 (S.D.N.Y. Jan. 26, 2010) ..........................................................59

*Akorn, Inc.* v. *Fresenius Kabi AG,*
  2018 Del. Ch. LEXIS 325 (Del. Ch. Oct. 1, 2018) ...............................................84

*Ally Financial Inc.* v. *Comfort Auto Group NY LLC,*
  2021 WL 4033249 (E.D.N.Y. Sept. 3, 2021) ........................................................83

*AP Servs. LLP* v. *Silva,*
  483 B.R. 63 (S.D.N.Y. 2012) .................................................................................31

*In re Appleseed's Intermediate Holdings, LLC,*
  470 B.R. 289 (D. Del. 2012) ...........................................................................22, 38

*ASARCO LLC* v. *Americas Mining Corp.,*
  396 B.R. 278 (S.D. Tex. 2008) .......................................................................67, 69

*In re Autobacs Strauss, Inc.,*
  473 B.R. 525, 565–67 (Bankr. D. Del. 2012) ...................................................42, 73

*Baisden* v. *I'm Ready Prods. Inc.,*
  2008 WL 2118170 (S.D. Tex. May 16, 2008) .......................................................81

*In re Barton-Cotton,*
  2012 WL 2803742 (Bankr. D. Md.  July 10, 2012) ...............................................49

*Bay Ctr. Apartments Owner, LLC* v. *Emery Bay PKI, LLC,*
  2009 WL 1124451 (Del. Ch. Apr. 20, 2009) .........................................................58

*In re Bayou Steel BD Holdings, L.L.C.,*
  642 B.R. 371 (Bankr. D. Del. 2022) ................................................................22, 29

*Bell Atl. Corp.* v. *Twombly*,
    550 U.S. 544 (2007) ................................................................................................9, 81

*In re Bernard L. Madoff Inv. Sec., LLC*,
    440 B.R. 243 (Bankr. S.D.N.Y. 2010) ..................................................................30

*In re Bernard L. Madoff Inv. Sec., LLC*,
    2022 WL 4349859, at *7 (Bankr. S.D.N.Y. Sept. 19, 2022) .................................26

*In re BH S & B Holdings LLC*,
    420 B.R. 112 (Bankr. S.D.N.Y. 2009) .............................................................73, 75

*In re Black Elk Energy Offshore Operations, LLC*,
    2019 WL 3889761 (Bankr. S.D. Tex. Aug. 16, 2019) ...........................................32

*Blair* v. *Infineon Techs. AG*,
    720 F. Supp. 2d 462 (D. Del. 2010) .........................................................70, 72, 75

*Bonded Fin. Servs., Inc.* v. *European Am. Bank*,
    838 F.2d 890 (7th Cir. 1988) .................................................................................24

*In re Boston Generating LLC*,
    617 B.R. 442 (Bankr. S.D.N.Y. 2020) ...................................................................18

*In re Boston Generating LLC*,
    617 B.R. 447 (Bankr. S.D.N.Y. 2020) ..............................................................20, 24

*In re Brooke Corp.*,
    469 B.R. 68 (D. Kan. 2012) ...................................................................................53

*Buzzfeed, Inc.* v. *Anderson*,
    2022 WL 15627216 (Del. Ch. Oct. 28, 2022) .......................................................65

*Cantor Fitzgerald, L.P.* v. *Cantor*,
    1998 WL 842316 (Del. Ch. Nov. 10, 1998) ..........................................................86

*CelestialRX Invs., LLC* v. *Krivulka*,
    2017 WL 416990 (Del. Ch. Jan. 31, 2017) ............................................................58

*In re Charys Holding Co., Inc.*,
    2010 WL 2774852 (Bankr. D. Del. July 14, 2010) ................................................38

*In re Charys Holding Co., Inc.*,
    443 B.R. 628 (Bankr. D. Del. 2010) .................................................................46, 51

*Clingman & Hanger Management Associates, LLC* v. *Rieck*,
    2023 WL 2744399 (S.D. Tex. Mar. 30, 2023) ..................................................62, 63

*United States* v. *Cmty Health Sys., Inc.*,
    666 F. App'x 410 (6th Cir. 2016) ........................................................60

*Collins* v. *Morgan Stanley Dean Witter*,
    224 F.3d 496 (5th Cir. 2000) ...............................................................9

*Compagnie des Grands Hotels d'Afrique S.A.* v. *Starwood Cap. Grp. Glob. I LLC*,
    2019 WL 148454 (D. Del. Jan. 9, 2019)...............................71, 72, 74, 75

*Crawford* v. *MagicStar Arrow Ent., LLC*,
    2023 WL 4141058 (N.D. Tex. June 22, 2023) ......................................32

*Creel* v. *Ecolab, Inc.*,
    2018 WL 5778130 (Del. Ch. Oct. 31, 2018) ........................................60

*Cross River Bank* v. *3 Bea's Assisted Living LLC*,
    2023 WL 6161414 (D. Md. Sept. 21, 2023) .........................................48

*Data Ctrs. LLC* v. *1743 Holdings LLC*,
    2015 Del. Super. LEXIS 561 (Del. Super. Ct. Oct. 27, 2015)..................87

*In re DBSI, Inc.*,
    445 B.R. 344 (Bankr. D. Del. 2011) ....................................................31

*In re Dewey & Leboeuf LLP*,
    2014 WL 4746209 (Bankr. S.D.N.Y. Sept. 23, 2014)......................49, 52

*In re Direct Response Media, Inc.*,
    466 B.R. 626 (Bankr. D. Del. 2012) ..............................................40, 42

*In re Duke and King Acquisition Corp.*,
    508 B.R. 107 (Bankr. D. Minn. 2014) .......................................38, 39, 55

*Dunlap* v. *State Farm Fire and Cas. Co.*,
    878 A.2d 434 (Del. 2005) ..................................................................85

*In re Essar Steel Minn. LLC*,
    602 B.R. 600 (Bankr. D. Del. 2019) ....................................................67

*In re Essex Construction, LLC*,
    624 B.R. 103 (Bankr. D. Md. 2020) ....................................................48

*In re Evergreen Energy, Inc.*,
    546 B.R. 549 (Bankr. D. Del. 2016) ....................................................54

*In re Exide Techs.*,
    299 B.R. 732 (Bankr. D. Del. 2003) ....................................................54

*In re Extended Stay, Inc.*,
2020 WL 10762310 (Bankr. S.D.N.Y. Aug. 8, 2020) .................................................22, 27, 29

*In re Ezcorp Inc. Consulting Agreement Deriv. Litig.*,
2016 WL 301245 (Del. Ch. Jan. 25, 2016) ...................................................................68

*In re F-Squared Investment Mgmt., LLC*,
633 B.R. 663 (Bankr. D. Del. 2021) ............................................................................51

*In re FAH Liquidating Corp.*,
572 B.R. 117 (Bankr. D. Del. 2017) ............................................................................57

*In re Fairfield Sentry Ltd.*,
596 B.R. 275 (Bankr. S.D.N.Y. 2018) .........................................................................23

*In re Fedders N. Am., Inc.*,
405 B.R. 527 (Bankr. D. Del. 2009) .......................................................................35, 36

*Feeley* v. *NHAOCG, LLC*,
62 A.3d 649 (Del. Ch. 2012)........................................................................................58

*Feuerbacher* v. *Moser*,
2012 WL 1070138 (E.D. Tex. 2012) ...........................................................................47

*Fla. Chem. Co., LLC* v. *Flotek Indus., Inc.*,
262 A.3d 1066 (Del. Ch. 2021)....................................................................................65

*GE Cap. Com., Inc.* v. *Wright & Wright, Inc.*,
2009 WL 5173954 (N.D. Tex. Dec. 31, 2009) ............................................................33

*In re Great Lakes Dredge & Dock Co. LLC*,
624 F.3d 201 (5th Cir. 2010) .........................................................................................9

*In re Greektown Holdings, LLC*,
621 B.R. 797 (Bankr. E.D. Mich. 2020) ......................................................................22

*In re Green Field Energy Servs., Inc.*,
2015 WL 5146161 (Bankr. D. Del. Aug. 31, 2015) .............................................31, 47, 51

*Greenstar, LLC* v. *Heller*,
814 F. Supp. 2d 444 (D. Del. 2011)..............................................................................83

*In re GTI Cap. Holdings, LLC*,
373 B.R. 671 (Bankr. D. Ariz. 2007) ...........................................................................53

*Gulf Coast Produce, Inc.* v. *Am. Growers, Inc.*,
2008 WL 660100 (S.D. Fla. Mar. 7, 2008)...................................................................33

*In re Gulf Fleet Holdings, Inc.*,
    491 B.R. 747 (Bankr. W.D. La. 2013) ................................................................38, 39, 55, 75

*In re Hechinger Inv. Co.* v. *Delaware*,
    274 B.R. 71 (D. Del. 2002) ................................................................................................31

*In re Hellas Telecommunications (Luxembourg) II SCA*,
    526 B.R. 499 (Bankr. S.D.N.Y. 2015) ..............................................................................30

*In re HH Liquidation, LLC*,
    590 B.R. 211 (Bankr. D. Del. 2018) ..................................................................................68

*Holliday* v. *Credit Suisse Sec. (USA) LLC*,
    2021 WL 4150523 (S.D.N.Y. Sept. 13, 2021) ....................................................18, 19, 20, 22

*IBP, Inc.* v. *Alvarez*,
    546 U.S. 21 (2005) ............................................................................................................24

*In PHP Healthcare Corp.*,
    128 F. App'x 839, 847 (3d Cir. 2005) ..............................................................................51

*Innova Hosp. San Antonio, L.P.* v. *Blue Cross and Blue Shield, Inc.*,
    892 F.3d 719 (5th Cir. 2018) ......................................................................................81, 82

*Innova Hospital San Antonio, L.P.* v. *Blue Cross & Blue Shield of Georgia, Inc.*,
    995 F. Supp. 2d 587, 603–04 (N.D. Tex. 2014) ..............................................................82

*Intel Corp. Investment Policy Committee* v. *Sulyma*,
    140 S. Ct. 768 (2020) ........................................................................................................79

*In re J&M Sales Inc.*,
    2022 WL 5265035 (Bankr. D. Del. Oct. 6, 2022) ............................................................53

*J. Ambrogi Food Distribution, Inc.* v. *Teamsters Local 929*,
    595 F. Supp. 3d 352 (E.D. Pa. 2022) ................................................................................84

*Janvey* v. *Alguire*,
    846 F. Supp. 2d 662 (N.D. Tex. 2011) ............................................................................32

*Kapila* v. *Lewis*,
    2020 WL 4041082 (M.D. Fla. July 17, 2020) ............................................................59, 61

*Kelly* v. *Blum*,
    2010 WL 629850 (Del. Ch. Feb. 24, 2010) ................................................................58, 62

*Kennard* v. *Elkton Banking & Trust Co. of Md.*,
    6 A.2d 258 (Md. 1939) ......................................................................................................48

*Kingsville Dodge, LLC* v. *Almy*,
   2007 WL 2332699 (D. Md. July 30, 2007)....................................................................50, 51

*In re Laurie*,
   2008 WL 886121 (Bankr. D. Md. Mar. 28, 2008) ...................................................................57

*In re Le Café Crème, Ltd.*,
   244 B.R. 221 (Bankr. S.D.N.Y. 2000) ......................................................................................49

*In re Lehman Bros. Holdings Inc.*,
   469 B.R. 415 (Bankr. S.D.N.Y. 2012) ......................................................................................30

*In re Life Partners Holdings, Inc.*,
   926 F.3d 103 (5th Cir. 2019) ....................................................................................................32

*Lippe* v. *Bairnco Corp.*,
   249 F. Supp. 2d 357 (S.D.N.Y. 2003).......................................................................................42

*In re Louisiana Pellets, Inc.*,
   838 Fed. App'x. 45 (5th Cir. 2020) .....................................................................................54, 55

*In re Lyondell Chem. Co.*,
   554 B.R. 635 (S.D.N.Y. 2016)...................................................................................................40

*Lyons Ins. Agency, Inc.* v. *Kirtley*,
   2019 WL 1244605 (Del. Mar. 18, 2019) ..................................................................................80

*In re Marketxt Holdings Corp.*,
   361 B.R. 369 (Bankr. S.D.N.Y. 2007)......................................................................................50

*Martin Hilti Family Tr.* v. *Knoedler Gallery, LLC*,
   386 F. Supp. 3d 319 (S.D.N.Y. 2019)......................................................................................76

*Mason* v. *Network of Wilmington, Inc.*,
   2005 WL 1653954 (Del. Ch. July 1, 2005)...............................................................................71

*Max Sugarman Funeral Home, Inc.* v. *A.D.B. Investors*,
   926 F.2d 1248 (1st Cir.1991)....................................................................................................36

*In re Maxus Energy Corp.*,
   571 B.R. 650 (Bankr. D. Del. 2017) ...........................................................................67, 70, 71

*In re Maxus Energy Corp*,
   641 B.R. 467 (Bankr. D. Del. 2022) ............................................................................... *passim*

*In re MBS Mgmt. Servs., Inc.*,
   690 F.3d 352 (5th Cir. 2012) ....................................................................................................11

*McPadden* v. *Sidhu*,
    964 A.2d 1262 (Del. Ch. 2008)..................................................................80

*Merit Management* v. *FTI Consulting, Inc.*,
    138 S. Ct. 883 (2018) ...................................................................... *passim*

*Mobil Oil Corp.* v. *Linear Films, Inc.*,
    718 F. Supp. 260 (D. Del. 1989)................................................................76

*N. Am. Catholic Educ. Programming Found., Inc.* v. *Gheewalla*,
    930 A.2d 92 (Del. 2007) ...........................................................................68

*Nijhawan* v. *Holder*,
    557 U.S. 29 (2009)....................................................................................24

*In re O.P.M. Leasing Services, Inc.*,
    28 B.R. 740 (Bankr. S.D.N.Y. 1983)........................................................57

*In re OpenPeak, Inc.*,
    2020 WL 7360482 (Bankr. D.N.J. Dec. 14, 2020) ...................................57

*In re Opus East, LLC*,
    528 B.R. 30 (Bankr. D. Del. 2015) ...........................................................73

*In re PennySaver USA Publ'g, LLC*,
    587 B.R. 445 (Bankr. D. Del. 2018) ..........................................................38

*In re PennySaver USA Publ'g, LLC*,
    602 B.R. 256 (Bankr. D. Del. 2019) ..........................................................37

*Pepsi-Cola Bottling Co.* v. *Handy*,
    2000 WL 364199 (Del. Ch. Mar. 15, 2000)...............................................78

*In re Pfeifer*,
    2013 WL 3828509 (Bankr. S.D.N.Y. July 23, 2013) ...............................57

*United States* v. *Pisani*,
    646 F.2d 83 (3d Cir. 1981)....................................................................72, 73

*In re Plassein International Corp.*,
    405 B.R. 402 (Bankr. D. Del. 2009) .....................................................52, 53

*In re Qimonda Richard, LLC*,
    467 B.R. 318 (Bankr. D. Del. 2012) ..........................................................53

*In re Quebecor World (USA) Inc.*,
    453 B.R. 201 (Bankr. S.D.N.Y. 2011) ......................................................30

*In re Quorum Health Corp.*,
2023 WL 2552399 (Bankr. D. Del. Mar. 16, 2023) ...................................................... *passim*

*In re R.M.L., Inc.*,
92 F.3d 139 (3d Cir. 1996) .......................................................................................... 53

*Raytheon Co.* v. *Boccard USA Corp.*,
369 S.W.3d 626 (Tex. App. 2012) ............................................................................... 67

*Ritchie Cap. Mgmt., LLC* v. *Stoebner*,
779 F.3d 857 (8th Cir. 2015) ...................................................................................... 36

*In re Roblin Indus., Inc.*,
78 F.3d 30 (2d Cir. 1996) ........................................................................................... 39

*In re Roco Corp.*,
701 F.2d 978 (1st Cir. 1983) ....................................................................................... 40

*In re Rood*,
459 B.R. 581 (Bankr. D. Md. 2011) ....................................................................... 31, 36

*Roselink Investors, LLC* v. *Shenkman*,
386 F. Supp. 2d 209 (S.D.N.Y. 2004) ........................................................................ 68

*Sanchez Oil & Gas Corp.* v. *Crescent Drilling & Prod., Inc.*,
7 F.4th 301 (5th Cir. 2021) .................................................................................. 81, 82

*Seaport Vill. Ltd* v. *Seaport Vill. Operating Co., LLC*,
2014 WL 4782817 (Del. Ch. Sept. 24, 2014) .............................................................. 64

*Sec. Inv. Prot. Corp.* v. *Bernard L. Madoff Inv. Sec. LLC*,
2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ............................................................... 28

*Sec. Inv. Prot. Corp.* v. *Bernard L. Madoff Inv. Sec. LLC*,
594 B.R. 167 (Bankr. S.D.N.Y. 2018) ........................................................................ 26

*Sinclair Oil Corp.* v. *Levien*,
280 A.2d 717 (Del. 1971) ....................................................................................... 68, 69

*In re Solomon*,
300 B.R. 57, 65 (Bankr. N.D. Okla. 2003) .................................................................. 52

*In re SunEdison, Inc.*
620 B.R. 505 (Bankr. S.D.N.Y. 2020) .................................................................... 18, 22

*Superior Offshore Int'l, Inc.* v. *Shaefer*,
2012 WL 5879608 (S.D. Tex. Nov. 20, 2012) ............................................................. 67

*In re TC Liquidations LLC*,
    463 B.R. 257 (Bankr. E.D.N.Y. 2011)..................................................................................45

*In re Red Dot Scenic, Inc*.,
    293 B.R. 116 (S.D.N.Y. 2003)........................................................................................24

*Thomson-CF, SA* v. *Am. Arb. Ass'n*,
    64 F.3d 773 (2d Cir. 1995)..............................................................................................65

*In re Tops Holding II Corp.*,
    646 B.R. 617 (Bankr. S.D.N.Y. Oct. 12, 2022) ........................................................... *passim*

*Trenwick Am. Litig. Tr.* v. *Ernst & Young LLP*,
    906 A.2d 168 (Del. Ch. 2006)........................................................................................87

*Trevino* v. *Merscorp, Inc.*,
    583 F. Supp. 2d 521 (D. Del. 2008)..........................................................................70, 71

*In re Tronox Inc.*,
    450 B.R. 432 (Bankr. S.D.N.Y. 2011).....................................................................39, 67, 68

*In re Tropicana Ent., LLC*,
    520 B.R. 455 (Bankr. D. Del. 2014)................................................................................85

*U.S. Bank Nat'l Ass'n* v. *Verizon Comms., Inc.*,
    761 F.3d 409 (5th Cir. 2014)..........................................................................................67

*Watson* v. *CitiMortgage, Inc.*,
    814 F. Supp. 2d 726 (E.D. Tex. 2011)............................................................................82

*Wellcraft Marine Corp.* v. *Roeder*,
    314 Md. 186 (Md. 1988)...............................................................................................36

*Weyerhaeuser Co.* v. *Domtar Corp.*,
    61 F. Supp. 3d 445 (D. Del. 2014)..................................................................................84

*Matter of Wiggains*,
    848 F.3d 655 (5th Cir. 2017) ....................................................................................31, 33

*Williams Cos., Inc.* v. *Energy Transfer Equity, L.P.*,
    159 A.3d 264 (Del. 2017) ..............................................................................................84

*In re Xiang Yong Gao*,
    560 B.R. 50 (Bankr. E.D.N.Y. 2016)...............................................................................50

**Statutes**

11 U.S.C. § 101(22A)(A)..............................................................................................25, 26

11 U.S.C. § 544(b) ............................................................................................... *passim*

11 U.S.C. § 546(e) ............................................................................................... *passim*

11 U.S.C. § 548 .................................................................................................... *passim*

11 U.S.C. § 550 .................................................................................................... *passim*

11 U.S.C. § 741(8) ....................................................................................................27

Del. Code Ann. tit. 6 § 18-607(a) ..................................................................31, 77, 78

Del. Code Ann. tit. 6 § 1304 ............................................................................31, 36, 51

Del. Code Ann. tit. 6 § 18-1101(c) ...........................................................................63

Md. Code Ann., Com. Law § 15-204 .......................................................................48

Md. Code Ann., Com. Law § 15-207 .......................................................................31

N.Y. Debt & Cred. Law § 272 ...........................................................................49, 50

**Other Authorities**

Fed. R. Civ. P. 8 ...................................................................................32, 33, 81, 84

Fed. R. Civ. P. 9 ...................................................................................................32, 33

Fed. R. Civ. P. 12(b)(6).......................................................................................9, 81

Plaintiffs Diamond Sports Group, LLC ("DSG") and Diamond Sports Net LLC ("DSN," and together with DSG, "Diamond"), submit this memorandum of law in opposition to the Sinclair Defendants' Motion to Dismiss Complaint (the "Motion" or "MTD") (ECF 44) and Defendant Bally's Corporation's Motion to Dismiss in Part Counts IX, X, and XI of Plaintiffs' Complaint (the "Bally's Motion") (ECF 38).[2]

## PRELIMINARY STATEMENT

Diamond's 382-paragraph, 122-page Complaint is based on a months' long investigation superintended by the Conflicts Committee of Diamond's Board of Directors and implemented by a team of experienced outside counsel and financial advisors. The investigation included the collection and review of over 65,000 documents from multiple parties and third parties, interviews with numerous individuals, and depositions of 13 witnesses collectively covering hundreds of transcript pages.

That methodical exercise uncovered a massive scheme to plunder Diamond and defraud its creditors for Sinclair's gain, perpetrated by Diamond's former owner and indirect controlling shareholder, Sinclair, and at least four of its senior officers and/or directors: David Smith, Christopher Ripley, Lucy Rutishauser, and Scott Shapiro. Those individuals—in the words of defendant Smith, Sinclair's Chairman and former longtime CEO—caused Sinclair to "***milk***" Diamond to the tune of hundreds of millions of dollars before pushing the company into bankruptcy. They treated Diamond "***like it's mine***," to quote Smith again, forcing it to make

---

[2]    Citations to "Compl. ¶ __" are to the Complaint filed by Diamond against Sinclair Broadcast Group, Inc. ("SBG" or "Sinclair"), Sinclair Television Group, Inc. ("STG"), Diamond Sports TopCo LLC ("TopCo"), Diamond Sports Intermediate Holdings LLC ("DSIH"), Diamond Sports Intermediate Holdings A LLC ("DSIH-A"), Diamond Sports Holdings LLC ("DSH"), David Smith, Chris Ripley, Lucy Rutishauser, Scott Shapiro (collectively, the "Sinclair Defendants"), and Bally's Corporation ("Bally's," and together with the Sinclair Defendants, the "Defendants") on July 19, 2023 (the "Complaint") (ECF 2). All emphasis has been added unless otherwise noted.

gratuitous distributions to its equity owner it was not obligated or even able to pay, yoking it to a services agreement that was shockingly favorable to Sinclair to Diamond's detriment, and compelling it to enter into a transaction whose intent and effect was to benefit Sinclair, not Diamond.  Through this and other persistent and pervasive wrongdoing, the Sinclair Defendants looted at least ***$1.5 billion*** from Diamond's coffers.

As set out in painstaking detail in Diamond's Complaint, Sinclair's malfeasance began as early as August 2019, when Sinclair acquired from Disney the regional sports networks (the "RSNs") that became Diamond.  Sinclair did not pay for Diamond by itself; instead, it funded the acquisition with $8.2 billion in debt it foisted on Diamond.  It used another $1.025 billion from the proceeds of preferred equity issued to J.P. Morgan Chase Funding, Inc. ("JPMCFI") by one of the intermediate holding companies Sinclair created (defendant DSH).  Diamond was not obligated in any way in respect of the DSH preferred equity, but, at JPMCFI's insistence, Sinclair guaranteed collection on the preferred equity, while it guaranteed none of the debt it loaded onto Diamond. Yet, Sinclair used Diamond as a piggy-bank to repay the DSH preferred units as to which Diamond had no obligation, ahead of Diamond's own creditors.

Concurrently with its acquisition of the RSNs, Sinclair thrust on Diamond a management services agreement (the "MSA") drafted exclusively by Sinclair personnel and signed by defendant Ripley on behalf of both parties.  The MSA was far from the product of any arm's length negotiating; no independent representative of Diamond was involved in negotiating or drafting it. Not surprisingly, therefore, it was, and is, a lopsided and off-market arrangement grossly skewed in favor of Sinclair that extracted from Diamond some ***$400 million*** in inflated fees over four years, nearly all while Diamond was insolvent (the "MSA Payments").  And, in what has proven to be a regular, illicit pattern, Sinclair attempted to shroud the MSA's one-sidedness behind a

veneer of legitimacy by hiring Duff & Phelps to generate a fairness opinion.  But the Duff & Phelps opinion—which was devised *only* to opine on whether the MSA was fair to Sinclair, not to Diamond—only underscores the one-sided and unfair nature of the agreement, as reflected in Duff & Phelps's conclusion that the MSA fees were "***significantly in excess***" of industry benchmarks.

Sinclair engineered this construct at a time when Diamond's financial situation and business prospects were under extraordinary strain that was obvious and known to the Sinclair Defendants.  These circumstances worsened dramatically over time, as Sinclair and its executives (the individual Sinclair Defendants, whom it appointed to "manage" Diamond as a Sinclair fief) well knew.  Internal Sinclair emails and testimony from Sinclair insiders illustrate in crystal-clear terms that Sinclair was closely monitoring Diamond's operations and was intimately familiar with its ever steepening decline that by any reasonable measure left Diamond insolvent by no later than December 2019—just a few months after its acquisition by Sinclair.

Nonetheless, Sinclair's pilfering spree continued unabated.  Over a period of only a few years, Sinclair and the individual Sinclair Defendants conceived of and unilaterally implemented unlawful distributions from DSG to its immediate parent, DSIH, totaling ***$929 million*** that was transferred up the chain to other defendants and used to satisfy both mandatory dividend payments and redemptions of the preferred equity units issued to JPMCFI.  These distributions benefitted Sinclair while providing no benefit to Diamond, ***which had no legal obligations in respect of the preferred units***, and almost all of them were made when Diamond was clearly insolvent.  Sinclair then set out to paper over its illegal conduct by ginning up rote "officer's certificates" and in which Rutishauser purported to attest to Diamond's solvency based on absolutely no analysis whatsoever.  Diamond's Sinclair-stuffed board then executed "written consents" in which they purported to rely upon Rutishauser's conclusions.  And then, for the third major distributions less than one year after

Sinclair's acquisition of the RSNs, Sinclair hired Empire Valuation Consultants—a valuation firm with little experience with solvency opinions—to opine that Diamond was solvent.  But, as Empire itself has testified, the Sinclair Defendants concealed material information, thereby fundamentally tainting and slanting Empire's so-called "analysis."

Sinclair's pillage of Diamond's assets (or what was left of them) did not stop there.  As soon as Sinclair bought the RSNs, it set its sights on monetizing one of Diamond's key assets: its naming rights.  Sinclair camouflaged its true intentions by launching an ostensibly bona fide bidding process for those rights.  But its true aim was laid bare in short order when it decided to sell Diamond's rights to defendant Bally's Corporation in a November 2020 deal (the "Bally's Transaction"), even though the other bidders' proposals were far richer and more beneficial to Diamond than what Bally's offered.  The reason for Sinclair's attraction to the Bally's proposal was that Bally's, unlike other bidders, offered a sweetener to Sinclair the other bidders did not: an enormous equity stake *for Sinclair* in Bally's, valued at hundreds of millions of dollars.  None of that equity went to Diamond.  Instead, while Sinclair reaped a huge financial reward for selling Diamond's naming rights, it left breadcrumbs for Diamond in the form of $88 million in cash Bally's would pay over a ten-year period.  And all of this occurred when Diamond was insolvent *according to Sinclair's own financial statements*.  Incredibly, Sinclair's own outside lawyers prophetically cautioned Sinclair before the Bally's Transaction closed that ███████████████

████████████████████████████████████████████████████████████████████████

███ Here again, Sinclair tried to mask its illicit conduct with a post hoc fairness opinion from Duff & Phelps.  Once again, the opinion Duff & Phelps generated was tainted by Sinclair's material omissions and dramatically misrepresented the value of the transaction to Diamond.

Given all this, it should come as no surprise that Diamond wound up in bankruptcy. Diamond now seeks to remedy the wrongs the Sinclair Defendants inflicted on it, asserting claims for actual fraudulent transfer under both federal and state law (Counts I, V, and IX), constructive fraudulent transfer under federal and state law (Counts II, VI, and X), breach of fiduciary duty (Counts XVI, XVII, and XVIII), alter ego/veil piercing (Count XIX), unlawful distribution under state law (Count IV), unjust enrichment (Counts XIII and XV), breach of the MSA (Counts VIII and XII), and breach of the implied covenant of good faith and fair dealing (Count XIV).

Against the extensive body of evidence of wrongdoing uncovered to date, the Sinclair Defendants have now moved to dismiss Diamond's Complaint for failure to state a claim, effectively seeking impunity by taking cover behind a grab bag of supposed pleading defects. But the Sinclair Defendants' efforts disregard the Complaint's actual allegations and misapprehend applicable precedent. They also ask the Court to engage with numerous factual issues that are not properly before the Court on a motion to dismiss. The Bally's Motion, meanwhile, raises a single argument not dispositive as to any claim asserted against it. In summary:

*First*, the Sinclair Defendants argue the safe harbor in section 546(e) of the Bankruptcy Code insulates them from fraudulent transfer liability for the distributions DSG made to DSIH that were then used to make payments to JPMCFI in connection with the preferred units. But for the safe harbor to apply, the Court would need to look not to the DSG-to-DSIH transfers—the transfers that Diamond seeks to avoid—but to subsequent transfers from non-debtor DSH to JPMCFI. But the Supreme Court's seminal decision in *Merit Management* v. *FTI Consulting, Inc.*, 138 S. Ct. 883 (2018), makes clear that the "focus" of the safe harbor analysis must be "***the transfer the trustee seeks to avoid***." The Sinclair Defendants' effort to divert the Court's attention from the DSG-to-DSIH initial transfers and focus instead on either the subsequent transfers from DSH or

JPMCFI or the overarching transfer from DSG to JPMCFI is contrary to both the plain language of the safe harbor and *Merit*. The Sinclair Defendants' argument that the DSG-to-DSIH transfers should be safe harbored raises questions of fact that cannot be resolved on a motion to dismiss.

*Second*, the Sinclair Defendants argue that Diamond's actual fraudulent transfer claims should be dismissed because the Complaint purportedly does not plead facts giving rise to an inference of an intent to hinder, delay, or defraud. This ignores the blatant reality exposed in the Complaint. Smith's vow to "milk" Diamond of hundreds of millions of dollars—attested to under oath not once but twice by the Commissioner of Major League Baseball and corroborated under oath by another witness—is ***direct evidence*** of fraudulent intent attributable to Diamond as well as Sinclair. So too is proceeding with the Bally's Transaction after being warned by their lawyers ██████████████████████████████████████████ withholding material information directly related to the challenged transactions from their advisors and attempting to shield their bad faith with worthless opinions. But even beyond the direct evidence of fraudulent intent, the Complaint abounds with specific factual allegations identifying multiple circumstantial "badges of fraud" in each of the challenged transactions.

*Third*, the Sinclair Defendants argue that Diamond's constructive fraudulent transfer claims based on its payments to Sinclair under the MSA are barred on the basis that Diamond received "reasonably equivalent value" merely because the payments were made to satisfy purported obligations under the MSA. But that is not the law. Under Maryland law (which the Sinclair Defendants admit likely applies to Diamond's state law claims), a challenged transfer is deemed made for "fair consideration" only if the transferee is shown to have acted in "good faith." Likewise, under both the Bankruptcy Code and Delaware law, an assessment of "reasonably equivalent value" requires analysis of the totality of circumstances of the transaction, including

the good faith of the parties and the value provided by the transferee.  The Complaint alleges an absence of good faith—and affirmatively shows bad faith—by Sinclair, and Sinclair's quarrel with these well-pleaded allegations cannot be resolved on a motion to dismiss.

*Fourth*, the Sinclair Defendants and Bally's argue that many of Diamond's claims under section 548 are time-barred under the Bankruptcy Code's two-year lookback period.  But their argument ignores that all of Diamond's fraudulent transfer claims are asserted under state as well as federal law, and that all such claims are timely under either Maryland or Delaware law.

*Fifth*, the Sinclair Defendants argue the Complaint's claims for breach of fiduciary duty should be dismissed because of alleged fiduciary duty waivers in the 2022 DSG LLC Agreement and the 2019 DSH LLC Agreement.  That is wrong.  The 2022 DSG LLC Agreement was not adopted until ***after*** the conduct on which Diamond's claims are based occurred.  There was no waiver of fiduciary duties in the prior DSG LLC agreement.  And, contrary to the Sinclair Defendants' argument, the 2022 amendment on its face does ***not*** retroactively waive fiduciary duties; indeed, it expressly says that it was made "as of May 1, 2022," and that it governs DSG's operations "after the date hereof."  As to the 2019 DSH LLC Agreement, it does contain a fiduciary duty waiver, but that is irrelevant because that agreement does not govern duties owed to DSG. The Sinclair Defendants also argue that SBG did not owe any fiduciary duties to DSG even when DSG was insolvent, but that position is squarely contrary to controlling Fifth Circuit precedent and the weight of authority construing Delaware law.

*Sixth*, the Sinclair Defendants argue that the Complaint does not plead sufficient facts supporting Diamond's claim that SBG and the intermediate companies it used to control Diamond were alter egos of one another.  But there can be no dispute that Sinclair exercised exclusive dominion and control over the intermediate holding companies through which it controlled

7

Diamond.  And the Complaint alleges in detail that Sinclair used these holding companies to inflict injustice and unfairness upon Diamond's creditors.  These allegations are more than sufficient to state a claim.

*Seventh*, the Sinclair Defendants similarly argue the Complaint's unlawful distribution claims are defective because the Complaint does not sufficiently allege that DSG's member DSIH had actual knowledge that the distributions occurred when Diamond was insolvent or that they would render Diamond insolvent.  But the Complaint alleges in detail that the individual Sinclair Defendants—the very same senior Sinclair executives who were officers or de facto managers of Diamond—were also the managers of DSIH, and they were well aware of Diamond's insolvency, as the Complaint alleges in detail.  At most, this argument raises factual issues not subject to adjudication on a motion to dismiss.

*Eighth*, the Sinclair Defendants argue that Diamond's unjust enrichment claims are barred by the 2019 DSG LLC Agreement, but they ignore that unjust enrichment claims may be pleaded in the alternative, and that Diamond's unjust enrichment claims are asserted against entities that were not parties to the 2019 DSG LLC Agreement, STG and SBG.

*Ninth*, the Sinclair Defendants urge dismissal of Diamond's claim for breach of the MSA in Count XII, arguing that the Complaint does not adequately specify the breached provisions of the MSA nor how those provisions were breached.  But the Complaint explicitly cites the relevant MSA provisions and pleads facts explaining how Sinclair violated the MSA by wrongfully allocating costs to Diamond, charging Diamond for extracontractual supplementary services, and acting in a commercially unreasonably manner by burdening Diamond with payroll costs of Diamond employees who largely or entirely worked for Sinclair.  Nothing more is required.

*Finally*, the Sinclair Defendants argue that the Complaint's implied covenant claim is deficient because, among other things, it imposes extracontractual obligations on Sinclair. That is inaccurate. The Complaint specifically identifies the provision in the LLC agreement obligating DSIH to manage Diamond's business, and no reasonable reading allows DSIH to permit Sinclair to misappropriate Diamond employees and assets as the Complaint alleges it did.

## ARGUMENT

In deciding a motion to dismiss, courts must accept "all well-pleaded facts as true and construe the complaint in the light most favorable to the plaintiff." *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010). To avoid dismissal, a complaint need only "state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007). The Fifth Circuit has explained that motions to dismiss under Rule 12(b)(6) are "viewed with disfavor and [are] rarely granted." *Collins* v. *Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (citations omitted).

## I.    THE DISTRIBUTIONS ARE NOT SUBJECT TO THE SECTION 546(e) SAFE HARBOR (COUNTS I–IV).

In a series of transfers that began shortly after Sinclair acquired the RSNs, an insolvent DSG was forced to distribute $929 million to non-debtor defendant DSIH, DSG's immediate corporate parent (the "Distributions"). Compl. ¶¶ 11, 162, 193, 253, 261, 268, 275. The Distributions are avoidable under section 544(b) of the Bankruptcy Code and applicable state law as actual and constructive fraudulent transfers (Counts I and II). DSIH distributed the funds to its corporate parent, DSIH-A, which distributed funds to its majority and minority equity owners, DSH and Byron Allen (a friend of Smith). Compl. ¶¶ 45, 162, 193. DSH used its portion of the DSIH-A distributions to pay JPMCFI on account of preferred equity units in DSH. Compl. ¶¶ 53, 162–63, 169–74, 193, 253, 261, 268–70, 275. Sinclair was a guarantor of the DSH preferred units,

but neither DSG nor its subsidiaries were obligors to JPMCFI with respect to the preferred equity.  Compl. ¶¶ 39–40, 162–63, 168, 196, 261, 268, 275.  The Complaint seeks to recover the subsequent transfers to DSIH-A, DSH, and SBG pursuant to section 550(a)(2) of the Bankruptcy Code (Count III).[3]

The Sinclair Defendants argue that these transfers are protected from avoidance under the safe harbor provision of section 546(e) of the Bankruptcy Code.  But, in making that argument, they largely ignore the initial DSG-to-DSIH transfers—the transfers that Diamond seeks to avoid—because those transfers are clearly not subject to the safe harbor.  Instead, they ask the Court to focus on the subsequent transfers from DSH to JPMCFI, which they argue satisfy the elements of the safe harbor.  *See, e.g.*, MTD ¶ 41 (arguing that "the *JPMCFI preferred unit redemptions* fall squarely within the scope of the Section 546(e)").  Their position is incompatible with the plain language of the statutory text and the Supreme Court's decision in *Merit*, which make clear that the Court should look only to the DSG-to-DSIH transfers that Diamond seeks to avoid.  Transfers to subsequent transferees under section 550(a)(2) are not subject to the safe harbor; as a result, none of the claims in the Complaint is subject to the safe harbor defense.  The Sinclair Defendants also suggest in passing that the DSG-to-DSIH transfers are subject to the safe harbor.  MTD ¶ 50.  But that suggestion is unsupported by law and contrary to the allegations of the Complaint, and in any case raises factual issues that cannot be resolved on a motion to dismiss.

---

[3]    In a separate action, Diamond seeks to recover the subsequent transfer from DSH to JPMCFI under section 550.  *See* Complaint, *Diamond Sports Group, LLC* v. *JP Morgan Chase Funding Inc.* (No. 4:23-ap-03135), ECF 2.

A.   **The Text of the Safe Harbor and the Supreme Court's Decision in *Merit* Direct that the Court's Safe Harbor Analysis Should Focus on the Transfers that Diamond Seeks to Avoid.**

The section 546(e) safe harbor applies to certain qualifying transactions made by or to a covered entity.  It provides, in pertinent part:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a . . . settlement payment . . . made by or to (or for the benefit of) a . . . financial participant, . . . or that is a transfer made by or to (or for the benefit of) . . . [a] financial participant . . . in connection with a securities contract[.]

11 U.S.C. § 546(e).  When applying the safe harbor, "[t]he courts' task" is "to apply the statutory provisions as Congress wrote them."  *In re MBS Mgmt. Servs., Inc.*, 690 F.3d 352, 355 (5th Cir. 2012).  The safe harbor acts as a "[l]imitation on [the trustee's] avoiding powers," and carves out limited exceptions where "the trustee may not avoid a transfer" that is otherwise avoidable under the substantive avoidance sections of the code.  *See* 11 U.S.C. § 546(e).  Here, Diamond seeks to avoid a series of initial transfers from DSG to DSIH under sections 548(a)(1) and 544 of the Code, and the plain text of the safe harbor directs the Court to consider whether "the trustee may . . . avoid" those transfers.

The Supreme Court's decision in *Merit* confirms that section 546(e) should be applied as written.  In *Merit*, the plaintiff-trustee, Valley View, sought to avoid a $16.5 million transfer to Merit Management under sections 548(a)(1)(B) and 544(b).  138 S. Ct. at 891, 891 n.4.  The transfer arose from Valley View's acquisition of a company called Bedford Downs through an agreement between Valley View (the "Buyer" in the transaction documents) and Bedford Downs's stockholders (the "Sellers").  *Id.* at 891.  The defendant, Merit, was one of Bedford Downs's stockholders.  Neither Merit nor Valley View were qualifying entities under the safe harbor.  The safe harbor argument in *Merit* focused instead on two other entities that participated in the transaction: Credit Suisse was a lender whose loan proceeds were used to buy the stock, and

11

Citizens Bank was an escrow agent through which Valley View paid Merit and other stockholders in exchange for their stock. *Id.* The funds flow for the transaction required Credit Suisse (lender) to wire money to Citizens Bank (escrow agent), which then wired money to Merit.

The trustee sought to avoid the transfer of funds from Valley View to Merit. 138 S. Ct. at 891. In an attempt to invoke the protections of the safe harbor, Merit argued "that the Court should look not only to the Valley View-to-Merit end-to-end transfer," which could not be safe harbored because neither was a qualifying entity, but "also to all its component parts," which included "one transaction by Credit Suisse to Citizens Bank . . . , and two transactions by Citizens Bank to Merit." *Id.* at 892. Merit argued the safe harbor applied on the basis of those transactions, which involved "transactions by and to financial institutions." *Id.*

The Supreme Court disagreed. It explained that the "very first clause" of the safe harbor indicates that it "operates as an exception to the avoiding powers afforded to the trustee under the substantive avoidance provisions. That is, when faced with a transfer that is otherwise avoidable, § 546(e) provides a safe harbor notwithstanding that avoiding power." *Id.* at 893. Therefore, the Court reasoned, "the plain meaning of § 546(e) dictates that ***the only relevant transfer for purposes of the safe harbor is the transfer that the trustee seeks to avoid***." *Id.* at 888. This plain meaning is further supported by the rest of the statutory text: "***the statutory language and the context in which it is used all point to the transfer that the trustee seeks to avoid as the relevant transfer*** for consideration of the § 546(e) safe-harbor criteria." *Id.* at 894.

In focusing the analysis on the "transfer the trustee seeks to avoid," the Supreme Court noted that "the trustee is not free to define the transfer that it seeks to avoid in any way it chooses," because it "must establish to the satisfaction of a court that the transfer it seeks to set aside meets the characteristics set out under the substantive avoidance provisions" invoked by the trustee. *Id.*

at 894. "Accordingly, after a trustee files an avoidance action identifying the transfer it seeks to set aside, *a defendant in that action is free to argue that the trustee failed to properly identify an avoidable transfer under the Code*." *Id.* However, if an avoidable transfer has been identified, there is no basis on which to consider any other transfers, including component parts, "when considering a limit to the avoidance power, where that limit is defined by reference to an otherwise avoidable transfer, as is the case with § 546(e)." *Id.* at 894–95.

In *Merit*, the trustee "identified the purchase of Bedford Downs' stock by Valley View from Merit as the transfer that it sought to avoid," but Merit did not challenge that transfer or argue it was not subject to avoidance; Merit "focus[ed] instead on whether [the trustee] can 'ignore' the component parts at the safe-harbor inquiry." *Id.* at 895. Absent argument that the Valley View-to-Merit transfer was not voidable, the Court explained that "the Credit Suisse and Citizens Bank component parts are simply irrelevant to the analysis under § 546(e). *The focus must remain on the transfer the trustee sought to avoid.*" *Id.* Therefore, looking *only* to the Valley View-to-Merit transfer that the trustee sought to avoid, the Supreme Court concluded: "Because the parties do not contend that either Valley View or Merit is a 'financial institution' or other covered entity, the transfer falls outside of the § 546(e) safe harbor." *Id.* at 897.

Applying *Merit*'s holding to this case yields the same result. Diamond seeks to avoid a series of initial transfers from DSG to DSIH. Yet, noticeably absent from the Motion is any argument that Diamond "failed to properly identify an avoidable transfer under the Code." *See id.* at 894. Nor do the Sinclair Defendants demonstrate that the DSG-to-DSIH initial transfers are themselves safe harbored (and they plainly are not).[4] Like the defendant in *Merit*, the Sinclair

---

[4]    The Sinclair Defendants argue that section 546(e) applies "regardless of what transaction is considered." MTD ¶ 50. They do not, however, make any effort to demonstrate how the safe harbor could apply to the DSG-to-DSIH transfers that Diamond seeks to avoid. Instead, the Sinclair Defendants argue that a different transaction, the

Defendants focus their safe harbor analysis on other transfers—the transfers "from DSG through DSH to JPMCFI."  But that is what *Merit* forbids: the "focus must remain on the transfer the trustee sought to avoid."  *Id.* at 895.

Judge Drain's decision in *In re Tops Holding II Corp.*, 646 B.R. 617 (Bankr. S.D.N.Y. Oct. 12, 2022) ("*Tops II*") further supports this interpretation of *Merit*.  Precisely as the Sinclair Defendants did here, the defendants in *Tops II* attempted to divert the court's attention away from the transfer the plaintiff sought to avoid (a non-safe harbored dividend payment from the debtor up the chain) to another transfer in a series of transactions (the underlying notes offerings that funded the dividends and involved qualifying entities) for purposes of analyzing the applicability of the safe harbor.  *Id.* at 679.  Faithful to the Supreme Court's directive in *Merit* to focus on the "transfer the trustee seeks to avoid," the *Tops II* court rejected the defendants' argument that "the dividends are safe-harbored because they were not standalone transfers" and recognized that "[t]his is a difficult argument to make in the light of *Merit Mgmt.*"  *Id.* at 681.

Tellingly, the Sinclair Defendants' 92-page, 180-paragraph Motion devotes only a single paragraph to a discussion of *Merit*—a critically important, Supreme Court decision that is dispositive here*.  See* MTD ¶ 43.  Rather than deal with the substance of that opinion, the Sinclair Defendants offer a cursory argument to support a gross misreading of it.  While paying lip service to *Merit*, the Sinclair Defendants argue that "the focus must be on the overarching transfer—here, the ultimate transfer from DSG through DSH to JPMCFI," not the DSG-to-DSIH transfers that Diamond seeks to avoid.  MTD ¶ 43.  This is directly contrary to *Merit*, and the Court should reject the Sinclair Defendants' sleight of hand.

---

transfers from DSH to JPMCFI, are subject to the safe harbor.  *See* MTD ¶¶ 51–64.  As demonstrated in Section C, *supra*, there is no credible argument that the DSG-to-DSIH transfers are safe harbored.

The Sinclair Defendants seize on a statement in that decision that the relevant transfer *in that case* was an "overarching transfer" from Valley View to Merit, and not transfers to or from Credit Suisse or Citizens Bank.  MTD ¶¶ 42–43.  But the reference to an "overarching transfer" in *Merit* was simply a description of the transfer the plaintiff sought to avoid in that case and was thus the "***only relevant transfer for purposes of the safe harbor [as] the transfer the trustee seeks to avoid***."  138 S. Ct. at 888.

The Sinclair Defendants also claim that "[w]hile *Merit Management* sometimes refers to 'the transfer the trustee sought to avoid,' the opinion clarifies that 'the trustee is not free to define the transfer that it seeks to avoid in any way it chooses,'" and that "the focus must be on the overarching transfer."  MTD ¶ 43.  This misconstrues *Merit* in three fundamental respects:

*First*, *Merit* does not just "sometimes" refer to "the transfer the trustee sought to avoid," as the Sinclair Defendants inaccurately claim—the central holding of *Merit* is that "***the only relevant transfer*** for purposes of the safe harbor ***is the transfer the trustee seeks to avoid***."  138 S. Ct. at 888.  *Merit* refers to the "transfer the trustee seeks to avoid" multiple times throughout the opinion, making clear that the Court must "focus" on only that transfer for purposes of applying the safe harbor.  *See, e.g.*, *id.* at 893 ("the text reminds us that the ***focus of the inquiry is the transfer that the trustee seeks to avoid***.").[5]  It is therefore plainly incorrect to suggest that *Merit* dictates that the "focus" should instead be "on the overarching transfer."  MTD ¶ 43.

---

[5]  *See also id.* at 888 ("The Court concludes that the plain meaning of § 546(e) dictates that the only relevant transfer for purposes of the safe harbor is the ***transfer that the trustee seeks to avoid***."); *id.* at 892 ("[T]he only relevant transfer for purposes of the § 546(e) safe-harbor inquiry . . . is the ***transfer that the trustee seeks to avoid*** under § 548(a)(1)(B)."); *id.* at 892–93 ("The Court agrees with FTI. The language of § 546(e), the specific context in which that language is used, and the broader statutory structure all support the conclusion that the relevant transfer for purposes of the § 546(e) safe-harbor inquiry is the overarching ***transfer that the trustee seeks to avoid*** under one of the substantive avoidance provisions."); *id.* at 893 ("[T]he relevant section heading demonstrates the close connection between the ***transfer that the trustee seeks to avoid*** and the transfer that is exempted from that avoiding power pursuant to the safe harbor."); *id.* at 894 ("[T]he statutory language and the context in which it is used all point to the ***transfer that the trustee seeks to avoid*** as the relevant transfer for consideration of

*Second*, while *Merit* does say, as the Sinclair Defendants point out, that "the trustee is not free to define the transfer that it seeks to avoid in any way it chooses," MTD ¶ 43 (quoting *Merit*, 138 S. Ct. at 894), *Merit* explains immediately thereafter—in an excerpt the Sinclair Defendants do not contend with—that the relevant limitation "is necessarily defined by the carefully set out criteria in the Code," because "the transfer identified must satisfy the terms of the avoidance provision the trustee invokes." 138 S. Ct. at 894. In other words, the trustee cannot define the transfer in any way it chooses because the transfer must be one that satisfies the elements of an avoidable transfer under sections 548 or 544(b). The Court even noted that a defendant could argue that the transfer identified by the trustee could be challenged on the grounds that intermediate steps make the "overarching" transfer not subject to avoidance. *See id.* at 894 ("[A] defendant . . . is free to argue that the trustee failed to properly identify an avoidable transfer under the Code, including any available arguments concerning the role of component parts of the transfer."). That limitation did not need to be addressed in *Merit* because the defendant did not dispute that the Valley View-to-Merit transfer was an avoidable transfer under the Bankruptcy Code. It is similarly irrelevant here—the Sinclair Defendants have not argued that the transfers from DSG to DSIH do not meet the "criteria in the Code" to state a claim for avoidance.

*Finally*, the Sinclair Defendants' argument that the relevant transfer here is the "overarching transfer" that occurred "from DSG through DSH to JPMCFI" fails for the additional reason that it overlooks the statutory distinction between section 550, which permits recovery from subsequent transferees and is not subject to the safe harbor, and sections 544(b) and 548, which

---

the § 546(e) safe-harbor criteria."); *id.* ("[I]t is only logical to view the pertinent transfer under § 546(e) as the same ***transfer that the trustee seeks to avoid*** pursuant to one of its avoiding powers."); *id.* at 897 ("For the reasons stated, we conclude that the relevant transfer for purposes of the § 546(e) safe harbor is the same ***transfer that the trustee seeks to avoid*** pursuant to its substantive avoiding powers.").

provide the substantive avoidance powers under the Code and are subject to the safe harbor.  The transfers involving DSH and JPMCFI are not subject to Diamond's avoidance powers; DSG made an initial distribution to DSIH, and DSH and JPMCFI are multiple subsequent transfers removed from that initial transfer.  Nowhere in *Merit* did the Supreme Court signal that it was erasing the distinction between the avoidance powers in sections 544 and 548, on the one hand, and the recovery provisions in section 550(a)(2), on the other.  Yet, the Sinclair Defendants argue implicitly that this Court should ignore that distinction, and treat subsequent transferees as though they were initial transferees under an "overarching transfer" theory when applying the safe harbor.  Doing so here necessarily requires application of the safe harbor to transfers *other than* the transfers Diamond seeks to avoid and would be contrary to *Merit*.

### B.     The Sinclair Defendants' Focus on Two Inapposite Out-of-Circuit Cases That Misconstrue *Merit* Does Not Compel Dismissal.

To avoid focusing on *Merit*—the only binding authority cited in the Motion—the Sinclair Defendants claim that "[c]ases since *Merit Management* have repeatedly focused on the overarching transfer."  MTD ¶ 44.  As purported support of that position, the Sinclair Defendants principally rely on two cases—*In re Boston Generating LLC*, 617 B.R. 442 (Bankr. S.D.N.Y. 2020), *aff'd sub nom. Holliday* v. *Credit Suisse Sec. (USA) LLC*, 2021 WL 4150523 (S.D.N.Y. Sept. 13, 2021) ("*BosGen*"), and *In re SunEdison, Inc.* 620 B.R. 505 (Bankr. S.D.N.Y. 2020) ("*SunEdison*").  MTD ¶¶ 44–46.  Both cases are entirely distinguishable, as they involved an attempt by the plaintiff or trustee to avoid only one component of an integrated transaction with multiple steps, all of which were embodied in an agreement that was a "securities contract."  The courts there looked at the entire integrated transaction, rather than just the component transfer that the trustee sought to avoid.  Significantly, the Sinclair Defendants ignore *Tops II*, in which the court concluded that both *BosGen* and *SunEdison* rested on a "rationale[] which pretty clearly turns

17

*Merit Mgmt.* on its head." 646 B.R. at 685. Simply put, even if the facts of *BosGen* and *SunEdison* were analogous to the facts here—and they are not—both cases mischaracterize *Merit* (as Judge Drain recognized in *Tops II*), and for that additional reason should not be followed.

In *SunEdison*, SUNE (the SunEdison parent company) sought to acquire certain assets from First Wind pursuant to the Purchase and Sale Agreement (the "2014 PSA"). 620 B.R. at 508–09. To effectuate the transaction, SUNE's subsidiary SunEdison Holdings transferred certain Class B shares to its subsidiary, Seller Note (the "Step One Transfer"). Seller Note then transferred the shares to Wilmington Trust as collateral agent, to hold those shares for the benefit of the defendants (the "Step Two Transfer"). *Id.* at 509–10. The complaint sought to avoid the Step One Transfer, and the plaintiff "urge[d] the Court to ignore the subsequent pledge of Seller Note's interests in the Class B Securities to Wilmington Trust," which involved a qualifying entity. *Id.* at 513. The defendants argued that the transfers must be considered together, "because the Step One Transfer would not have occurred without the parties agreeing to the Step Two Transfer." *Id.* Although the *SunEdison* court began its analysis with a discussion of *Merit*, the court (contrary to *Merit*) determined that "the relevant transfer for the safe harbor inquiry" was the broader multi-step transaction. It reached that conclusion for a reason not at issue here: "the Step One Transfer was part of the overarching transaction ***described in the 2014 PSA***," which "required the formation of a special purpose vehicle (i.e., Seller Note)" and "[a]s conditions to closing, SunEdison Holdings would contribute the Class B Securities to Seller Note . . . and Seller Note would pledge the Class B Securities to Wilmington Trust." *Id.* at 514. In other words, "[t]his was an integrated transaction," and the court declined to ignore other interdependent steps that were all required by a single securities contract. *Id.* at 515.

*BosGen* similarly involved a multi-step transaction that was integrated by express agreement to which the plaintiff debtor was a party.  There, BosGen and its parent company EBG offered to repurchase EBG LLC membership units, provided that EBG and BosGen could secure $2.1 billion in new financing.  *BosGen*, 617 B.R. at 451–52.  The multi-step transaction proceeded as follows: the lenders deposited the new financing in BosGen's bank account at US Bank, the funds were then transferred to EBG's bank account at BoA (the "Step One Transfer"), then transferred to EBG's bank account at BONY (the "Step Two Transfer"), with BONY authorized to act as agent for BosGen and EBG in connection with the Tender Offer.  *Id.* at 456.  After BosGen filed for bankruptcy, the trustee sought to avoid the Step One transfer and to recover its value from the ultimate transferees, the redeeming equity holders in the Tender Offer, under a theory that neither BosGen nor EBG were qualifying entities for purposes of the safe harbor.  *Id.* at 491.  Instead, the bankruptcy court declined to disaggregate the various steps and looked to the overarching transfer, which it concluded was made in connection with a securities contract (the Tender Offer).  *Id.* at 492.

A critical factor in the *BosGen* court's decision to look to the broader transaction for purposes of the safe harbor was that every instrument relating to the multi-step transaction made clear that the various steps were interdependent and no step would have happened but for successful completion of the earlier step in the chain.  *See, e.g.*, *id.* at 461 ("[T]he Credit Facilities expressly disclosed and required the Debtors to use the loan proceeds in connection with the Tender Offer"); *id.* at 486 ("[O]f course the $708 Million was transferred to EBG to complete the repurchase of securities—without it, EBG would not have had enough money . . . to fund the Unit Redemptions[.]"); *Tops II*, 646 B.R. at 684 ("Certain passages in *Boston Generating* indeed highlight the interlocking provisions of the underlying contracts").  In affirming the bankruptcy

19

court's decision, the district court noted all of the parties involved in the transaction "knew that BostonGen would transfer a portion of its loan proceeds to achieve the goal of the Leveraged Recap Transaction, funding the Tender Offer." *Holliday*, 2021 WL 4150523, at *3 (noting this was "an integrated securities transaction consisting of multiple component parts").

Here, there are no securities contracts that contemplate or require all of the steps in a multi-step transaction that could support this Court's application of the safe harbor to some "overarching" integrated transaction, as the courts did in *BosGen* and *SunEdison*.  The Motion mentions the DSH LLC Agreement, but that agreement actually demonstrates that DSH's rights and obligations to redeem preferred units is entirely unrelated to a dividend payment from DSG to DSIH.  The DSH LLC Agreement specifically permitted "[d]istributions by DSG or any direct or indirect parent company of DSG (other than [DSH] and its parent companies) to the common equity holders of any such entity" without requiring any concurrent payment on the preferred units.  Section 4.4(b), (e).  In other words, DSIH could cause its subsidiary DSG to make distributions to DSIH without triggering any obligations with respect to the preferred equity units. JPMCFI also required that Sinclair guarantee the preferred units, precisely so DSH could redeem those units and satisfy its obligations regardless of DSG's financial health.  Compl. ¶ 2.  The fact that the written consents—which are indisputably not securities contracts—mention a series of transfers broader than the singular transfer Diamond seeks to avoid does not render this an integrated transaction as was the case in *BosGen* and *SunEdison*.  Diamond's dividend to DSIH is in no way interdependent on any other step in the transaction, and unlike an integrated multiparty

and multistep transaction, DSG received no consideration from any party.  Diamond issued a dividend to DSIH, nothing more.[6]

In addition to being inapposite, *SunEdison* and *BosGen* also mischaracterize the holding in *Merit* as requiring that courts look to the "overarching transfer" even if the trustee seeks to avoid some other transfer.  As set forth above, *supra* Section I.A, that is the opposite of what *Merit* held.  *See, e.g.*, 138 S. Ct. at 894 ("Given th[e] structure [of § 546(e)], it is only logical to view the pertinent transfer under § 546(e) ***as the same transfer that the trustee seeks to avoid pursuant to one of its avoiding powers***.").

The Sinclair Defendants also ignore recent authority expressly rejecting the misreading of *Merit* the Sinclair Defendants are advocating.

In *Tops II*, the plaintiff sought to avoid dividends from the debtor up the corporate chain, where the dividends had been funded by loan proceeds under three indentures (which were securities contracts).  646 B.R. at 679.  The crux of the defendants' argument was that "the dividends [were] safe-harbored because they were not standalone transfers, but, rather, only one element of an integrated transaction that started with the safe-harbored issuance of the private notes and concluded with the dividends." *Id.* at 681.  The *Tops II* court rejected this argument, explaining that, unless the integrated transaction theory "is invoked to avoid a transfer[,] . . . it should not, after *Merit Mgmt.*, justify collapsing a transaction for purposes of section 546(e)'s safe harbor." *Id.* at 685.[7]  Consistent with *Merit*, the court in *Tops II* therefore considered the applicability of

---

[6]    In the Motion, the Sinclair Defendants note that it is "regular course of . . . business" for an entity to make distributions to one's owners.  MTD ¶ 93.  Such ordinary course distributions are clearly not safe harbored. *See, e.g.*, *Tops II*, 646 B.R. at 681 ("What clearly is not a 'settlement payment' in respect of a securities contract for purposes of section 546(e), however, is a dividend[.]").

[7]    *See also In re Greektown Holdings, LLC*, 621 B.R. 797, 819–20 (Bankr. E.D. Mich. 2020) (noting that, in a case where the transfer the trustee sought to avoid was the "overarching" transfer, "once the trustee identifies the transfer it seeks to avoid, and defendant does not object to such identification," then that becomes the relevant

the safe harbor only with respect to the transfers the trustee sought to avoid—the dividends up the chain.

In contrast to *Tops II*, the courts in both *BosGen* and *SunEdison* incorrectly accepted the defendants' arguments that *Merit* requires a court to consider the "overarching transfer" if the transfer the trustee sought to avoid was part of an integrated transaction that included a safe harbored step. *SunEdison*, 620 B.R. at 514–15 ("[T]he Step One Transfer was part of the overarching transaction described in the 2014 PSA . . . This was an integrated transaction[.]"); *Holliday*, 2021 WL 4150523, at *3 (noting that *BosGen* involved an "integrated securities transaction consisting of multiple component parts," the district court concluded that "[a]ny safe harbor inquiry that focuses on a component part of that transfer would be contrary to the holding in *Merit*").[8]  This explanation of *Merit* is directly contrary to what the Supreme Court *actually said.  See, e.g.*, *Merit*, 138 S. Ct. at 895 ("The focus must remain on the transfer the trustee sought to avoid.").  The court in *Tops II* recognized that the approach taken in these cases "pretty clearly turns *Merit Mgmt.* on its head," because "the transaction in *Merit* involved multiple, if interrelated steps," yet the Supreme Court "did not inquire into how closely linked the steps were in the drafting of the various documents."  646 B.R. at 684–86.  After discussing *BosGen* at length,

---

transfer for analysis under the safe harbor); *In re Extended Stay*, 2020 WL 10762310 at *79–84 (Bankr. S.D.N.Y. Aug. 8, 2020) (declining to apply the safe harbor to dividends where defendants were unable to demonstrate on the face of the complaint that they were made to complete a securities transaction); *In re Appleseed's Intermediate Holdings, LLC*, 470 B.R. 289, 302 (D. Del. 2012) (declining to apply the safe harbor to a dividend transaction that was not an exchange but rather a one-way payment in which Debtors received nothing in exchange); *In re Bayou Steel BD Holdings, L.L.C.*, 642 B.R. 371, 391 (Bankr. D. Del. 2022) (holding that where the relationship between a distribution and securities contract is unclear, a determination of the applicability of the safe harbor "requires further factual development").

[8]    In affirming the *BosGen* opinion, the *Holliday* court wrote that *Merit* "instructs that the relevant transfer is not limited to 'any component part'" if faced with an action that seeks to avoid one component of an integrated securities transaction with multiple parts.  2021 WL 4150523, at *3.  Although the Supreme Court wrote the words "any component part," this explanation of *Merit*'s holding is plainly incorrect, as set forth in detail above.

the *Tops II* court "decline[d] to follow it." *Id.* at 685.  This court should heed the warning of *Tops II* and not replicate the error of these other out-of-circuit courts.[9]

### C.     The DSG-to-DSIH Initial Transfers Are Not Subject to the Safe Harbor.

As relevant here, the safe harbor applies to two types of voidable transfers—"settlement payment[s]" and transfers "in connection with a securities contract"—made "by or to (or for the benefit of)" a "financial participant."  11 U.S.C. § 546(e).  "The section 546(e) safe harbor is an affirmative defense as to which the Defendants bear the burden of proof."  *In re Fairfield Sentry Ltd.*, 596 B.R. 275, 307 (Bankr. S.D.N.Y. 2018) (collecting cases).  Despite their assertion to the contrary, MTD ¶¶ 51–64, the Sinclair Defendants cannot show that the safe harbor applies to the initial transfers from DSG to DSIH that Diamond seeks to avoid.

### 1.     The DSG-to-DSIH Transfers Were Not "for the Benefit of" a Qualifying Entity.

The Sinclair Defendants have not demonstrated that the DSG-to-DSIH Distributions were made "by or to (or for the benefit of)" a qualifying entity.

*First*, the Sinclair Defendants' assertion that the DSG-to-DSIH initial transfers were made for JPMCFI's benefit is contrary to the law.  The Complaint describes a series of initial transfers from DSG to DSIH, followed by subsequent transfers from DSIH to DSIH-A, then from DSIH-A to DSH (and Byron Allen), and then from DSH to JPMCFI.  Section 550(a) of the Bankruptcy Code provides that the trustee can recover an avoided transfer from either "(1) the initial transferee of such transfer ***or the entity for whose benefit such transfer was made***," or "(2) any immediate

---

[9]     In a footnote, the Sinclair Defendants cite *In re Quorum Health Corp.*, 2023 WL 2552399, at *5 (Bankr. D. Del. Mar. 16, 2023), for the proposition that the court there "reject[ed] trustee's argument that it could seek to avoid an intermediate transaction, and instead holding that the court must consider the overarching transaction."  MTD ¶ 47 n.89.  The Sinclair Defendants' explanatory parenthetical is not at all accurate. The plaintiffs in *Quorum* sought to avoid and recover a transfer that had been made to an intermediate entity, BridgeCo, which then merged into defendant CHS-2.  2023 WL 2552399, at *2.  Consistent with *Merit*, the court found that the fact that BridgeCo was not a financial participant at the time of the transfer was irrelevant, given that the plaintiff sought to avoid the transfer to CHS-2, which was a financial participant.  *Id.* at *7–8.

or mediate transferee of such initial transferee."  11 U.S.C. § 550(a).  JPMCFI is clearly alleged to be a subsequent transferee from whom Plaintiffs can recover pursuant to section 550(a)(2), *see, e.g.*, Compl. ¶ 169 (referring to "subsequent distributions to DSIH-A, DSH, and JPMCFI"), and the case law is clear that a subsequent transferee cannot *also* be the party for whose "benefit" the initial transfer was made.  *See, e.g.*, *In re Red Dot Scenic, Inc.*, 293 B.R. 116, 124 n.4 (S.D.N.Y. 2003) ("As a subsequent transferee, [defendant] also could not be 'the entity for whose benefit' the transfer was made."); *Bonded Fin. Servs., Inc.* v. *European Am. Bank*, 838 F.2d 890, 896 (7th Cir. 1988) ("§ 550 distinguishes transferees (those who receive the money or other property) from entities that get a benefit because someone else received the money or property.").  While those cases address the term "benefit" as used in section 550(a)(1), the same term should be afforded the same meaning for purposes of the safe harbor in section 546(e).  *See, e.g.*, *Nijhawan* v. *Holder*, 557 U.S. 29, 39 (2009) ("Where, as here, Congress uses similar statutory language and similar statutory structure in two adjoining provisions, it normally intends similar interpretations."); *IBP, Inc.* v. *Alvarez*, 546 U.S. 21, 34 (2005) ("[I]dentical words used in different parts of the same statute are generally presumed to have the same meaning.").  The Sinclair Defendants do not cite any cases with even remotely analogous facts where courts have accepted their interpretation of "for the benefit of" as used in section 546(e).[10]

*Second*, there is no financial participant that can be identified on the face of the Complaint.  The Sinclair Defendants do not argue that DSIH is a qualifying entity; instead, they argue that "regardless of what transaction is considered," the transfers were made "for the benefit" of

---

[10]   The Sinclair Defendants cite *Quorum* and *BosGen* in support of their argument that the transfers were "for the benefit of" JPMCFI.  MTD ¶ 50.  But the transactions at issue in those cases are not analogous.  The entity that received the "benefit" of the transfer in *Quorum* was the surviving entity of a merger between the initial transferee and transferor and says nothing of whether JPMCFI can be the entity for whose "benefit" the DSG to DSIH transfers were made here.  *BosGen* is equally inapposite, as the financial institution in that case was acting as agent for its customers in connection with a tender offer.

JPMCFI, which they assert is a financial participant based solely on the fact that "DSH issued $1.025 billion in preferred equity units to JPMCFI" and thus both JPMCFI and DSH were "parties to agreements or transactions with an amount outstanding of over $1 billion."  MTD ¶¶ 50, 63.  But that argument is contrary to the plain language of the Bankruptcy Code.  Neither JPMCFI's nor DSH's status as a financial participant can be determined on the face of the Complaint.[11]

The Bankruptcy Code defines "financial participant" as "an entity that, ***at the time it enters into a securities contract*** . . . ***has*** one or more [securities contracts] . . . of a total gross dollar value of not less than $1,000,000,000 in notional or actual principal amount outstanding . . . ***at such time***." 11 U.S.C. § 101(22A)(A).  It is clear from this definition that the Sinclair Defendants cannot use the agreements that govern the issuance of the preferred equity to satisfy the $1 billion threshold, and there is nothing in the Complaint to suggest that JPMCFI already "ha[d]" an agreement with $1 billion outstanding "at such time."  The Sinclair Defendants argue that "the time for measuring" whether an entity has $1 billion outstanding is "at the time [the entity] enters into a securities contract."  MTD ¶ 62.  But the Sinclair Defendants ignore that the definition requires that, "at the time [the entity] enters into a securities contract," that the entity already "***has*** one or more agreements" with $1 billion outstanding.  11 U.S.C. § 101(22A)(A).  In other words, the definition of "financial participant" requires proof that the entity meets the requisite threshold ***prior to*** the time a securities contract is entered into in order to be considered a "financial participant" "at such time." Otherwise, the definition of financial participant could simply have included "any entity that enters into a securities contract" worth $1 billion or more.  The Sinclair

---

[11]    DSH's potential status as a qualifying entity is relevant only to the Sinclair Defendants' argument that the Court should consider applicability of the safe harbor as to the DSH-to-JPMCFI transfers (rather than the transfers that Diamond actually seeks to avoid).  For the reasons set forth herein as to JPMCFI, DSH cannot be a "financial participant" based on the preferred equity alone.  The Court should only consider the applicability of the safe harbor to the DSG-to-DSIH transfers that Diamond seeks to avoid, and the Sinclair Defendants do not argue that those transfers were made for DSH's benefit.

Defendants' argument as to JPMCFI's status as a "financial participant" on the basis of the DSH preferred equity itself should therefore be rejected.

*Finally*, the fact that JPMCFI is a subsequent transferee (against which claims are asserted under section 550(a)(2) in a parallel lawsuit) makes its potential status as a qualifying entity irrelevant: the safe harbor does not apply to claims against subsequent transferees under section 550 (Count III) given that section 550 is not listed among the Code provisions to which section 546(e) applies.  *See* 11 U.S.C. § 546(e) (identifying only "sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title"); *see also Sec. Inv. Prot. Corp.* v. *Bernard L. Madoff Inv. Sec. LLC*, 594 B.R. 167, 197 (Bankr. S.D.N.Y. 2018) ("By its terms, the safe harbor is a defense to the avoidance of the *initial* transfer . . .  The Trustee does not, however, 'avoid' the subsequent transfer; he recovers the value of the avoided initial transfer from the subsequent transferee under 11 U.S.C. § 550(a), and the safe harbor does not refer to the recovery claims under section 550." (emphasis in original)); *In re Bernard L. Madoff Inv. Sec. LLC*, 2022 WL 4349859, at *7 (Bankr. S.D.N.Y. Sept. 19, 2022) ("Since there must be an initial transfer in order for the Trustee to collect against a subsequent transferee, a subsequent transferee may raise the safe harbor as a defense—but only in so far as the avoidance of the initial transfer is concerned.").  As a result, the text of section 546(e) makes clear that the safe harbor does not apply to the transfers between DSG and DSIH— the transfers that DSG seeks to avoid under section 544(b).  Nor does the safe harbor apply to DSG's claims against subsequent transferees of the initial voidable transfer under section 550(a)(2).

### 2.  The DSG-to-DSIH Transfers Are Not Qualifying Transactions.

The DSG-to-DSIH initial transfers are also not safe harbored for the independent reason that they are not qualifying transactions under the Bankruptcy Code.  As relevant here, for the safe

harbor to apply, the transfers would need to be "settlement payment[s]" or "transfer[s] made . . . in connection with a securities contract." 11 U.S.C. § 546(e).  The Distributions are neither.

The Bankruptcy Code defines a "settlement payment" as a "preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement  payment on account,  final settlement payment, or any other similar payment commonly used in the securities trade." 11 U.S.C. § 741(8).  While courts have described that definition as "circular and cryptic," courts have nonetheless concluded that it is "clear that the term must be construed 'in the context of the securities trade.'" *Extended Stay, Inc.*, 2020 WL 10762310, at *83.  And, "a 'settlement' in the context of the securities industry 'refers to the completion of a securities transaction' and a 'settlement payment' is 'an *exchange* of money or securities that completes a securities transaction." *Tops II*, 646 B.R. at 681 (emphasis in original) (quoting *Enron Creditors Recovery Corp.* v. *Alfa, S.A.B. de C.V.*, 651 F.3d 329, 337 (2d Cir. 2011)).  By contrast, "a traditional corporation-to-shareholder dividend may not be a 'settlement payment' within the plain meaning of § 546(e) because it is a one-way distribution that occurs without commensurate consideration." *Extended Stay*, 2020 WL 10762310, at *84; *Tops II*, 646 B.R. at 681 ("What clearly is not a 'settlement payment' in respect of a securities contract for purposes of section 546(e), however, is a dividend").  That is precisely what the DSG-to-DSIH transfers were: one-way distributions from an entity to its owner, which as the Sinclair Defendants claim occurs in the "regular course of their business." MTD ¶ 93.  And, the Sinclair Defendants do not even attempt to argue those dividends were in exchange for any consideration to DSG.

Next, even if the DSH-to-JPMCFI subsequent transfer was made pursuant to a "securities contract," it does not follow that the DSG-to-DSIH initial transfers were made "in connection with a securities contract."  Indeed, "[s]ection 546(e)'s requirement that a transfer be made 'in

connection with a securities contract' means that the transfer must be 'related to' that securities contract." *Sec. Inv. Prot. Corp.* v. *Bernard L. Madoff Inv. Sec. LLC*, 2013 WL 1609154, at *9 (S.D.N.Y. Apr. 15, 2013). "However, this broad 'related to' notion is tempered by the fact that it must be alleged that the *initial* transfer . . . [is] itself . . . related to that security agreement." *Id.* (emphasis in original). The court in *Madoff* explained that whether an initial transfer is "related to" a later transaction involving a securities contract depends on whether it is the initial transferor's "payment obligations to a subsequent transferee under a securities contract" or whether the initial transfer "just happens to be used in relation to a securities contract a few levels removed from that initial transfer." *Id.* Here, DSG was not obligated in any way in respect of the preferred units, *see* Compl. ¶ 168 ("DSG had no obligation to JPMCFI or anyone else with respect to the preferred units"), and the ordinary-course distributions DSG paid to its parent were not "in connection" with the securities contract several levels up the chain.

### D.     The Safe Harbor Cannot Be Resolved in the Sinclair Defendants' Favor on a Motion to Dismiss.

"Section 546(e) provides defendants with an affirmative defense, and unless this affirmative defense is 'clearly established on the face of the complaint,' invocation of the safe harbor does not defeat a plaintiff's otherwise valid complaint." *In re 45 John Lofts, LLC*, 599 B.R. 730, 748 (Bankr. S.D.N.Y. 2019). As the court in *Tops II* explained, section 546(e) can properly be considered on a motion to dismiss only where "the complaint and other documents that the Court can consider establish it and where the facts are not in dispute, or where there is already a sufficiently detailed factual record to decide whether the applicable statutory definitions are met, such that the application of Section 546(e) presents a straightforward question of statutory interpretation of the type that is appropriately resolved on the pleadings." *Tops II*, 646 B.R. at 678–79 (citation and internal quotation marks omitted).

There is no basis here for concluding at the pleading stage that the DSG-to-DSIH initial transfers were made "in connection" with a securities contract, that those distributions were "settlement payments," or that they were made "for the benefit of" any qualifying entity. It would also be improper at this stage to conclude that the numerous distinct transfers here were all part of an "integrated transaction," even assuming that was a relevant consideration under *Merit* for the application of the safe harbor (as *Tops II* explained, it is not). *See Bayou Steel BD Holdings, L.L.C.*, 642 B.R. at 390–91 (declining to apply section 546(e) and integrate a dividend payment with an agreement for the purchase and sale of membership interests at the motion to dismiss stage where "the relationship between the Distribution and the [sale] is not clear from the face of the Trustee's Complaint and requires further factual development."); *Extended Stay*, 2020 WL 10762310, at *84 (declining to apply section 546(e) and integrate a dividend payment with an LBO transaction at the motion to dismiss stage where "[i]t is not at all clear on the face of the documents that the Preferred Dividend payments were made to complete the LBO Transaction."). Nor can it be determined on the basis of the Complaint that JPMCFI or DSH are "financial participants." The Sinclair Defendants' arguments regarding the applicability of the safe harbor are therefore "at best premature" at the motion to dismiss stage. *See In re Bernard L. Madoff Inv. Sec., LLC*, 440 B.R. 243, 266 (Bankr. S.D.N.Y. 2010) (noting that the defendants "invocation of the 546(e) defense [was] at best premature" as "the Court cannot find as a matter of law that section 546(e) applies to the transactions at issue"); *see also In re Quebecor World (USA) Inc.*, 453 B.R. 201, 211 (Bankr. S.D.N.Y. 2011) ("It is appropriate to resolve a dispute over the legal application of a safe harbor provision in the context of a dispositive motion *such as a motion for summary judgment.*"), *aff'd* 480 B.R. 468 (S.D.N.Y. 2012), *aff'd* 719 F.3d 94 (2d Cir. 2013).

### E.      The Safe Harbor Does Not Apply to the Illegal Dividend Claim.

Even if, contrary to law and fact, the safe harbor applied to Diamond's fraudulent transfer claims (Counts I and II), section 546(e) does not preempt Diamond's illegal dividend claim (Count IV).  Section 546(e) references the provisions to which it applies; it does not reference state-law claims, and its cross-reference to section 544(b) only includes transfers that are voidable under state law.  Courts have thus held that section 546(e) "does not bar [p]laintiffs from maintaining all common law claims, intentional fraud claims and any other claims not expressly embraced by section 546(e)."  *In re Lehman Bros. Holdings Inc.*, 469 B.R. 415, 450 (Bankr. S.D.N.Y. 2012) ("The safe harbors are not all encompassing and do not offer 'fail safe' protection against every cognizable claim made in relation to transactions that may fit within the statutory framework"); *see also Quorum Health Corp.*, 2023 WL 2552399, at *12 (same); *In re Hellas Telecommunications (Luxembourg) II SCA*, 526 B.R. 499, 509–10 (Bankr. S.D.N.Y. 2015) (unjust enrichment claims not subject to the safe harbor even though "the allegations underlying the plaintiffs' unjust enrichment claim were substantially identical to the allegations underpinning the plaintiffs' constructive fraudulent transfer claims").

Diamond's illegal dividend claim, which is asserted against DSIH, also does not implicate the fundamental purpose of the safe harbor—protection of the securities markets.  Claims for money damages "would not implicate the danger against which Section 546(e) is intended to protect—unwinding settled securities transactions."  *AP Servs. LLP* v. *Silva*, 483 B.R. 63, 72 (S.D.N.Y. 2012); *In re Hechinger Inv. Co.* v. *Delaware*, 274 B.R. 71, 89 n.8 (D. Del. 2002) ("Whereas the remedy for a fraudulent transfer claim is avoidance of the transfer and recovery from the transferee, the remedy for breach of fiduciary duty claim is a money judgment against the directors and their aiders and abettors.").  Section 18-607 of the Delaware Code, by its terms, holds a member "liable to a limited liability company for the amount of the distribution" if the

30

member knowingly receives an illegal distribution; it does not seek to avoid the distribution.  As such, in *Quorum Health Corp.*, 2023 WL 2552399, at *11–12, the court declined to extend section 546(e) to claims for illegal dividend and aiding and abetting illegal dividend, neither of which claims are encompassed by the plain language of section 546(e).

## II.     THE   COMPLAINT   STATES   CLAIMS   FOR   ACTUAL   FRAUDULENT TRANSFER (COUNTS I, V, AND IX).

Under the Bankruptcy Code and Maryland and Delaware law, any conveyance made with actual intent to hinder, delay, or defraud creditors is fraudulent and may be avoided.  *See* 11 U.S.C. § 548(a)(1)(A); Md. Code Ann., Com. Law § 15-207; Del. Code Ann. tit. 6 § 1304(a)(1).

An actual fraudulent conveyance claim may be supported by direct or circumstantial evidence of intent.  Where direct evidence of such intent is available, "there is no need for the court to rely on circumstantial evidence or inferences in determining whether the debtor had that intent."  *Matter of Wiggains*, 848 F.3d 655, 662 (5th Cir. 2017) (quotations omitted).  Fraudulent intent can also be inferred from "badges of fraud," which serve "as indicia for exposing fraudulent intent and establishing the knowledge necessary for a fraudulent conveyance."  *In re Rood*, 459 B.R. 581, 601 (Bankr. D. Md. 2011); *see In re DBSI, Inc.*, 445 B.R. 344 (Bankr. D. Del. 2011); *In re Green Field Energy Servs., Inc.*, 2015 WL 5146161, at *6 (Bankr. D. Del. Aug. 31, 2015) (badges of fraud can be used to establish intent because direct evidence is "often unavailable").

A claim of actual fraudulent transfer is sufficiently pleaded so long as the complaint "set[s] out the details of the allegedly fraudulent transfers—including the transferor, transferees, amounts, and time period"—and details "the underlying fraudulent scheme."  *Crawford* v. *MagicStar Arrow Ent., LLC*, 2023 WL 4141058, at *6 (N.D. Tex. June 22, 2023); s*ee also In re Black Elk Energy Offshore Operations, LLC*, 2019 WL 3889761, at *5 (Bankr. S.D. Tex. Aug. 16, 2019) (actual fraudulent transfer sufficiently pleaded where complaint identified transferor, transferees, specific

dates and amounts for each transfer, and provided "background to detail [the defendant's] alleged fraudulent scheme").

The Sinclair Defendants assume without support that "claims for actual fraud must . . . satisfy the heightened pleading requirements of Rule 9(b)."  MTD ¶ 86.  But the Fifth Circuit has never "addressed the question of whether an actual fraudulent transfer claim is subject to Rule 9(b)'s heightened pleading requirements."  *In re Life Partners Holdings, Inc.*, 926 F.3d 103, 118 (5th Cir. 2019) (concluding that, because the complaint in that case satisfied both Rule 8 and Rule 9(b), "we need not weigh in on this vexing question").  District courts in this and other circuits have recognized that because fraudulent intent on the part of the defendant is not an element of a claim for actual (or constructive) fraudulent transfer, there is "no principled reason for applying Rule 9's pleading requirements" to fraudulent transfer claims.  *Janvey* v. *Alguire*, 846 F. Supp. 2d 662, 676 (N.D. Tex. 2011) (holding that Rule 9(b) standard does not apply to actual fraudulent transfer claim, and noting that claims for fraudulent transfer under the Uniform Fraudulent Transfer Act "do not require any showing of scienter on the transferee-defendants' part"); *see also Crawford*, 2023 WL 4141058, at *6 ("Rule 9 does not appear to govern" the plaintiff's actual fraudulent transfer claim); *GE Cap. Com., Inc.* v. *Wright & Wright, Inc.*, 2009 WL 5173954, at *10 (N.D. Tex. Dec. 31, 2009) (holding that Rule 9(b) did not apply to claim for actual fraudulent transfer); *Gulf Coast Produce, Inc.* v. *Am. Growers, Inc.*, 2008 WL 660100, at *6 (S.D. Fla. Mar. 7, 2008) ("The Court concludes that the heightened pleading standard of Rule 9(b) does not apply to claims brought under the [Florida Uniform Fraudulent Transfer Act].").  The Complaint far exceeds Rule 8's low bar, and the Sinclair Defendants do not even attempt to argue otherwise.  While not necessary to defeat the Motion, the allegations in the Complaint satisfy even the higher standard of Rule 9.

### A.      Diamond Alleges Direct Evidence of Fraudulent Intent.

The Complaint alleges extensive direct evidence of fraudulent intent as to each of the challenged transactions. That evidence includes the following:

- Smith expressly acknowledged Sinclair's intent to "milk" Diamond, its wholly controlled subsidiary, of "$150 million . . . in management fees every year, and whatever else [it could] take out of the company" before causing Diamond to file for bankruptcy. Compl. ¶ 159. Given Sinclair's complete dominance and control over Diamond, this intent is attributable to Diamond. The Sinclair Defendants try to undercut the significance of this damning admission with clumsy jokes (accusing Diamond of relying on "lactose-infused rhetoric," MTD ¶ 7) and by bizarrely (and wrongly) arguing that Smith's direct, unequivocal statement of fraudulent intent "cannot paper over the absence of any badges of fraud," MTD ¶ 90. But "there is no need . . . to rely on circumstantial evidence or inferences" where fraudulent intent is admitted. *Wiggains*, 848 F.3d at 662. On this motion to dismiss, of course, the Court should give no weight to Smith's self-interested denial, *see* MTD ¶¶ 6, 90, particularly in the face of sworn testimony by a witness whom the Court found "credible," and whose testimony was corroborated by a second witness, Compl. ¶ 106. Finally, the assertion that Smith made this statement only in "late 2021," MTD ¶ 90, is scarcely a defense. The facts alleged in the Complaint strongly evidence that this was Sinclair's plan for years. In any event, this assertion at most raises a question of fact that cannot be resolved on a motion to dismiss.

- The Sinclair Defendants' fraudulent intent is powerfully confirmed by their actions in misleading and concealing material information from Duff & Phelps, whose purported fairness opinion they obtained in putting the grossly one-sided MSA in place. Compl. ¶¶ 129–40. Duff & Phelps sought to compare the MSA fees with Sinclair's costs for the services it promised to provide. Compl. ¶ 132. The Sinclair Defendants falsely represented to Duff & Phelps that "accurate costs estimates . . . [were] not currently available," although internal documents showed that those costs were far less than the fees Sinclair imposed on Diamond. Compl. ¶ 132. Contrary to the Sinclair Defendants' unsupported assertion, MTD ¶ 93, such concealment is evidence of fraudulent intent. *See, e.g.*, *Tops II*, 646 B.R. at 675 ("[T]he Complaint pleads *direct* evidence of intent to defraud by alleging that Tops (and the Morgan Stanley Director Defendants and other Morgan Stanley personnel who controlled it) manipulated the third-party valuations used to support each dividend." (emphasis in original)).

- Sinclair and Diamond proceeded with the Bally's Transaction in the face of an express warning from their own lawyers ████████████████████████████████ ████████████████████████████████ Compl. ¶ 229. The Sinclair Defendants' argument that its fraudulent intent is not attributable to Diamond, MTD ¶ 95, improperly ignores the detailed factual allegations in the Complaint that Sinclair dominated and controlled Diamond, Compl. ¶¶ 46–58; Ripley's testimony that Sinclair acted as Diamond's representative in the Bally's Transaction, Compl. ¶ 205; and that the lawyers' cautions about ███████████████ were communicated to, among others, Rutishauser, another Diamond officer, Compl. ¶¶ 49–50, 229–32.

Case 23-03134 Document 70 Filed in TXSB on 10/18/23 Page 47 of 100

- The Sinclair Defendants proceeded with the transactions in full knowledge of Diamond's insolvency. Compl. ¶¶ 84–103. Indeed, the Bally's Transaction closed just two weeks *after* Sinclair disclosed that it had taken a $4.2 billion write-down of Diamond's intangible assets, leaving Diamond with negative equity of $2.5 billion. Compl. ¶¶ 94–95.

- The Sinclair Defendants' knowledge that Diamond was insolvent is further established by their concealment of material information from their advisors at Empire, who provided a solvency opinion that Sinclair deployed to siphon more than $350 million from Diamond in August 2020. Compl. ¶¶ 185–87, 190–92. Rutishauser, as Diamond's CFO, represented to Empire that the financial projections provided to Empire were "prepared in good faith and are based upon assumptions which are believed by management to be reasonable at the time such projections were made." Compl. ¶ 185. Yet Diamond's internal forecasts, known to Rutishauser and Ripley, among others, showed that Diamond's forecasted "True P/L" was far lower than what was provided to Empire. Compl. ¶ 186. Empire's corporate designee testified that the failure to provide these internal projections was a "material omission." Compl. ¶ 186.

- The Sinclair Defendants similarly withheld material information from Duff & Phelps in connection with the Bally's Transaction, and that Duff & Phelps's opinion (issued months after the closing) relied upon conclusions that Sinclair knew to be false. Compl. ¶¶ 215–23. Among other things, Duff & Phelps concluded, based upon representations by Sinclair, that (i) Bally's marketing commitment would result in "incremental profit" to Diamond, a conclusion directly contrary to the views contemporaneously expressed by Sinclair's senior executives, Compl. ¶ 291; (ii) Diamond's naming rights were worthless, a conclusion apparently based upon a represented by Sinclair that there was "[n]ot a lot of demand [for the naming rights] as Bally's first entered the deal" and squarely inconsistent with what had been revealed by the sale process, Compl. ¶¶ 220–21; and (iii) the value of the equity and warrants provided to Sinclair was $183.6 to $198.6 million, an amount that appears to have been substantially understated, Compl. ¶ 222.

The number, scope, and timing of these multiple fraudulent transactions over a period of years—and the direct evidence of fraudulent intent as to each of them—further evidence fraudulent intent as to all of the challenged transactions. These were not ordinary-course business transactions that are now retroactively being recharacterized. Nor were they small or one-time missteps or actions taken without the involvement of Diamond's senior management. The Complaint alleges two dozen payments of MSA fees between October 2019 and November 2021, totaling in excess of $316 million (plus an additional $100 million in deferred MSA Payments), Compl. ¶ 104 and Ex. A; more than ten distributions to DSIH for no consideration between September 30, 2019, and the fourth quarter of 2022, totaling more than $929 million, Compl.

¶ 193; and the complex Bally's Transaction planned and executed over more than a year and involving the transfer of hundreds of millions of dollars of value to Sinclair, Compl. ¶¶ 203–42.  These transactions were part of a planned, cohesive strategy by the most senior executives of Sinclair and Diamond—as Smith admitted—to drain assets from Diamond and its creditors for the benefit of Sinclair.

In sum, the direct evidence of fraudulent intent alleged in the Complaint—all of which is attributable to Diamond—is more than enough at the pleading stage.  As we now discuss, the Complaint also alleges multiple badges of fraud providing further, circumstantial evidence of fraudulent intent.

### B.    The Complaint Sufficiently Pleads Multiple Badges of Fraud as to Each of the Challenged Transactions.

Badges of fraud under the Bankruptcy Code include (i) the relationship between the debtor and the transferee; (ii) consideration for the conveyance; (iii) insolvency or indebtedness of the debtors; (iv) how much of the debtor's estate was transferred; and (v) secrecy or concealment of the transaction.  *In re Fedders N. Am., Inc.*, 405 B.R. 527, 545 (Bankr. D. Del. 2009).  Likewise, under Maryland law, badges of fraud include (i) the insolvency/indebtedness of the debtor; (ii) lack of consideration for the conveyance; (iii) a relationship between the transferor and the transferee; (iv) secrecy/concealment; and (v) departure from the usual method of business.  *In re Rood*, 459 B.R. at 601; *Wellcraft Marine Corp.* v. *Roeder*, 314 Md. 186, 189–90 (Md. 1988) (badges of fraud under Maryland law); *see also* Del. Code Ann. tit. 6 § 1304(b) (identifying substantially similar badges of fraud under Delaware law).

These badges of fraud are not exclusive; courts "may consider other factors relevant to the transaction."  *In re Fedders*, 405 B.R. at 545; *see also Wellcraft*, 314 Md. at 189–90 (listed badges of fraud are "not exhaustive").  Nor is there a formula for assessing whether badges of fraud are

sufficient to give rise to an inference of intent.  Instead, they are "nothing more than a list of circumstantial factors that a court may use to infer fraudulent intent."  *Ritchie Cap. Mgmt., LLC* v. *Stoebner*, 779 F.3d 857, 863 (8th Cir. 2015) (citation omitted).  While "[t]he presence of a single badge of fraud may spur mere suspicion, the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose."  *Max Sugarman Funeral Home, Inc.* v. *A.D.B. Investors*, 926 F.2d 1248, 1254–55 (1st Cir.1991) (citation omitted).

1.   **Diamond Sufficiently Pleads its Actual Fraudulent Transfer Claim as to the MSA Payments (Count V).**

The Complaint's direct evidence of fraudulent intent is corroborated by ample badges of fraud that provide additional, inferential evidence of fraudulent intent as to the MSA Payments. They include the following:

- *Relationship between transferor and transferee*.  There can be no dispute about the existence of a close relationship between Sinclair and Diamond.  Sinclair was the indirect controlling shareholder of Diamond at all relevant times and its senior officers were also the senior officers of Diamond.  Compl. ¶¶ 44–59.  As Smith testified about Diamond, "I treated it like it's mine."  Compl. ¶ 55.  Sinclair unilaterally drafted and executed the MSA, and Ripley signed it on behalf of both DSG and STG.  *See* Compl. ¶¶ 107–08.

- *Lack of consideration for the conveyance*.  The Complaint shows in detail that the MSA Payments far exceeded fees paid pursuant to industry standard agreements and Sinclair's costs for providing the services.  Compl. ¶¶ 114–15, 125–26, 133–36.  Duff & Phelps also concluded that the fees imposed on Diamond were "significantly in excess" of those paid in comparable transactions.  Compl. ¶ 136.  Sinclair witnesses were unable to explain how these above-market fees were derived.  Compl. ¶¶ 117–121, 126–127.  The Complaint also alleges in detail that Sinclair abused its position of authority over Diamond to squeeze additional, unwarranted MSA fees from Diamond.  Compl. ¶¶ 141–155, 235–42.

- *Insolvency/indebtedness of the debtors*.  The Complaint alleges in detail that Sinclair continued to extract exorbitant fees from Diamond long after Diamond was unquestionably insolvent (and the Sinclair Defendants knew it was insolvent).  Compl. ¶¶ 84–103.  Indeed, beginning as early as December 2019—before the vast bulk of the MSA fees were paid— analysts estimated that Diamond had negative equity value.  Compl. ¶¶ 98–102.

36

- ***Departure from usual method of business and secrecy/concealment***.  As discussed above, the Complaint alleges that Sinclair concealed material information from Duff & Phelps in connection with its opinion that the MSA was fair to Sinclair.  Compl. ¶¶ 135–36.

- ***How much of the debtor's estate was transferred***.  The MSA Payments were unquestionably material to Diamond.  As the Complaint alleges, Diamond paid fees to Sinclair of more than $316 million and accrued liabilities for deferred fees for an additional $104 million, for a total of at least $420 million.  Compl. ¶ 104, Ex. A.  Moreover, the amount of the debtor's estate that was transferred cannot be viewed in isolation; instead, the entirety of fraudulent transfers must be taken into account.  *See In re PennySaver USA Publ'g, LLC*, 602 B.R. 256, 272–73 (Bankr. D. Del. 2019) (concluding that an aggregate of $7 million in distributions, management fees, and other transfers paid by debtor to defendant were, evaluated "in total," sufficient to allege that "the amount was most likely more than the Debtors could afford" under the badges of fraud analysis).  In total, the challenged transactions involved the transfer of at least $1.5 billion.  Compl. ¶ 8.  That amount is roughly 14% of the $10.6 billion purchase price for the RSNs in August 2019, and undoubtedly a substantially larger proportion of its value at the times the transfers occurred, when Diamond was insolvent.

These allegations of fraudulent intent are at least as substantial as those in other cases in which courts have denied motions to dismiss actual fraudulent transfer claims.  For example, in *Appleseed's*, the debtors alleged that the defendants had "used their domination and control" to require the debtors to enter into an advisory agreement that charged excessive "advisory fees." 470 B.R. at 295.  The court found sufficient the four alleged badges of fraud, that (i) the transfers were to an insider that directly or indirectly controlled the debtors; (ii) the transfers occurred at the same time as other substantial new debts were incurred; (iii) the debtors received no consideration in return; and (iv) the debtors were or became insolvent around the time of the transfers.  *Id*. at 300; *see also In re Charys Holding Co., Inc.*, 2010 WL 2774852, at *6 (Bankr. D. Del. July 14, 2010) (denying motion to dismiss actual fraudulent transfer claim based upon transfers pursuant to agreement, where the transfers were to an insider and were concealed from certain participants, the debtor was insolvent, and little to no consideration was received in return by the debtor); *In re PennySaver USA Publ'g, LLC*, 587 B.R. 445, 461 (Bankr. D. Del. 2018) (denying motion to

dismiss fraudulent transfer claim where debtor was insolvent at time it was forced to make outsized payments to transferee's employee for no consideration).

The Sinclair Defendants present a hodgepodge of arguments intended to disguise their wrongdoing.  For example, they seek refuge in flawed analogies to two inapposite decisions that are not binding on this Court: *In re Gulf Fleet Holdings, Inc.*, 491 B.R. 747 (Bankr. W.D. La. 2013), and *In re Duke and King Acquisition Corp.*, 508 B.R. 107 (Bankr. D. Minn. 2014).  *See* MTD ¶¶ 88–90.  But the detailed factual allegations here—and the direct evidence of intent discussed above—contrast sharply with the threadbare, conclusory allegations of intent in those cases.  The *Duke and King* court described the allegations as a "rote recitation of the bare, abstract elements of [the] claim under law," which "lack[ed] specificity for the transfers" or "as to a specific intent to harm or hamper creditors."  508 B.R. at 138–39.  The *Gulf Fleet* court found that the complaint "plead[s] no facts (as opposed to conclusions)" showing that the challenged transactions affected the debtor's solvency (but granted leave to replead to allege additional facts).  491 B.R. at 767–68.  And, of course, those decisions did not involve concrete direct evidence of fraudulent intent, which exists here in spades.

The Sinclair Defendants nonetheless argue that the MSA Payments could not be actual fraudulent transfers because they were allegedly made in satisfaction of contractual obligations.  MTD ¶ 90.  But, as discussed in Section III, *infra*, there is no per se rule that a transfer made to satisfy an antecedent obligation is made for reasonably equivalent value (and the Sinclair Defendants cite no cases that actually stand for this proposition).  The Complaint also alleges in detail that Diamond did not receive reasonably equivalent value for the MSA transfers.  Compl. ¶¶ 111–12, 133–38, 141–55.  There were no such allegations in *Gulf Fleet* or *Duke and King*.

38

The Sinclair Defendants do not and cannot challenge the adequacy of Diamond's detailed allegations—based upon internal insolvency testing and forecasts, assessments by outside analysts, trading prices of Diamond's debt, Diamond's multibillion dollar writedown of intangible assets leaving it with negative equity, and other evidence—that Diamond was insolvent when it made the vast bulk of the MSA Payments.  Compl. ¶¶ 84–103.  Nor could they, because, as courts have consistently held, "[i]nsolvency is a question of fact."  *In re Roblin Indus., Inc.*, 78 F.3d 30, 35 (2d Cir. 1996); 5 Collier on Bankruptcy ¶ 548.05 (16th ed. 2020) ("The calculation of insolvency is often technical and will require expert testimony[.]").  Courts therefore routinely decline to consider questions as a company's solvency at the motion to dismiss stage.  *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 37 (Bankr. S.D.N.Y. 2007) ("[T]he Court does not believe that the insolvency issue can be considered under the present 12(b)(6) motions."); *see also In re Tronox Inc.*, 450 B.R. 432, 439 (Bankr. S.D.N.Y. 2011) (same).

The Sinclair Defendants contend that Diamond's insolvency does not support Diamond's claims for actual fraud on the ground that "insolvent companies regularly pay trade creditors," MTD ¶ 90, but that is sophistry.  As discussed above, the solvency of the transferor is recognized as a badge of fraud under the Bankruptcy Code and Delaware and Maryland law.  *See supra* pp. 35–36.  And Sinclair was the furthest thing from a "trade creditor"; it ***completely*** controlled Diamond, unilaterally imposed the MSA with no independent input from Diamond, and then forced Diamond to comply with it for years.

Finally, the Sinclair Defendants' argument that their fraudulent intent is not attributable to Diamond, MTD ¶ 90, likewise ignores that Sinclair controlled Diamond and that the individual Sinclair Defendants were senior executives of both companies, Compl. ¶¶ 44–59.  Their intent is therefore attributable to Diamond.  *See In re Roco Corp.*, 701 F.2d 978, 984 (1st Cir. 1983)

(imputing intent of debtor's president and sole shareholder to debtor under section 548(a)(1) because "he was in a position to control the disposition of [the debtor's] property"); *In re Lyondell Chem. Co.*, 554 B.R. 635, 648 (S.D.N.Y. 2016) ("[CEO]'s alleged knowledge that the EBITDA figures were fraudulent, as well as his intent in creating and presenting them, can be imputed to [the company]."); *In re Direct Response Media, Inc.*, 466 B.R. 626, 654 (Bankr. D. Del. 2012) (finding that actual fraud was adequately pled when the defendants used a "cross-pollinated ownership and organizational structure" to "control the Debtor and its property" such that the challenged transactions took place "with [the] Debtor lacking the power to stop them").

### 2. Diamond Sufficiently Pleads Its Actual Fraudulent Transfer Claim as to the Distributions to DSIH (Count I).

The Sinclair Defendants' argument that the Complaint does not adequately plead badges of fraud concerning the Distributions, MTD ¶¶ 91–93, is equally misguided.  In addition to the direct evidence of fraudulent intent discussed in Section II.A above, the Complaint alleges the following badges of fraud relevant to the Distributions:

- ***Relationship between transferor and transferee***.  As discussed with respect to the MSA Payments, there can be no dispute about the existence of a close relationship between Sinclair and DSG.  Compl. ¶¶ 44–59.  The same is true of DSIH: it was DSG's sole shareholder, and DSIH's sole asset was its controlling interest in DSG.  *See* Compl. ¶¶ 26, 45.  At all relevant times, the same individuals—Ripley, Rutishauser, and Smith—were the Board of Managers of DSIH-A, DSIH's sole member, and were officers or de facto managers of DSG.  Compl. ¶¶ 27–29.  The individual Sinclair Defendants were intimately involved in the decision to approve the Distributions.  *See* Compl. ¶¶ 170–72, 195–202.

- ***Lack of consideration for the conveyance***.  DSG received no consideration for the $929 million in Distributions to DSIH.  Compl. ¶ 162.  Nor did DSG receive any benefit from the subsequent distributions to JPMCFI in connection with the preferred units, because DSG had no obligations with respect to those units.  Compl. ¶ 162.

- ***Insolvency/indebtedness of the debtors***.  Diamond was insolvent no later than December 2019, and thus was insolvent when all but approximately $10 million of the Distributions to DSIH were made.  Compl. ¶¶ 84–103, 193.

- ***Departure from usual method of business and secrecy/concealment***.  As discussed above, Sinclair (through the individual Sinclair Defendants) concealed material information from

Empire in connection with its solvency opinion in August 2020 immediately before a $353 million Distribution. Compl. ¶¶ 175–92. The information withheld from Empire allowed it to opine that DSG was solvent; applying Empire's analysis to assumptions consistent with the views expressed internally by Sinclair personnel and relied on internally—but not shared with Empire—would have resulted in a conclusion that DSG was insolvent—as it was. Compl. ¶ 175.

- ***How much of the debtor's estate was transferred***. As noted, the amount of Distributions was approximately $929 million, or nearly $1 billion. Compl. ¶ 193. That amount alone was approximately 8% of the $10.6 billion purchase price for the RSNs in August 2019, and undoubtedly a far greater proportion of Diamond's value when the Distributions were made and Diamond was already insolvent and had negative equity value. As discussed above, taking all of the challenged transactions into account, the amount transferred was at least $1.5 billion. Compl. ¶ 8.

Courts have upheld allegations of actual fraudulent transfer based upon similar badges of fraud. For example, in *Direct Response Media*, the court refused to dismiss claims where the defendants allegedly used "interlocking directorates" and a "cross-pollinated ownership and organizational structure" to force the debtor to pay defendants' own obligations while receiving no consideration in return. 466 B.R. at 654. Likewise, in *In re Autobacs Strauss, Inc.*, the court found sufficient the debtor's allegations that the defendant, an insider, had caused the debtor to incur debt obligations for the benefit of the defendant, without consideration, while the debtor was insolvent, and the defendant attempted to conceal the scheme from the debtor's creditors. 473 B.R. 525, 565–67 (Bankr. D. Del. 2012).

The Sinclair Defendants argue that the Distributions were not actual fraudulent transfers because they "did not go into the pockets of SBG or its actual owners," but instead to JPMCFI, an entity "wholly independent of the Sinclair Defendants." MTD ¶ 91. That argument ignores that the payments to JPMCFI directly benefitted Sinclair by relieving SBG of its obligations to guarantee the preferred units. Compl. ¶¶ 161–68, 195–202. JPMorgan's statement that repaying the preferred units its affiliate held "is more NPV positive than buying back DSG notes," MTD ¶ 91 (quoting Compl. ¶ 171), does not override the compelling evidence of fraudulent intent.

The Sinclair Defendants' reliance on *Lippe* v. *Bairnco Corp.*, 249 F. Supp. 2d 357 (S.D.N.Y. 2003), MTD ¶ 93, is misplaced.  The court in *Lippe*, on a full summary judgment record, credited "substantial direct evidence" showing the defendant's good faith, noted that the challenged dividends were "based on dividends paid by comparable companies," and observed that "[b]efore each quarterly dividend the [company's] Board reviewed [the company's] financial condition, and there was always substantial cash on hand." *Id.* at 384.  In contrast, the Distributions here were made while Diamond was insolvent, *see* Compl. ¶¶ 84–103; no independent assessment of Diamond's financial condition was made before the Distributions (other than the fundamentally flawed Empire solvency opinion); and the Sinclair Defendants concealed Diamond's insolvency through Rutishauser's sham Officer's Certificates and the worthless Empire report.  Compl. ¶¶ 172–92, 198–99.

The Sinclair Defendants also argue that the Distributions occurred before Diamond's insolvency because the "bulk" of them were made "before Diamond's bankruptcy."  MTD ¶ 93. But insolvency is not equivalent to filing for bankruptcy, and, as noted, the Sinclair Defendants do not and cannot challenge the adequacy of Diamond's allegations that it was insolvent at least as early as December 2019—before all but approximately $10 million of the nearly $930 million of challenged transfers was made.  *See* Compl. ¶ 193.

### 3. Diamond Sufficiently Pleads Its Actual Fraudulent Transfer Claim as to the Bally's Transaction (Count IX).

The Sinclair Defendants' argument that the Complaint fails to allege sufficient badges of fraud in connection with the Bally's Transaction, *see* MTD ¶¶ 94–96, is equally without merit.

- ***Relationship between transferor and transferee***.  The Complaint alleges that the Bally's Transaction involved a fraudulent transfer of value from Diamond to Sinclair, because, while Diamond provided by far the bulk of the value transferred to Bally's, Sinclair obtained for itself by far the larger share of the value Bally's paid.  *See* Compl. ¶¶ 203–34. As discussed above, there can be no dispute about the existence of a close relationship between Sinclair and Diamond.  Compl. ¶¶ 44–59.  As Smith testified about Diamond, "I

treated it like it's mine."  Compl. ¶ 55.  The Complaint alleges in detail that the Bally's
Transaction "was negotiated and approved entirely by Sinclair personnel," and that "no
independent representative of Diamond or the RSNs was involved or was asked to review
or approve the agreement."  Compl. ¶ 205.

- *Lack of consideration for the conveyance*.  The Complaint shows in detail that the amount
  Diamond received in the transaction was far less than what it conveyed.  The bidding
  process undertaken by Sinclair revealed that other third parties were willing to pay
  substantially more for Diamond's naming rights that Diamond received from Bally's.
  Compl. ¶¶ 206–07.  In contrast, the Duff & Phelps opinion obtained by Sinclair shows
  that Sinclair received from Bally's warrants and options worth between $183.6 and $198.6
  million, while providing Bally's only $27.7 to $47.4 million in value.  Compl. ¶ 217; *see
  generally* Compl. ¶¶ 224–27.

- *Insolvency/indebtedness of the debtors*.  By the time the Bally's Transaction closed,
  Diamond was unquestionably insolvent.  Compl. ¶¶ 84–103.  On November 4, 2020, two
  weeks before the closing, Sinclair disclosed that it had taken a $4.2 billion write-down of
  Diamond's goodwill, leaving Diamond with negative equity of $2.5 billion.  Compl. ¶¶ 94–
  95.  Sinclair's internal forecasting from December 2020 showed Diamond with $0 in equity
  value.  Compl. ¶ 94.

- *Departure from usual method of business and secrecy/concealment*.  The Complaint
  alleges that the "fairness" opinion issued by Duff & Phelps in connection with (but months
  after) the Bally's Transaction relied upon conclusions that Sinclair knew to be false.
  Compl. ¶¶ 215–23.  Among other things, Duff & Phelps concluded, based upon
  representations by Sinclair, that (i) Bally's marketing commitment would result in
  "incremental profit" to Diamond, a conclusion directly contrary to the views
  contemporaneously expressed by Sinclair's senior executives, Compl.  ¶ 219;
  (ii) Diamond's naming right were worthless, a conclusion apparently based upon a
  represented by Sinclair that there was "[n]ot a lot of demand [for the naming rights] as
  Bally's first entered the deal," a representation squarely inconsistent with what had been
  revealed by the sale process, Compl. ¶¶ 220–21; and (iii) the value of the equity and
  warrants provided to Sinclair was $183.6 to $198.6 million, an amount that Sinclair appears
  to have known was substantially understated, Compl. ¶ 222.

- *How much of the debtor's estate was transferred*.  The $183.6 to $198.6 million in value
  obtained by Sinclair in the Bally's Transaction—most if not all of which should have gone
  to Diamond—was unquestionably material.  And, as discussed above, that was only a
  fraction of the transfers of at least $1.5 billion in challenged transfers.  Compl. ¶ 8.

The Sinclair Defendants attempt to dodge the Complaint's detailed allegations that

Diamond received far less than reasonably equivalent value in the transaction.  MTD ¶¶ 94–

95.  They point to the allegation that Bally's agreed to pay Diamond $88 million for Diamond's

naming rights together with a (minimally valuable) marketing commitment, MTD ¶¶ 94–95, but

43

ignore the well-supported allegations that Sinclair—without giving up significant value—received more than twice that amount in warrants and options, *see* Compl. ¶¶ 204–22.  At the same time, the principal benefit that Bally's received, Diamond's naming rights, was worth far more than the $88 million over ten years that Diamond received, as evidenced by the fact that multiple other bidders expressed an interest in paying substantially more for them, including one expression of interest at more than twice that amount.  Compl. ¶¶ 206–14, 220.

The Sinclair Defendants completely ignore that Sinclair's ***own counsel*** explicitly warned at the time that ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████.  Compl. ¶ 229. Sinclair's counsel likewise cautioned the Sinclair Defendants that ████████████████████ ████████████████████████████████████████████████████████████████████████ █████████████████████████████████  Compl. ¶ 231.  The Sinclair Defendants have no answer to these allegations.

The Sinclair Defendants improperly ignore the well-pleaded allegations of the Complaint and instead argue with straw men.  They assert that the Complaint does not allege that the Bally's marketing "commitment" "has no value to Diamond" or that Bally's "did not spend money" pursuant to that "commitment."  MTD ¶ 95.  But the Complaint explains in detail why the "commitment" had no value to Diamond, and that even Sinclair's own Chief Revenue Officer concluded that it "would not be accretive to [Diamond's] business."  Compl. ¶ 213; *see also* Compl. ¶ 214 (alleging that Bally's does not appear to have purchased a meaningful amount of advertisements on the Diamond RSNs since the Bally's agreement was executed); Compl. ¶ 219. Likewise, the Sinclair Defendants assert that Sinclair "provided consideration in the deal" in the form of integration and naming rights.  MTD ¶ 95.  But the Sinclair Defendants do not even try to

argue that the consideration Sinclair provided was worth anywhere near the value of the consideration Sinclair received.  Nor could they; as noted, Sinclair's own advisors at Duff & Phelps estimated that the total value of *all* consideration provided by Sinclair was a fraction of the consideration it received.  Compl. ¶¶ 217, 222.  In any event, where actual intent is shown, a transfer may be avoided "regardless of the adequacy of consideration given."  *In re TC Liquidations LLC*, 463 B.R. 257, 276 (Bankr. E.D.N.Y. 2011) (quoting *United States* v. *McCombs*, 30 F.3d 310, 328 (2d Cir. 1994)).

Finally, the Sinclair Defendants assert that the Duff & Phelps fairness opinion "further supports that DSG did not have the intent to defraud creditors."  MTD ¶ 95.  But they ignore the detailed allegations explaining why that opinion, which the Sinclair Defendants did not obtain until months after the transaction closed, should be given no weight.  Among other things, they ignore the allegations that Duff & Phelps (with Sinclair's input) inexplicably and unjustifiably valued Diamond's naming rights at zero, Compl. ¶¶ 215–23, and that Sinclair concealed material information from Duff & Phelps, Compl. ¶¶ 220–21.  The Sinclair Defendants' conclusory assertion that their concealment of information "is irrelevant to DSG's intent," MTD ¶ 95, ignores Sinclair's complete control of Diamond, Compl. ¶¶ 44–59, and Ripley's testimony that Sinclair negotiated the Bally's Transaction on Diamond's as well as Sinclair's behalf, Compl. ¶ 205.

## III.   THE COMPLAINT ALLEGES THAT THE MSA PAYMENTS ARE CONSTRUCTIVE FRAUDULENT TRANSFERS (COUNTS VI AND VII).

The payments Diamond made to Sinclair pursuant to the one-sided and extortionate MSA are quintessential constructive fraudulent transfers:  Diamond made the payments when it was

insolvent and did not receive fair consideration or reasonably equivalent value in return.  Compl. ¶¶ 84–103, 104–60. [12]

The Sinclair Defendants nevertheless argue that the MSA Payments cannot be constructive fraudulent transfers "because such payments were to satisfy prior contractual commitments—DSG's obligations under the MSA—and thus were for reasonably equivalent value."  MTD ¶ 74. But the rule the Sinclair Defendants urge—that any transfer to satisfy a preexisting obligation is per se for reasonably equivalent value or fair consideration—is not the law.  And whether a transfer was for fair consideration or reasonably equivalent value is a fact question that cannot be decided on a motion to dismiss.  *See, e.g.*, *In re Charys Holding Co., Inc.*, 443 B.R. 628, 638 (Bankr. D. Del. 2010) ("[R]easonably equivalent value is a fact intensive determination that typically requires testing through the discovery process."); *In re Green Field*, 2015 WL 5146161, at *8 (same).

Under applicable state and federal law, the Complaint adequately pleads that the MSA Payments were constructive fraudulent transfers.  The Maryland Uniform Fraudulent Conveyance Act ("MUFCA") defines "fair consideration" to include both equivalent value *and* "good faith" on the part of the transferee, and the Complaint here amply alleges an absence of good faith by the Sinclair Defendants.  And the great majority of cases construing Bankruptcy Code section 548 and the parallel provision under Delaware law similarly hold that an assessment of "reasonably equivalent value" requires a fact-specific analysis of the totality of the circumstances, including the good faith of the parties and the actual value exchanged.

---

[12]  Diamond started making the MSA Payments to Sinclair in October 2019, *see* Compl. Ex. A, three years prior to the date of the Tolling Agreement.  Accordingly, all $420 million of the MSA Payments are avoidable under the applicable lookback period under Maryland law.  *See infra* Section IV.

### A.     Diamond Has Adequately Alleged Fair Consideration as Required by Maryland Law.

The Sinclair Defendants concede that Maryland law likely applies to the Complaint's state law claims that the MSA Payments are constructive fraudulent transfers.  MTD ¶ 75 n.120.  Accordingly, MUFCA likely governs the state law constructive fraudulent transfer claims.

MUFCA defines a constructive fraudulent conveyance as a conveyance made "by a person who is or will be rendered insolvent by it" if the conveyance is made "without fair consideration." Md. Code Ann., Com. Law § 15-204.   MUFCA defines "fair consideration" as both "fair equivalen[ce]" between the amounts exchanged and "good faith" by the transferee.  It provides:

> Fair consideration is given for property or an obligation, if:
> (1) In exchange for the property or obligation, as a fair equivalent for it ***and in good faith***, property is conveyed or an antecedent debt is satisfied; or
> (2) The property or obligation is ***received in good faith*** to secure a present advance or antecedent debt in an amount not disproportionately small as compared to the value of the property or obligation obtained.

*Id*. § 15-203 (emphases added).

Under MUFCA, therefore, a payment in satisfaction of an antecedent debt is not per se "fair consideration."   Instead, fair consideration exists only if *both* the amount paid is fairly equivalent to the debt *and* the transferee acts in good faith.  *See Cross River Bank* v. *3 Bea's Assisted Living LLC*, 2023 WL 6161414, at *6 (D. Md. Sept. 21, 2023) ("Consideration is considered fair where it is given in exchange for the property as a fair equivalent for it and in good faith." (citation and internal quotation marks omitted)); *Kennard* v. *Elkton Banking & Trust Co. of Md.*, 6 A.2d 258, 260 (Md. 1939) ("To sustain such a transaction as this, . . . the conveyance or transfer must have been made in good faith.").

A transfer for antecedent debt can thus be avoided under Maryland law if the transferee does not act in good faith.  In *In re Essex Construction, LLC*, 624 B.R. 103 (Bankr. D. Md. 2020), for example, the defendant (the debtor's owner) received more than $500,000 from the debtor

when the debtor was insolvent, and the payments were later challenged as constructive fraudulent transfers under MUFCA.  *See id*. at 115–17.  The defendant argued that the payments could not be fraudulent transfers because they were made in satisfaction of an antecedent debt.  *Id.* 117–18.  The court squarely rejected this argument and concluded that "even if . . . the transfers were in payment of an antecedent debt," the court "would not conclude the transfers were made in good faith as required by MUFCA."  *Id.*  The court explained that "it [wa]s not good faith under MUFCA" for the debtor to "make continual and substantial transfers" to its owner "while suffering losses" and experiencing financial distress.  *Id.* at 118.

The meaning of "fair consideration" under MUFCA—and the relevance of good faith to determining whether the transferor received fair consideration—is further illustrated by case law construing an analogous provision of New York's Debtor and Creditor Law ("DCL").  Until 2020, the DCL, like MUFCA, provided that the absence of "fair consideration" was an essential element of a claim for constructive fraudulent transfer.  The definition of "fair consideration" in the DCL is similar to that in MUFCA, and includes a requirement of good faith.  *See* N.Y. Debt & Cred. Law § 272 (repealed effective 2020) (defining "fair consideration" as requiring the exchange of property "as a fair equivalent" and "good faith"); *see also In re Barton-Cotton*, 2012 WL 2803742, at *5 (Bankr. D. Md. July 10, 2012) (using the same standard to evaluate "fair consideration" under Maryland and New York law).  Courts construing the DCL have also held that good faith is lacking when the transferee has "knowledge of [the] transferor's unfavorable financial condition at the time of the transfer" or holds a "position as an insider with control over the [transferor's] finances." *In re Le Café Crème, Ltd.*, 244 B.R. 221, 241 (Bankr. S.D.N.Y. 2000).

Even when the challenged transfer was made in satisfaction of an antecedent contractual obligation, courts construing the DCL held that "fair consideration" was lacking if the transfer was

48

not made in good faith. For example, in *In re Dewey & Leboeuf LLP*, 2014 WL 4746209 (Bankr. S.D.N.Y. Sept. 23, 2014), a trustee brought an adversary proceeding against the debtor's former Chief Operating Officer seeking to claw back large payments made pursuant to an employment contract and a consulting agreement. *Id.* at *2–3. The court denied the defendant's motion to dismiss on the ground that the complaint adequately alleged that payments made when the debtor was insolvent and to an insider were not in good faith. *Id.* at *12. Likewise, in *In re Marketxt Holdings Corp.*, 361 B.R. 369 (Bankr. S.D.N.Y. 2007), the court declined to dismiss claims to avoid transfers made to secure antecedent because the agreements were with an "insider" and thus raised an inference of a lack of good faith. *Id.* at 399–400; *see also In re Xiang Yong Gao*, 560 B.R. 50, 62 (Bankr. E.D.N.Y. 2016) (noting that "lack of good faith may serve as an independent ground to set aside a conveyance" even if the transfers were made on account of antecedent debt).

Defendants cite no cases to the contrary under MUFCA. Instead, they rely exclusively on cases involving "reasonably equivalent value," the terminology used by the Bankruptcy Code, and argue that "fair consideration" under Maryland law has the same meaning. MTD ¶ 75.[13] While, as shown below, most cases construing "reasonably equivalent value" under the Code have recognized that it incorporates an element of good faith, the text of section 548 does not have a separate "good faith" element, and the cases the Sinclair Defendants cite construing it are inapposite to Diamond's MUFCA claims. As the leading bankruptcy treatise explains, comparisons between statutes requiring "fair consideration" and those requiring "reasonably

---

[13]  The Sinclair Defendants cite *Kingsville Dodgs, LLC* v. *Almy* (and another case that quotes *Kingsville*), which, after quoting section 548, provides as follows: "Maryland's Uniform Fraudulent Conveyance Act similarly provides: 'Every conveyance made and every obligation incurred by a person who is or will be rendered insolvent by it is fraudulent as to creditors without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration.'" 2007 WL 2332699, at *2 n.5 (D. Md. July 20, 2007) (quoting Md. Code Ann. Com. Law § 15–204). The use of the word "similarly," without any accompanying analysis or discussion, is not a meaningful substitute for the Court's consideration of case law actually addressing the meaning of a separately defined element in MUFCA not present under the Code.

49

equivalent value" are "problematic, and inapposite in many cases" because "fair consideration" requires an independent statutory element of good faith.  5 Collier on Bankruptcy ¶ 548.05 n.9.

**B.      The Complaint Also Alleges a Lack of Reasonably Equivalent Value Under the Bankruptcy Code and Delaware Law.**

The Complaint also states a claim to avoid the MSA Payments as constructive fraudulent transfers under the Bankruptcy Code and under the Delaware Uniform Fraudulent Transfer Act ("DUFTA").  As discussed above, section 548 of the Bankruptcy Code provides that a transfer is constructively fraudulent when it is made by an insolvent transferor in exchange for "less than a reasonably equivalent value."   11 U.S.C. § 548(a)(1)(A).   Likewise, DUFTA states that a constructive fraudulent transfer occurs when the debtor is insolvent and does not receive "reasonably equivalent value in exchange for the transfer."  Del. Code Ann. tit. 6 § 1304(a)(2). The Sinclair Defendants acknowledge that the meaning of "reasonably equivalent value" is the same under DUFTA and the Bankruptcy Code.  *See* MTD ¶ 75 n.125; *see In PHP Healthcare Corp.*, 128 F. App'x 839, 847 (3d Cir. 2005) (fraudulent transfer provisions of DUFTA "are substantially the same as the relevant parts of the Bankruptcy Code"); *In re F-Squared Investment Mgmt., LLC*, 633 B.R. 663, 670 n.48 (Bankr. D. Del. 2021) (same).

Most federal courts construing reasonably equivalent value under section 548 apply a totality-of-the-circumstances test, taking into account factors including "the good faith of the parties, the difference between the amount paid and the market value, and whether the transaction was at arm[']s length." *In re Charys Holding Co., Inc.*, 443 B.R. at 637; *see also Kingsville Dodge, LLC* v. *Almy*, 2007 WL 2332699, at *2 (D. Md. July 30, 2007).  This is a fact-dependent inquiry and thus is not appropriate for resolution on a motion to dismiss.  *See In re Charys*, 443 B.R. at 638; *In re Green Field Energy Servs., Inc.*, 2015 WL 5146161, at *8.

Applying this approach, most federal courts have rejected the argument urged by the Sinclair Defendants that reasonably equivalent value is per se satisfied for transfers made to satisfy existing contractual obligations.  MTD ¶ 80.  For example, in *In re Solomon*, the court noted that, while Section 548 "states that the securing of antecedent debt constitutes value," it "does *not* say that the securing of antecedent debt constitutes *reasonably equivalent value.*"  300 B.R. 57, 65 (Bankr. N.D. Okla. 2003), *aff'd*, 299 B.R. 626 (B.A.P. 10th Cir. 2003) (emphasis in original).  The court reasoned that "[i]f Congress had wanted any and all securing of antecedent debt to be free from scrutiny under § 548, it could have so provided in the Bankruptcy Code."  *Id.*  Thus, the court found that it was required to "look to all of the facts and circumstances of the particular case," and applying that test concluded that reasonably equivalent value was not present.  *Id.* at 67–68.

In *Dewey & LeBoeuf*, discussed above, the court applied the same totality-of-the-circumstances approach to assess whether the challenged transfers, made pursuant to a preexisting contract, could give rise to a claim under section 548.  *See* 2014 WL 4746209, at *10–11.  The court explained that "[t]he question of reasonably equivalent value is based on the facts and circumstances of each case," including "the good faith of the parties, whether it was an arm's length transaction, and what the debtor actually received."  *Id.* at *10 (internal citations and quotation marks omitted).  The court concluded that a lack of reasonably equivalent value was adequately pleaded, noting that the payments were allegedly "so exorbitant that they could not be justified by the services that [the defendant] performed" and also that the employment contract "was not negotiated at arm's length or consistent with industry practice."  *Id.* at *11.

The court in *In re Plassein International Corp.*, 405 B.R. 402 (Bankr. D. Del. 2009), applied the same approach in analyzing whether payments by the debtor pursuant to a preexisting management services agreement with its private equity owner were for reasonably equivalent

value. The court noted that "reasonably equivalent value" is determined under "the totality of the circumstances," including:

> (1) whether the transaction was at arm's length, (2) whether the transferee acted in good faith, and (3) the degree of difference between the fair market value of the assets transferred and the price paid.

*Id.* at 411–12 (citation and internal quotation marks omitted). (Although *Plassein*'s analysis involved an application of Delaware law, its articulation of the standard for evaluating reasonably equivalent value relied entirely on a Third Circuit case construing federal law, *In re R.M.L., Inc.*, 92 F.3d 139 (3d Cir. 1996), further illustrating that the meaning of reasonably equivalent value is identical under DUFTA and the Bankruptcy Code.)

Other federal courts have similarly rejected the contention that satisfaction of an antecedent obligation is per se reasonably equivalent value. *See, e.g.*, *In re Qimonda Richard, LLC*, 467 B.R. 318, 326 (Bankr. D. Del. 2012) (rejecting argument that challenged transfers were necessarily reasonably equivalent value because they were made to secure antecedent debt, and holding that "the issue of 'reasonably equivalent value' requires a factual determination that cannot be made on a motion to dismiss," including consideration of "factors such as market value, good faith, and whether the transaction was at arms length"); *In re J&M Sales Inc.*, 2022 WL 5265035, at *5 (Bankr. D. Del. Oct. 6, 2022) (noting that a rule that "payments made were in satisfaction of valid antecedent debts . . . therefore constitute reasonably equivalent value as a matter of law" would be incompatible with the "inherently fact driven" totality-of-the-circumstances approach); *In re GTI Cap. Holdings, LLC*, 373 B.R. 671, 676–77 (Bankr. D. Ariz. 2007) (declining to adopt such a per se rule because "a determination of 'reasonably equivalent value' is a factual question to be decided on the facts of each case"); *In re Brooke Corp.*, 469 B.R. 68, 70–71 (D. Kan. 2012) ("The Court does not follow a *per se* rule by which any payment for an antecedent debt constitutes REV [reasonably equivalent value]; rather, the Court must examine the particular facts and compare the

value of the property transferred by the debtor to the amount of the antecedent debt, in order to determine whether REV has been exchanged.").

There is good reason that the great weight of authority rejects the per se rule urged by the Sinclair Defendants.  Such a rule would create perverse incentives by giving parent companies free rein to force their subsidiaries into contracts obligating the subsidiary to make regular payments to the parent, in exchange for no or *de minimis* value, regardless of whether the subsidiary later falls into insolvency.  Under such a rule, so long as the parent can keep the subsidiary from filing for bankruptcy for the two-year lookback period under the Code, such a contract would shield the parent from any claim for constructive fraudulent transfer, regardless of the degree of bad faith involved or the discrepancy between the payments made by the subsidiary and the value, if any, provided in consideration by the parent.

Under these standards, the Complaint more than adequately alleges that Diamond did not receive reasonably equivalent value for the MSA Payments.  It alleges that the MSA fees far exceeded the market value of the services Sinclair provided in return as reflected in the benchmark transactions reviewed by Duff & Phelps.  Compl. ¶¶ 113–16, 134–38; *see also In re Evergreen Energy, Inc.*, 546 B.R. 549, 562 (Bankr. D. Del. 2016) (denying motion to dismiss fraudulent transfer claims based on payments for investment banking services where the complaint "adequately alleges a lack of reasonably equivalent value because the transfers . . . exceeded the market rate for comparable investment banking services"); *In re Exide Techs.*, 299 B.R. 732, 748 (Bankr. D. Del. 2003) (explaining that "market value is an important component" of the totality of the circumstances test).  Additionally, the MSA Payments were not the result of an arm's-length transaction between equals; rather, the contract was drafted unilaterally by Sinclair and was signed by Ripley on behalf of both parties.  *See* Compl. ¶¶ 107–08; *see also In re Louisiana Pellets, Inc.*,

838 F. App'x. 45, 50 (5th Cir. 2020) (explaining that the arm's-length nature of a transaction is relevant to reasonably equivalent value).  Finally, as discussed above, the MSA was imposed on Diamond in bad faith to allow Sinclair to "milk" Diamond of millions of dollars of fees.  Compl. ¶ 106.

None of the three cases the Sinclair Defendants cite requires a different result.  In *Louisiana Pellets*, the court concluded that the plaintiff received reasonably equivalent value for an antecedent debt payment "assuming . . . that the debt itself was based upon value."  838 F. App'x at 50.  The quoted phrase makes clear that the circumstances of the original debt must be examined to assess whether the original transaction "was based upon value," and thus whether transfers in satisfaction of the debt are for reasonably equivalent value.  Consistent with the totality of circumstances approach, the court also noted that whether a transaction was at an arm's length is a "relevant, though not dispositive" factor in assessing reasonably equivalent value.  *Id.*

*Gulf Fleet* and *Duke and King*, are similarly inapposite, and neither adopted the per se rule the Sinclair Defendants claim.  In *Gulf Fleet*, the court granted leave to replead to allow the plaintiff to "allege any additional facts showing that, despite Gulf Fleet's pre-existing contractual obligations, Gulf Fleet did not receive reasonably equivalent value for the payments."  491 B.R. at 766, 768.  The *Gulf Fleet* court would not have granted leave to replead if it had concluded, as the Sinclair Defendants contend, that a payment in satisfaction of a contract is per se reasonably equivalent value.

Similarly, the court in *Duke and King* emphasized the pleading deficiencies of the complaint in that case, concluding that the allegations of reasonably equivalent value said "nothing concrete as to a lack of reasonably equivalent value, in the absolute or even in the comparative."  508 B.R. at 141.  The court concluded that a challenged payment made in accordance with

preexisting debt was not voidable on the ground that the transaction involved "no allegation of fraud . . . or collusion" and thus that the "contracted debt . . . is to be recognized as a bargained exchange of equivalents." *Id.* at 147. That statement—making clear that "reasonably equivalent value" depends on the specific facts and circumstances of the challenged transfer—is squarely inconsistent with the Sinclair Defendants' reading of the case.[14]

## IV. DIAMOND'S FRAUDULENT TRANSFER CLAIMS ARE TIMELY (COUNTS I–III, V–VII, AND IX–XI).

The Sinclair Defendants argue that many of Diamond's avoidance claims under section 548 are time-barred under the Code's two-year lookback period. MTD ¶ 16. They acknowledge that, in view of the tolling agreement that Diamond and Sinclair entered into on October 20, 2022, Diamond's claims under section 548 (Counts I–III and V–VII) that arise on or after October 20, 2020, are timely. Bally's similarly argues that Diamond's claims relating to the Bally's Transaction (Counts IX, X, and XI) are time barred to the extent they arise under section 548. Bally's Motion at 3–4.[15]

Defendants do not dispute that Diamond's claims to avoid the challenged transfers under state law are timely. In addition to section 548, all of Diamond's fraudulent transfer claims are asserted under section 544(b), the Maryland Uniform Fraudulent Conveyance Act (MUFCA), and/or the Delaware Uniform Fraudulent Transfer Act. Section 544(b) "permits the trustee to use applicable state law to avoid transfers of a debtor's interest in property and to obtain a longer lookback period than the two-year period that applies under § 548 of the Bankruptcy Code." *In re*

---

[14]   To the extent that any language in *Duke & King* can be read to adopt a per se rule that transfers in satisfaction of a preexisting contractual obligation are invariably made for reasonably equivalent value, Diamond respectfully submits that it is contrary to the weight of authority cited above and should not be followed.

[15]   Diamond does not dispute that its claims against the Sinclair Defendants are time-barred to the extent they arise under section 548 and seek to avoid transactions before October 20, 2020. Nor does Diamond dispute that its claims against Bally's under section 548 are time-barred.

*Pfeifer*, 2013 WL 3828509, at *2 (Bankr. S.D.N.Y. July 23, 2013); *see also In re O.P.M. Leasing Services, Inc.,* 28 B.R. 740, 759 (Bankr. S.D.N.Y. 1983) (same).  Maryland employs a three-year lookback period, making all claims arising on or after October 20, 2019 (three years before the Tolling Date) timely.  *See In re Laurie*, 2008 WL 886121, *5 n.3 (Bankr. D. Md. Mar. 28, 2008) ("[T]he 'look back' period under Maryland law is effectively three years[.]").  All of Diamond's fraudulent transfer claims are also timely under Delaware's four-year lookback period.  *See In re FAH Liquidating Corp.*, 572 B.R. 117, 129 (Bankr. D. Del. 2017); *In re OpenPeak, Inc.*, 2020 WL 7360482, *30 (Bankr. D.N.J. Dec. 14, 2020).  Accordingly, all of Diamond's state-law fraudulent transfer claims are timely under section 544(b).

## V.   THE COMPLAINT STATES CLAIMS FOR BREACH OF FIDUCIARY DUTY (COUNTS XVI, XVII, AND XVIII).

There is no merit to the Sinclair Defendants' arguments for dismissing Diamond's claims for breach of fiduciary duty.  *First*, the fiduciary duty waivers in the DSG LLC Agreement as amended on May 1, 2022 (the "2022 DSG LLC Agreement"), MTD Ex. 3, and the DSH LLC Agreement as amended on August 23, 2019 (the "DSH LLC Agreement"), MTD Ex. 5, do not preclude Diamond's claims.  *Second*, under settled Delaware law, SBG, as DSG's indirect controlling shareholder, likewise owed DSG fiduciary duties when DSG was insolvent.  *Third*, because the SBG and the individual Sinclair Defendants each owed DSG fiduciary duties, they are liable for aiding and abetting each other's breaches of those duties.

### A.   Diamond's Fiduciary Duty Claims Are Not Waived (Counts XVI, XVII, and XVIII).

The Sinclair Defendants' reliance on the fiduciary duty waivers in the 2022 DSG LLC Agreement and the DSH LLC Agreement is misplaced.  Diamond's claims arose before the 2022 DSG LLC Agreement was entered into, and the agreement by its terms is not retroactive.  Sinclair's

reliance on the DSH LLC Agreement is likewise far afield; that agreement governs DSH, and DSG is neither a party to that agreement nor bound by it.

> 1.  **The 2022 DSG LLC Agreement Does Not Retroactively Waive the Sinclair Defendants' Fiduciary Duties to DSG for the Challenged Transactions.**

The Sinclair Defendants argue that Diamond's claims for breach of fiduciary duty are barred by a provision in the 2022 DSG LLC Agreement that "eliminated" fiduciary duties owed to DSG.  MTD ¶¶ 130–41.  The Sinclair Defendants do not dispute that Diamond's claims for breach of fiduciary duty arose before that date, and that the prior DSG LLC Agreement entered into on July 18, 2019 (the "2019 DSG LLC Agreement"), MTD Ex. 2, did not waive fiduciary duties.  They argue, however, that the 2022 DSG LLC Agreement *retroactively* acts to bar Diamond's claims.  MTD ¶ 135.  Their argument is counterintuitive and contrary to the express language and stated purpose of the 2022 DSG LLC Agreement itself and Delaware law.

Under Delaware law, "in the absence of a contrary provision in the LLC agreement, LLC managers and members owe traditional fiduciary duties of loyalty and care to each other and to the company."  *Kelly* v. *Blum*, 2010 WL 629850, at *10 (Del. Ch. Feb. 24, 2010) (citation and internal quotation marks omitted).  Thus, "the intention of the parties to the agreement that fiduciary duties apply to managers is implied where that agreement does not provide otherwise." *CelestialRX Invs., LLC* v. *Krivulka*, 2017 WL 416990, at *16 (Del. Ch. Jan. 31, 2017).

The Delaware courts have "consistently found that removal of [the] default fiduciary duties from an LLC agreement must be **clear** and **unambiguous**."  *Id.*; *see also Feeley* v. *NHAOCG, LLC*, 62 A.3d 649, 664 (Del. Ch. 2012) ("Drafters of an LLC agreement must make their intent to eliminate fiduciary duties plain and unambiguous."); *Bay Ctr. Apartments Owner, LLC* v. *Emery Bay PKI, LLC*, 2009 WL 1124451, at *9 (Del. Ch. Apr. 20, 2009) ("the interpretative scales . . .

tip in favor of preserving fiduciary duties under the rule that the drafters of chartering documents must make their intent to eliminate fiduciary duties plain and unambiguous").

Delaware law likewise construes contractual provisions to apply only prospectively unless the contract explicitly provides otherwise.  Thus, "[w]here there is not an earlier effective date and the intent to make an agreement retroactive is not clear on the face of the contract, courts decline to hold modifications retroactive."  *AgroFresh Inc.* v. *MirTech, Inc.*, 257 F. Supp. 3d 643, 661 (D. Del. 2017); *accord Akhenaten* v. *Najee, LLC*, 2010 WL 305309, at *2 (S.D.N.Y. Jan. 26, 2010).

The decision in *Kapila* v. *Lewis*, 2020 WL 4041082 (M.D. Fla. July 17, 2020), applying Delaware law, is on point.  There, the court rejected an argument, akin to the argument the Sinclair Defendants urge here, that a revised provision of an LLC agreement eliminating fiduciary duties applied retroactively.  The court explained that "[b]ecause the [new waiver provision] contains no suggestion of retroactive application, [it] does not . . . eliminate a breach of fiduciary duty occurring before the revision."  *Id.* at *5.  The Sinclair Defendants cite no cases to the contrary.

The Sinclair Defendants identify no statement in the 2022 DSG LLC Agreement providing that the elimination of fiduciary duties should apply retroactively—much less one that is "clear," "plain," and "unambiguous."  The agreement nowhere uses the term "retroactive" or any synonym. Nor does it identify an "effective date" earlier than May 1, 2022.

On the contrary, the 2022 DSG LLC Agreement states plainly that it applies only after the date of execution.  The very first words of the agreement read as follows:

> THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") of Diamond Sports Group, LLC, a Delaware limited liability company (the "Company") is made and entered into between the Company and Diamond Sports Intermediate Holdings LLC, as its sole member, *as of May 1, 2022*.

> WHEREAS, this Agreement sets forth the terms and conditions governing the operation of Diamond Sports Group, LLC *after the date hereof*.

*See* MTD Ex. 3 at 1.  This language is unambiguous: the 2022 DSG LLC Agreement was intended to apply "as of May 1, 2022"—not as of any earlier date.  Any possible ambiguity is resolved by the clause that immediately follows, which explains that the agreement governs the operation of DSG "after the date hereof."  *Id.*  The drafters could not have been more clear that the 2022 DSG LLC Agreement was not intended to apply retroactively.

The language in these recitals is critical context to understand the intent of the Agreement.  *See Creel* v. *Ecolab, Inc.*, 2018 WL 5778130, at *4 (Del. Ch. Oct. 31, 2018) (noting that recitals "can be useful to explain the meaning of other terms" of a contract (internal quotation marks omitted)).  As one court explained,

> recitals can establish the background of a contract, that is, the purposes and the motives of the parties.  They also may have a material influence in construing the contract and determining the intent of the parties, for if an operative section of a contract is ambiguous, the recitals govern the construction.

*United States* v. *Cmty Health Sys., Inc.*, 666 F. App'x 410, 417 (6th Cir. 2016) (citation and internal quotation marks omitted).

The background to the 2022 DSG LLC Agreement makes clear why the drafters would have chosen not to make the agreement (including the provision eliminating fiduciary duties) retroactive.  As the Complaint alleges, in May 2022—the date as of which the 2022 Amendment was made—"Diamond's governance structure was overhauled" in connection with a new $635 million financing provided by Diamond's lenders to transfer management control of DSG from Sinclair to creditor-appointed board members.  Compl. ¶¶ 244–45.  Accordingly, DSG's prior managers—consisting of one Sinclair executive and two unaffiliated directors who could be removed at Sinclair's insistence—were replaced by a new, independent Board with a majority of independent directors appointed by DSG's creditors and removable only by that group.  *Id.*  Under those circumstances, it was entirely reasonable for the creditor group and the directors it appointed

to start from scratch, and that they would have had no interest in retroactively waiving claims against Sinclair or the prior, Sinclair-controlled managers and officers.

The contractual language on which Sinclair relies does not evidence an intent that the waiver of fiduciary duties (or the rest of the agreement) apply retroactively—and certainly does not do so in the "clear" and "unambiguous" way Delaware law requires.  The Sinclair Defendants point to language in the 2022 DSG LLC Agreement that fiduciary duties are eliminated "to the fullest extent permitted under the [Delaware LLC] Act and any other applicable law."  MTD ¶¶ 134–36.  But to "eliminate" a duty, as a matter of plain English, means to abolish it; it does not entail releasing previously accrued claims.  The Sinclair Defendants do not point to anything in the Agreement releasing existing claims, and there is nothing.  *See Kapila*, 2020 WL 4041082, at *5 (concluding that provision eliminating duties "to the maximum extent" permitted by law "contains no suggestion on the face of the contract to eliminate retroactively a fiduciary duty").

The other snippets from the agreement that the Sinclair Defendants cite likewise show no clear intent that the agreement should apply retroactively.  Sinclair contends that the definition of "Covered Persons" in the 2022 DSG LLC Agreement indicates an intent to apply the waiver provision retroactively because it includes "former" as well as current members or managers of DSG.  MTD ¶ 136.  But this definition does not modify the meaning or scope of the fiduciary duty provision, let alone do so "clearly" and "unambiguously."  On the contrary, it merely confirms, consistent with the stated purpose of the Agreement, that former members or managers do not have any ongoing obligations of any kind after Agreement was executed.

Finally, Sinclair purports to glean retroactive intent from the fact that the agreement is entitled an "Amended and Restated" LLC Agreement.  MTD ¶ 137.  But that title says nothing about retroactive application.  It merely makes clear that the 2022 DSG LLC Agreement

supersedes the 2019 DSG LLC Agreement in its entirety.  The title cannot be construed to require retroactive application absent any language to that effect in the agreement itself and in view of the explicit language that it was "as of" May 1, 2022, and applied "after the date hereof."

The Sinclair Defendants' reliance on *Clingman & Hanger Management Associates, LLC* v. *Rieck*, 2023 WL 2744399 (S.D. Tex. Mar. 30, 2023), is misplaced.  Nothing in the LLC agreement at issue in that case stated explicitly that it was intended to govern the LLC's operations "after the date hereof."  While the court in that case relied on a provision in the agreement that it "amended and restated" the "Previous Agreement," there is no similar reference in the 2022 DSG LLC Agreement to the prior LLC agreement.  The Sinclair Defendants' reliance on *Clingman* for their argument that DSG cannot "bring claims that arose under the superseded [2019 DSG LLC Agreement]," MTD ¶ 134, misconstrues the nature of DSG's claims.  DSG's claims for breach of fiduciary duty do not arise under the 2019 DSG LLC Agreement, but under the common law rule that members and officers owe fiduciary duties to LLC unless such duties are abolished by contract.  *Kelly*, 2010 WL 629850, at *10.  Finally, Sinclair's reliance on *Clingman* in support of its argument that a retroactive intent can be inferred from the provision in the 2022 DSG LLC Agreement that fiduciary duties are eliminated "to the fullest extent permitted under the [Delaware LLC] Act and any other applicable law" is misplaced.  MTD ¶¶ 134–36.  The sole support cited in *Clingman* on this point is that the plaintiff there "conceded" at oral argument that "Delaware law . . . allows an LLC to ***release*** its officers from past breaches of fiduciary duty."  2023 WL 2744399, at *14.  But, as discussed above, the 2022 DSG LLC Agreement does not purport to release any claims against the Sinclair Defendants or anyone else.[16]

---

[16]  The *Clingman* court acknowledged the lack of "controlling authority from the Delaware Supreme Court that resolves the retroactive effect of the exculpatory clause here at issue." 2023 WL 2744399, at *14.  To the extent that *Clingman* could be interpreted to call for retroactive application of the fiduciary duty waiver in the 2022 DSG

### 2. The DSH LLC Agreement Does Not Bar Liability for the Sinclair Defendants' Conduct as Fiduciaries of DSG.

The Sinclair Defendants argue in the alternative that Diamond's claims for breach of fiduciary duty are barred by the waiver of fiduciary duties in the LLC Agreement for a different entity, DSH.  MTD ¶¶ 142–48.  DSG is not a party to the DSH LLC Agreement and the agreement imposes no obligations on DSG.  The Sinclair Defendants contend, however, that the waiver in the DSH Agreement applies to DSG in reliance on a provision in Delaware Code Section 18-1101(c) that an LLC agreement may waive fiduciary duties to "another person that is a party to or is otherwise bound" by the agreement, and the provision in the DSH LLC Agreement waiving fiduciary duties to any "Person bound by this agreement."  MTD ¶¶ 142–48; MTD Ex. 5 § 6.2(a). The Sinclair Defendants' argument fails for multiple reasons.

*First*, the reference to "duties (including fiduciary duties)" in Section 6.2(a) of the DSH LLC Agreement logically refers to duties owed to *DSH* and its members, and not duties owed to downstream entities, such as subsidiaries, by officers or managers of those downstream entities. MTD Ex. 5 § 6.2(a).  Had the drafters of the DSH Agreement intended to waive duties owed to DSG or any direct or indirect subsidiaries of DSH, they easily could have said that.  Their silence on this point cannot be considered unintentional.

That conclusion is particularly compelling in view of the absence of any provision eliminating fiduciary duties in the 2019 DSG LLC Agreement, entered into only a month earlier. The decision to eliminate fiduciary duties in the 2022 DSG LLC Agreement further evidences that the DSH LLC Agreement did not eliminate such duties as to DSG.  Had the parties understood the

---

LLC Agreement here, Diamond respectfully submits that, for the reasons given in the text, it misconstrues Delaware law and should not be followed.  Alternatively, the Court may wish to certify the retroactivity question to the Delaware Supreme Court under Del. R. Sup. Ct. 41(a)(ii).

DSH LLC Agreement to eliminate such duties as to DSG, there would have been no need to add such a provision to the 2022 DSG LLC Agreement.

*Second*, contrary to Sinclair's argument, DSG was not "bound by" the DSH LLC Agreement.  Sinclair acknowledges, as it must, that DSG was not a party to and did not otherwise sign or execute the DSH LLC Agreement.  *See* MTD ¶¶ 142–48; MTD Ex. 5 at Ex. A (listing parties); MTD Ex. 5 at 1 (stating that the DSH LLC Agreement was "made and entered into by and among the Persons . . . listed on . . . Exhibit A").  Indeed, the term "Diamond Sports Group" appears in the DSH LLC Agreement only in a recital paragraph explaining that the Agreement was executed concurrently with DSG's acquisition of the RSNs from Disney and Fox.  *See* MTD Ex. 5 at 1.  Nothing in that recital purports to bind DSG.

DSG is not "bound by" the DSH LLC Agreement under basic principles of contract law.  "As a general matter, only parties to a contract are bound by that contract."  *Seaport Vill. Ltd* v. *Seaport Vill. Operating Co., LLC*, 2014 WL 4782817, at *2 (Del. Ch. Sept. 24, 2014) (citation and internal quotation marks omitted).  A non-party may only be "bound by" a contract under certain exceptions, none of which are present here, including incorporation by reference;[17] assumption;[18]

---

[17]   Incorporation by reference occurs when the non-signatory enters into a separate contractual agreement that incorporates the other agreement.  *See Thomson-CF, SA* v. *Am. Arb. Ass'n*, 64 F.3d 773, 777 (2d Cir. 1995).  DSG has not entered into any contractual agreement incorporating the DSH LLC Agreement.

[18]   A party may be bound by an agreement if its subsequent conduct indicates that it is assuming obligations under the agreement.  *See id.*  DSG has not indicated through its conduct any intent to assume the terms and obligations of the DSH LLC Agreement, and certainly not its fiduciary duty waiver.

agency;[19] veil piercing/alter ego;[20] third-party beneficiary; and equitable estoppel.[21]  *See Buzzfeed, Inc.* v. *Anderson*, 2022 WL 15627216, at *8 (Del. Ch. Oct. 28, 2022) (naming circumstances under which a non-party may be "bound by" an arbitration agreement); *Fla. Chem. Co., LLC* v. *Flotek Indus., Inc.*, 262 A.3d 1066, 1090 (Del. Ch. 2021) (explaining that a non-party may be bound by a forum selection clause if it "has a sufficiently close relationship to the agreement, either as an intended third-party beneficiary under the agreement or under principles of estoppel").  Each of these exceptions requires assent by the non-party to the terms of the agreement or a benefit received by the non-party from the agreement.  But DSG did not assent and received no benefit from the DSH LLC Agreement.

The Sinclair Defendants argue that DSG is nevertheless "bound by" the DSH LLC Agreement because that Agreement provides that the business of DSH "and its subsidiaries" will be managed by a board of managers.  MTD ¶ 143.  But the Sinclair Defendants cite no authority for the proposition that a nonparty is "bound" by a contract merely because the agreement affects the nonparty in some way.

*Third*, the DSH LLC Agreement by its terms makes clear that DSG is not bound by that agreement.  The agreement itself identifies those who are "bound" by it—namely, the members listed on Exhibit A to the Agreement and any other party that "evidence[s]" its assent to be bound

---

[19]   In the analogous context of arbitration agreements, "traditional principles of agency law may bind a non-signatory to an arbitration agreement in circumstances that evidence the agent's intention to be bound."  *Buzzfeed*, 2022 WL 15627216, at *9.  There are no circumstances suggesting that DSG granted DSH the authority to bind DSG to the DSH LLC Agreement, so this exception does not apply.  *See id.*

[20]   DSH cannot "pierce" DSG's corporate veil to force DSG to be bound by the terms of the DSH LLC Agreement.  Veil piercing is only warranted "where a parent dominates and controls a subsidiary."  *Thomson*, 64 F.3d at 777.  DSG does not "dominate" DSH—rather, the opposite is true, as argued elsewhere in this brief—so DSH cannot pierce DSG's veil.

[21]   The third-party beneficiary and estoppel exceptions apply only when a non-signatory directly benefits from the agreement.  *See Fla. Chem. Co.*, 262 A.3d at 1090 n.5 (third-party beneficiary agreement); *Buzzfeed*, 2022 WL 15627216, at *11 (estoppel).  Sinclair has not pointed to any facts in the record suggesting that DSG received "benefits" from the DSH LLC Agreement.

by executing the agreement or "another instrument."  MTD Ex. 5 § 1.1.  DSG did not execute the DSH LLC Agreement, and the Sinclair Defendants cite no "other instrument" executed by DSG that evidences its intent to be bound by it.  Likewise, Section 11.2 of the DSH LLC Agreement, titled "Binding Effect," similarly states that the Agreement "***shall be binding upon*** and inure to the benefit of the Members, and their respective heirs, legatees, legal representatives and permitted successors, transferees and assigns."  MTD Ex. 5 § 11.2.  DSG is none of those things.

Section 6.1 of the DSH LLC Agreement further demonstrates that DSG is not bound by that Agreement.  It provides that "[n]o Member, Manager, or Officer" of DSH "shall have the actual or apparent authority to cause the LLC or any of its Subsidiaries to become bound to any contract, agreement or obligation."  MTD Ex. 5 § 6.1(a)(iv).  As this provision makes clear, the parties to the DSH LLC Agreement had no authority to bind DSG to any contract, agreement, or obligation, and thus that they did not purport to bind DSG to that Agreement.

**B.     SBG Owed DSG Fiduciary Duties at the Time of the Challenged Transactions (Count XVII).**

Sinclair next argues for dismissal of Diamond's fiduciary-duty claim against SBG on the ground that SBG did not owe any fiduciary duties to DSG even when DSG was insolvent. *See* MTD ¶¶ 149–52.  This argument is contrary to Delaware law as construed by the Fifth Circuit, the Bankruptcy Court in Delaware, and other courts.

As the Fifth Circuit has held, a corporate "parent owes fiduciary duties to a subsidiary when that subsidiary is insolvent." *U.S. Bank Nat'l Ass'n* v. *Verizon Comms., Inc.*, 761 F.3d 409, 438 (5th Cir. 2014).  Federal and state courts in Texas interpreting Delaware law have agreed.  *See Raytheon Co.* v. *Boccard USA Corp.*, 369 S.W.3d 626, 634 (Tex. App. 2012); *see also Superior Offshore Int'l, Inc.* v. *Shaefer*, 2012 WL 5879608, at *3 (S.D. Tex. Nov. 20, 2012) (citing *Raytheon* for the same rule).  So have other courts.  As the bankruptcy court in Delaware has stated, "under

Delaware law, a parent is found to owe fiduciary duties to its subsidiary in the context of a subsidiary's insolvency." *In re Maxus Energy Corp.*, 571 B.R. 650, 659 (Bankr. D. Del. 2017); *see also In re Tronox Inc.*, 450 B.R. 432, 438 (Bankr. S.D.N.Y. 2011) (under Delaware law, "a parent owes fiduciary duties to a subsidiary when that subsidiary is insolvent").

Against this authority, Sinclair cites two cases stating an opposite understanding of Delaware law, but those cases are inapplicable and in any event should not be followed. *ASARCO LLC* v. *Americas Mining Corp.*, 396 B.R. 278 (S.D. Tex. 2008), which Sinclair cites for the proposition that a parent corporation does not owe a fiduciary duty to an insolvent subsidiary, MTD ¶ 150, addresses *New Jersey* law, not *Delaware* law. The other case on which the Sinclair Defendants rely, *In re Essar Steel Minn. LLC*, 602 B.R. 600 (Bankr. D. Del. 2019), cites *ASARCO* in support of its holding. Both cases fail to grapple with the extensive authority cited above providing that a parent owes fiduciary duties to an insolvent subsidiary.

Moreover, the rationale of those two decisions is dubious. Their holdings appear to be premised on avoiding the creation of a "new" duty upon the insolvency of a subsidiary. *See ASARCO*, 396 B.R. at 415 ("[T]o recognize the urged exception, the Court would have to find that a new duty is *created* by the subsidiary's insolvency."); *Essar Steel*, 602 B.R. at 608. But the duty of a parent to a subsidiary in those circumstances is no different from the duty Delaware law imposes on the subsidiary's directors and officers. In each case, when the subsidiary is insolvent, fiduciary duties are owed to the subsidiary, and "creditors of the subsidiary have standing to enforce such duties." *Tronox*, 450 B.R. at 438–39; *N. Am. Catholic Educ. Programming Found., Inc.* v. *Gheewalla*, 930 A.2d 92, 101–02 (Del. 2007) (cited in *U.S. Bank*, 761 F.3d at 438).

The Sinclair Defendants assert that a parent's duties to its subsidiary are somehow lessened when the subsidiary is "indirect." *See* MTD ¶¶ 149, 151. They cite no Delaware precedent in

support of that argument.  On the contrary, courts have held that fiduciary duties apply "even if the controller participated in the transaction through intervening entities" such as an intermediate holding company.  *In re Ezcorp Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *9 (Del. Ch. Jan. 25, 2016).  Sinclair cites *In re HH Liquidation, LLC*, 590 B.R. 211, 271 (Bankr. D. Del. 2018), in a footnote for the uncontroversial rule that parent companies do not owe fiduciary duties to their *solvent* subsidiaries, whether direct or indirect.  MTD ¶ 151 n.321.  But that statement in no way implies that fiduciary duties of a controlling entity to an insolvent indirect subsidiary are weaker than its duties to an insolvent direct subsidiary.

Finally, SBG owed DSG fiduciary duties for another, independent reason:  SBG did not "wholly own" DSG because the Diamond and the defendant holding companies had a minority shareholder, Byron Allen.  Compl. ¶ 45.  Under Delaware law, a controlling parent company always owes fiduciary duties to a subsidiary that has minority shareholders.  *See Sinclair Oil Corp.* v. *Levien*, 280 A.2d 717, 720 (Del. 1971).  "[I]t is well established under Delaware law that the duties owed to a subsidiary with minority shareholders run directly to the subsidiary itself."  *In re Tronox*, 450 B.R. at 438; *see also Roselink Investors, LLC* v. *Shenkman*, 386 F. Supp. 2d. 209, 218 n.3 (S.D.N.Y. 2004).  Byron Allen's equity interest in DSIH-A diluted SBG's ownership stake in DSIH-A and each of the entities below it in the corporate chain, including DSG, such that SBG did not wholly own DSG.  Compl. ¶ 45.  The small size of Byron Allen's ownership stake in DSG is of no consequence.  Indeed, in *Sinclair Oil*, the controlling parent was found to owe fiduciary duties to its subsidiary when the parent owned all but 3% of the subsidiary's stock.  280 A.2d at 719.  Because Diamond had a minority shareholder, Byron Allen, and SBG did not wholly own DSG, SBG owed fiduciary duties directly to DSG, as its controlling shareholder, at all times.

### C.    The Complaint States a Claim Against the Sinclair Defendants for Aiding and Abetting Breaches of Fiduciary Duties (Count XVIII).

Because SBG and each of the individual Sinclair Defendants owed fiduciary duties to Diamond and those duties were not waived, Diamond's claim against them for aiding and abetting breach of fiduciary duty (Count XVIII) survives as well.  The Complaint's aiding-and-abetting claim against SBG also survives for the independent reason that SBG is alleged to have knowingly participated in the individual Sinclair Defendants' breaches of their duties to DSG (and the Sinclair Defendants do not argue otherwise).  Indeed, the court in *ASARCO*, in concluding that a controlling corporate parent has no fiduciary duty to its subsidiary under New Jersey law, reasoned that it was "not necessary" to impose such a duty on parents of an insolvent subsidiary because "the applicable law recognizes a claim against a parent corporation for aiding and abetting a subsidiary's directors' breach[es] of fiduciary duty."  *ASARCO*, 396 B.R. at 415–16.

## VI.    DIAMOND SUFFICIENTLY PLEADS ITS ALTER EGO CLAIMS (COUNT XIX).

The Sinclair Defendants argue that the Complaint fails to allege facts to support an alter ego theory of liability against DSIH, DSIH-A, DSH, and TopCo (together, the "Companies").  This argument ignores the allegations of the Complaint and should be rejected.

Under Delaware law, "to state a claim for piercing the corporate veil under an alter ego theory, [the plaintiff] must show (1) that the corporation and its shareholders operated as a single economic entity, and (2) that an overall element of injustice or unfairness is present." *Trevino* v. *Merscorp, Inc.*, 583 F. Supp. 2d 521, 528 (D. Del. 2008).  Thus, the complaint must allege (1) Sinclair's dominion and control and (2) unfairness and injustice.  *In re Maxus Energy Corp,*, 641 B.R. 467, 551 (Bankr. D. Del. 2022).  "The nature and extent of the dominion and control exercised by the [parent] over the [s]ubsidiaries is a question of fact, not subject to resolution on a motion to dismiss." *Blair* v. *Infineon Techs. AG*, 720 F. Supp. 2d 462, 473 (D. Del. 2010).

The Sinclair Defendants argue that Diamond must independently pierce the veil of each parent-subsidiary pairing to reach SBG.  MTD ¶¶ 159, 162.  Courts have repeatedly rejected such a "sequential veil piercing" requirement, and for good reason.  *See Maxus Energy*, 641 B.R. at 556–58 (collecting cases).  As the court explained in *Maxus Energy*, such a requirement:

> does not account for the reality that corporate separateness may be ignored in many scenarios.  For example, all the entities could have acted as a whole (in a collective corporate-pot) or a grandparent-corporation could reach directly to the grandchild-corporation without regard to its corporate parent. . . .  "To hold the party actually responsible" is the key phrase – not the sequential parent – but *the party actually responsible*.

*Id*. at 557.

In any event, under either standard, the Complaint alleges specific facts to state an alter ego claim.  *See* Compl. ¶¶ 44–52; 169–71.  It plausibly alleges that (1) Sinclair dominated and controlled the Companies, and (2) it exploited its control to unfairly and unjustly loot DSG and injure its creditors for its own benefit.

### A.     The Complaint Plausibly Alleges That Sinclair Exercised Dominion and Control over the Companies.

Sinclair's exercise of dominion and control over DSG and each of the Companies can scarcely be disputed.  Ripley, the CEO of both Sinclair and Diamond, acknowledged that Sinclair "controlled Diamond via employees of [Sinclair] being on the board of Diamond."  Compl. ¶ 47.  Smith, the Executive Chairman of Sinclair, testified that he:

> viewed Diamond as essentially really nothing more than another television station that we owned . . .  I view Diamond as essentially one and the same as Sinclair, even though I know technically as a matter this is a subsidiary of some sort.  But the fact of the matter is I treated it like it's mine.

Compl. ¶¶ 55–56.  Sinclair appointed three of its senior officers—Ripley, Rutishauser, and Smith—to sit on the Boards of Managers for both DSIH-A and DSH, which controlled the sole member of DSG, DSIH, and thereby controlled DSG itself.  Compl. ¶¶ 46–51, 376.  None of the

Companies had any material assets other than the equity of the other entities in the chain of ownership between SBG and DSG.  Compl. ¶¶ 26, 380; *see also* Compl. ¶¶ 44–59 (providing additional details about Sinclair's control of DSG and the Companies).

In the analysis of dominion and control, courts consider various factors, none of which is dispositive, exclusive, or required: "(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder." *Maxus Energy*, 641 B.R. at 551 (quoting *EBG Holdings LLC* v. *Vredezicht's Gravenhage 109 B.V.*, 2008 WL 4057745, at *12 (Del. Ch. Sept. 2, 2008)); *see also Trevino*, 583 F. Supp. 2d at 528–29 (same, and adding the "absence of corporate records" as a factor).  These factors further establish Sinclair's dominion and control here:

**Insolvency.**  "[M]aking payments 'at a time when a corporation is insolvent favors piercing the corporate veil.'" *Compagnie des Grands Hotels d'Afrique S.A.* v. *Starwood Cap. Grp. Glob. I LLC*, 2019 WL 148454, at *4 (D. Del. Jan. 9, 2019) (citations omitted); *see Maxus Energy*, 641 B.R. at 551–53; *Mason* v. *Network of Wilmington, Inc.*, 2005 WL 1653954, at *3 (Del. Ch. July 1, 2005).  Sinclair does not dispute that the Complaint adequately alleges DSG's insolvency.  *See* MTD ¶ 169; Compl. ¶¶ 84–103. In any case, factual disputes about solvency cannot be resolved on a motion to dismiss.  *See Blair,* 720 F. Supp. 2d at 473.  Nor does Sinclair dispute that the Companies were just shell entities with no material assets other than their equity interest in the companies beneath them, all of which were dependent for their value on the solvency of DSG.  *See* MTD ¶ 169; Compl. ¶ 26.

**Failure to Observe Corporate Formalities.** The Complaint alleges in detail that Sinclair failed to observe corporate formalities. As discussed above, the Companies had no independent management. In circumstances similar to those here, the *Starwood* court held that the complaint adequately alleged a failure to observe corporate formalities where it alleged "not only that Starman often responded for Woodman on issues arising under the Management Agreement, but also that 'Starman's management was Woodman's management.'" 2019 WL 148454, at *4.

The allegations in the Complaint that numerous Diamond employees did work solely for Sinclair, and that Sinclair did not reimburse Diamond for the costs of employing them, further show the absence of appropriate corporate formalities. *See* Compl. ¶¶ 235–39. In *Maxus Energy*, the court held that evidence of similar disregard of the subsidiary's separate existence presented a factual issue that could not be resolved on summary judgment. 641 B.R. at 552. In particular, the court noted evidence that "intercompany payables and receivables were not recorded or respected, such as Maxus personnel providing services to Repsol entities without Maxus being compensated or adequately compensated, missing services agreements . . . and deficient invoicing." *Id*.

The Companies also failed to maintain corporate records. To the extent Diamond and the intermediate holding companies ever held any board meetings, they were merely informal discussions that occurred during Sinclair board meetings, and no records were maintained of most if not all of the few meetings that did occur. Compl. ¶¶ 53–54, 377. In analogous circumstances, the court in *United States* v. *Pisani* affirmed an alter ego finding where the defendant "kept no corporate minute books and observed no corporate formalities." 646 F.2d 83, 85, 88–89 (3d Cir. 1981). The court in *In re Autobacs Strauss, Inc.*, likewise weighed the facts that "no meetings were called" and "no minutes kept" in the plaintiffs' favor on a motion to dismiss an alter ego claim. 473 B.R. at 556–57.

71

The Sinclair Defendants attempt to dismiss the significance of the lack of corporate records by asserting that DSG and the Companies, as LLCs, were not required to hold board meetings or observe other corporate formalities.  MTD ¶¶ 165–67.  But the cases the Sinclair Defendants cite for that proposition are inapposite.  In *In re BH S & B Holdings LLC*, the court noted that the absence of board meetings on the part of the debtor entity was readily explained by the fact that it was in existence for only a few months.  420 B.R. 112, 140 (Bankr. S.D.N.Y. 2009).  No similar facts explain the absence of corporate records or Board meetings in the multi-year period here.

The facts in *In re Opus East, LLC*, 528 B.R. 30 (Bankr. D. Del. 2015) (subsequent history omitted), likewise differ dramatically from those here.  In that case, the debtor was "operated in a decentralized fashion," with "its own management, financing, and financial-reporting department." *Id.* at 60.  "All the Debtor's employees" in *Opus East* "worked in the Debtor's offices or at its project sites, not in the offices of any other entities."  *Id.* at 61.  The debtor had its own "separate board of directors and had its own officers," "held periodic board meetings at which its affairs were discussed in depth, and it maintained separate corporate records."  *Id.* at 63.  Minutes of meetings of the debtor's board "were kept in the Debtor's minute book." *Id.* at 62.  Here, by contrast, Diamond operated out of Sinclair's headquarters in Maryland, lacked any of independent management or Board, and was, as Smith testified, operated as "nothing more than another television station that we owned."  Compl. ¶ 44–59.

**Siphoning of Company Funds.**  The allegations that Sinclair "siphon[ed] . . . [Diamond's] funds" further establishes dominion and control.  *Starwood*, 2019 WL 148454, at *4.  In *Starwood*, the court held that the plaintiff had adequately pleaded siphoning where, as here, the defendant "profited from 'payments . . . under an operating agreement which it allegedly entered into with" the allegedly insolvent party."  2019 WL 148454, at *4.

72

The Sinclair Defendants contend that payments under the MSA and the distributions connected to the preferred units "do not support any claim of siphoning of funds" because they were "[p]ayments made pursuant to existing contracts."   MTD ¶ 170.  But that is not what the Complaint alleges.  On the contrary, the Complaint alleges that the fees Diamond paid under the MSA were far above market, and that Diamond was "charged double for services covered under the MSA"; charged for purported "supplementary services" without "*any* documentation establishing that Diamond agreed to these fees"; and "was not involved in reviewing or approving any charges arising out of the MSA at all."  *See* Compl. ¶¶ 153–54.  Thus, these fees were not "legitimate contractually obligated payments."  *Starwood*, 2019 WL 148454 at *4.  Similarly, with respect to the distributions to DSIH that were used to fund the preferred unit distributions, "DSG had no obligation to JPMCFI or anyone else with respect to the preferred units."  Compl. ¶ 168.

Sinclair also argues that Diamond does not allege that the funds of the Companies (DSIH, DSI-A, DSH, and TopCo) were *each* improperly siphoned.  Compl. ¶ 171.  But as noted above, that misstates the law and overstates Diamond's burden.  In any event, the Complaint alleges that the transfers relating to the preferred units were distributed from DSG to DSIH, from DSIH to DSIH-A, and from DSIH-A to DSH, ultimately for the benefit of Sinclair.  Compl. ¶¶ 169–74.

**Functioning as a Façade.**  The Companies "functioned as a facade" for Sinclair, further establishing dominion and control.  *Maxus Energy*, 641 B.R. at 551.  "To plead façade, Plaintiff must show [the parent company] had significant control over [the debtor's] operations and finances."  *Starwood*, 2019 WL 148454, at *5.  Here, as discussed above, the Complaint alleges (and the Sinclair Defendants do not dispute) that Sinclair exercised complete control of the Companies.  Compl. ¶¶ 44–59.  Similarly, in *Blair*, allegations that the parent installed "three of its own officers or board members to officer or board member positions" at the subsidiary,

73

provided "general support services," published "earnings and losses on a consolidated basis," and required the subsidiary to use the parent's facilities and buy the parent's products, and that "employee recruitment was shared" between the parent and subsidiary, "[gave] rise to the inference that the [parent company] defendants created a facade by exercising significant control over the [subsidiary]'s operations [and] finances."  720 F. Supp. 2d at 472.  Likewise in *Maxus Energy*, the court found "sufficient disputed facts to proceed to trial as to whether the overlap of officers and directors made [the plaintiff trust] a facade of [the defendant]."  641 B.R. at 552.

The Sinclair Defendants argue that Diamond cannot satisfy this factor because it had an independent existence and business, citing *Gulf Fleet*, 491 B.R. at 789, and *BH S & B Holdings*, 420 B.R. at 136.  In *Gulf Fleet*, however, the court found that the parties "operated as two distinct types of businesses" because the defendants were "private equity investors with a principal place of business in Miami, Florida," whereas the plaintiff "had operated an offshore transportation business in Louisiana for eight years prior to its purchase by [the parent]."  *Gulf Fleet*, 491 B.R. at 789.  Here, Diamond and Sinclair operated similar businesses out of the same offices and through the same management, and Smith testified that he viewed the companies as "one and the same" and treated Diamond as "another television station that we owned."  Compl. ¶ 55.

*BH S & B Holdings* is equally inapposite.  There, the complaint conceded that the debtor was established for a legitimate business purpose.  *See* 420 B.R. at 136.  Here, by contrast, the Companies were holding companies with no other business of their own.  Compl. ¶ 26.

## B.   The Complaint Adequately Alleges That Sinclair Used the Companies to Commit Unfairness and Injustice.

Diamond also plausibly alleges unfairness and injustice.  To satisfy this factor, Diamond "need not prove that the corporation was created with fraud or unfairness in mind.  It is sufficient

to prove that it was so used." *See Maxus Energy*, 641 B.R. at 551; *see also Martin Hilti Family Tr.* v. *Knoedler Gallery, LLC*, 386 F. Supp. 3d 319, 356 (S.D.N.Y. 2019) (collecting cases).

As alleged in the Complaint, Sinclair used the Companies to facilitate injustice and unfairness to DSG's creditors. Among other things, it used the Companies to siphon cash from DSG for the ultimate purpose of making distributions on account of another entity's preferred units, at a time that DSG was insolvent. Compl. ¶ 7. DSH itself was created and issued the preferred units to secure funding that it otherwise could not obtain, and then imposed the cost of satisfying its obligations on those units on DSG and the Companies. Compl. ¶ 39, 161–68.

Courts have denied motions to dismiss alter ego claims based upon similar allegations. In *Quorum Health Corp.*, the parent company's scheme was allegedly "designed to offload [the parent company's] debt problem onto [the debtor] without regard for [the debtor]'s financial well-being." 2023 WL 2552399, at *15. The court held that these allegations sufficed to support the plaintiff's alter ego theory. *Id.* Likewise, in *Maxus Energy*, the court denied summary judgment on the plaintiff's alter ego claims where the complaint alleged that the plaintiff was forced "to make a loan [to the parent company] for under market-terms" and was treated as an extension of the parent company, "rather than an independent corporation." 641 B.R. at 555.

Sinclair relies on *Mobil Oil Corp.* v. *Linear Films, Inc.*, 718 F. Supp. 260 (D. Del. 1989), for the proposition that the "underlying cause of action does not supply the necessary fraud or injustice" required to sustain an alter ego claim. MTD ¶ 175. But *Mobil* does not stand for that broad proposition. The plaintiff in *Mobil* alleged injustice based on alleged patent infringement. The court explained that although a breach of contract or "any tort—such as patent infringement—is, in some sense, an injustice . . . this type of 'injustice' is not what is contemplated by the common law rule that piercing the corporate veil is appropriate only upon a showing of fraud or something

like fraud." *Id*. at 268.  The court also reasoned that the plaintiff had "an adequate remedy" because the relevant "tangible assets have been and continue to be held" directly by a subsidiary, not by its parent.  *Id*. at 270.  Here, in contrast, Diamond has alleged fraud and injustice in the corporate form, separate from an underlying tort, and Diamond has no adequate remedy other than piercing Sinclair's veil because the holding companies "do not have any assets separate from their membership and equity interests in other Diamond entities, including DSG."  Compl. ¶ 380.

## VII.   THE COMPLAINT SUFFICIENTLY PLEADS AN UNLAWFUL LLC DISTRIBUTION CLAIM (COUNT IV) BECAUSE DSIH KNEW OF DIAMOND'S INSOLVENCY AT THE TIME OF THE DISTRIBUTIONS.

The Complaint alleges in Count IV, ¶¶ 271–76, that DSG is entitled to avoid and recover the $929 million in distributions it made to DSIH because those distributions were unlawful under the illegal distribution provision of the Delaware LLC Act, Del. Code Ann. tit. 6 § 18-607. Subsection (a) of Section 18-607 prohibits an LLC (here, DSG) from making a distribution to a member (here, DSIH) if, at the time of the distribution, the LLC is insolvent or would be rendered insolvent by the distribution.  *See* Del. Code Ann. tit. 6 § 18-607(a).  Subsection (c) of Section 18-607 provides that a member who received a distribution in violation of subsection (a) "and who knew at the time of the distribution that the distribution violated subsection (a)" is liable to the LLC for the amount of the distribution.  The Sinclair Defendants argue that Count IV should be dismissed because, they contend, the Complaint fails to plead facts "showing that DSIH *actually* knew that the distributions would cause DSG's insolvency."  MTD ¶ 100.  Not so.

To begin with, the statute does not require DSG to plead that DSIH knew the illegal distribution would "cause" DSG to become insolvent.  Instead, it requires only that DSIH knew that DSG was insolvent "at the time of the distribution, after giving effect to the distribution."  Del. Code Ann. tit. 6 § 18-607(a).  The Sinclair Defendants' reliance on *Pepsi-Cola Bottling Co*. v. *Handy*, 2000 WL 364199, at *3 (Del. Ch. Mar. 15, 2000), is misplaced because the reference in

the opinion to causing insolvency merely described the facts of that case and did not purport to alter the unequivocal language of the statute or limit its scope.

In any event, the Complaint adequately pleads that DSIH was well aware that Diamond was insolvent at the time the challenged distributions were made.  It alleges that "the officers and managers of DSIH are the same as the officers and managers of DSG," and that these DSIH officers and managers—Smith, Ripley, Rutishauser, and Shapiro—knew of dramatic declines in Diamond's forecasted EBITDA as early as November 2019, Compl. ¶¶ 87–88; that Sinclair's internal models showed that DSG "[f]ail[ed]" standard solvency tests as early as April 2020, Compl. ¶ 90; and that Diamond's financial statements as of the third quarter of 2020 showed that its fair value was less than the amount of its debt, Compl. ¶ 94; *see generally* Compl. ¶¶ 84–103; 170–74.  The actions by the Sinclair Defendants, including Rutishauser, to conceal material information from Empire, which Sinclair retained to opine on DSG's solvency, as well as Empire's reliance on assumptions the Sinclair Defendants knew to be unwarranted, further supports an inference that they (and hence DSIH) knew DSG was insolvent.  *See generally* Compl. ¶¶ 175–92.

The Sinclair Defendants assert that the allegation in the Complaint that Sinclair hired Empire to perform a solvency analysis "show[s] that DSIH did *not* have actual knowledge of pending insolvency."  MTD ¶ 100.  But their flagrant efforts to create a misleading paper record by obtaining a solvency opinion based on misleading and partial information shows just the opposite.  Likewise, the self-serving testimony by Ripley and Rutishauser that the internal models showed that DSG was insolvent were just "back of the envelope" estimates, MTD ¶ 100, should be given no weight on this motion.  That testimony is also not remotely plausible: as the Complaint alleges, these estimates reflected enormous work by Rutishauser and other senior finance personnel and were ultimately presented to Sinclair's (and Diamond's) CEO.  Compl. ¶ 191.

Sinclair's reliance on general statements about the meaning of actual knowledge in *Intel Corp. Investment Policy Committee* v. *Sulyma*, 140 S. Ct. 768, 777 (2020), is also misplaced. The Supreme Court in *Intel* emphasized that "[n]othing in [its] opinion forecloses any of the 'usual ways' to prove actual knowledge," including "inference from circumstantial evidence." *Id.* at 779. The facts as alleged here contain ample direct and circumstantial evidence of knowledge on the part of DSIH's Board of Managers (Smith, Ripley, Rutishauser) as to Diamond's insolvency.

## VIII. DIAMOND'S UNJUST ENRICHMENT CLAIM AGAINST STG AND SBG (COUNT XV) IS NOT BARRED, BECAUSE SINCLAIR UNJUSTLY ENRICHED ITSELF THROUGH THE 2019 DSG LLC AGREEMENT.

Sinclair argues that Diamond's unjust enrichment claim is barred by the 2019 DSG LLC Agreement, which provides DSIH, the sole member of DSG, the power to conduct and control DSG's business and affairs. MTD ¶¶ 123–24. Sinclair's argument fails.

*First*, Diamond pleads Count XV in the alternative to Count XIV, which alleges that DSIH—as a party to the 2019 DSG LLC Agreement—breached the implied covenant of good faith and fair dealing by misappropriating Diamond's employees and assets. *See* Compl. ¶¶ 343–48. Unjust enrichment may be pleaded as an alternative theory of recovery to breach of contract. *See Lyons Ins. Agency, Inc.* v. *Kirtley,* 2019 WL 1244605, at *2 (Del. Mar. 18, 2019).

*Second*, although an unjust enrichment claim may be dismissed if "the relationship between the parties is comprehensively governed by contract," such a claim may be stated "if a *nonparty* to a contract knowingly facilitates prohibited activities," *Lyons,* 2019 WL 1244605, at *2, or where the defendant enriches itself through manipulative conduct *resulting in* the parties' contract, *McPadden* v. *Sidhu*, 964 A.2d 1262, 1276–77 (Del. Ch. 2008).

Those exceptions apply here. Diamond asserts its unjust enrichment claim against STG and SBG, who were not parties to the 2019 DSG LLC Agreement but facilitated its creation for the purpose of exploiting Diamond's employees and assets. Compl. ¶¶ 349–53. Thus, the contract

was brought about specifically through STG and SBG's manipulation and for their own enrichment.  Compl. ¶¶ 46, 349–53.

The facts in *McPadden* are analogous.  There, the plaintiff alleged that a defendant was unjustly enriched by the sale of its subsidiary to the defendant for a below-market price. *McPadden,* 964 A.2d at 1263.  The defendant moved to dismiss the plaintiff's unjust enrichment claim on the ground that the parties' rights were governed by a "letter of intent."  *Id.* at 1276.  The court denied the defendant's motion, reasoning that because the letter of intent itself was the alleged unjust enrichment, and was brought about by the defendant's "manipulative conduct," the plaintiff's claim was sufficiently pleaded.  *Id.*  Likewise, here, STG and SBG unjustly enriched themselves through the 2019 DSG LLC Agreement, which enabled them to completely control Diamond, and used that control to misappropriate Diamond's employees and assets.

## IX.    DIAMOND PROPERLY PLEADS A CLAIM FOR BREACH OF THE MSA (COUNT VIII).

The Sinclair Defendants argue that Diamond's claims for breach of the MSA should be dismissed because (a) the Complaint fails to identify the specific provisions of the MSA that STG breached and (b) Diamond's allegations are "conclusory" and insufficiently particularized.  MTD ¶¶ 107–14.  These arguments should be rejected.

A complaint "does not need detailed factual allegations" to overcome a motion to dismiss under Rule 12(b)(6).  *Twombly*, 550 U.S. at 555.  Rather, under Rule 8, the Complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  *Id.*; *see also Sanchez Oil & Gas Corp.* v. *Crescent Drilling & Prod., Inc.,* 7 F.4th 301, 309 (5th Cir. 2021) (holding that complaint adequately pleaded claim for breach of contract under *Twombly*); *Innova Hosp. San Antonio, L.P.* v. *Blue Cross and Blue Shield, Inc.,* 892 F.3d 719, 731–32 (5th Cir. 2018) (same).  Rule 8 requires only that a breach-of-contract claim give "fair notice of what

79

the plaintiff's claim is and the grounds upon which it rests" to a defendant.  *Baisden* v. *I'm Ready Prods. Inc.*, 2008 WL 2118170, at *6 (S.D. Tex. May 16, 2008).

### A.    The Complaint Identifies the Specific Provisions of the MSA That Sinclair Breached.

The Complaint expressly identifies—and quotes from—the relevant provisions of the MSA that STG breached, and certainly does so in compliance with Rule 8.  It alleges that Sinclair breached provisions of the MSA (i) prohibiting Sinclair from "unreasonably and disproportionately allocat[ing] to [Diamond] costs for assets or services procured from third parties for [Diamond] and other Sinclair Services," Compl. ¶¶ 153, 298; (ii) permitting Sinclair to provide and bill for "supplementary services" not otherwise provided for in the MSA only "as mutually agreed by the parties," Compl. ¶¶ 154, 300; (iii) requiring Sinclair to provide services to Diamond in a "commercially reasonable" manner, Compl. ¶¶ 10, 236, 304; and (iv) requiring Sinclair to "reasonably use the same degree of care Sinclair and its affiliates use in rendering comparable services for their respective operations," Compl. ¶ 329–30, 334.

These allegations more than suffice to "point to a specific provision in the contract that was breached by the Defendant."  *Watson* v. *CitiMortgage, Inc.*, 814 F. Supp. 2d 726, 732 (E.D. Tex. 2011).  In *Sanchez*, for example, the Fifth Circuit held that the complaint at issue sufficiently pleaded a claim for breach of a Master Service Agreement, allegedly due to the defendant's failure to comply with the Fair Labor Standards Act ("FLSA"), although it "specifically referenced" only a single contractual provision of the contract and "only generally alleged other MSA provisions." 7 F.4th at 310.  The court concluded that these allegations "provided sufficient notice that [the defendant's] alleged failure to comply with the FLSA may have breached one or more provisions of the MSA."  *Id*.  Likewise, in *Innova*, the Fifth Circuit held that the plaintiff adequately pleaded claims against insurance companies and plan administrators for breach of certain employee benefit

plans although the plaintiff was unable to specify the terms of the plans.  892 F.3d at 731–32.  In so holding, the court reversed the district court's dismissal of the plaintiff's claims on the ground that the complaint did not identify the specific provisions of the contracts that were allegedly breached.  *Id.* at 731.

The cases the Sinclair Defendants cite are inapposite.  MTD ¶¶ 108–109.  In a district court opinion in *Innova Hospital San Antonio, L.P.* v. *Blue Cross & Blue Shield of Georgia, Inc.*, the plaintiffs attached to their complaint a claim schedule listing 999 claims against 33 defendant, but did not identify the relevant contracts on which each claim was based.  995 F. Supp. 2d 587, 603–04 (N.D. Tex. 2014).  As noted, on a subsequent appeal following an amendment of the complaint, the Fifth Circuit reversed the district court's ruling dismissing the plaintiffs' claims for breach of contract on the ground that the amended complaint failed to identify the specific contractual provisions that the defendants breached.  *Innova,* 892 F.3d at 725, 731–32.  Likewise, in *Ally Financial Inc.* v. *Comfort Auto Group NY LLC*, 2021 WL 4033249, at *5 (E.D.N.Y. Sept. 3, 2021), the plaintiff simply alleged that the plaintiff had "breached the agreements" without any reference to relevant contractual obligations.  The facts here are not remotely analogous.

### B.    The Complaint Sufficiently Alleges The Conduct Constituting the Breaches.

"Under Delaware law, the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) resulting damage to the plaintiffs."  *Greenstar, LLC* v. *Heller*, 814 F. Supp. 2d 444, 450 (D. Del. 2011).  Diamond plausibly alleges each of these elements with respect to each of the three theories of breach in the Complaint.

*First*, the Sinclair Defendants argue that Diamond fails to adequately allege that STG breached the MSA by "unreasonably and disproportionately allocating expenses to Diamond."  MTD ¶ 111.  But the Complaint alleges in detail that Sinclair took advantage of the one-sided nature of the MSA to narrow the scope of the services it provided and to charge Diamond

unexplained fees for services that should have been covered by the base management fee, Compl. ¶¶ 146–47; and that Sinclair charged Diamond for third-party services that it did not receive and allocated expenses to Diamond without explanation, Compl. ¶¶ 151–52. These allegations more than satisfy Diamond's pleading obligations.

The Sinclair Defendants' argument that the Complaint "identifies no MSA provision requiring STG to use Diamond's preferred allocation methodology or documentation procedure," MTD ¶ 111 (citing Compl. ¶¶ 149, 153), is a straw man. The Complaint does not allege that the MSA required some specific methodology or procedure to track and allocate expenses. Rather, it alleges that the MSA prohibited Sinclair from "'unreasonably and disproportionately allocate[ing] to [Diamond] costs for assets or services procured from third parties for [Diamond] and other Sinclair Services,'" and that Sinclair violated that prohibition. Compl. ¶ 153. The Complaint further alleges that Sinclair has identified no "allocation methodology or documentation procedure" to justify its allocations. The absence of any explanation further supports the inference that STG's allocations were unreasonable, in breach of the MSA. Compl. ¶ 153.

*Second*, the Sinclair Defendants argue that Diamond does not adequately allege that Sinclair unilaterally charged Diamond for supplementary services without the "mutual agree[ment]" required by the MSA. They contend that Diamond has not "substantiate[d] whether a breach occurred" because the Complaint does not detail the amount billed for improper supplementary services or the timing of those bills. MTD ¶ 112. But Rule 8 imposes no obligation on Diamond to "substantiate" its claims or to plead a specific amount of damages. *See J. Ambrogi Food Distribution, Inc.* v. *Teamsters Local 929*, 595 F. Supp. 3d 352, 359 (E.D. Pa. 2022); *Weyerhaeuser Co.* v. *Domtar Corp.*, 61 F. Supp. 3d 445, 453 (D. Del. 2014). And STG's "lack of

documentation for supplementary billing" itself creates an inference that there was no agreement for such services.  *See* Compl. ¶¶ 112, 154.

*Third*, the Sinclair Defendants argue that Diamond fails to adequately allege that Sinclair provided HR and payroll services in a manner that was not "commercially reasonable."  MTD ¶ 113.  "Commercially reasonable efforts" mean "not requiring a party to take any action that would be commercially detrimental" to the party.  *Akorn, Inc.* v. *Fresenius Kabi AG*, 2018 Del. Ch. LEXIS 325, at *203-04 (Del. Ch. Oct. 1, 2018); *see also Williams Cos., Inc.* v. *Energy Transfer Equity, L.P.*, 159 A.3d 264, 273 (Del. 2017) (noting "commercial[] reasonable[ness]" requirement imposes an obligation to take reasonable steps to fulfill the objectives of the contract).

The Complaint adequately alleges that Sinclair violated these obligations by, among other things, causing Diamond to hire and compensate dozens of employees who spent all or nearly all of their time providing services exclusively to Sinclair.  Compl. ¶ 237, 239.  Sinclair argues that the MSA does not prohibit Diamond employees from working on projects for Sinclair.  MTD ¶ 113.  But misappropriating Diamond's resources by requiring its employees to work full-time for Sinclair is "commercially detrimental" to Diamond.  In any event, the Sinclair Defendants' argument raises factual disputes that cannot be resolved on this motion.

## X.   DIAMOND PROPERLY PLEADS A CLAIM FOR BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING CLAIM (COUNT XIV).

Diamond brings a claim for breach of the implied covenant of good faith and fair dealing against DSIH based on the allegations that DSIH permitted STG and SBG to misappropriate Diamond's employees and assets in violation of the 2019 DSG LLC Agreement.  Sinclair's arguments for dismissal of that claim should be rejected.

Delaware law reads the implied covenant of good faith and fair dealing into every contract. The covenant is "best understood as a way of implying terms in the agreement, whether employed

to analyze unanticipated developments or to fill gaps in the contract's provisions." *Dunlap* v. *State Farm Fire and Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (internal quotations marks omitted).  The covenant requires a party to a contract to "refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Id.* at 442.  To plead a violation of the covenant, the plaintiff must allege only "a specific implied contractual obligation and allege how the violation of the obligation denied the plaintiff the fruits of the contract."  *In re Tropicana Ent., LLC*, 520 B.R. 455, 475 (Bankr. D. Del. 2014).  In *Tropicana*, for example, the court denied a motion to dismiss an implied covenant claim based upon a contract for management services where the defendants allegedly "managed the Debtors in a way that unreasonably benefitted [the defendants'] properties to the detriment of the . . . Debtors" and ultimately "destroy[ed] value of the . . . Debtors." *Id*. at 472, 474–75.

The Complaint easily states a claim under these standards.  DSG and DSIH were parties to the 2019 DSG LLC Agreement pursuant to which DSG was member-managed by DSIH. *See* Compl. ¶¶ 344–45.  The Complaint alleges that DSIH permitted Sinclair to misappropriate Diamond's employees and assets, including by permitting Diamond employees to dedicate substantially all of their time to working for Sinclair, and by using Diamond's assets to fulfill Sinclair's obligations relating to an employee's extravagant golfing expenses. *See* Compl. ¶¶ 291–41, 344–47.  These allegations state a claim that DSIH breached the implied covenant of good faith and fair dealing in the 2019 DSG LLC Agreement.

The Sinclair Defendants argue that "Count XIV attempts to recycle identical allegations supporting Debtors' breach of contract claim *against STG* and arising under the *MSA*."  MTD ¶ 117.  But the Sinclair Defendants cite no authority holding that the same conduct cannot breach both the explicit terms of the MSA and the implied terms of the 2019 DSG LLC Agreement.  In

84

addition, the misappropriation of Diamond's assets to pay Sinclair's obligations to an employee for golf expenses, Compl. ¶ 347, is not at issue in Diamond's claim for breach of the MSA.

The Sinclair Defendants argue further that the Complaint does not specify an implied contractual obligation arising from the 2019 DSG LLC Agreement that DSIH breached.  MTD ¶ 118.  But implying a contractual obligation is proper "where obligations which can be understood from the text of the written agreement have nevertheless been omitted from the agreement in the literal sense."  *See Cantor Fitzgerald, L.P.* v. *Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998).  Here, the 2019 DSG LLC Agreement provides that "[t]he conduct and control of the business and affairs" of DSG is vested in DSIH.  That provision implies an obligation on DSIH not to allow Diamond's resources to be misappropriated for Sinclair's benefit.  Compl. ¶¶ 345–46.

The Sinclair Defendants also argue that the Complaint has not identified a "gap" in the 2019 DSG LLC Agreement and that the covenant should not be used "as a backstop to imply terms that the parties failed to include but which could easily have been drafted."  MTD ¶¶ 116, 119 (quoting *Baldwin* v. *New Wood Res. LLC*, 283 A.3d 1099, 1116–17 (Del. 2022)).  But Diamond had no opportunity to include such a term.  As the Complaint alleges, at all times between Sinclair's acquisition and May 2022 Sinclair controlled all aspects of Diamond's business and Diamond had no independent management.  Compl. ¶¶ 44–59.  Indeed, the 2019 DSG LLC Agreement was executed even before the acquisition, and was signed on behalf of both DSG and its sole member, DSIH, by the same person—defendant Ripley.  MTD Ex. 2 at 1, 7.  The Sinclair Defendants should not be permitted to exploit their own imposition of contract terms on Diamond to defeat Diamond's claim.

The Sinclair Defendants also argue that Diamond has insufficiently alleged that DSIH acted in bad faith.  MTD ¶ 120.  But a plaintiff is only required to "allege a specific implied

contractual obligation and allege how the violation of that obligation denied it the fruits of the" contract. *Data Ctrs. LLC* v. *1743 Holdings LLC*, 2015 Del. Super. LEXIS 561, at \*18 (Del. Super. Ct. Oct. 27, 2015).  Diamond has done so in pleading that Sinclair exploited and misappropriated its employees and assets, as described above.

Finally, the Sinclair Defendants argue that Diamond cannot invoke the implied covenant on the ground that "wholly owned subsidiaries exist to advance the benefit of the parent entity." MTD ¶ 121 (citing *Trenwick Am. Litig. Tr.* v. *Ernst & Young LLP*, 906 A.2d 168, 173 (Del. Ch. 2006)).  *Trenwick* did not involve a breach of contract or implied covenant claim, nor does it provide any analysis of the sufficiency of pleading such a claim.  *See* 906 A.2d at 173 (assessing whether a parent company owes its wholly-owned subsidiary fiduciary duties prior to insolvency). And, as discussed in Section V.B, *supra*, the principle upon which the Sinclair Defendants rely does not apply where, as in this case, the subsidiary is insolvent.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss the Complaint should be denied in their entirety.

Dated: October 18, 2023

*/s/ John F. Higgins*
**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6248
jhiggins@porterhedges.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Brian S. Hermann (Admitted *Pro Hac Vice*)
Andrew M. Parlen (Admitted *Pro Hac Vice*)
Gregory F. Laufer (Admitted *Pro Hac Vice*)
William A. Clareman (Admitted *Pro Hac Vice*)
Randy Luskey (Admitted *Pro Hac Vice*)
Jonathan Hurwitz (Admitted *Pro Hac Vice*)
Yotam Barkai (Admitted *Pro Hac Vice*)
Alison R. Benedon (Admitted *Pro Hac Vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
bhermann@paulweiss.com
aparlen@paulweiss.com
glaufer@paulweiss.com
wclareman@paulweiss.com
rluskey@paulweiss.com
jhurwitz@paulweiss.com
ybarkai@paulweiss.com
abenedon@paulweiss.com

*Attorneys for Plaintiffs*